## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Elizabeth E. Brown

In re:                              )
                                    )
**KDA PROPERTIES, LLC**             )     Case No. 21-14821 EEB
**Tax ID #XX-XXX1526**              )     Chapter 11 Bankruptcy
                                    )
   Debtor.           )

---

### MOTION TO DISMISS CHAPTER 11 BANKRUPTCY
### FOR CAUSE PURSUANT TO 11 U.S.C. 1112(b)(4)

---

The Movant, **PANGEA MORTGAGE CAPITAL, LLC** ("Pangea"), a secured creditor, by and through its attorneys, BROWN DUNNING WALKER FEIN PC, submits its Motion to Dismiss Chapter 11 Bankruptcy for Cause Pursuant to 11 U.S.C. 1112(b)(4), as follows:

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, et seq.

2.    The Debtor, **KDA Properties, LLC** ("Debtor") filed this Chapter 11 bankruptcy on September 21, 2021, just two days before the Debtor's only asset was scheduled to go to foreclosure sale on September 23, 2021 in Denver County Public Trustee Sale No. 2020-000229.

3.    Pangea is a secured creditor of the Debtor, pursuant to the following non-exclusive list of loan documents:

    a.   Promissory Note dated March 11, 2020, executed by the Debtor and Nativ Hotel LLC in the original principal amount of $6,650,000.00, a copy of which is attached as Exhibit "1";

    b.   Loan Agreement dated March 11, 2020, executed by the Debtor and Nativ Hotel LLC, a copy of which is attached as Exhibit "2";

KDA Properties, LLC
Case No. 21-14821-EEB
Page 2 of 13

    c.   Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents dated March 11, 2020 and recorded in the real property records of the City and County of Denver, State of Colorado at Reception No. 2020036070 on March 12, 2020, pledging the real property commonly known as 1612 Wazee Street, Denver, CO 80202 (the "Real Property"), to secure repayment of the Note, a copy of which is attached as Exhibit "3";

    d.   Assignment of Leases and Rents dated March 11, 2020, and recorded in the real property records of the City and County of Denver, State of Colorado at Reception No. 2020036071 on March 12, 2020, pledging the leases and rents derived from the Property to secure repayment of the Note, a copy of which is attached as Exhibit "4";

    e.   UCC Financing Statement recorded March 16, 2020 with the Colorado Secretary of State at Reception No. 20202026022, a copy of which is attached as Exhibit "5";

    f.   Collateral Assignment, Pledge and Security Agreement dated March 11, 2020, evidencing a pledge by Amin Suliaman of all of his ownership interests in the Debtor to Pangea, a copy of which is attached as Exhibit "6";

    g.   Collateral Assignment, Pledge and Security Agreement dated March 11, 2020, evidencing a pledge by Kenneth C. Ware of all of his ownership interests in the Debtor to Pangea, a copy of which is attached as Exhibit "7";

    h.   Collateral Assignment, Pledge and Security Agreement dated March 11, 2020, evidencing a pledge by Amin Suliaman of all of his ownership interests in Nativ Hotel, LLC to Pangea, a copy of which is attached as Exhibit "8";

2

KDA Properties, LLC
Case No. 21-14821-EEB
Page 3 of 13

    i.    Collateral Assignment, Pledge and Security Agreement dated March 11, 2020, evidencing a pledge by Kenneth C. Ware of all of his ownership interests in Nativ Hotel, LLC to Pangea, a copy of which is attached as Exhibit "9";

    j.    Irrevocable Transfer Powers dated March 11, 2020, granting the power to transfer ownership interests of Amin Suliaman and Kenneth C. Ware in the Debtor to Pangea, copies of which are collectively attached as Exhibit "10";

    k.    Irrevocable Transfer Powers dated March 11, 2020, granting the power to transfer ownership interests of Amin Suliaman and Kenneth C. Ware in Nativ Hotel, LLC to Pangea, copies of which are collectively attached as Exhibit "11";

    l.    Assignment of Agreements Affecting Real Estate dated March 11, 2020, executed by Debtor and Nativ Hotel, LLC in favor of Pangea, assigning all agreements, including, but not limited to, permits, licenses, contracts, documents, approvals, or otherwise related to the use and operation of the Property, a copy of which is attached hereto as Exhibit "12";

    m.    Subordination Agreement dated March 11, 2020, executed by Debtor and Nativ Hotel, LLC, subordinating that certain Lease entered into between Debtor, as landlord, and Nativ Hotel, LLC, as tenant, for the possession, use and operation of the Property as the Nativ Hotel, a copy of which is attached hereto as Exhibit "13".

4.    The documents identified in paragraphs 3(a) through 3(m) above are collectively referred to as the "Loan Documents." The Debtor and Nativ Hotel, LLC are sometimes hereinafter collectively referred to as the "Borrowers."

5.    The Deed of Trust on the Property is a first priority lien.

KDA Properties, LLC
Case No. 21-14821-EEB
Page 4 of 13

6.      The Debtor, which is owned by Amin Suliaman and Kenneth C. Ware, owns the real property located at 1612 Wazee Street, Denver, CO 80202, which is operated as the Nativ Hotel, Bar and Lounge.  The Debtor is the property holding company, and Nativ Hotel, LLC is the operating entity, also co-owned by Suliaman and Ware.  Until the end of May 2021, Nativ Hotel leased the Property from the Debtor and operated the hotel and bar operations.

7.      Almost immediately after execution of the Loan Documents on March 11, 2020, the Covid-19 pandemic began affecting the ability of the Nativ Hotel to operate the hotel and bar.  This, in turn, affected the Borrowers' ability to make their payments to Pangea and to pay the Note in full by its Initial Maturity Date of June 30, 2021.

8.      Over the course of the pandemic, Pangea has worked tirelessly to accommodate the Borrowers' financial struggles that are, in part, attributable to the pandemic.  On May 31, 2020, Pangea and the Borrowers entered into a Modification of Loan Documents, thereby modifying certain terms of the Loan Documents and allowing the Borrowers to defer and make reduced payments to Pangea.

9.      On September 15, 2020, Pangea and the Borrowers entered into a Forbearance Agreement, which, in part, allowed Borrowers to make interest-only payments through the forbearance period, which was to expire on June 30, 2021.  The Borrowers defaulted under the Forbearance Agreement and were unable to make the required payments.  There was evidently insufficient revenue from operation of the business, and the Borrowers' principals were evidently unwilling to contribute additional capital to make the payments.

10.     When the Borrowers defaulted under that first Forbearance Agreement, Pangea commenced a foreclosure on the Property on December 23, 2020 (the "Foreclosure").

KDA Properties, LLC
Case No. 21-14821-EEB
Page 5 of 13

11.     After the Foreclosure was filed, Pangea continued to work with the Borrowers and entered into Second, Third, Fourth and Fifth Forbearance Agreements, further extending and modifying the Borrowers' payment obligations, while tolling the Foreclosure pending the Borrowers' performance on the Forbearance Agreements.

12.     The Borrowers signed the Fifth Forbearance Agreement on or around September 8, 2021, went into default again, and then filed this Chapter 11 less than two weeks later on September 21, 2021, in order to stop the Foreclosure sale scheduled for September 23, 2021.

13.     Unbeknownst to Pangea, one of the Debtor's principals, Amin Suliaman, had formed an entity known as Wazee Group, LLC, on August 25, 2021, of which he is the sole member.

14.     Despite not being officially formed yet, Wazee Group, LLC entered into a "Special Servicer Agreement" effective June 1, 2021, with the Debtor, whereby it "[took] over management of Nativ Hotel and Lounge as a result of the termination of the lease term May 31, 2021, and Nativ Denver, LLC's (the Lessee) default in its rent payments to KDA." *See* Special Servicer Agreement attached as Exhibit "14."

15.     Under the Special Servicer Agreement, the Debtor agreed to pay Wazee Group, LLC (solely owned by insider Amin Suliaman), $3,000 per week in exchange for Wazee operating the Hotel and/or Bar, and conveying the revenues therefrom to the Debtor.

16.     Debtor and Nativ Hotel, LLC, have effectively transferred the hotel and bar operations away from the co-borrower, Nativ Hotel, LLC, in a poorly concealed and bad faith effort to continue operating while siphoning funds away from Pangea.

17.     The Debtor reached out to Pangea after the filing of the bankruptcy and suggested that their sole intent in the bankruptcy was to sell the Property.   Based upon those

KDA Properties, LLC
Case No. 21-14821-EEB
Page 6 of 13

representations, Pangea has given the Debtor time to formulate an orderly liquidation of the Property. As part of this process, the Debtor and Pangea interviewed auctioneers and discussed re-opening the hotel and bar in order to try to improve the Property's value and show it to potential buyers as a going concern. As part of that discussion, Pangea requested adequate protection payments for the interim use of its collateral.

18.     However, when the City and County of Denver reinstated Covid restrictions late this fall, the Debtor advised it was no longer willing to re-open the hotel and bar operations and would therefore not have any funds available to make any adequate protection payments.

19.     However, in the midst these discussions, and despite Debtor's representations that they were not operating the hotel and bar, Pangea has learned that the Debtor has continued to allow either Nativ or Wazee Group to host events nearly every weekend over the past few months without accounting to the Debtor or to Pangea.  A representative of Pangea visited the Property on November 12, 2021, to find the bar and lounge open and heavily populated.  *See* photographs of the November 12 event attached as Exhibit "15."

20.     When Pangea raised this issue of unauthorized use of the Property and Pangea's collateral, the Debtor advised that it had only opened for that one weekend, that the event lost money, and that they had no intentions further events at the Property.  However, despite their representations, Pangea continues to receive evidence of ongoing unauthorized use.

21.     A review of Nativ's Instagram account conducted on December 29, 2021, revealed advertisements and photographs of events hosted nearly every weekend during November and December, including Thanksgiving weekend, Christmas Eve, Christmas Day, and the New Year's holiday weekend.  *See* Instagram posts attached as Exhibit "16."

KDA Properties, LLC
Case No. 21-14821-EEB
Page 7 of 13

22.    The Debtor specifically advised that, despite the advertisements, they did not intend to host events on New Year's Eve.  Nonetheless, Pangea hired a private investigator to observe the Property on New Year's Eve, who saw the Property open and clearly hosting an event for partygoers, with gas lanterns lit outside, a bouncer at the door, and people dressed in New Year's Eve attire entering the Property.  *See* New Year's Eve photo attached as Exhibit "17."  Pangea also has video evidence of the Property's operations on New Year's Eve which will be disclosed and relied upon in any evidentiary hearing on this Motion.

23.    Despite its continued operations of the bar and lounge, the Debtor has reflected no revenue in its most recent operating report for the month-ended November 30, 2021, despite the Special Servicer Agreement's requirements that such revenues be conveyed to Debtor by Wazee Group, LLC.  It also appears that the bar and lounge are being permitted to operate at the Debtor's Property rent free, and to generate, keep and distribute revenue to insiders that are property of the bankruptcy estate and Pangea's collateral.

24.    When Pangea brought the additional evidence of unauthorized use to the Debtor's attention prior to New Year's Eve, the Instagram posts were all deleted that same day and the undersigned was advised that there were no New Year events taking place at the Property.

25.    Additionally, despite Pangea's good faith efforts to give the Debtor additional time, reduced payments and five separate forbearance agreements, the Debtor used the bankruptcy filing to disparage Pangea to the press.  In an article titled "LoDo Hotel files for bankruptcy in bid to slow down foreclosure process," in the Denver Post on September 24, 2021, Amin Suliaman had the following to say about Pangea:  ""We've recently had the intention to exit the property, but we're going to exit our way," said Nativ Hotel co-owner Amin Suliaman.

KDA Properties, LLC
Case No. 21-14821-EEB
Page 8 of 13

"I'm not going to let them bully us out of the property.'"" The maxim remains true – no good deed goes unpunished. *See* article attached as Exhibit "18."

26.     The total amount owing to Pangea as of the date of the bankruptcy filing was $8,180,437.13, which includes the original principal balance of $6,650,000.00, less the unused portion of the original loan reserves of $490,653.86, new reserves per the forbearance of $145,000.00, a loan exit fee of $66,500.00, unpaid regular interest through the forbearance of $231,693.40, default interest through the forbearance of $131,761.40, less the unused reserves of $145,000.00, plus post-forbearance regular interest of $714,584.16, less interest payments made of $147,800.00, plus post-forbearance default interest of $1,000,417.82, attorney fees of $22,518.67, and lender costs of $1,415.55, plus any Public Trustee fees and costs. Interest has continued to accrue since September 21, 2021 at the rate of $4,489.53 per day, as well as additional bankruptcy and foreclosure attorney fees and other costs.

27.     Although the Debtor initially listed the value of the Property at $10,500,000.00, which was the amount it paid for it, Pangea believes that the Debtor will acknowledge that the value of the hotel is less than the amounts owed to Pangea. If the Debtor is unwilling to make this admission, Pangea is prepared to submit expert valuation testimony through appraisers and/or auctioneers to establish same. Accordingly, there is no equity in the Property to protect Pangea's position, and with the Debtor allowing Wazee Group, LLC or other insiders to continue operating the bar, hotel and/or lounge without receiving any income for the bankruptcy estate, there is a continuing loss and diminution to the estate.

28.     The Debtor intentionally failed to disclose to Pangea that it was terminating the lease with co-borrower Nativ Hotel, LLC, forming another entity, and transferring operations of the hotel, bar and lounge to it.

KDA Properties, LLC
Case No. 21-14821-EEB
Page 9 of 13

29. For all intents and purposes, the Debtor has one asset and one secured creditor – Pangea. The Debtor filed its proposed Plan on December 20, 2021, in which it acknowledges it has no ability to generate sufficient revenues to pay its operating expenses or Pangea. The Plan states that, upon plan confirmation, it will cease business operations, if any, and sell its sole asset, the Property, at auction. Thus, it is clear that the Debtor does not intend to reorganize, there is no need for this bankruptcy in what is essentially a two-party dispute, that the Debtor filed this bankruptcy solely to forestall the Foreclosure, that the Debtor's conduct constitutes bad faith, and that the Plan proposed by the Debtor can be accomplished through dismissal of the bankruptcy and allowing Pangea's Foreclosure to proceed.

30. Debtor's bankruptcy should be dismissed for cause for the following reasons:

a. Due to the lack of any equity in the Property, combined with the Debtor allowing insider-owned Wazee Group, LLC and/or third parties to continue to use the Property, rent free, without delivering any revenues to Debtor, there is an ongoing substantial and continuing loss or diminution of the Estate and the absence of a reasonable likelihood of rehabilitation;

b. The Debtor has grossly mismanaged this Estate by its decision to cease operations, only operate sporadically, and by undermining Pangea's security interests by terminating the Lease with Nativ Hotel, LLC and transferring the management of the hotel, bar and lounge to Wazee Group, LLC, which is solely owned by insider Amin Suliaman;

c. The Debtor has acted in bad faith in its misrepresentations about the use and operation of the Property and by failing to collect revenues, or concealing revenues, being generated by Wazee Group, LLC;

      d.      Due to the lack of equity in the hotel, it appears that the only purpose of this bankruptcy is to try to minimize the negative impact of the principals' liability under their guarantees on any deficiency;

      e.      The Debtor is unable to effectuate consummation of a confirmable Plan.

31.     Negative cash flow and an inability to pay current expenses as they come due, satisfies the substantial loss or diminution of the estate for purposes of 11 USC 1112 (b). *In re Western States, Inc.,* 2018 Bankr. LEXIS 247 (Bankr. Wyo.) where the Court, Judge Parker residing, found that the debtor hotels continuing monthly losses as evidenced on its financials demonstrated substantial loss to the estate. In their explanations to Pangea as to why they were only opening sporadically, the Debtor has explained that they have suffered substantial losses during such attempts to operate.

32.     *In re Western* also addressed the reasonable likelihood of reorganization component as it relates to finding cause for dismissal of the Chapter 11 bankruptcy. In *Western,* the debtor hoped that the oil and gas industry in Wyoming would rebound, and therefore its income from operating its hotel would increase and put the hotel on sound financial footing. *Westerns'* hope of a more robust oil and gas industry is similar to Debtor's hope that Covid restrictions will be lifted and allow for a profitable re-opening and operating of Nativ Hotel, bar and lounge. Just as the hope for a rebounding oil and gas industry would not lead to either a plausible nor probable plan for reorganization in *Western*, the recent continuation of Covid restrictions in the Denver metropolitan area and ongoing new variants of the virus demonstrate that improving the Property's value for liquidation purposes by a quick re-start of operations is neither a plausible nor probable plan. The Debtor's Plan does not even contemplate attempting to reorganize. There is no basis to believe that Debtor's liquidation plan will be less costly, more

KDA Properties, LLC
Case No. 21-14821-EEB
Page 11 of 13

efficient, or more beneficial to the estate or creditors than simply dismissing the case and allowing the Foreclosure to proceed.

33.     Debtor's case should also be dismissed for gross mismanagement of the Debtor's estate.  The Debtor never advised Pangea, during their ongoing negotiations and agreements to forbear, that they were terminating the lease between Nativ Hotel, LLC and Debtor, forming a new entity solely owned by Amin Suliaman, and placing the operation, management and control of hotel, bar and lounge operations with that new entity, at Debtor's expense.  The Debtor's unilateral decision to do so is gross mismanagement of the estate.  Due to the Estate's substantial losses, the lack of a likely reorganization and Debtor's gross mismanagement, Debtor's bankruptcy should be dismissed. *See In re Rent-Rite Super Kegs W. Ltd*, 484 B.R. 799 (Colo. Bk. 2012).

34.     The Debtor has not attempted to propose a feasible plan of reorganization, and its proposed liquidation plan is wholly unnecessary.  The Debtor has not identified any reasons why permitting the Debtor to proceed with an auction will be more efficient, less costly, or result in any greater recovery for creditors and the estate, than simply allowing Pangea to move forward with the Foreclosure.

35.     Finally, the Debtor's pre-petition and post-petition conduct constitutes bad faith. "Although a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal."  *In re effusion Svcs., LLC*, 2014 Bankr. LEXIS 4412 (Bankr. D. Colo. 2014).

36.     "Findings of bad faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and are based on multiple factors

KDA Properties, LLC
Case No. 21-14821-EEB
Page 12 of 13

rather than on any single event.  In this Circuit, several factors have been identified which support a finding of a bad faith filing in a Chapter 11 case: 1) the debtor has only one asset; 2) the debtor has only one creditor; 3) the debtor acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; 4) the debtor was revitalized on the eve of foreclosure to acquire the insolvent property; 5) the debtor has no ongoing business or employees; 6) the debtor lacks a reasonable probability of reorganization; and 7) the Chapter 11 filing stopped the foreclosure.  Individual factors, in and of themselves, may not lead to a conclusion that a bankruptcy filing is in bad faith.  Bad faith exists when the cumulative effect of these individual factors, viewed in the totality of the circumstances, paints a factual picture leading to the inescapable conclusion that the use of the bankruptcy laws by the debtor is inappropriate." *In re Ladouceur*, 2017 Bankr. LEXIS 3797 (Bankr. D. Colo. 2017)(*quoting In re effusion Svcs, supra*).

37.     In *In re Ladouceur*, the Court found the following factors indicative of bad faith: (i) the debtor owned one group of assets consisting of three real properties, two of which were subject to the secured claims of Wells Fargo; (ii) the amount owed to Wells Fargo dwarfed the other creditors in the case; (iii) the case was a two party dispute in which the bankruptcy was filed to stop Wells Fargo's foreclosures; (iv) the debtor had no ongoing business or employees; (v) the debtor lacked a reasonable probability of an effective reorganization; (vi) the case was filed on the eve of foreclosure; and (vii) the proposed treatment of Wells Fargo's claims violated § 1123(b)(5).  In this case, factors (i) through (vi) are all present.

38.     "Bad faith is determined on a case-by-case basis and the totality of the circumstances including pre-petition and post-petition conduct, the impact of the plan upon creditors and the accuracy of financial disclosures.  The doctrine of bad faith allows the

bankruptcy judge to veto any chapter 11 plan." *Id*. Here, the Debtor's pre-petition and post-petition conduct, including the utter lack of transparency about the termination of the Lease, the execution of the Special Servicer Agreement, and the lack of honesty and accurate financial reporting about the ongoing use and operation of the Property, all support a finding of bad faith and dismissal of this Chapter 11.

39.     As such, the Debtor's bankruptcy should be dismissed for cause pursuant to 11 U.S.C. §1112(b)(4).

WHEREFORE, for the reasons set forth above, Pangea respectfully requests that this Court dismiss Debtor's Chapter 11 Bankruptcy.

DATED this 6th day of January, 2022.

Respectfully submitted,

BROWN DUNNING WALKER FEIN PC

*s/ David C. Walker*
Douglas W. Brown, Reg. No. 10429
David C. Walker, Reg. No. 36551
2000 S. Colorado Blvd.
Tower Two, Suite 700
Denver, CO  80222
Telephone: 303-329-3363
Facsimile:  303-393-8438
dbrown@bdwf-firm.com; dwalker@bdwf-firm.com
*Attorneys for Pangea Mortgage Capital, LLC*

Movant's Address

549 W. Randolph Street
2nd Floor
Chicago, IL 60661

EXHIBIT 1

## PROMISSORY NOTE

$6,650,000.00                                          Date:  March 11, 2020
Denver, Colorado                        Initial Maturity Date:  June 30, 2021

1.     **AGREEMENT TO PAY**.  For value received, **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Borrower"), hereby jointly and severally promise to pay to the order of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company, and its successors and assigns ("Lender"), the maximum principal sum of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00) (the "Loan"), on or before June 30, 2021 (the "Initial Maturity Date"), as such date may be extended in accordance with Section 4 hereof, together with interest on the principal amount thereof outstanding from time to time at the rate or rates described below, and any and all other amounts which may be due and payable hereunder or under any of the Loan Documents (as hereinafter defined) from time to time.  This Promissory Note (this "Note") is made pursuant to the terms and conditions set forth in that certain Loan Agreement dated as of even date herewith by and between Borrower and Lender (as amended, modified and restated from time to time, the "Loan Agreement").  The amount disbursed by Lender to Borrower, repayment of which is evidenced by this Note, is referred to as the "Loan." *All capitalized terms used and not expressly defined herein shall have the meanings given to such terms in the Loan Agreement.*

2.     **INTEREST RATE**.

2.1     Interest Prior to Default.  Interest will accrue on the principal balance of this Note outstanding (including reserves deemed disbursed) from the date of this Note through the Maturity Date at the greater from time to time of (i) nine and three-quarters percent (9.75%) per annum (the "Interest Rate Floor"), and (ii) a floating per annum rate of interest equal to the Prime Rate (as defined below), plus four and three-quarters percent (4.75%) (the "Floating Rate"; the greater from time to time of the Interest Rate Floor and the Floating Rate being referred to in this Note as the "Interest Rate").  Changes in the Floating Rate to be charged under this Note based on the Prime Rate will take effect immediately at Lender's option upon the occurrence of any change in the Prime Rate (it being understood and agreed that any increase or decrease in the amount of interest payable on the then-current Payment Date resulting from a change in the Floating Rate occurring from and after the date Lender delivers to Borrower written notice of the amount of interest payable on the then-current Payment Date shall be payable on or deducted from (as applicable) the amount of interest payable on the Payment Date immediately following the then-current Payment Date).  As used in this Note, the "Prime Rate" means the floating per annum rate of interest most recently displayed in the Money Rates column of the Wall Street Journal (or other authoritative source selected by Lender in its discretion).  A certificate made by an officer of the Lender stating the Prime Rate in effect on any given day, for the purposes of this Note, will be conclusive evidence of the Prime Rate in effect on such day.  The Prime Rate is a base reference rate of interest adopted by the Lender as a general benchmark from which the Lender determines the floating interest rates chargeable on various loans to borrowers with

varying degrees of creditworthiness and the Borrower acknowledges and agrees that the Lender has made no representations whatsoever that the Prime Rate is the interest rate actually offered by the Lender to borrowers of any particular creditworthiness. In the event that the prime rate is no longer published by the Wall Street Journal, it shall then be the rate selected by Lender as its reference rate.

2.2    Interest After Default. From and after the Maturity Date or upon the occurrence of an Event of Default (as hereinafter defined), without notice from Lender to Borrower, interest shall accrue on the unpaid principal balance during any such period at an annual rate (the "Default Rate") equal to twenty-four percent (24%) per annum. The interest accruing under this section shall be immediately due and payable by Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

2.3    Interest Calculation. Interest on this Note shall be calculated on the basis of a three hundred sixty (360) day year and the actual number of days elapsed in any portion of a month in which interest is due. If any payment to be made by Borrower hereunder shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.

3.    **PAYMENT TERMS**.

3.1    Principal and Interest. Payments of principal and interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows (each such date when a payment is due and payable, a "Payment Date"):

(a)    Commencing on the first (1st) day of May, 2020, and on the first (1st) day of each successive month thereafter, to and including the first (1st) day of the month containing the Maturity Date, Borrower shall make payments to Lender of interest on the then-outstanding principal balance of the indebtedness evidenced by this Note.

(b)    The Loan shall be due and payable, and Borrower hereby promises to pay the outstanding principal amount of the Loan to Lender, together with all accrued interest thereon then remaining unpaid and all other unpaid amounts, charges, fees and expenses outstanding under this Note or under any of the other Loan Documents, including, without limitation, the Exit Fee (as defined in the Loan Agreement), on the Maturity Date, subject to earlier prepayment as provided in Section 3.4 hereof or as otherwise provided herein or in any other Loan Document.

(c)    All net sale proceeds from the sale of the Premises (defined herein) or other collateral for the Loan shall be paid to Lender and may be applied in Lender's sole discretion including, without limitation, as a principal paydown of this Note.

3.2    Method of Payments. Borrower shall make each payment under this Note on the date when due in lawful money of the United States to Lender in immediately available funds. All monthly payments made by Borrower with respect to the Loan shall be paid to Lender at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois 60661. The monthly principal and interest payments due hereunder shall be charged or credited to this account on each Payment Date or the

2

first (1st) Business Day after such Payment Date if the Payment Date falls on other than a Business Day (and such extension of time shall be included in computing the interest then due and payable).   Any other deposits or payments Borrower is required to make to Lender or otherwise under the terms of the Loan Documents shall be made by the same payment method and on the same date as the installments of principal and interest due under this Note.

3.3   Late Charge.   If any payment of interest or principal due hereunder is not made within five (5) days after such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, Borrower shall pay to Lender a "late charge" of five cents ($0.05) for each whole dollar so overdue to defray part of the cost of collection and handling such late payment; provided, however, that no late charge shall be assessed with respect to the final repayment of the indebtedness hereunder made after the Maturity Date unless Borrower or any Guarantor shall contest in any way to any action by Lender to collect such amounts due or unless Lender shall foreclose the Mortgage.   Borrower agrees that the damages to be sustained by the holder hereof for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that the amount of five cents ($0.05) for each one dollar ($1.00) due is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

3.4   Principal Prepayments for Loan.   Borrower shall be allowed to prepay the Loan in whole if (a) the proposed prepayment occurs on the Maturity Date or the last day of a calendar month during the term of the Loan, and (b) Borrower tenders the following amounts at the time of a proposed prepayment: (i) all accrued interest on the Loan being prepaid through the date of prepayment, (ii) the Exit Fee, (iii) Borrower has previously paid to Lender interest in an amount equal to or greater than TWO HUNDRED SEVENTY-THREE THOUSAND NINE HUNDRED EIGHT AND 42/100 DOLLARS ($273,908.42) (the "Required Debt Service Amount") or Borrower paid to Lender an amount equal to the Required Debt Service Amount less the actual amount of interest paid by Borrower to Lender as of the date of the proposed prepayment, and (iv) any additional fees and costs associated with the Loan not previously paid by Borrower, as determined by Lender in Lender's sole discretion.

3.5   Initial Loan Fees.   In consideration of Lender's agreement to make the Loan, Borrower shall pay to Lender the Commitment Fee (as defined in the Loan Agreement) which shall be due and payable in full upon the closing of the Loan.   Certain additional loan fees are owed pursuant to the Loan Documents (including, without limitation, those fees provided in Section 3.7 of the Loan Agreement).

4.   **EXTENSION OPTIONS**.

4.1   Borrower's Extension Options.   Subject to Lender's written approval in Lender's sole discretion, Borrower shall have two (2) options to extend the Initial Maturity Date by delivering written notice of such election to Lender, together with any other documentation or materials as required hereby, and otherwise subject to the following terms and conditions.

Subject to Lender's written approval in Lender's sole discretion, Borrower may, at its option, exercise the aforementioned two (2) options ("Borrower's Extension Option") to extend the (I) Initial Maturity Date six (6) months to December 31, 2021 (the "First Extended

Maturity Date"), and (II) the First Extended Maturity Date six (6) months to June 30, 2022 (the "Second Extended Maturity Date") (the First Extended Maturity Date, Second Extended Maturity Date and Initial Maturity Date, as applicable, are collectively referred to herein as the "Maturity Date"), subject to the following terms and conditions:

(a)     Borrower has delivered to Lender written notice of the exercise of Borrower's Extension Option not less than thirty (30) days prior to the Initial Maturity Date or the First Extended Maturity Date, as applicable;

(b)     No Event of Default, Unmatured Default, or occurrence which could rise to the level of an Event of Default shall exist as of the date of the exercise of Borrower's Extension Option through and including the Initial Maturity Date or the First Extended Maturity Date, as applicable;

(c)     Borrower shall have paid to Lender contemporaneous with its exercise of each applicable Borrower's Extension Option an extension fee in the amount of Eighty-Three Thousand One Hundred Twenty-Five Dollars and 00/100 Dollars ($83,125.00) (the "Extension Fee"), due upon the exercise of Borrower's Extension Option. For the avoidance of doubt, in the event Borrower fails to extend the Initial Maturity Date or the First Extended Maturity Date, as applicable, for any reason after delivering to Lender its written notice of its exercise of Borrower's Extension Option, Borrower is still responsible for payment of the Extension Fee; and

(d)     Borrower's Extension Option shall be subject to Lender's written approval in its discretion in all respects.

Notwithstanding anything herein to the contrary, should Borrower desire to extend the Loan but fail to properly exercise Borrower's Extension Option, Lender shall have the option in its sole and absolute discretion to extend the Initial Maturity Date or the First Extended Maturity Date, as applicable, to the First Extended Maturity Date and the Second Extended Maturity Date, respectively, by delivering to Borrower written notice of said extension. In the event Lender delivers said extension notice to Borrower consistent with this paragraph, Borrower shall pay the Extension Fee to Lender within three (3) Business Days after the date of Lender's written notice to Borrower.

4.2     Lender's Extension Option.  Notwithstanding anything herein to the contrary, from and after the Maturity Date, in Lender's sole discretion, Lender may charge Borrower the Extension Fee in addition to Default Interest and such amount shall be immediately due and payable by Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

5.     **SECURITY**.  This Note is evidenced and secured by: (a) the Loan Agreement, (b) a Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents dated as of even date herewith, executed by Borrower to and for the benefit of Lender (the "Mortgage"), creating a first mortgage lien on certain real property commonly known as 1612 Wazee Street, Denver, Colorado 80202 (the "Premises") legally described in Exhibit "A" attached to the Mortgage; (b) an Assignment of Leases and Rents dated as of even date herewith,

executed by Borrower to and for the benefit of Lender encumbering the Premises (the "Assignment of Leases"); (c) a Guaranty of Payment dated as of even date herewith, executed by AMIN SULIAMAN, an individual, and KENNETH C. WARE, an individual (individually and collectively (as the context shall require) referred to as "Guarantor"), to and for the benefit of Lender (the "Guaranty"); (d) an Environmental Indemnity Agreement dated of even date herewith, jointly and severally executed by Borrower and Guarantor to and for the benefit of Lender (the "Indemnity Agreement"); and (e) Collateral Assignment, Pledge and Security Agreements executed by Guarantor and the other parties named therein to and for the benefit of Lender (collectively referred to herein as, the "Pledge Agreements"; together with the Loan Agreement, the Mortgage, the Assignment of Leases, the Guaranty, the Indemnity Agreement, the Pledge Agreements and any and all other document now or hereafter given to evidence or secure payment of this Note or delivered to induce Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, restated or replaced from time to time, are hereinafter collectively referred to as the "Loan Documents"). Reference is hereby made to the Loan Documents (which are incorporated herein by reference as fully and with the same effect as if set forth herein at length) for a statement of the covenants and agreements contained therein, a statement of the rights, remedies, and security afforded thereby, and all matters therein contained.

6. **EVENTS OF DEFAULT**. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

(a)     the failure by Borrower to pay (i) any installment of principal or interest on the date when due; (ii) any other amount payable to Lender under this Note, the Mortgage or any of the other Loan Documents within five (5) days after the date when any such payment is due in accordance with the terms hereof or thereof, or, if no date for payment is stated, within five (5) days after written demand therefor in accordance with the terms of the Loan Documents; or

(b)     failure by Borrower to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower contained in this Note and not specifically referred to elsewhere in this Section 6; provided, however, that if such failure by its nature can be cured, then so long as the continued operation and safety of the Premises, and the priority, validity and enforceability of the liens created by this Note, the Mortgage or any of the other Loan Documents and the value of the Premises is not impaired, threatened or jeopardized, then Borrower shall have a period ("Cure Period") of ten (10) days after Borrower obtains actual knowledge of such failure or receives written notice of such failure to cure the same and an Event of Default shall not be deemed to exist during the Cure Period (provided, however, such period shall be limited to five (5) days if such failure can be cured by the payment of money); or

(c)     the failure by Borrower or Guarantor to pay when due any amount to Lender under any other loan or debt due from Borrower or Guarantor to Lender or any amount due under any other existing obligations whether to Lender or any other lender of Borrower or Guarantor; or

(d)  if Borrower shall obtain any financing, all or part of which, will be secured by (i) the Property, or (ii) any membership interest in Borrower, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly, or indirectly, Borrower; or

(e)  the occurrence of any "Event of Default" under the Loan Agreement, the Mortgage or any of the other Loan Documents.

7.  **REMEDIES**.  At the election of the holder hereof, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default.  Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default.  No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.  The rights, remedies and powers of the holder hereof, as provided in this Note, the Mortgage and in all of the other Loan Documents are cumulative and concurrent, and may be pursued singly, successively or together against Borrower, any Guarantor hereof, the Premises and any other security given at any time to secure the repayment hereof, all at the sole discretion of the holder hereof.  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, Borrower promises and agrees to pay all costs of collection, including reasonable attorneys' fees and court costs.

8.  **COVENANTS AND WAIVERS**.  Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:  (i) waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (iii) except as expressly provided in the Loan Documents, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder; (iv) waive any and all lack of diligence and delays in the enforcement of the payment hereof; (v) agree that the liability of Borrower and each guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by Lender to any of them with respect hereto; (vi) consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and (vii) consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby.  This provision is a material inducement for Lender making the Loan to Borrower.

9.    **ASSIGNMENTS AND PARTICIPATIONS**.  Lender may at any time assign its rights in this Note and the Loan Documents, or any part thereof and transfer its rights in any or all of the collateral, and Lender thereafter shall be relieved from all liability with respect to such collateral.  Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.  Notwithstanding anything in the Loan Documents to the contrary, Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in or assignments of the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more participants, purchasers or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy or confidentiality Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the assignees and purchasers of any participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the assignment of such Loan or the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any assignee or any purchaser of such participation interest and unconditionally agrees that either Lender, such assignee or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in any Loan. Borrower further agrees that any assignee or the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

10.    **GENERAL AGREEMENTS**.

10.1    Business Purpose Loan.  The Loan is a business loan which comes within the purview of Section 205/4, paragraph (1)(c) of Chapter 815 of the Illinois Compiled Statutes, as amended.  Borrower agrees that the Loan evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C., §1601, et seq.

10.2    Time.  Time is of the essence hereof.

10.3    Governing Law.    This Note is governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the State of Illinois, without regard to its conflict of laws provisions.

10.4    Amendments.  This Note may not be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

10.5    No Joint Venture.  Lender shall not be construed for any purpose to be a partner, joint venturer, agent or associate of Borrower or of any lessee, operator, concessionaire or licensee of Borrower in the conduct of their business, and by the execution of this Note, Borrower agrees to indemnify, defend, and hold Lender harmless from and against any and all

damages, costs, expenses and liability that may be incurred by Lender as a result of a claim that Lender is such partner, joint venturer, agent or associate.

10.6    Joint and Several Obligations.  If this Note is executed by more than one party, the obligations and liabilities of Borrower under this Note shall be joint and several and shall be binding upon and enforceable against Borrower and their respective successors and assigns.  This Note shall inure to the benefit of and may be enforced by Lender and its successors and assigns.

10.7    Severable Loan Provisions.  If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Note and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

10.8    Interest Limitation.  If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and Lender has agreed to accept such extra payment(s) as a premium-free prepayment.  Notwithstanding the foregoing, however, Lender may at any time and from time to time elect by notice in writing to Borrower to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence.  In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Premises are located for the use or detention of money or for forbearance in seeking its collection.

11.    **NOTICES**.  All notices required under this Note will be in writing and will be transmitted in the manner and to the addresses required by the Loan Agreement, or to such other addresses as Lender or Borrower may specify from time to time in writing.

12.    **CONSENT TO JURISDICTION**.  BORROWER HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS NOTE SHALL BE LITIGATED IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION. BORROWER HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY

REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THE LOAN AGREEMENT. BORROWER WAIVES ANY CLAIM THAT COOK COUNTY, ILLINOIS, OR THE NORTHERN DISTRICT OF ILLINOIS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD BORROWER, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND BORROWER HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

13. **WAIVER OF JURY TRIAL**. BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

14. **WAIVER OF DEFENSES**. OTHER THAN CLAIMS BASED UPON THE FAILURE OF LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, BORROWER WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS NOTE OR ANY OF THE LOAN DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

15. **EXPENSES AND INDEMNIFICATION**. Borrower shall pay all costs and expenses incurred by Lender in connection with the preparation of this Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of Lender or any affiliate or parent corporation of Lender. Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Note and the other instruments and documents to be delivered hereunder, and agree to save Lender harmless from

and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses. Borrower hereby authorizes Lender to charge any account of any Borrower with Lender for all sums due under this section. Borrower also agrees to defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, any parent corporation, affiliated corporation or subsidiary of Lender, and each of their respective officers, directors, employees, attorneys and agents (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of Lender or any parent or affiliated corporation of Lender), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities, environmental laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Note or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Note and the Loan Documents, the making or issuance and management of the Loan, the use or intended use of the proceeds of the Loan and the enforcement of Lender's rights and remedies under this Note, the Loan Documents, any other instruments and documents delivered hereunder or thereunder, or under any other agreement between Borrower and Lender; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party as determined by a final non-appealable judgment by a court of competent jurisdiction. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to such Indemnified Party within thirty (30) days following written demand therefor, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by such Indemnified Party until paid by Borrower, shall be added to the obligations of Borrower evidenced by this Note and secured by the collateral securing this Note. This indemnity is not intended to excuse Lender from performing hereunder. The provisions of this section shall survive the closing of the Loan, the satisfaction and payment of this Note and any cancellation of the Loan Documents. Borrower shall also pay, and hold Lender harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection with arranging the Loan. Lender hereby represents that it has not employed a broker or other finder in connection with the Loan. Borrower represents and warrants that no brokerage commissions or finder's fees are to be paid in connection with the Loan.

16.   **WAIVER OF OFFSET**.  Borrower hereby fully and forever waives its rights to offset amounts that Lender or its affiliates may owe (or Borrower may claim that Lender or its affiliates owe) Borrower or its members or affiliates. The obligations of Borrower, as applicable, under this Note shall be absolute and without right of offset. This waiver shall be construed as broadly as possible and shall apply to damages suffered by Borrower or its members or affiliates under the Loan Documents or any other damages or obligations. Borrower knowingly and

10

intelligently has waived the common law right of offset against amounts that it may owe under the Loan Documents.

17. **CONFESSION OF JUDGMENT**. THE UNDERSIGNED, HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY-AT-LAW TO APPEAR IN ANY COURT OF RECORD AND TO CONFESS JUDGMENT AGAINST IT FOR THE UNPAID AMOUNT OF THIS NOTE AS EVIDENCED BY AN AFFIDAVIT SIGNED BY AN AUTHORIZED AGENT OF LENDER OR ITS ASSIGNEE SETTING FORTH THE AMOUNT THEN DUE, ATTORNEYS' FEES PLUS COSTS OF SUIT, AND TO RELEASE ALL ERRORS, AND WAIVE ALL RIGHTS OF APPEAL. IF A COPY OF THIS NOTE, VERIFIED BY AN AFFIDAVIT, SHALL HAVE BEEN FILED IN THE PROCEEDING, IT WILL NOT BE NECESSARY TO FILE THE ORIGINAL AS A WARRANT OF ATTORNEY. THE UNDERSIGNED WAIVES THE RIGHT TO ANY STAY OF EXECUTION AND THE BENEFIT OF ALL EXEMPTION LAWS NOW OR HEREAFTER IN EFFECT. NO SINGLE EXERCISE OF THE FOREGOING WARRANT AND POWER TO CONFESS JUDGMENT WILL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE, OR VOID; BUT THE POWER WILL CONTINUE UNDIMINISHED AND MAY BE EXERCISED FROM TIME TO TIME AS LENDER OR ITS ASSIGNEE MAY ELECT UNTIL ALL AMOUNTS OWING ON THIS NOTE HAVE BEEN PAID IN FULL. THE UNDERSIGNED HEREBY WAIVES AND RELEASES ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH THE UNDERSIGNED MIGHT HAVE AGAINST ANY ATTORNEY ACTING UNDER THE TERMS OF AUTHORITY WHICH THE UNDERSIGNED HAS GRANTED HEREIN ARISING OUT OF OR CONNECTED WITH THE CONFESSION OF JUDGMENT HEREUNDER. THIS NOTE WAS EXECUTED IN CHICAGO, COOK COUNTY, ILLINOIS.

18. **RIGHT OF SETOFF**. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts at Lender or any bank directed by Lender,. This includes all accounts Borrower holds jointly and with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and at Lender's option, to administratively freeze all accounts to allow Lender to protect Lender's charge and setoff rights provided in this section.

19. **JOINT AND SEVERAL LIABILITY**. This Note is made subject to the terms of Section 10.21 of the Loan Agreement and the terms of Section 10.21 of the Loan Agreement are hereby incorporated herein by this reference.

20. **COUNTERPARTS**. This Note may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together will constitute one and the same instrument. The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this letter agreement attached thereto.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Borrower has executed and delivered this Promissory Note as of the day and year first above written.

**BORROWER:**

**KDA PROPERTIES LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

**NATIV DENVER LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

EXHIBIT 2

# LOAN AGREEMENT

## BETWEEN

### KDA PROPERTIES LLC,
a Colorado limited liability company,
and
**NATIV DENVER LLC**, a Colorado limited liability company,
collectively, jointly and severally, as Borrower

## AND

### PANGEA MORTGAGE CAPITAL, LLC,
an Illinois limited liability company, as Lender

dated March 11, 2020

1612 Wazee Street, Denver, Colorado 80202

# Table of Contents

                                                                                    **Page**

1.   **RECITALS** ...................................................................................................1

2.   **DEFINITIONS** ...............................................................................................1
     2.1   Defined Terms...........................................................................................1
     2.2   Singular and Plural Terms.........................................................................11
     2.3   Accounting Principles...............................................................................11
     2.4   References and Other Terms......................................................................11

3.   **COMMITMENT TO LEND** .............................................................................11
     3.1   Loan Amount; Prepayment........................................................................11
     3.2   Loan Advances Evidenced by Note ...........................................................12
     3.3   Calculation of Interest..............................................................................12
     3.4   Payments of Interest.................................................................................12
     3.5   Default Rate.............................................................................................12
     3.6   Late Charge..............................................................................................12
     3.7   Fees .........................................................................................................12

4.   **CLOSING DOCUMENTS** ...............................................................................13
     4.1   Loan Documents.......................................................................................13
     4.2   Survey .....................................................................................................13
     4.3   Insurance .................................................................................................13
     4.4   Title Insurance Policy ..............................................................................13
     4.5   Title Clearance Documents.......................................................................13
     4.6   Recorded Documents ...............................................................................13
     4.7   Searches ..................................................................................................13
     4.8   Opinion of Counsel..................................................................................13
     4.9   Flood Plain ..............................................................................................13
     4.10  Leases......................................................................................................14
     4.11  Service Contracts.....................................................................................14
     4.12  Environmental Report...............................................................................14
     4.13  Financial Conditions................................................................................14
     4.14  Organizational Documents .......................................................................14
     4.15  Additional Documents .............................................................................15

5.   **DISBURSEMENT OF THE LOAN** ...................................................................15
     5.1   Conditions Precedent in General................................................................15
     5.2   Conditions Precedent to Disursement from the Reserve Accounts...................15
     5.3   Acquiescence not a Waiver.......................................................................20
     5.4   No Liability for Disbursements.................................................................21
     5.5   Reserves ..................................................................................................21
     5.6   Deposit Account; Cash Management..........................................................23

6.   **REPRESENTATIONS AND WARRANTIES** .....................................................26
     6.1   Formation, Qualification and Compliance..................................................26
     6.2   Execution and Performance of Loan Documents..........................................26

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 6.3 | Title | 27 |
| 6.4 | Validity and Enforceability of Documents | 28 |
| 6.5 | Litigation | 28 |
| 6.6 | Utilities; Authorities | 28 |
| 6.7 | Solvency | 28 |
| 6.8 | Financial Statements | 28 |
| 6.9 | No Material Adverse Change | 29 |
| 6.10 | Hazardous Materials | 29 |
| 6.11 | Name and Principal Place of Business | 29 |
| 6.12 | Compliance with Laws | 29 |
| 6.13 | Financing Statements | 29 |
| 6.14 | Event of Default | 29 |
| 6.15 | No Defects | 29 |
| 6.16 | Additional Agreements | 29 |
| 6.17 | Ineligible Securities | 29 |
| 6.18 | Deposit Account | 29 |
| 6.19 | Hotel Matters | 30 |
| 7. | **BORROWER'S COVENANTS** | 30 |
| 7.1 | Compliance with Laws | 30 |
| 7.2 | Inspection | 30 |
| 7.3 | Mechanics' Liens | 31 |
| 7.4 | Financial Statements; Reports | 31 |
| 7.5 | Affirmation of Representations and Warranties | 31 |
| 7.6 | Title | 31 |
| 7.7 | Proceedings Affecting Property | 32 |
| 7.8 | Disposal and Encumbrance of Property | 32 |
| 7.9 | Insurance | 32 |
| 7.10 | Performance of Obligations; Notice of Default | 32 |
| 7.11 | Restrictions Affecting Borrower | 33 |
| 7.12 | Use of Receipts; Limitation on Distributions | 33 |
| 7.13 | Management and Leasing Agreements; Subordination | 33 |
| 7.14 | Additional Documents | 33 |
| 7.15 | OFAC | 33 |
| 7.16 | Loan Expenses | 33 |
| 7.17 | Lender's Action for Lender's Own Protection Only | 34 |
| 7.18 | Changes in Property Restrictions | 34 |
| 7.19 | Books and Records | 34 |
| 7.20 | Existence | 34 |
| 7.21 | Notice of Certain Matters | 34 |
| 7.22 | Additional Reports and Information | 35 |
| 7.23 | Further Assurances | 35 |
| 7.24 | Amendment of Organizational Documents | 35 |
| 7.25 | Limitations on Additional Indebtedness; Other Prohibited Transactions | 35 |
| 7.26 | Insurance | 35 |
| 7.27 | Casualty Loss; Proceeds of Insurance | 37 |
| 7.28 | Condemnation and Eminent Domain | 39 |
| 7.29 | Disbursement of Insurance Proceeds and Awards | 40 |

**TABLE OF CONTENTS**

(continued)

|  |  |  | Page |
|---|---|---|---|
| | 7.30 | Cooperation with Regard to Liquor Licenses | 41 |
| | 7.31 | Refinance | 41 |
| 8. | **EVENTS OF DEFAULT** | | 41 |
| 9. | **REMEDIES** | | 44 |
| | 9.1 | Remedies | 44 |
| | 9.2 | Cumulative Remedies, No Waiver | 44 |
| 10. | **MISCELLANEOUS** | | 45 |
| | 10.1 | Additional Indebtedness | 45 |
| | 10.2 | Additional Acts | 45 |
| | 10.3 | Loan Agreement Governs | 45 |
| | 10.4 | Additional Advances | 45 |
| | 10.5 | Amendment; Waiver; Approval | 45 |
| | 10.6 | Notice | 45 |
| | 10.7 | Benefit; Assignment | 46 |
| | 10.8 | Governing Law | 47 |
| | 10.9 | Indemnity | 47 |
| | 10.10 | Headings | 47 |
| | 10.11 | No Partnership or Joint Venture | 47 |
| | 10.12 | Time is of the Essence | 47 |
| | 10.13 | Invalid Provisions | 47 |
| | 10.14 | No Offset | 47 |
| | 10.15 | Acts by Lender | 48 |
| | 10.16 | Binding Provisions | 48 |
| | 10.17 | Counterparts | 48 |
| | 10.18 | No Third Party Beneficiary | 48 |
| | 10.19 | Publicity | 48 |
| | 10.20 | Joint and Several Liability | 48 |
| | 10.21 | JURISDICTION AND VENUE | 52 |
| | 10.22 | JURY WAIVER | 53 |
| | 10.23 | ASSIGNMENTS AND PARTICIPATIONS | 53 |
| **11.** | **ELECTRONIC SIGNATURES** | | 53 |

iii

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** ("Agreement") is dated as of March 11, 2020, by and between **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Borrower"), and **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company, and its successors and assigns ("Lender").

1.   **RECITALS**.

(a)   Borrower known as KDA Properties LLC is the fee owner of the Property (this and all other capitalized terms used in this Article 1 and not otherwise defined shall have the meanings ascribed thereto in Article 2 below).

(b)   Borrower has requested that Lender make a loan to Borrower in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 ($6,650,000.00)** to pay a portion of the amounts needed to re-finance the Improvements. Lender has agreed to make the Loan subject to the terms and conditions set forth herein.

(c)   In consideration of the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

2.   **DEFINITIONS**.

2.1   Defined Terms. All capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the following meanings:

"Affiliate" shall mean, with respect to any Person, (a) any other Person which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, (i) such Person or (ii) any general partner, manager or managing member of such Person; (b) any other Person twenty-five percent (25%) or more of the equity interest of which is held beneficially or of record by (i) such Person or (ii) any general partner, manager or managing member of such Person, and (c) any general partner, limited partner or member of (i) such Person or (ii) any general partner or managing member of such Person. As used in the previous sentence, "control" means the possession, directly or indirectly, of the power to cause the direction of the management of a Person, whether through voting securities, by contract; family relationship or otherwise.

"Applicable Laws" shall mean all laws, statutes, ordinances, rules, regulations, judgments, decrees or orders of any state, federal or local government or agency which are applicable to the Obligors and/or the Property.

"Assignment of Agreements" shall mean that certain Assignment of Agreements Affecting Real Estate dated as of even date herewith from Borrower to Lender, as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Assignment of Leases and Rents" shall mean that certain Assignment of Leases and Rents dated as of even date herewith, executed by Borrower to and for the benefit of Lender encumbering the Land as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Borrower Entity Documents" shall mean the Operating Agreement and the Articles of Organization of Borrower.

"Business Day" shall mean each day excluding Saturdays, Sundays and any other day on which Lender is closed for business to the public.

"Cash Trap Period" shall be deemed to (a) commence upon: (i) the occurrence of any Event of Default; or (ii) the Net Operating Income Delta is equal to or less than ninety-five one hundredths (0.95); and (b) have terminated, if ever: (i) in the case of the foregoing clause (a)(i), (A) other than the Event of Default giving rise to the Cash Trap Period, no other Event of Default has occurred during the term of the Loan, and (B) Lender accepts a cure of such Event of Default; or (ii) in the case of the foregoing clause (a)(ii), for two (2) consecutive calendar quarters since the commencement of the existing Cash Trap Period, (A) no Event of Default has occurred, and (B) the Net Operating Income Delta is greater than ninety-five one-hundreths (0.95) at the end of each such calendar quarter.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Completion Date" shall mean May 1, 2020.

"Completion of Construction" shall mean all of the following have occurred: (a) Borrower has delivered evidence satisfactory to Lender that the GR Completion Work hase been completed in accordance with all Applicable Laws, and (b) such New Guest Rooms are a part of the inventory of guest rooms available for occupation by licensees thereof (for the avoidance of doubt, the inability of Lender personnel to book a reservation thereon shall be conclusive evidence that the requirements of this clause (b) have not been satisfied).

"Credit Card Companies" shall mean each of the banks, issues, processors, credit card companies and other entities with which Borrower has entered into merchant's or other credit card or similar agreements with respect to the processing of charge card, credit card, debit card or comparable forms of payment, including, but not limited to, each of the banks, issuers, processors or credit card companies to which Borrower has delivered a Credit Card Direction Letter.

"Credit Card Direction Letter" shall mean a written notice in a form substantially similar to the form attached hereto as **Schedule I**.

"Debtor Relief Laws" shall mean, collectively, the Bankruptcy Code and all other applicable Federal or State law, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

"Default Rate" shall mean twenty-four percent (24%) per annum (which shall be inclusive of the Interest Rate and not in addition thereto)."Deposit Account" shall mean, individual and collectively (as the context shall require), Deposit Account 1 and Deposit Account 2.

"Deposit Account 1" shall mean a segregated Eligible Account established and maintained at the Deposit Bank as the clearing account of Borrower known as KDA Properties LLC and the Property, which account shall be established and maintained in trust for the benefit of Lender and, subject to the terms hereof and the Deposit Account Control Agreement, shall be under the sole dominion and control of Lender. The Deposit Account shall be entitled "KDA

Properties LLC", as pledgor, for the benefit of Pangea Mortgage Capital, LLC, as Secured Party – Deposit Account", or such other name as required by Lender from time to time.

"Deposit Account 2" shall mean a segregated Eligible Account established and maintained at the Deposit Bank as the clearing account of Borrower known as NATIV Denver LLC and the Property, which account shall be established and maintained in trust for the benefit of Lender and, subject to the terms hereof and the Deposit Account Control Agreement, shall be under the sole dominion and control of Lender. The Deposit Account shall be entitled "NATIV Denver LLC", as pledgor, for the benefit of Pangea Mortgage Capital, LLC, as Secured Party – Deposit Account", or such other name as required by Lender from time to time.

"Deposit Bank" shall mean Wells Fargo Bank, N.A., or any successor Eligible Institution acting as "Deposit Bank" under the Deposit Account Control Agreement.

"Deposit Account Control Agreement" shall mean those certain Deposit Account Control Agreements, dated as of the Closing Date among Borrower, Lender and Deposit Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, relating to funds deposited in the Deposit Account.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a Federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution; or (b) a segregated trust account or accounts maintained with a Federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least Fifty Million Dollars ($50,000,000) and subject to supervision or examination by Federal and state authority, as applicable. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short-term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P and "P-1" by Moody's, in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "A+" by S&P and "Aa3" by Moody's).

"Environmental Laws" shall mean any and all federal, state and local laws or statutes that relate to or impose liability or standards of conduct concerning public or occupational health and safety or the environment, as now or hereafter in effect and as have been or hereafter may be amended, modified or reauthorized, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), the Hazardous Materials Transportation Authorization Act of 1994 (42 U.S.C. §5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), the Safe Drinking Water Act of 1974 (42 U.S.C. §300(f) et seq.), and the Occupational Safety and Health Act of 1970 (29 U.S.C. §651 et seq.), and all rules, regulations, codes, ordinances and guidance documents now or hereafter promulgated or published thereunder, and the provisions of any licenses, permits, orders and decrees now or hereafter issued pursuant to any of the foregoing.

"Event of Default" shall have the meaning ascribed to it in Section 8 of this Agreement.

"Excess Cash" shall have the meaning set forth in Section 5.6(g) hereof.

"FF&E" shall have the meaning set forth in Section 5.5(b) hereof.

"FF&E Reserve Account" shall have the meaning set forth in Section 5.5(b) hereof.

"FF&E Reserve Funds" shall have the meaning set forth in Section 5.5(b) hereof.

"FF&E Reserve Initial Deposit" shall have the meaning set forth in Section 5.5(b) hereof.

"Governmental Agency" shall mean any governmental or quasi-governmental agency, board, bureau, commission, department, court, administrative tribunal or other instrumentality or authority, and any public utility.

"GR Completion Reserve Account" shall have the meaning set forth in Section 5.5(a) hereof.

"GR Completion Reserve Funds" shall have the meaning set forth in Section 5.5(a) hereof.

"GR Completion Work" shall have the meaning set forth in Section 5.5(a) hereof.

"Gross Income from Operations" shall mean, for any period, all income derived from the ownership and operation of the Property but excluding (a) taxes required to be accounted for by Borrower to any governmental authority; (b) refunds and uncollectible accounts; (c) proceeds from the sale of the Property (or any portion thereof) in accordance with the terms of this Agreement; (d) insurance proceeds and condemnation proceeds; (e) business interruption or other loss of income insurance; and (f) any disbursements to Borrower from any of the Reserves.

"Guarantor" or "Guarantors" shall mean AMIN SULIAMAN, an individual, KENNETH C. WARE, an individual, and any Person who now or hereafter partially or fully guarantees the payment or performance of any indebtedness or other obligation to Lender under any Loan Document.

"Guaranty" shall mean the Guaranty of Payment.

"Guaranty of Payment" shall mean the Guaranty of Payment dated as of even date herewith from the Guarantor in favor of Lender, guaranteeing the repayment of the Loan, as amended, modified and restated from time to time.

"Hazardous Substances" shall mean:

(a)     Any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law;

(b)     Those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and

(c)     Any substance, material, or waste that is petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"Improvements" shall mean, collectively, all improvements currently located or hereinafter existing on the Land.

"Indebtedness" shall mean any and all obligations, contingent or otherwise, whether now existing or hereafter arising, of Borrower to Lender or to any of its Affiliates or successors, arising under or in connection with the Loan, this Agreement, or any other Loan Document.

"Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated as of even date herewith by Borrower and the Guarantor in favor of Lender, as amended, modified and restated from time to time.

"Interest Rate" shall have the meaning ascribed to such term in the Note.

"Items of Payment" shall have the meaning set forth in Section 5.6(k) hereof.

"Land" shall mean the tract of land located in the City of Denver, Denver County, Colorado, which is legally described in **Exhibit A** attached hereto.

"Leases" shall mean all leases now or hereafter executed by or on behalf of Tenants pertaining to the rental of space within the Property, if any.

"Liquor License" shall mean, collectively, all liscenses and permits necessary to serve alcoholic beverages for consumption at the Property or are otherwise required or necessary in connection with the use, occupation or operation of the Property as a hotel, including that certain Alcohol Beverage License (License No. 03-10126) issued by the Department of Revenue of the State of Colorado (Liquor Enforcement Divisions) on October 18, 2019.

"Loan" shall mean the loan from Lender to Borrower in an amount not to exceed SIX MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($6,650,000.00) in the aggregate which is to be disbursed pursuant to this Agreement and which loan shall otherwise be governed by the provisions hereof.

"Loan Advance" shall mean the disbursement of all of the Loan from Lender to Borrower on the Loan Opening Date.

"Loan Documents" shall mean this Agreement, the Mortgage, the Note, the Assignment of Leases and Rents, the Assignment of Agreements, the Guaranty, the Indemnity Agreement, the Pledge Agreement and every other document now or hereafter evidencing, securing or otherwise executed in conjunction with the Loan, together with all amendments, restatements, supplements and modifications thereof.

"Loan Expenses" shall mean, collectively, the expenses, charges, costs (including both hard costs and soft costs) and fees relating to the making, administration, negotiation, documentation or any other aspect of the Loan, including, without limitation, Lender's reasonable attorneys' fees and costs in connection with the negotiation, documentation and enforcement of the Loan, the fees of the Lender, all recording fees and charges, title insurance charges and

premiums, escrow fees, fees of insurance consultants, costs of surveys and of other bonds required by the Title Company in connection with clearing title to the Real Property or the issuance of title reports, binders, policies and the like, and all other costs, expenses, charges and fees referred to in or necessitated by the terms of this Agreement or any of the other Loan Documents.

"Loan Opening Date" shall mean the date hereof.

"Manager" shall mean, individually and collectively, the Guarantor.

"Maturity Date" shall mean June 30, 2021, subject to extension as provided in the Note.

"Mortgage" shall mean the Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents encumbering the Real Property dated as of even date herewith, executed by Borrower to and for the benefit of Lender to secure the Indebtedness, encumbering the Land, as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Net Operating Income" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"Net Operating Income Delta" shall mean, as of any date, the ratio calculated by Lender of (a) the Net Operating Income for the three (3) month period ending as of the applicable Reference Date to (b) the Net Operating Income for the same period in the immediately preceding calendr year.

"New Guest Rooms" shall mean, collectively, those certain four (4) to be completed guest rooms which are to occupy the entirety of fourth (4th) floor of the Property.

"Note" shall mean the Promissory Note evidencing the Loan dated as of even date herewith by Borrower payable to the order of Lender in the maximum principal amount of SIX MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($6,650,000.00), as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Obligors" shall mean, individually and collectively, as applicable, each of Borrower and the Guarantor.

"Operating Agreement" shall mean that certain (i) Operating Agreement dated as of March 16, 208 (in the case of Borrower known as KDA Properties LLC), as amended on or prior to the date hereof and as may hereafter be amended from time to time, and (ii) Operating Agreement dated March 23, 2018 (in the case of Borrower knowns as NATIV Denver LLC) , as amended on or prior to the date hereof and as may hereafter be amended from time to time.

"Operating Expenses" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP (or such other accounting principles acceptable to Lender), of whatever kind relating to the operation, maintenance and management of the Property), which expenditures are incurred on a regular monthly or other periodic basis, including utilities, ordinary repairs and maintenance, insurance, license fees, real estate taxes, other charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation and other non-cash items,

Debt Service, capital expenditures, asset management fees and other expenses reasonably determined by Lender to be non-recurring.

"Payment Date" shall have the meaning ascribed to such term in the Note.

"Payment Direction Letter" shall mean a written notice in a form substantially similar to the form attached hereto as **Schedule II**.

"Permitted Exceptions" shall mean the exceptions to the title of the Real Property listed on **Exhibit B** attached hereto and all Leases of the Property (approved by Lender if such approval is required) hereafter executed in accordance with the terms of the Loan Documents.

"Person" shall mean any individual, firm, corporation, business enterprise, trust, association, joint venture, partnership, governmental body or other entity, whether acting in an individual, fiduciary or other capacity.

"Personal Property" shall mean and include any and all furniture, furnishings, appliances, equipment and all fixtures (to the extent such fixtures are attached in a manner so as not to be deemed to be part of the Real Property) located at the Real Property which are or will be used or usable in connection with the ownership, development or operation of the Real Property and which are or will be owned, leased or otherwise possessed by Borrower or any of its Affiliates.

"Pledge Agreement" shall mean, individually and collectively, those certain Collateral Assignment, Pledge and Security Agreements dated of even date herewith granted by Manager in favor of Lender, as the same may be amended, restated, modified or supplemented and in effect from time to time.

"Principal Balance" shall mean the unpaid principal balance of the Loan outstanding from time to time.

"Property" shall mean the Real Property and the Personal Property and all other tangible and intangible assets benefitting or otherwise appertaining to the Improvements and the Land, including, without limitation, all of the collateral for the Loan described in the Loan Documents.

"Real Property" shall mean the Land, the Improvements and all easements and appurtenants thereto.

"Reserve Accounts" shall mean, individually and collectively, the GR Completion Reserve Account, the FF&E Reserve Account and the Tax Lien Reserve Account.

"Reserve Funds" shall mean, individually and collectively, the GR Completion Reserve Funds, the FF&E Reserve Funds, the Tax Lien Reserve Account.

"Special Purposes Entity" shall mean a limited liability company which at all times prior to, on and after the Loan Opening Date:

(a)     was, is and will be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property (and no other property), entering into this Agreement with Lender and performing Borrower's obligations under the Loan Documents, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)     has not, and without the unanimous consent of its manager and all of Borrower's members, will not (with respect to itself or to any other entity in which Borrower has a direct or indirect legal or beneficial ownership interest (without implying Lender's consent to such ownership by Borrower of such interest)) (i) take any Bankruptcy Proceeding or otherwise institute insolvency proceedings or otherwise seek any relief under any Debtor Relief Laws; (ii) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) for Borrower or for all or any portion of Borrower's property; (iii) make any assignment for the benefit of Borrower's creditors; (iv) take any action that might cause Borrower to become insolvent;

(c)     has not been, is not, and will not be engaged, in any business unrelated to the acquisition, development, ownership, leasing, management and/or operation of the Property;

(d)     has not had, does not have, and will not have, any assets other than those related to the Property;

(e)     has not engaged, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of Borrower's assets, transfer of membership interests or amendment of Borrower's articles of organization/certificate of formation (as applicable) or limited liability company operating agreement with respect to the matters set forth in this definition;

(f)     has been, is and intends to remain solvent and has paid and shall pay Borrower's debts and liabilities from Borrower's then available assets (including a fairly-allocated portion of any personnel and overhead expenses that Borrower shares with any Affiliate) as the same shall become due, and has maintained and shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of Borrower's size and character and in light of Borrower's contemplated business operations; *provided, however*, that the foregoing shall not require any Person to make capital contributions to Borrower, nor shall this clause (f) be violated because the value of the Property is less than the Principal Balance of the Loan;

(g)     has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity and has not and shall not identify itself as a division of any other Person;

(h)     has maintained and will maintain Borrower's accounts, books, balance sheets, financial statements, records, resolutions and agreements separate from any other Person and has filed and will file Borrower's own tax returns, except to the extent that Borrower has been or is required to file consolidated tax returns by law;

(i)     has not (i) commingled, and will not commingle, Borrower's funds or assets with those of any other Person; and (ii) has not participated and will not participate in any cash management system with any other Person;

(j)     has held and will hold Borrower's assets in Borrower's own name;

(k)     has conducted and shall conduct Borrower's business in Borrower's name;

(l)     has not permitted, and will not permit, Borrower's assets to be listed as assets on the financial statement of any other entity except as required by generally accepted accounting principles (or such other sound accounting principles consistently applied and reasonably acceptable to Lender); *provided, however*, that appropriate notation shall be made on any such consolidated statements to indicate Borrower's separateness from such Affiliate and to indicate that Borrower's assets and credit are

not available to satisfy the debt and other obligations of such Affiliate or any other Person and such assets shall be listed on Borrower's own separate balance sheet;

(m)      has paid and will pay Borrower's own liabilities and expenses, including the salaries of Borrower's own employees, out of Borrower's own funds and assets, and has maintained and will maintain a sufficient number of employees in light of Borrower's contemplated business operations; *provided, however,* that the foregoing shall not require any Person to make capital contributions to Borrower, nor shall this clause (m) be violated because the value of the Property is less than the Principal Balance of the Loan;

(n)      has observed and will observe all limited liability company formalities;

(o)      has had no and will have no Indebtedness other than (i) the Loan; (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the Loan, in the aggregate, which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances; and (iii) such other liabilities that are expressly permitted pursuant to this Agreement;

(p)      has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out Borrower's credit as being available to satisfy the obligations of any other Person except as expressly permitted pursuant to this Agreement;

(q)      has not acquired and will not acquire obligations or securities of Borrower's members or any Affiliate;

(r)      has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(s)      has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing Borrower's name, which stationery, invoices, and checks utilized by Borrower or utilized to collect Borrower's funds or pay Borrower's expenses have borne, shall bear Borrower's own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being Borrower's agent;

(t)      except pursuant to the Loan Documents, has not pledged and will not pledge Borrower's assets for the benefit of any other Person;

(u)      has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under Borrower's own name and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in clause (w) below of this definition, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(v)      has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(w)      has not entered into or been a party to, and will not enter into or be a party to, any transaction with Borrower's members or Affiliates, except (i) in the ordinary course of Borrower's business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to Borrower than would be obtained in a comparable arm's-length transaction with an unrelated third party; (ii) in connection with this Agreement; or (iii) capital contributions permitted under the terms of Borrower's organizational documents;

(x)      has not had and shall not have any obligation to, and has not indemnified and shall not indemnify Borrower's partners, officers, directors or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the indebtedness and shall not constitute a claim against Borrower in the event that Borrower's cash flow is insufficient to pay the indebtedness;

(y)      shall consider the interests of Borrower's creditors in connection with all limited liability company actions;

(z)      does not and will not have any of Borrower's obligations guaranteed by any Affiliate except as provided in the Loan Documents;

(aa)      has complied and will comply with all of the terms and provisions contained in Borrower's organizational documents and cause statements of facts contained in Borrower's organizational documents to be and to remain true and correct;

(bb)      has not permitted and shall not permit any Affiliate or constituent party independent access to Borrower's bank accounts except as permitted under the Loan Documents;

(cc)      except as expressly permitted under this Agreement, shall not sell, encumber or otherwise dispose of any Property necessary for the operation of the Property;

(dd)      shall have a limited liability company operating agreement that provides that Borrower shall not, without the consent of Lender, (i) dissolve, merge, liquidate, consolidate; (ii) sell all or substantially all of the assets of Borrower; or (iii) engage in any other business activity or amend Borrower's articles of organization/certificate of formation (as applicable) or other formation agreement or document in any material term or manner which adversely affects Borrower's existence as a Special Purpose Entity; and

(ee)      shall not, nor shall any member, amend, modify or otherwise change Borrower's articles of organization/certificate of formation (as applicable) or limited liability company operating agreement or other formation agreement in any material term or manner which adversely affects Borrower's existence as a Special Purpose Entity.

"State" shall mean the State of Colorado.

"Survey" shall mean the plat of survey of the Real Property as described in Section 4.2 below.

"Tax Lien Payment Date" shall mean May 31, 2020.

"Tax Lien Reserve Account" shall have the meaning set forth in Section 5.5(c) hereof.

"Tax Lien Reserve Funds" shall have the meaning set forth in Section 5.5(c) hereof.

"<u>Tax Liens</u>" shall mean, individually and collectively (as the context shall require) that certain (a) IRS tax lien in the amount of ONE HUNDRED TWENTY-THREE THOUSAND EIGHT HUNDRED THIRTY-NINE AND 98/00 DOLLARS ($123,839.98), recorded in the Official Records of Denver County on September 8, 2014, as Document No. 20142084311, (b) Colorado tax lien in the amount of TWELVE THOUSAND NINE HUNDRED THIRTY-SIX AND NO/100 DOLLARS ($12,936.00), which is the subject to that certain Denver Case No. 2016 CV 808968 filed on October 7, 2016, (c) IRS tax lien in the amount of EIGHTY-THREE THOUSAND SEVEN HUNDRED SIXTEEN AND 88/00 DOLLARS ($83,716.88), recorded in the Official Records of Denver County on June 14, 2016, as Document No. 20162053500, and (d) Colorado tax lien in the amount of EIGHT THOUSAND EIGHT HUNDRED SIXTY-TWO AND NO/100 DOLLARS ($8,862.00), which is the subject to that certain Denver Case No. 2016 CV 803460 filed on February 23, 2016.

"<u>Tenants</u>" shall mean all tenants now or hereafter occupying space within the Property pursuant to validly existing Leases.

"<u>Title Company</u>" shall mean Chicago Title Insurance Company.

"<u>Title Policy</u>" shall mean the title insurance policy described in <u>Section 4.4</u> below.

"<u>Unmatured Default</u>" shall mean an event or circumstance that with the giving of notice, the passage of time, or both, would constitute an Event of Default.

2.2     Singular and Plural Terms.  Any defined term used in the plural in any Loan Document shall refer to all members of the relevant class and any defined term used in the singular shall refer to any number of the members of the relevant class.

2.3     Accounting Principles.  Any accounting term used and not specifically defined in any Loan Document shall be construed in conformity with, and all financial data required to be submitted under any Loan Document shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis or in accordance with such other principles or methods as are reasonably acceptable to Lender.

2.4     References and Other Terms.  Any reference to any Loan Document or other document shall include such document both as originally executed and as it may from time to time be modified. References herein to Articles, Sections and Exhibits shall be construed as references to this Agreement unless a different document is named.  References to subparagraphs shall be construed as references to the same Section in which the reference appears.  The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" mean "including (include) without limitation."

3.     **COMMITMENT TO LEND**.

3.1     Loan Amount; Prepayment.  Lender agrees to lend to Borrower, and Borrower may borrow from Lender the maximum aggregate principal amount of SIX MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($6,650,000.00) for the purposes, upon the terms, and subject to the conditions contained in this Agreement.  The Loan is not a revolving facility, and Borrower shall not have the right to re-borrow any portion of the Principal Balance of the Loan repaid by Borrower. Borrower shall not have the right to prepay the Loan except in accordance with the terms of the Note.  As of the Loan Opening Date and so long as the terms and conditions set forth herein are satisfied, a portion of the Loan in the amount of SIX MILLION ONE HUNDRED FIFTY-EIGHT THOUSAND ONE

HUNDRED FORTY-FIVE AND 14/100 DOLLARS ($6,158,145.14) shall be advanced by Lender to Borrower in connection with the refinance of the Real Property and a portion of the Loan in the amount of (a) the GR Completion Reserve Funds shall be paid to Lender for deposit in the GR Completion Reserve Account, (b) the FF&E Reserve Funds shall be paid to Lender for deposit in the FF&E Reserve Account, and (c) Tax Lien Reserve Funds shall be paid to Lender for deposit in the Tax Lien Reserve Account.

3.2     Loan Advances Evidenced by Note.  The Loan Advance hereunder shall be evidenced by the Note, which shall be executed and delivered by Borrower simultaneously with the execution of this Agreement.

3.3     Calculation of Interest.  Interest shall be calculated in accordance with the terms of the Note.

3.4     Payments of Interest .  Payments of interest due under this Agreement shall be made in accordance with the terms of the Note.

3.5     Default Rate.  Upon the occurrence of an Event of Default under this Agreement or any of the other Loan Documents, and after the Maturity Date or following the acceleration of the maturity of the Loan, Lender, at its option, may, if permitted under Applicable Law, with or without notice to Borrower do one or both of the following:  (a) increase the rate of interest on the Principal Balance and any other amounts then owing by Borrower to Lender to the Default Rate until paid in full; and (b) add any unpaid accrued interest to principal and such sum shall bear interest therefrom until paid in full at the Default Rate.  The Default Rate shall also remain in effect from and after the entry of judgment entered pursuant to a decree of foreclosure.  Neither the Interest Rate nor the Default Rate shall exceed the maximum rate permitted by Applicable Law under any circumstance.

3.6     Late Charge.  If any payment under this Agreement or any other Loan Document is not made within five (5) days after such payment is due, then, in addition to the payment of the amount so due, Borrower shall pay to Lender a "late charge" equal to five percent (5.0%) of the amount of that payment.  This late charge may be assessed without notice, shall be immediately due and payable and shall be in addition to all other rights and remedies available to Lender.  Borrower agrees that the damages to be sustained by Lender for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that the amount of five cents ($0.05) for each one dollar ($1.00) due is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

3.7     Fees.  Borrower shall pay the following fees which shall be deemed fully earned by Lender when owed and shall be non-refundable to Borrower when paid:

(a)     On the Loan Opening Date, Borrower shall pay to Lender, for Lender's sole account in immediately available funds, a loan fee in the amount of NINETY-NINE THOUSAND SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($99,750.00) (the "Commitment Fee").

(b)     Upon the Maturity Date (whether by acceleration or otherwise), an Event of Default, or any partial or full prepayment of the Loan, an exit fee equal to SIXTY-SIX THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($66,500.00) shall be due from Borrower to Lender (the "Exit Fee").

(c)     Upon each and any extension of the Maturity Date in accordance with Borrower's rights under the Note, as a condition precedent to Borrower's right to exercise such extension right an extension fee equal to EIGHTY-THREE THOUSAND ONE HUNDRED TWENTY-

FIVE AND NO/100 DOLLARS ($83,125.00) shall be due from Borrower to Lender (the "Extension Fee").

(d)      Certain other fees referenced in the Note and the other Loan Documents including, without limitation, Section 3 of the Note.

4.      **CLOSING DOCUMENTS**.  Prior to the Loan Advance, Borrower shall execute and/or deliver to Lender those of the following documents and other items required to be executed and/or delivered by Borrower, and shall cause to be executed and/or delivered to Lender those of the following documents and other items required to be executed and/or delivered by others, all of which documents and other items shall contain such provisions as shall be required to conform to this Agreement and otherwise shall be satisfactory in form and substance to Lender in Lender's sole discretion:

4.1      Loan Documents.  The Loan Documents.

4.2      Survey.  A survey ("Survey") of the Land which Survey must be prepared by a registered Colorado land surveyor in accordance with the current survey standards of the American Land Title Association and American Congress on Surveying and Mapping for urban surveys.  The Survey must be certified to Borrower, Lender and the Title Company.  The Survey must satisfy all of Lender's current standards for surveys, as delivered by Lender to Borrower, and include such additional information as may be required by the Title Company to provide survey coverage in the Title Policy.

4.3      Insurance.  The policies of insurance as provided in the Mortgage and as required pursuant to **Exhibit C** attached hereto.

4.4      Title Insurance Policy.  An ALTA 2006 Loan Policy of Title Insurance (the "Title Policy") issued by the Title Company in the full amount of the Note insuring that the Mortgage will be a first priority lien upon the fee simple title to the Real Property to the extent of advances of the Loan made by Lender from time to time under this Agreement, subject to no liens, claims, exceptions or encumbrances except the Permitted Exceptions and endorsements as may be reasonably required by Lender based upon its review of the Title Policy and Survey.

4.5      Title Clearance Documents.  Copies of such documents, if any, as Borrower has provided the Title Company in connection with the issuance and underwriting of the Title Policy.

4.6      Recorded Documents.  Copies of all recorded documents described in the Title Policy.

4.7      Searches.  Current Uniform Commercial Code, federal and state tax lien and judgment searches, pending suit and litigation searches and bankruptcy court filings searches covering each Obligor, and all other Persons owning a twenty percent (20%) direct or indirect interest in Borrower and disclosing no matters objectionable to Lender (individually and collectively, the "Searches").

4.8      Opinion of Counsel.  An opinion letter from legal counsel for Borrower and Guarantor (which counsel must be approved by Lender with respect to the issuance of such opinion) opining to the authority of said parties to execute, deliver and perform their respective obligations under the Loan Documents, to the validity and binding effect and enforceability of the Loan Documents and to such other matters as Lender and its counsel shall require.

4.9      Flood Plain.  Lender shall have received evidence that the Property is not situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973,

as amended, or designated as a wetlands by any governmental entity having jurisdiction over the Property.

4.10     Leases.  Certified copies of each of the Leases, if any.

4.11     Service Contracts.  Certified copies of all service contracts, development agreements and other agreements affecting the use, development or operation of the Property, if any.

4.12     Environmental Report.  Lender shall have received an Environmental audit of the Property from a consultant acceptable to Lender in its sole discretion.  The audit shall (i) be addressed to Lender; (ii) state that Lender may rely thereon; and (iii) be acceptable to Lender in its sole discretion.

4.13     Financial Conditions.  Evidence that, as of the date of the Loan Advance, there has been no material adverse change in the financial or other projections for the Property, the physical condition of the Property or the financial condition of Borrower or Guarantor since the date of the most recent financial statements or projections delivered to Lender or the most recent inspections of the condition of the Property made by the Lender, as the case may be.

4.14     Organizational Documents.  A certified copy (certified, where applicable, by the state office in which such documents were filed, and in all other cases by an appropriate representative of the entity) of:

(a)     The Operating Agreement for Borrower (in the case of Borrower known as KDA Properties LLC);

(b)     The Operating Agreement for Borrower (in the case of Borrower known as NATIV Denver LLC);

(c)     The Articles of Organization of Borrower;

(d)     Each entity whose authorization is necessary to authorize the execution, delivery and performance of the Loan Documents, or whose authorization is necessary to authorize any other entity whose authorization is necessary in respect thereto, certified by the appropriate officer or representative.  For purposes hereof, Borrower, Manager, Borrower's other members, such members' managers and members, and all such other entities are referred to herein below as the "Constituent Entities";

(e)     Resolutions by the applicable Constituent Entities authorizing the execution and delivery of the documents evidencing and securing the Loan, certified by an appropriate representative of the Constituent Entities;

(f)     An incumbency certificate, including specimen signatures for all individuals executing any of the Loan Documents, for each Constituent Entity executing any of the Loan Documents, certified by the secretary or other appropriate representative of such entity;

(g)     Certificates of existence for all limited partnerships and certificates of good standing for all corporations or limited liability companies that are Constituent Entities from their state of formation, and, if Borrower or any such other entity was not formed in the State of Illinois, a certificate of good standing or existence, as applicable, from the State of Illinois; and

(h)     All other instruments and documents concerning the formation and existence of the Constituent Entities, and the execution and delivery of the Loan Documents by the Constituent Entities, required by Lender.

4.15    Additional Documents.  Such other papers and documents regarding Borrower, Manager and the other members and managers of Borrower, such members' managers and members, or the Property as Lender may require in Lender's sole discretion.

5.    **DISBURSEMENT OF THE LOAN**.

5.1    Conditions Precedent in General.  In addition to the other conditions set forth herein, the obligation of Lender to make the Loan Advance under this Agreement shall be conditioned upon and subject to the payment to Lender of all loan fees then owing from Borrower to Lender and to satisfaction of all of the following conditions:

(a)    All representations and warranties contained in this Agreement and in the other Loan Documents shall be true in all material respects on and as of the date of such disbursement.

(b)    Borrower shall have performed all of its obligations under all Loan Documents which are required to be performed on or prior to the date of such disbursement.

(c)    There shall be no material adverse change in the financial condition of Borrower or Guarantor as reasonably determined by Lender.

(d)    No Event of Default shall have occurred that has not been waived in writing by Lender, and no Unmatured Default or occurrence which could rise to the level of an Event of Default shall then exist.

(e)    No litigation or proceedings are pending or threatened (including proceedings under Title 11 of the United States Code) against Borrower, Guarantor or the Property, which litigation or proceedings, in the reasonable judgment of Lender, would adversely affect Borrower's or Guarantor's ability to perform its respective obligations under the Loan Documents.

5.2    Conditions Precedent to Disursement from the Reserve Accounts.

(a)    Conditions Precedent to Disbursement from the GR Completion Reserve Account.  In addition to the other conditions set forth herein, prior to any disbursement from the GR Completion Reserve Account, Borrower shall execute and/or deliver to Lender those of the following documents and other items required to be executed and/or delivered by Borrower (as applicable), and shall cause to be executed and/or delivered to Lender those of the following documents and other items required to be executed and/or delivered by others, all of which documents and other items shall contain such provisions as shall be required to conform to this Agreement and otherwise shall be satisfactory in form and substance to Lender in Lender's sole discretion:

(i)    Evidence satisfactory to Lender that the Completion of Construction has occurred; and

(ii)    To the extent not delivered on or prior to the Loan Opening Date, a fully executed original of the (x) Deposit Account Control Agreement for the Deposit Account 1, and (y) Deposit Account Control Agreement for the Deposit Account 2.

(b)    Conditions Precedent to Disbursement from the FF&E Reserve Account.  In addition to the other conditions set forth herein, prior to any disbursement from the FF&E Reserve Account, Borrower shall execute and/or deliver to Lender those of the following

15

documents and other items required to be executed and/or delivered by Borrower (as applicable), and shall cause to be executed and/or delivered to Lender those of the following documents and other items required to be executed and/or delivered by others, all of which documents and other items shall contain such provisions as shall be required to conform to this Agreement and otherwise shall be satisfactory in form and substance to Lender in Lender's sole discretion:

(i)        Contracts/Subcontracts.  Certified copies of each contract (and, if applicable, subcontract) for the purchase and installation of FF&E then in effect and, to the extent applicable, all licenses, permits and governmental approvals necessary for the installation of the FF&E, the use or operation thereof.

(ii)       Plans and Secifications.   To the exent applicable, all plans and specifications approved in writing by any governmental agency.

(iii)      Service Contracts.   Certified copies of all service contracts (if any) affecting the use or operation of the FF&E.

(iv)      Certificates.   Certificates executed by any parties providing construction/installation services in connection with the construction of the FF&E.

(c)       Conditions Precedent to Disbursement from the Tax Lien Reserve Account.  In addition to the other conditions set forth herein, prior to any disbursement from the Tax Lien Reserve Account, Borrower shall execute and/or deliver to Lender those of the following documents and other items required to be executed and/or delivered by Borrower (as applicable), and shall cause to be executed and/or delivered to Lender those of the following documents and other items required to be executed and/or delivered by others, all of which documents and other items shall contain such provisions as shall be required to conform to this Agreement and otherwise shall be satisfactory in form and substance to Lender in Lender's sole discretion:

(i)        Demand Letter.  A demand letter from the applicable Governmental Agency reflecting the total amount owed to such Governmental Agency, together with payment instructions for payment of amounts owed to such Governmental Agency.

(ii)       Releases.  Release(s) of the liens in favor of the applicable Governmental Agency executed and, if applicable, acknowledged by such Governmental Agency, and in form and substance acceptable to Lender, together with (x) a commitment from such Governmental Agency to file/record, as applicable, such releases, or (y) approval to file/record, as applicable, such releases.

(d)       Use of Reesrve Funds; Inspections of the Work.  The Reserve Funds disbursed to Borrower shall be used by Borrower:  (a) with respect to the GR Completion Reserve Funds, solely for the purpose of paying (or reimbursement to others for payment of) the GR Completion Work actually incurred by Borrower, (b) with respect to the FF&E Reserve Funds, solely for the purpose of paying (or reimbursement to other for payment of) the FF&E and the construction/installation thereof, and (C) with respect to the Tax Lien Reserve Funds, solely for the payment in full of the Tax Liens.  Notwithstanding anything contained in this Agreement to the contrary, all inspections of the GR Completion Work and the construction/installation of the FF&E, if any, made by Lender, or its respective agents, employees and designees shall be solely for Lender's own information and shall not be deemed to have been made for or on account of Borrower or any other party.  Borrower hereby specifically relieves Lender of any and all liability or responsibility relating in any way whatsoever to the construction of the GR Completion Work

and the construction/installation of the FF&E, including but not limited to, the work thereof, the material or labor supplied in connection therewith, and any errors, inconsistencies or other defects in the Property.

(e)     Disbursement Requests.

(i)     No amount shall be disbursed by Lender from the Reserve Accounts at Closing. Borrower shall request and Lender shall be required to disburse the Reserve Funds from the Reserve Accounts (in the applicable requested amount) not more frequently than once each calendar month between the 1st and 10th of that calendar month and not more than five (5) times during the term of the Loan. Lender may at any time take such action as it deems appropriate to verify that the conditions precedent to each disbursement from the applicable Reserve Account has been satisfied, including, without limitation, verification of any amounts due under any contract. Borrower agrees to cooperate with Lender in any such action. If in the course of any such verification, any amount shown on any contract or subcontract entered into in connection with the performance of the GR Completion Work and/or the purchase/construction/installation of the FFE, or any application for payment, sworn statement or waiver of lien is subject to a possible discrepancy, such discrepancy shall be resolved by Borrower to Lender's satisfaction. Each request for a disbursement shall be made in writing within ten (10) Business Days of the requested date of disbursement, in a disbursement request in the form satisfactory to Lender (the "Disbursement Request"). Upon Lender's receipt of Disbursement Request from Borrower for a disbursement from the GR Completion Reserve Account and/or the FF&E Reserve Account, Lender will have the opportunity to inspect the Property prior to the processing of the Disbursement Request (each a "Draw Inspection"). With each Disbursement Request for a disbursement from the GR Completion Reserve Account and/or the FF&E Reserve Account, Borrower will deliver to Lender the sum of One Thousand Five Hundred Dollars and No/100 ($1,500.00) as and for the cost related to the Draw Inspection (individually and collectively, the "Inspection Payment"). Each Disbursement Request shall be deemed to be Borrower's direction to Lender to disburse the funds requested by such Disbursement Request to be disbursed from the proceeds of the Loan in accordance with this Agreement, specifying in detail the amount and mode of each disbursement and accompanied by the following, all in form and substance satisfactory to Lender:

(1)     An owner's sworn statement from Borrower and Disbursement Request;

(2)     If applicable and/or requested by Lender, a contractor's application for payment and a sworn statement from the contractor or any applicable subcontractor, and a statement of a duly authorized officer of such Person that all items of construction cost are for the GR Completion Work or the purchase/construction/installation of the FF&E, as applicable, have been incorporated into the Property in accordance with the Applicable Laws, together with waivers of lien with respect to the current disbursement and all previous disbursements from the contractor and all subcontractors and materialmen to whom payment is to be made, as are required by the Title Company as a condition to issuing a date-down endorsement pursuant to Section (d)(i)(3)(3) below;

17

(3)      If required by Lender: endorsements to the Title Policy to cover the amount and date of the disbursement insuring that the Mortgage is a first, prior and paramount lien on the Property subject only to Permitted Exceptions, that nothing has intervened to affect the validity or priority of the Mortgage, insuring against mechanics' lien claims for work performed prior to the date covered by such continuation, and containing a mechanics' lien interim certification to cover the amount of the Loan then disbursed (including the current disbursement); which endorsements may be delivered to Lender concurrently with the disbursement of the proceeds of the Loan which are the subject of the endorsements;

(4)      If applicable, copies of any change orders to the contracts and subcontracts not theretofore delivered to Lender;

(5)      Such other documents, assignments, certificates and opinions as are required by the Title Company, or as may be reasonably required by Lender; and

(6)      If applicable, the required Inspection Payment.

(f)      Lender's Verification of Contracts.  Prior to the Loan Opening Date, and from time to time thereafter, Lender or the Title Company may forward to the contractor and any or all subcontractors listed on any such Person's sworn statement a contract verification to confirm the terms and amount of the applicable contract or subcontract for the contractor and each subcontractor.  If there is any discrepancy between the terms and amounts as shown by any contract, any subcontract, such Person's sworn statement and any other verifications, Lender may require, as a condition to authorizing further disbursements, that such discrepancies be eliminated to its satisfaction.  Borrower hereby consents to Lender contacting contractor and subcontractors to verify the current status of the contracts and subcontracts, and may make any other inquiries reasonably required by Lender.

(g)      Certifications, Representations and Warranties. Each request for disbursement by Borrower shall constitute (a) Borrower's certification that the representations and warranties contained in Article 6 below are true and correct in all material respects as of the date of such request, (b) Borrower's certification that Borrower is in compliance with the conditions contained in this Article 5, and (c) Borrower's representation and warranty to Lender, with respect to the GR Completion Work and the FF&E, materials and other items for which payment is requested that (as applicable) (i) such work and materials have been incorporated into the Property, free and clear of liens, claims and encumbrances, (ii) the value thereof is as estimated therein, (iii) such work and materials substantially conform to the terms of this Agreement and all Applicable Laws, and (iv) the requisitioned value of such work and materials and the amounts of all other items of cost for which payment is requested by Borrower have theretofore been in fact paid for in cash by Borrower or the same are then due and owing by Borrower and (unless Lender disburses funds directly to the parties performing the work or to the Title Company) will in fact be paid in cash by Borrower within five (5) days after Borrower's receipt of the requested disbursement.  Neither review nor approval by Lender of requests for disbursement or any information contained therein or any other information provided to Lender in accordance with the other provisions of this Article 5 shall constitute the acceptance or approval by Lender of any portion of the work or materials.

(h)     Amount of Disbursements.  Subject to the other conditions and limitations set forth herein, the amount of each disbursement shall be the amount requested by Borrower; provided, however, that in no event shall Lender be obligated to disburse amounts (in the aggregate) in excess of the Reserve Funds allocated to such    work and/or materials. Notwithstanding anything to the contrary set forth herein, Lender has the right, in its sole and absolute discretion, to decline a Disbursement Request and the disbursement set forth in such Disbursement Request for any soft costs found to be unreasonable, in Lender's sole and absolute discretion.  In addition, Borrower and/or its affiliates shall not be paid unless Lender is first informed in writing that a disbursement is being delivered to a third party and Lender first approves such disbursement.

(i)     Costs. For purposes of this Agreement: (a) the cost of labor and material (except stored and unincorporated materials) furnished for the work shall be deemed to be incurred by Borrower when the labor and material have been incorporated into the Property and the payment therefor is due and payable, (b) the cost of stored and unincorporated materials shall be deemed to be incurred by Borrower when such materials are purchased by Borrower, (c) the cost of services shall be deemed to be incurred by Borrower when the services are actually rendered and the payment therefor is due and payable, and (d) any other costs shall be deemed to be incurred by Borrower when the payment therefor is due and payable, but not before the value to be received in return for such cost has been received by Borrower.

(j)     Application of Disbursements.

(i)     Lender shall make each requested disbursement of the Reserve Funds to Borrower within ten (10) days after all of the conditions precedent to such disbursement set forth in this Article have been satisfied (including delivery of all documentation required hereuunder), except that Lender, in its discretion, may make payments  directly to Borrower or to the Person or entity Lender determines is entitled to such payment or jointly to Borrower and such Person or entity.

(ii)     Notwithstanding the foregoing, Lender shall not be responsible, liable or obligated to any contractor or aubcontractors, suppliers, materialmen, laborers, architects, engineers, or any other parties, for services or work performed, or for goods delivered by them or any of them, in and upon the Land or employed directly or indirectly in the performance of the work, or for any debts or claims whatsoever accruing in favor of any such parties and against Borrower or others, or against the Property.  It is expressly understood and agreed that Borrower is not and shall not be an agent of Lender for any purpose whatsoever.  Without limiting the generality of the foregoing, advances made at Lender's option, directly to any contractor, subcontractor or supplier of labor or materials, or any other party, shall not be deemed a recognition by Lender of any third party beneficiary status of any such person or entity.

(iii)     Borrower covenants and agrees that it shall receive all disbursement from the Reserve Accounts as a trust fund and that Borrower shall use said funds solely for which such Loan proceeds were requested by Borrower, and for no other purpose whatsoever; however, nothing herein shall impose upon Lender any obligation whatsoever to see to the proper application of any such monies by Borrower.

(iv)     Whenever so requested by Lender, Borrower shall promptly furnish Lender written evidence reasonably satisfactory to Lender that all monies theretofore advanced by Lender pursuant to this Agreement have actually been paid or applied in

payment of the GR Completion Work, the purchase/construction/installation of the FFE for which such funds were advanced by Lender, the payment of the Tax Liens, and until such evidence is produced, at the option of Lender, no future or additional payments or advances of Loan funds need be made hereunder.

(k)     Completion Date. Borrower acknowledges and agrees that: (a) the GR Completion Work shall be completed no later than the Completion Date (subject to any extension approved in writing by the Lender in its sole and absolute discretion); and (b) if the GR Completion Work is not completed prior to the Completion Date, then Lender shall no longer be obligated to disburse any additional proceeds from the GR Completion Reserve Account and no further GR Completion Reserve Funds shall otherwise be available to Borrower after such time (except as otherwise agreed to in writing by Lender in its sole and absolute discretion).

(l)     Tax Liens Payment Date. Borrower acknowledges and agrees that (a) all of the Tax Liens shall be paid in full on or the Tax Lien Payment Date, and (b) if all of the Tax Liens are not paid in prior to the Tax Lien Payment Date, then Lender shall no longer be obligated to disburse any additional proceeds from the Tax Lien Reserve Account and no further Tax Lien Reserve Funds shall otherwise be available to Borrower after such time (except as otherwise agreed to in writing by Lender in its sole and absolute discretion).

(m)     Lender's Representatives.  Lender, at Borrower's expense, shall have the right to engage personnel in connection with the negotiation, documentation, administration and servicing of the Loan, and Lender shall disclose all information necessary (and for which Borrower hereby waives any rights to privacy or confidentiality Borrower may have with respect to such matters) for such personnel to (i) conduct monthly inspections of the work and report on the progress of construction thereof, (ii) review and approve all change orders, (iii) review and approve applications for disbursements and accompanying documents, (iv) issue reports and certificates to Lender, (v) determine whether the work has been completed in accordance with the terms hereof, and (vi) provide other services as requested by Lender.

(n)     Stored and Unincorporated Materials. No disbursement for materials purchased by Borrower but not yet installed or incorporated into the Property shall be made without Lender's prior approval of the conditions under which such materials are purchased and stored. In no event shall any such disbursement be made unless the materials involved have been delivered to the Land or stored with a bonded warehouseman, with satisfactory evidence of security, insurance both during storage and transit and suitable storage.  Borrower shall provide Lender, in connection with such materials, a copy of a bill of sale or other evidence of title in Borrower, together with a copy of UCC searches against Borrower and the warehouseman, if applicable, indicating no liens or claims which may affect such materials.  Borrower shall provide Lender, any architect and any applicable governmental agency or testing authority having jurisdiction over the Proeprty with access to inspect, test or otherwise examine such stored and unincorporated materials.

5.3     Acquiescence not a Waiver.  To the extent that Lender may have acquiesced (whether intentionally or unintentionally) in Borrower's failure to comply with and satisfy any condition precedent to the Loan Advance or any subsequent disbursement of Reserve Funds from the Reservee Accounts, such acquiescence shall not constitute a waiver by Lender of any condition precedent set forth in this Agreement (unless Lender shall have agreed to the contrary in writing), and Lender at any time thereafter may require Borrower to comply with and satisfy all conditions and requirements of this Agreement.

5.4     No Liability for Disbursements. Under no circumstances shall Lender be responsible or liable to any Person, including without limitation Borrower, for or on account of any disbursement of, or failure to disburse, the proceeds of the Loan or any part thereof. The forgoing shall be in addition to all other limitations on the responsibility and liability of Lender set forth in this Agreement.

5.5     Reserves. Lender may establish and set aside out of the undisbursed proceeds of the Loan, reserves (the "Loan Reserves") in such amounts as may be reasonably estimated by Lender from time to time to provide for payment of items as the same may accrue or become payable prior to the repayment in full of the Loan. Amounts set aside as Loan Reserves shall not be available for disbursement to Borrower for any purpose other than payment of the item or group or items for which the Loan Reserve was established. Based upon the facts then available to Lender, Lender may adjust and reallocate the amount of any Loan Reserves from time to time. Items for which Loan Reserves may be established shall include, but are not limited to: (i) Loan Expenses, (ii) real estate taxes and assessments, (iii) premiums on insurance policies and bonds (if any) required to be furnished by Borrower hereunder (iv) leasing commissions, if applicable, and (v) contingencies. Borrower hereby acknowledges that, as of the Loan Opening Date, the GR Completion Reserve and the FF&E Reserve have been established as more fully set forth below in this Section 5.5.

(a)     GR Completion Reserve. On the Loan Opening Date, Borrower shall establish with Lender a guest room completion reserve (the "GR Completion Reserve Account") and pay (from the Loan Advance) a deposit into the GR Completion Reserve Account an amount equal to ONE HUNDRED SIXTY-TWO THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($162,500.00) (the "GR Completion Reserve Funds"), on account of the reimbursement of the costs and expenses of constructing certain reservations (the "GR Completion Work"). Interest shall accrue on the GR Completion Reserve Funds as of the Loan Opening Date. After commencement of any portion of the Guest Room Completion Work, Borrower shall cause the GR Completion Work to be diligently prosecuted and completed, performed, remediated and corrected in a lien-free (except for Permitted Exceptions) and in a good and workman-like manner (all to the reasonable satisfaction of Lender) on or before the Completion Date. Borrower hereby grants to Lender a power of attorney, coupled with an interest, to cause the GR Completion Work to be completed, performed, remediated and corrected to the satisfaction of Lender upon Borrower's failure to do so in accordance with the terms and conditions of this Agreement, and to apply the GR Completion Reserve Funds to the costs and expenses associated therewith, all as Lender may determine in Lender's absolute discretion but without obligation to do so. Notwithstanding anything contained herein, nothing in this Section 5.5(a) shall (i) make Lender responsible for performing or completing any GR Completion Work; (ii) require Lender to expend funds in addition to the GR Completion Reserve Funds to complete any GR Completion Work; (iii) obligate Lender to proceed with any GR Completion Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any of the GR Completion Work.

(i)     Other. The GR Completion Reserve Account is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment (or reimbursement) of the costs and expenses of constructing the GR Completion Work in accordance with the terms and conditions of Section 5.5(a) hereof, and beyond the allowing of due credit for the sums actually received.

(ii)     No Release from Obligations. Nothing contained herein, including the insufficiency of the GR Completion Reserve Funds, shall release Borrower of Borrower's obligation to construct the GR Completion Work in a good and workmanlike manner and

strictly in accordance with the terms and conditions of the Loan Documents and all Applicable Laws.

(b)     FF&E Reserve.  On the Loan Opening Date, Borrower shall establish with Lender a replacement reserve (the "FF&E Reserve Account") and pay (from the Loan Advance) a deposit into the FF&E Reserve Account an amount equal to ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "FF&E Reserve Initial Deposit") on account of the reimbursement of the costs and expenses of purchasing furniture, fixtures and equipment (expressly excluding any furniture fixture or equipment for the New Guest Rooms) (the "FF&E"). Commencing on December 1, 2020 and on each Payment Date thereafter, Borrower shall pay to Lender the FF&E Reserve Monthly Deposit for deposit into the FF&E Reserve Account (the FF&E Reserve Initial Deposit, together with theFF&E Reserve Monthly Deposit paid to Lender pursuant to the terms hereof are collectively referred to herein as the "FF&E Reserve Funds"). Interest shall accrue on the FF&E Reserve Initial Deposit as of the Loan Opening Date. Borrower hereby grants to Lender a power of attorney, coupled with an interest, to purchase such FF&E upon Borrower's failure to do so in accordance with the terms and conditions of this Agreement, and to apply the FF&E Reserve Funds to the costs and expenses associated therewith, all as Lender may determine in Lender's absolute discretion but without obligation to do so. Notwithstanding anything contained herein, nothing in this Section 5.6(b) shall (i) make Lender responsible for purchasing the FF&E; (ii) require Lender to expend funds in addition to the FF&E Reserve Funds to purchase the FF&E; (iii) obligate Lender to proceed with any FF&E purchases; or (iv) obligate Lender to demand from Borrower additional sums to complete the purchase of the FF&E.

(i)     Other. The FF&E Reserve Account is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment (or reimbursement) of the costs and expenses of purchasing the FF&E in accordance with the terms and conditions of Section 5.6(b) hereof, and beyond the allowing of due credit for the sums actually received.

(ii)    No Release from Obligations. Nothing contained herein, including the insufficiency of the FF&E Reserve Funds, shall release Borrower of Borrower's obligation to purchase the FF&E strictly in accordance with the terms and conditions of the Loan Documents and all Applicable Laws.

(iii)   FF&E Reserve Account Shortfall. Notwithstanding anything contained herein, (x) in the event (at any time and from time to time during the period commencing on April 1, 2020 though and including January 31, 2021) the FF&E Reserve Funds then on deposit in the FF&E Reserve Account are less than ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00), Borrower shall (not later than ten (10) days after Lender's request therefor) pay to Lender (for deposit into the FF&E Reserve Account) an amount equal to four percent (4%) of the Gross Income from Operations until such time as the balance of FF&E Reserve Funds in the FF&E Reserve Account is equal to ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00), and (y) in the event (at any time and from time to time from and after February 1, 2021) the FF&E Reserve Funds then on deposit in the FF&E Reserve Account are less than ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00), Borrower shall (not later than ten (10) days after Lender's request therefor) pay to Lender (for deposit into the FF&E Reserve Account) an amount equal to four percent (4%) of the Gross Income from Operations until such time as the balance of FF&E Reserve Funds in

the FF&E Reserve Account is equal to ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00).

(c)     Tax Lien Reserve.  On the Loan Opening Date, Borrower shall establish with Lender a tax lien reserve (the "Tax Lien Reserve Account") and pay (from the Loan Advance) a deposit into the Tax Lien Reserve Account an amount equal to TWO HUNDRED TWENTY-NINE THOUSAND THREE HUNDRED FIFTY FOUR AND 86/100 DOLLARS ($229,354.86) on account of the payment of the Tax Liens (the "Tax Lien Reserve Funds").  Interest shall accrue on the Tax Lien Reserve Funds as of the Loan Opening Date. Borrower hereby grants to Lender a power of attorney, coupled with an interest, to pay the Tax Liens in accordance with the terms and conditions of this Agreement and the other Loan Documents, and to apply the Tax Lien Reserve Funds in payment thereof, all as Lender may determine in Lender's absolute discretion but without obligation to do so.  Notwithstanding anything contained herein, nothing in this Section 5.6(c) shall (i) make Lender responsible for paying the Tax Liens; (ii) require Lender to expend funds in addition to the Tax Lien Reserve Funds inpayment of the Tax Liens; (iii) obligate Lender to proceed with the payment of the Tax Liens; or (iv) obligate Lender to demand from Borrower additional sums to complete the payment of the Tax Liens.

(i)     Other. The Tax Lien Reserve Account is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment (or reimbursement) of Tax Liens in accordance with the terms and conditions of Section 5.6(c) hereof, and beyond the allowing of due credit for the sums actually received.

(ii)     No Release from Obligations. Nothing contained herein, including the insufficiency of the Tax Lien Reserve Funds, shall release Borrower of Borrower's obligation to pay the Tax Liens in full and strictly in accordance with the terms and conditions of the Loan Documents and all Applicable Laws.

5.6     Deposit Account; Cash Management.

(a)     Borrower shall establish and maintain the Deposit Account in Borrower's name (which "deposit account" shall constitute a deposit account within the meaning of the UCC) with the Deposit Bank in trust for the benefit of Lender, and notify Lender of the account number thereof. Funds deposited into the Deposit Account shall not be commingled with other monies held by Borrower or Deposit Bank. At no time during the term of the Loan shall Borrower in any way alter, modify or close the Deposit Account.

(b)     To secure all of the Obligations, Borrower hereby unconditionally and irrevocably assigns and pledges to Lender, and hereby grants to Lender a security interest in, (i) the Deposit Account, money deposited therein, all interest and other income earned thereon and any other reserve or escrow account established pursuant to the terms hereof or of any other Loan Document, (ii) all insurance on said Deposit Account, (iii) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (iv) all replacements, substitutions or proceeds thereof, (v) all instruments and documents now or hereafter evidencing the Deposit Account or such accounts, (vi) all powers, options, rights, privileges and immunities pertaining to the Deposit Account (including the right to make withdrawals therefrom) and (vii) all replacements, substitutions and all proceeds (as defined in the UCC) of the foregoing.

(c)     Pursuant and subject to the terms hereof and of the other Loan Documents, Borrower agrees that the Deposit Bank shall comply with all instructions originated by Lender,

without further consent by Borrower, directing disposition of the Deposit Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities.

(d)     Borrower shall deposit all items of Rents received by Borrower and all other receipts related to or arising from the Property into the Deposit Account (including but not limited to all insurance proceeds and condemnation proceeds) no later than the first (1st) Business Day immediately following Borrower's receipt thereof. Furthermore, upon the written request of Lender at any time that a Cash Trap Period exists, Borrower shall execute and deliver (i) to all other Persons who collect Rents on behalf of or for the benefit of Borrower (including any parking operators and parking managers at the Property) written notice, in form and content reasonably acceptable to Lender, directing all such Persons to deposit all items of Rents received by such Persons directly into the Deposit Account, and (ii) to A all Tenants, Payment Direction Letters, directing all such Tenants to deposit all Rents payable pursuant to Leases and other items of Rent from such Tenants directly into the Deposit Account  and (B) all Credit Card Companies, the Credit Card Direction Letters, directing all such Credit Card Companies to deposit all Rents directly into the Deposit Account. In furtherance of the forgoing, on the Closing Date, Borrower shall execute and deliver to Lender a Payment Direction Letter (in blank) and a Credit Card Direction Letter (in blank), which shall be delivered by Lender to the Tenants and Credit Card Companies, as applicable, in the event Borrower fails to deliver to Lender evidence (satisfactory to Lender) that Borrower has delivered the same in accordance with the terms of the immediately preceding sentence.

(e)     Borrower shall not further pledge, assign or grant any security interest in the Deposit Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f)     Borrower shall indemnify Lender and Deposit Bank and hold Lender and Deposit Bank harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and costs) arising from or in any way connected with the Deposit Account, the Deposit Account Control Agreement or the performance of the obligations for which the Deposit Account was established (unless arising from the gross negligence or willful misconduct of Lender or Deposit Bank, as applicable).

(g)     Until the occurrence of a Cash Trap Period, Borrower shall, subject to the provisions of this Agreement and the other Loan Documents, have full right of access to and the right to withdraw funds from the Deposit Account and otherwise administer the Deposit Account; *provided, however*, that prior to any other payment from such funds, Borrower shall apply (or cause to be applied) the funds in the Deposit Account to the payment of the following items in the order indicated: (i) first, to the payment to Deposit Bank of the fees and expenses of the Deposit Bank then due and payable pursuant to the terms of the Deposit Account Control Agreement; (ii) second, to the payment of budgeted and approved operating expenses due and payable by Borrower and any extraordinary expenses, if any, approved by Lender; (iii) third, to the payment to Lender of the monthly payment of interest; (iv) fourth, to the payment to Lender of the amounts to be deposited into the FF&E Reserve Account (in that order) pursuant to the terms hereof; (v) fifth to the payment to Lender of all other amounts then due and payable under the Loan Documents; and (vi) sixth, all amounts then remaining after payment of items (i) through (v), if any (such amounts hereinafter being referred to as "Excess Cash") to Borrower. From and

after the occurrence of a Cash Trap Period and during the continuance of a Cash Trap Period, Borrower shall not have any right to withdraw or direct payment of funds from the Deposit Account or otherwise administer the Deposit Account, and all funds in the Deposit Account shall be disbursed as hereinafter provided, until the expiration of the applicable Cash Trap Period.

(h)      Provided no Default or Event of Default shall have occurred and be continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the next Business Day) during a Cash Trap Period, Borrower authorizes Lender to withdraw all funds on deposit in the Deposit Account and apply such funds to the payment of the following items in the order indicated:

(i)      first, to the payment to Deposit Bank of the fees and expenses of the Deposit Bank then due and payable pursuant to the terms of the Deposit Account Control Agreement;

(ii)      second, to the payment of budgeted and approved operating expenses due and payable by Borrower and any extraordinary expenses, if any, approved by Lender;

(iii)      third, to the payment to Lender of the monthly payment of interest;

(iv)      fourth, to the payment to Lender of the amounts to be deposited into the FF&E Reserve Account pursuant to the terms hereof;

(v)      fifth, to the payment to Lender of all other amounts then due and payable under the Loan Documents; and

(vi)      sixth, all Excess Cash, if any, to Borrower.

The foregoing withdrawals and payments shall be made only to the extent that funds are on deposit in the Deposit Account and Lender shall have no responsibility to make additional funds available if funds on deposit are insufficient. The insufficiency of funds on deposit in the Deposit Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(i)      From and after the occurrence of an Event of Default, Lender shall have all of the remedies provided in this Agreement and otherwise, including the right to withdraw all funds from the Deposit Account and make any payments in any order of priority, all in Lender's discretion, including applying any or all sums in the Deposit Account to any amounts due under or in respect of the Loan, all in such order and proportions as Lender may elect, after deducting all reasonable costs and expenses of every kind incurred with respect to the Deposit Account and the other collateral pledged by this Agreement or in any way relating to the rights of Lender hereunder (including reasonable attorneys' fees and costs), Borrower remains liable for any deficiency remaining unpaid after such application, and only after such application and after the payment by Lender of any other amount required by any provision of law, is Lender required to account for the surplus, if any, to Borrower.

(j)      In addition to the rights and remedies granted to Lender in this Agreement and in any other Loan Document, Lender shall have all the rights and remedies of a secured party under the UCC and all rights and remedies under other applicable law and at equity, all such rights, and

remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as Lender deems expedient. To the extent permitted by applicable law, Borrower waives all claims, damages and demands against Lender arising out of the retention, application or sale of all or any portion of the Collateral pledged hereby. To the extent that the UCC applies to any collateral pledged hereunder, Borrower agrees that Lender need not give more than ten (10) days' notice to Borrower of the time and place of any public sale of such collateral or of the time after which a private sale of such collateral may take place and that such notice is reasonable notification of such matters. Borrower hereby waives presentment, demand, protest and any notice (to the extent permitted by applicable law) of any kind in connection with this Agreement or all (or any portion) of the Collateral pledged hereunder. Borrower further waives and agrees not to assert any rights or privileges that Borrower may acquire under any Section of the UCC.

(k)     Borrower hereby irrevocably and unconditionally appoints Lender the attorney-in-fact of Borrower, coupled with an interest, to process all Rents during the existence of a Cash Trap Period, including, but not limited to, checks, drafts, cash, money orders and other remittances, received by Lender which designate as payee Borrower, any of Borrower's Affiliates, any of Borrower's respective partners, employees, agents or nominees, Lender, or any name or names which, in Lender's sole judgment, resemble any such names. Lender shall process and forward for presentment all such Rents and deposit any cash items into the Deposit Account (the items which are processed and forwarded for presentment by Lender are referred to hereinafter as "Items of Payment"). Lender shall endorse all Items of Payment in such form as Lender may deem necessary. In addition, Borrower hereby irrevocably and unconditionally appoints Lender Borrower's attorney-in-fact, coupled with an interest, to execute any documents and instruments required, in Lender's judgment, to reflect the restrictions provided for in this Agreement which are applicable to the Deposit Account or to effect, further or confirm the purposes of this Agreement. The Deposit Account Control Agreement and Deposit Account shall remain in effect until the payment and performance in full of the Obligations.

6.     **REPRESENTATIONS AND WARRANTIES**.  In order to induce Lender to execute this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows:

6.1     Formation, Qualification and Compliance.

(a)     Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the Colorado.  Borrower has full power and authority to conduct its business as presently conducted, to refinance the Property, to enter into this Agreement, the other Loan Documents to which it is a party and to perform all of its duties and obligations under this Agreement and such other Loan Documents.  Such execution and performance have been duly authorized pursuant to the Operating Agreement and Borrower's Articles of Organization.

(b)     Manager has the full power and authority to enter into any Loan Documents to which he is a party and to perform all of his duties and obligations under such Loan Documents; to serve as the manager of Borrower, and to perform all of his duties and obligations under the Operating Agreement.

6.2     Execution and Performance of Loan Documents.

(a)     Borrower, Manager the other members Borrower, such members' managers and members, and Guarantor have all requisite authority to execute, deliver, and perform their obligations under the Loan Documents to which they are a party.

26

(b)     The execution and delivery by Borrower, Manager the other members of Borrower, such members' managers and members, and Guarantor of, and the performance by Borrower, Manager, the other members of Borrower, such members' managers and members, and Guarantor of their obligations under each Loan Document to which they are a party have been authorized by all necessary action and do not and will not:

(i)     require any consent or approval not heretofore obtained of any Person having any interest in Borrower, Manager, the other members of Borrower, such members' managers and members or Guarantor;

(ii)    violate any provision of, or require any consent or approval not heretofore obtained under, any partnership agreement, articles of incorporation, bylaws, operating agreement or other governing document applicable to Borrower, Manager, the other members of Borrower, such members' managers and members or Guarantor;

(iii)   result in or require the creation of any lien, claim, charge or other right of others of any kind (other than under or as provided for in the Loan Documents) on or with respect to any property now or hereafter owned or leased by Borrower, Manager, the other members of Borrower, such members' managers and members or Guarantor;

(iv)    violate any provision of any Law presently in effect; or

(v)     constitute a breach or default under, or permit the acceleration of obligations owed under, any contract, loan agreement, lease or other agreement or document to which Borrower, Manager the other members of Borrower, such members' managers and members is a party or by which Borrower,Manager, the other members of Borrower, such members' managers and members  or any of their property is bound.

(c)     None of Borrower or Manager, the other members of Borrower, such members' managers and members or Guarantor is in default, in any respect that is adverse to Lender's interests in or under the Loan Documents or that would have any material adverse effect on the financial condition of BorrowerManager, the other members of Borrower, such members' managers and members or the conduct of their respective businesses, under any Law, contract, lease or other agreement or document described in Subparagraphs (ii) or (v) of the previous Subsection.

(d)     No approval, license, exemption or other authorization from, or filing, registration or qualification with, any Governmental Agency is required in connection with:

(i)     the execution by Borrower, Manager, the other members of Borrower, such members' managers and members and Guarantor of, and the performance by Borrower, Manager, the other members of Borrower, such members' managers and members and Guarantor of their obligations under, the Loan Documents to which they are a party; and

(ii)    the creation of the liens described in the Loan Documents other than the recording of recordable documents and filing the financing statements.

6.3     Title. Borrower owns good and marketable fee simple title to the Real Property and the Personal Property.  The Real Property and the Personal Property are owned free and clear of all liens, claims and encumbrances, except the Permitted Exceptions.

27

6.4     **Validity and Enforceability of Documents.**  Upon the execution and delivery of the Loan Documents, the Loan Documents shall be valid and binding upon the parties that have executed the same in accordance with the respective provisions thereof, and shall be enforceable in accordance with the respective provisions thereof, subject only to applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws affecting the enforcement of creditor's rights.  Execution, delivery and performance of the Loan Documents do  not and will not contravene, conflict with, violate or constitute a default under Borrower Entity Documents or the resolutions of the Manager, or any Applicable Law or any agreement, indenture or instrument to which Borrower, or the Guarantor is a party or is bound or which is binding upon or applicable to the Property or any portion thereof.  In making this Loan, Lender shall at all times be entitled to rely upon any statements, representations, Borrower Entity Documents, resolutions of the Manager, any Applicable Law or any agreement, indenture or instrument provided by Borrower, Guarantor and/or the Affiliates, agents, employees and designees of Borrower or Guarantor which are applicable to the Loan or any portion thereof.

6.5     **Litigation.**  There is not any condition, event or circumstance existing, or any litigation, arbitration, governmental or administrative proceeding, action, examination, claims or demand pending or, to the best of Borrower's knowledge after due inquiry, threatened affecting Borrower, the Guarantor or the Property, or involving the validity or enforceability of the Loan Documents or involving any risk of a judgment or liability which, if satisfied, would have an adverse effect on the financial condition, business or properties of Borrower, the Guarantor or the priority of the lien of the Mortgage, or which would prevent Borrower or the Guarantor from complying with or performing his, her or its obligations under this Agreement, the Note, the Guaranty or any of the other Loan Documents within the time limits set forth therein for such compliance or performance and no basis for any such matter exists.

6.6     **Utilities; Authorities.**  All utilities necessary for the use, operation and occupancy of the Property (including, without limitation, water, storm sewer, sanitary sewer and drainage, electric, gas and telephone facilities) are available at the boundaries of the Land (or in the streets adjoining the Land), and all requirements for the use of such utilities have been fulfilled.  All building, zoning, safety, disabled persons, health, fire, water district, sewerage and environmental protection agency permits and other licenses and permits (including the Liquor License) which are required by any governmental authority for the use, occupancy and operation of the Property have been obtained by or furnished to Borrower and are in full force and effect and will be maintained in full force and effect by Borrower when and as required by any governmental authority.

6.7     **Solvency.**  Each Obligor is solvent and able to pay such Obligor's debts as such debts become due, and has capital sufficient to carry on such Obligor's present business transactions.  The value of each Obligor's property, at a fair valuation, is greater than the sum of such Obligor's debts.  No Obligor is bankrupt or insolvent, nor has any Obligor made an assignment for the benefit of such Obligor's creditors, nor has there been a trustee or receiver appointed for the benefit of such Obligor's creditors, nor has there been any bankruptcy, reorganization or insolvency proceedings instituted by or against any Obligor, nor will any Obligor be rendered insolvent by such Obligor's execution, delivery or performance of the Loan Documents or by the transactions contemplated thereunder.

6.8     **Financial Statements.**  All financial statements submitted to Lender relating to Borrower, the Guarantor and the Property are true, complete and correct, and have been prepared in accordance with generally accepted accounting principles and fairly present the financial condition of the Person to which they pertain and the other information therein described and do not contain any untrue statement of a material fact or omit to state a fact material to the financial statement submitted or this Agreement.  No material adverse change has occurred in the financial condition of Borrower, Guarantor or the Property since the dates of each such financial statements.

6.9     No Material Adverse Change.  There has been no material adverse change in the condition, financial or otherwise, or the properties or businesses of Borrower, Manager, the other members of Borrower, such members' managers and members or Guarantor since the dates of the latest financial statements furnished to Lender.  Since those dates, none of Borrower, Manager, the other members of Borrower, such members' managers and members or Guarantor has entered into any material transaction whether or not disclosed in such financial statements or otherwise disclosed to Lender in writing.  Further, there are no existing Unmatured Defaults under any of the Loan Documents, nor do there exist any circumstances or conditions that with the passage of time or giving of notice or both would result in an Unmatured Default or an Event of Default under any of the Loan Documents.

6.10     Hazardous Materials.  Borrower has no knowledge of the presence on, under or about the Property, now or in the past, of any Hazardous Materials, or of the transportation to or from the Property of any Hazardous Materials.

6.11     Name and Principal Place of Business.  Borrower presently uses no trade name other than its actual name.  Borrower's principal place of business is 1612 Wazee Street, Denver, Colorado 80202.

6.12     Compliance with Laws. The Property and the use, occupancy and operation thereof for its intended purposes does not and will not violate any Applicable Laws, any contractual arrangements with third parties, or any covenants, conditions, easements, rights of way or restrictions of record affecting the Property.  Neither Borrower nor any agent thereof has received any notice, written or otherwise, alleging any such violation, which violation has not previously been cured.  The Property is in full compliance and conformity with all zoning requirements, including without limitation, those relating to setbacks, height, parking, floor area ratio, fire lanes and percentage of land coverage, and will not be a non-conforming or special use.  No right to any off-site facilities is necessary to insure compliance by the Property with all Applicable Laws.

6.13     Financing Statements.  There are no UCC financing statements in effect with respect to the Personal Property other than those to be filed and/or recorded by Lender which name Borrower as debtor.

6.14     Event of Default.  No Event of Default, Unmatured Default, or occurrence which could rise to the level of an Event of Default has occurred.

6.15     No Defects.  To the best of Borrower's knowledge, there are no defects in the design or completion of the Improvements which would have a material adverse effect on their value, safety or intended use.

6.16     Additional Agreements.  There are no management, leasing, development or other agreements in existence that affect the Property, other than those described in the schedule of Permitted Exceptions or as previously delivered to Lender.

6.17     Ineligible Securities.  No portion of any advance or Loan made hereunder shall be used directly or indirectly to purchase ineligible securities, as defined by applicable regulations of the Federal Reserve Board, underwritten by any Affiliate of Lender during the underwriting period and for thirty (30) days thereafter.

6.18     Deposit Account.  This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the UCC) in the Deposit Account in favor of Lender, as and when each such account may be established, which security interest is prior to all other Liens, other than Permitted Exceptions, and is enforceable as such against creditors of and purchasers from

Borrower. Other than in connection with the Loan Documents and except for Permitted Exceptions, Borrower has not sold, pledged, transferred or otherwise conveyed Borrower's interest in the Deposit Account. Neither Borrower nor the Property is subject to any cash management system (other than pursuant to the Loan Documents), and any and all existing tenant instruction letters issued in connection with any previous financing have been duly terminated prior to the Closing Date.

6.19    Hotel Matters.

(a)    Liquor License(s).  Borrower has delivered to Lender copies of all licenses in effect with respect to the Property including the Liquor License. All licenses, including the Liquor License are in full force and effect.

(b)    Labor Matters.  There are no: (i) collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower, or by which it is or may be bound; or (iii) plans and/or agreements under which "fringe benefits" (including, but not limited to, vacation plans or programs, and related or similar dental or medical plans or programs, and related or similar benefits) are afforded to employees of Borrower.  Borrower has not violated any Applicable Laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate governmental authorities.

(c)    Brokers.  Other than the brokerage fee due and owing to Marcus & Millichap, there are no other brokerage commissions, finder's fees or investment banking fees payable in connection with any of the transactions contemplated by this Agreement or any other Loan Document.  Notwithstanding any other language to the contrary contained herein or in any other Loan Document, Borrower shall be solely and exclusively responsible for payment of any brokerage fee or other fees and expenses due and owing to at Marcus & Millichap.

All representations and warranties which have been made by Borrower in this Agreement or the other Loan Documents shall be true in all respects at all times that the Loan remains outstanding, and in the event of any material breach, misrepresentation or omission, Lender shall have the absolute right to terminate its obligations under this Agreement (without any obligation to refund any loan or other fees previously paid), and upon demand by Lender, Borrower shall reimburse Lender for the Loan Expenses, and Lender shall be entitled to recover from Borrower all losses and damages resulting therefrom.

7.    **BORROWER'S COVENANTS**.

7.1    Compliance with Laws.  Borrower shall comply or cause compliance with all Applicable Laws governing the development, use and operation of the Property.  Evidence of such compliance shall be submitted to Lender on request.

7.2    Inspection.  Upon reasonable prior written or oral notice (which shall not be required in the event of an emergency), Borrower shall permit inspection of the Property by Lender and any other agent or designee of Lender.  In addition, upon reasonable prior written or oral notice (which notice shall not be required in the event of an emergency), Borrower shall permit Lender and/or its agents and designees access to and the right to inspect, audit and copy all books, records, contracts and other documents and information relating to Borrower, the Guarantor or the Property.  Lender shall use reasonable efforts to keep confidential all information and documentation obtained by Lender in

connection with such audits and inspections, except to the extent that Lender determines, in its reasonable discretion, a need to disclose same; provided, however, under no circumstances shall Lender have any liability to Borrower or Guarantor in the event of an unintentional disclosure or disclosure deemed necessary by Lender. All such books, records and accounts of operations relating to the Property shall be kept in accordance with sound accounting practices consistently applied. Borrower shall promptly respond to any inquiry from Lender for information with respect to the Property, which information may be verified by Lender at Borrower's expense; provided, however, that Lender shall at all times be entitled to rely upon any statements or representations made by Borrower or any agent thereof.

7.3     Mechanics' Liens.   Borrower shall not permit any mechanics' lien claims to be filed or otherwise asserted against the Property or against any funds due any contractor or subcontractor, and Borrower shall promptly (and in any event within fifteen (15) days after Borrower has received notice of such filing) discharge or cause to be discharged the same in case of the filing of any claims for lien or proceedings for the enforcement thereof.

7.4     Financial Statements; Reports.   In addition to such progress reports and any other financial statements required to be delivered to Lender pursuant to the provisions of any of the other Loan Documents, Borrower will from time to time furnish to Lender such information and reports, financial and otherwise, concerning each Obligor and the operation of the Property as Lender reasonably requires, including, without limitation, the following:

(a)     Financial statements of each Obligor on a form acceptable to Lender, containing income and expense statements and a balance sheet. The financial statements shall be certified by the chief financial officer of each Obligor (as applicable) as fairly and accurately presenting the information contained therein. Such financial statements shall be certified as true and correct by each Obligor. Notwithstanding anything to the contrary set forth herein, Borrower covenants and agrees to deliver to Lender on a monthly basis such certified financial statements no later than the 10th day of each month.

(b)     Personal financial statements for each Obligor, such financial statements to be on Lender's standard form or another form acceptable to Lender, such statements to include a global cash flow statement, contingent liabilities and evidence of liquidity satisfactory to Lender, and certified by each Obligor as fairly and accurately presenting the information contained therein.

(c)     Copies of the federal and state income tax returns (including K1s) for each Obligor, together with all supporting schedules.

(d)     A rent roll covering all Leases of space in the Property, leasing status reports and such other information as Lender reasonably requests, all, on forms acceptable to Lender, and certified by the chief financial officer of Borrower as fairly and accurately presenting the information contained therein, together with conformed copies of all Leases of space in the Property not previously delivered to Lender. Notwithstanding anything to the contrary set forth herein, Borrower covenants and agrees to deliver to Lender on a monthly basis a certified rent roll no later than the 10th day of each month.

7.5     Affirmation of Representations and Warranties.   Borrower agrees that all representations and warranties of Borrower contained in Article 6 hereof shall remain true in all material respects at all times until the Loan is repaid in full.

7.6     Title.   Except for (a) the Mortgage and other security for the Loan, (b) the lien of general real estate taxes payment of which is not yet due, (c) mechanics' liens which are released within fifteen

31

(15) days of the filing thereof, and (d) any other Permitted Exceptions, Borrower shall keep its fee simple title to the Property free and clear of all liens, claims and encumbrances, whether senior or junior to or at parity with the Mortgage.

7.7     Proceedings Affecting Property.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the occupancy, use, maintenance or operation of the Property, or any portion thereof, Borrower shall cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom, and shall, without limiting the generality of the foregoing, resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such proceedings.  All such proceedings, including without limitation, all of Lender's costs, and fees and disbursements of Lender's counsel in connection with any such proceedings, whether or not Lender is a party thereto, shall be at Borrower's expense.  To the extent that Lender incurs any such expenses, including attorneys' fees and fees and charges for court costs, bonds and the like, Borrower shall reimburse Lender for such expenses and the amount due Lender shall bear interest from the date so incurred by Lender until repaid to Lender at the Default Rate and shall be payable to Lender on demand. The foregoing provisions of this Section shall not limit or affect the provisions of <u>Section 9.1</u> below.

7.8     Disposal and Encumbrance of Property.  In each instance, without Lender's prior written consent, Borrower covenants and agrees that it, Manager, will not:

(a)     sell, lease, assign, transfer, hypothecate, grant a security interest in or convey title to (i) the Property or any part thereof, or (ii) any membership interest in Borrower, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Borrower;

(b)     obtain any financing, all or a part of which, will be secured by (i) the Property, or (ii) any membership interest in Borrower, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Borrower; or

(c)     convert from one type of legal entity into another type of legal entity without in each instance, Lender's prior written consent.

Notwithstanding the foregoing, Borrower, may enter into Leases in accordance with the terms and conditions of the Assignments of Leases and Rents.  Any consent given by Lender or any waiver of default under this Section, shall not constitute a consent to, or waiver of any right, remedy or power of Lender under any subsequent default hereunder.  Any violation of this <u>Section 7.8</u> shall be deemed a "Prohibited Transfer."  Any transfers in favor of Lender under the Loan Documents shall not be deemed Prohibited Transfers.

7.9     Insurance.  Borrower shall pay all premiums on all insurance policies required from time to time under the Mortgage, and thirty (30) days prior to expiration of any such policies, Borrower shall furnish to Lender, with premiums prepaid, additional and renewal policies in form, and with companies, coverage, deductibles and amounts satisfactory to Lender.  In the event of failure by Borrower to provide such insurance, Lender may, but shall not be required to, place insurance and treat the amounts expended therefore as disbursements of Loan proceeds and such amounts from the date so expended by Lender until repaid to Lender shall bear interest at the Default Rate.

7.10    Performance of Obligations; Notice of Default.  Borrower shall promptly and fully perform and comply in all respects with the obligations, terms, agreements, provisions and requirements

of this Agreement and the other Loan Documents and all other documents and instruments relating thereto and will not permit to occur any default or breach hereunder or thereunder. Borrower shall promptly give to Lender notice of the occurrence of any Unmatured Default or of any event that could have a material adverse effect on any security for the Loan or on Borrower's ability to perform its obligations under this Agreement or any of the other Loan Documents or on the Guarantor's ability to perform its obligations under the Guaranty and the other Loan Documents to which Guarantor is a party.

       7.11    Restrictions Affecting Borrower. At all times prior to the repayment of the Loan, (A) Borrower shall not enter into any contract or agreement for the provision of services or otherwise with respect to the Property with Manager, the other members of Borrower, such members' managers and members or Affiliate of Borrower Manager, the other memebrs of Borrower, such members' managers and members, unless such contract or agreement is an arms-length, market rate agreement and is cancelable upon thirty days written notice from any owner of the Property; and (B) Borrower shall not be dissolved or its existence terminated.

       7.12    Use of Receipts; Limitation on Distributions. Borrower shall cause all rents and other income and receipts realized and received by Borrower from and in connection with the Property to be used for the purpose of paying the actual costs and expenses incurred by Borrower, if any, in connection with the ownership, operation, management and repair of the Property, including without limitation, operating expenses, real estate taxes, insurance premiums and interest on the Loan. Borrower shall not make any distributions to Manager or any other member of Borrower until the Loan is repaid in full.

       7.13    Management and Leasing Agreements; Subordination. Borrower shall not amend, extend, substitute or enter into any new management or leasing agreement covering all or any portion of the Property without Lender's prior written consent, except as expressly authorized in the Assignment of Leases and Rents such consent not to be unreasonably withheld or delayed. In the event that Lender grants such consent, Borrower shall cause the manager or leasing broker under said agreement to enter into an agreement with Lender, acceptable in form and substance to Lender, pursuant to which said manager or broker subordinates its liens for unpaid fees to the liens of the Mortgage and the other Loan Documents.

       7.14    Additional Documents. Borrower shall not execute or record any document pertaining to, affecting or running with all or any portion of the Property, including, without limitation, any condominium declaration or plat, without the prior written approval of Lender of the form and substance of such documents.

       7.15    OFAC. Borrower shall (a) ensure that no Person or entity that owns a controlling interest in or otherwise controls Borrower is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of any proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply with all applicable Bank Secrecy Act laws and regulations, as amended.

       7.16    Loan Expenses. Borrower agrees to pay all of the Loan Expenses. Any Loan Expenses paid by Lender shall bear interest commencing on the date demand for repayment thereof is made by Lender until repaid to Lender at the Default Rate and shall be paid by Borrower upon demand, or may be paid by Lender at any time by disbursement of proceeds of the Loan. Any Loan Expenses paid by Lender shall be reimbursed to Lender by Borrower regardless of whether there shall be any disbursements of the Loan.

7.17    Lender's Action for Lender's Own Protection Only.  The authority herein conferred upon Lender and any action taken by Lender or its agents or employees in making inspections of the Property will be taken by Lender and its agents or employees for their own protection only, and neither Lender nor its agents or employees shall be deemed to have assumed any responsibility to Borrower or Guarantor or any other Person or entity with respect to any such action herein authorized or taken by them or with respect to the completion of the Improvements, performance of the contract or subcontracts or prevention of claims for mechanics' or materialmen's liens.

7.18    Changes in Property Restrictions.  Borrower shall not initiate, join in or consent to any change in any applicable zoning ordinance, general plan or similar law, or to any private restrictive covenant or any similar public or private restriction on the use of the Property, except with the prior written consent of Lender.

7.19    Books and Records.  Borrower shall maintain complete books of account and other records reflecting the operations of the Property in accordance with generally accepted accounting principles applied on a consistent basis or in accordance with such other principles or methods as are reasonably acceptable to Lender.

7.20    Existence.  Borrower shall maintain its existence as a limited liability company in good standing under the laws of the State of Colorado, and continue to be a Special Purpose Entity.

7.21    Notice of Certain Matters.  Borrower shall give notice to Lender, within fifteen (15) days after Borrower obtains actual knowledge thereof, of each of the following:

(a)    any litigation or claim affecting or relating to the Property and involving an amount in excess of One Thousand Dollars ($1,000.00); and any litigation or claim that might subject Borrower, Manager or Guarantor to liability in excess of Ten Thousand and No/100 Dollars ($10,000), whether covered by insurance or not;

(b)    any dispute between Borrower and any Governmental Agency relating to the Property, the adverse determination of which might materially affect the Property;

(c)    any trade name hereafter used by Borrower and any change in Borrower's principal place of business;

(d)    any Unmatured Default or Event of Default;

(e)    the creation or imposition of any mechanics' lien or other lien against the Property;

(f)    except as disclosed in the Reports (as defined in the Environmental Indemnity Agreement), the presence of any Hazardous Materials on, under or about the Property; any enforcement, clean-up, removal or other action or requirement of any Governmental Agency relating to any such Hazardous Materials; and the existence of any occurrence or condition on any property in the vicinity of the Property that could cause the Property to be otherwise subject to any restrictions relating to Hazardous Materials; and/or

(g)    any material adverse change in the financial condition of Borrower, Manager or Guarantor.

34

7.22     Additional Reports and Information.  Borrower shall deliver to Lender, concurrently with delivery to the third parties noted hereafter, (a) copies of all financial statements and non-legally privileged reports that Borrower sends to Manager or Guarantor or Manager sends to Borrower or Guarantor, and (b) copies of all reports which are available for public inspection or which Borrower is required to file with any Governmental Agency.  Borrower also shall deliver to Lender, in form and substance reasonably satisfactory to Lender and within five (5) days of Lender's written request therefore, all other information relating to Borrower, Manager, the other members of Borrower, such members' managers and members, the Property, Guarantor or the Loan (or the collateral and security therefore) reasonably required by Lender from time to time.

7.23     Further Assurances.  Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all documents, and take all actions, reasonably required by Lender from time to time to confirm the rights created or now or hereafter intended to be created under the Loan Documents, to protect and further the validity, priority and enforceability of the Loan Documents, to subject to the Loan Documents any property intended by the terms of any Loan Document to be covered by the Loan Documents, or otherwise to carry out the purposes of the Loan Documents and the transactions contemplated thereunder (including , but not limited to, the executing and delivering all such writings necessary to transfer any Liquor Licenses with respect to the Property into the name of Lender or Lender's designee after the occurrence of an Event of Default).

7.24     Amendment of Organizational Documents.  Neither the Operating Agreement nor the Articles of Organization of Borrower shall be amended, supplemented or restated, in whole or in part, without the prior, written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed).  Borrower shall deliver to Lender a copy of any amendment to the Operating Agreement or the Articles of Organization of Borrower within five (5) days after the execution of any such amendment, regardless of whether such amendment requires the prior written consent of Lender.

7.25     Limitations on Additional Indebtedness; Other Prohibited Transactions.

(a)     Except as expressly permitted herein, Borrower shall not, without the prior written consent of Lender granted in its sole discretion, incur any indebtedness of any kind other than the Loan; (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the Loan, in the aggregate, which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances.

(b)     Borrower shall not, without the prior written consent of Lender, engage directly or indirectly in any off balance sheet, hedge or derivative transactions, including without limitation, interest rate swaps and interest rate caps except with Lender and its affiliates and subsidiaries.  In addition to the foregoing, Borrower shall not cause or allow the proceeds of the Loan to be invested.

7.26     Insurance.

(a)     Borrower shall obtain and maintain at all times during the term of the Loan the insurance required by Lender pursuant to **Exhibit C** attached hereto.  In addition, Borrower shall cause Lender to be named as a named insured under the insurance policies required by Lender and Lender shall be identified in each policy as follows.  Borrower shall provide Lender with evidence of all such insurance required hereunder.

(b)     The policies of insurance to be obtained and maintained by Borrower under the provisions of this Agreement shall be issued by responsible insurance carriers with a Best's rating of no less than A/VII, licensed to do business in the State of Colorado, who are acceptable to Lender and shall be in such form and with such endorsements (including a mortgagee clause in favor of Lender), waivers and deductibles (in no event to exceed Ten Thousand Dollars ($10,000.00)) as Lender shall designate or approve.  Without limitation on the foregoing:

(i)     All policies shall name Borrower as the insured, and (with the exception of policies for workmen's compensation insurance) shall name Lender as mortgagee and as an additional insured (under a standard non-contributing mortgagee protection clause, in form reasonably satisfactory to Lender, attached to such policy or policies whenever applicable, and providing, among other matters, that all insurance proceeds shall be paid to Lender).

(ii)     All policies shall contain:  (1) the agreement of the insurer to give Lender at least thirty (30) days' written notice prior to cancellation or expiration of or change in such policies, or any of them; (2) a waiver of subrogation rights against Lender and, if available Borrower; (3) an agreement that such policies are primary and non-contributing with any insurance that may be carried by Lender; (4) a statement that the insurance shall not be invalidated should any insured waive in writing prior to a loss any or all right of recovery against any party for loss accruing to the property described in the insurance policy; and (5) if obtainable, a provision that no act or omission of Borrower shall affect or limit the obligation of the insurance carrier to pay the amount of any loss sustained.   As of the date hereof, and subject to any changes in such requirements which Lender may, in its discretion, make from time to time pursuant to its rights under this Section 7.26, each policy of property insurance hereunder shall contain a lender's loss payable endorsement, lender clause, or other non-contributory mortgagee clause of similar form and substance acceptable to Lender in favor of Lender as a mortgagee.

(c)     Concurrently herewith, Borrower shall deliver to Lender original policies or certificates with premiums prepaid evidencing the insurance required hereunder.  Borrower shall procure and pay for renewals of such insurance (or shall cause the procurement and payment) from time to time before the expiration thereof, and Borrower shall deliver to Lender such original renewal policies or certificates with premiums prepaid at least thirty (30) days before the expiration of any existing policy.

(d)     Borrower, for itself, and on behalf of its insurers, hereby releases and waives any right to recover against Lender on any liability for:  damages for injury to or death of persons; any loss or damage to property, including the property of any occupant of the Property; any loss or damage to buildings or other Improvements comprising the Property; any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the insurance required to be carried hereunder by Borrower, or is otherwise insured; or claims arising by reason of any of the foregoing, except to the extent caused solely by the gross negligence or willful misconduct of Lender.

(e)     Lender shall not, by reason of accepting, rejecting, obtaining or failing to obtain insurance, incur any liability for (i) the existence, non-existence, form, amount or legal sufficiency thereof, (ii) the solvency or insolvency of any insurer, or (iii) the payment of losses.  All insurance required hereunder or carried by Borrower shall be procured at Borrower's sole cost and expense.  Borrower shall deliver to Lender receipts satisfactory to Lender evidencing full

36

prepayment of the premiums therefor. In the event of foreclosure on, or other transfer of title in lieu of foreclosure of, the Property, all of Borrower's interest in and to any and all insurance policies in force shall pass to Lender, or the transferee or purchaser as the case may be, and Lender is hereby irrevocably authorized to assign in Borrower's name to such purchaser or transferee all such policies, which may be amended or rewritten to show the interest of such purchaser or transferee.

(f)     Borrower and Guarantor are hereby notified pursuant to the Illinois Collateral Protection Act (815 ILCS 180/1 et. seq.) that unless Borrower provides Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase the required insurance at Borrower's expense to protect Lender's interest in the Property. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Property. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Property, Borrower will be responsible for the costs of that insurance, including interest at the Default Rate and any other charges Lender may impose in connection with the placement of the insurance until the effective date of the cancellation or the expiration of the insurance. The costs of the insurance shall be added to Borrower's total outstanding balance or obligation and shall constitute additional Indebtedness. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

(g)     Approval by Lender of any policies of insurance ("Policies") shall not be deemed a representation by Lender as to the adequacy of coverage of such Policies or the solvency of the insurer.

7.27    Casualty Loss; Proceeds of Insurance.

(a)     Borrower will give Lender prompt written notice of any loss or damage to the Property, or any part thereof, by fire or other casualty.

(b)     In case of loss or damage covered by any one of the Policies in excess of Ten Thousand Dollars ($10,000.00) (the "Threshold Amount"), Lender is hereby authorized to settle and adjust any claim under such Policies (and after the entry of a decree of foreclosure, or a sale or transfer pursuant thereto or in lieu thereof, the decree creditor or such purchaser or transferee, as the case may be, are hereby authorized to settle and adjust any claim under such Policies) upon consultation with, but without requiring the consent of, Borrower; and Lender shall, and is hereby authorized to, collect and receipt for any and all proceeds payable under such Policies in connection with any such loss (collectively, the "Insurance Proceeds"). Borrower hereby irrevocably appoints Lender as its attorney-in-fact for the purposes set forth in the preceding sentence. Each insurance company is hereby authorized and directed to make payment (i) of one hundred percent (100%) of all such losses (if such loss exceeds said amount) directly to Lender alone, and (ii) of one hundred percent (100%) of all such losses (if such loss is less than or equal to said amount) directly to Borrower alone, and in no case to Borrower and Lender jointly. All reasonable costs and expenses incurred by Lender in the adjustment and collection of any such Insurance Proceeds (including without limitation reasonable attorneys' fees and expenses) shall be so much additional Indebtedness, and shall be reimbursed to Lender upon demand or may be paid and deducted by Lender from such Insurance Proceeds prior to any other application thereof. Lender shall not be responsible for any failure to collect any Insurance Proceeds due under the terms of any policy regardless of the cause of such failure, other than the gross negligence or

willful misconduct of Lender as determined by a final non-appealable judgment of a court of competent jurisdiction.

(c)     Net Insurance Proceeds received by Lender under the provisions of this Agreement or any instrument supplemental hereto or thereto or any policy or policies of insurance covering any Improvements on the Property or any part thereof shall be applied by Lender at its option as and for a prepayment on the Note, without a prepayment fee (whether or not the same is then due or otherwise adequately secured), or shall be disbursed for restoration of such Improvements ("Restoration"), in which event Lender shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the indebtedness evidenced by the Note.  If Lender elects to permit the use of Insurance Proceeds to restore such Improvements it may do all necessary acts to accomplish that purpose, including advancing additional funds and all such additional funds shall constitute part of the Indebtedness.  If Lender elects to make the Insurance Proceeds available to Borrower for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such Improvements, any excess of Insurance Proceeds above the amount necessary to complete the Restoration shall be applied as and for a prepayment on the Note, without a prepayment fee or premium.  No interest shall be payable to Borrower upon Insurance Proceeds held by Lender.

(d)     Notwithstanding the provisions of Section 7.27(c) above, Lender agrees to allow the Insurance Proceeds to be disbursed for Restoration provided: (i) no Event of Default, and no default with which the passage of time or giving of notice would constitute and Event of Default, shall have occurred; (ii) Lender shall be satisfied in its sole and absolute discretion, that by expenditure of the Insurance Proceeds hereunder the Property damaged or destroyed shall be fully restored within a reasonable period of time to the condition and value contemplated by this Agreement and the Restoration Plans (as hereinafter defined), and all payments required under the Loan will continue to be paid as and when the same become due and payable; (iii) in Lender's good faith judgment, such work of repair and Restoration can be completed in the ordinary course of business not later six (6) months prior to the Maturity Date; (iv) the Insurance Proceeds do not exceed the Threshold Amount; (v) Lender shall have reviewed and approved Borrower's plans and specifications for the repair and Restoration of the Property (the "Restoration Plans"), Borrower's architect and any general contractors, subcontractors and material suppliers employed to perform such work; (vi) if so required by Lender in its sole and absolute discretion, all general contractors, all major subcontractors and material suppliers shall have supplied one hundred percent (100%) performance and completion bonds; (vii) if the net Insurance Proceeds available are insufficient for payment of the full cost of Restoration or repair and the payments under the Loan during the completion period, as estimated by Lender, then Borrower shall have deposited with Lender sufficient additional funds to insure payment of all such costs, or made arrangements acceptable to Lender for such sufficient additional funds; (viii) rent loss or business interruption insurance is available to cover the full amount of any loss of income from the Property during its repair and Restoration (including continuing expenses and necessary payroll while the Property is under Restoration); (ix) Borrower shall provide evidence of the implementation of builder's risk coverage for the Property with coverage and in such amounts as Lender shall request and which otherwise complies with the insurance requirements set forth in Section 7.26 hereof; and (x) Borrower shall have satisfied such other conditions as Lender may in good faith determine to be appropriate.

(e)     So long as any Indebtedness shall be outstanding and unpaid, and whether or not Insurance Proceeds are available or sufficient therefor, Borrower shall promptly commence and complete, or cause to be commenced and completed, with all reasonable diligence, the Restoration of the Property as nearly as possible to the same value, condition and character which

existed immediately prior to such loss or damage in accordance with the Restoration Plans and in compliance with all legal requirements. Any Restoration shall be effected in accordance with procedures to be first submitted to and approved by Lender in accordance with Section 7.29 hereof. Borrower shall pay all costs of such Restoration to the extent Insurance Proceeds are not made available or are insufficient.

7.28    Condemnation and Eminent Domain.

(a)    Any and all awards (the "Awards") in excess of the Threshold Amount heretofore or hereafter made or to be made to Borrower (or any subsequent owner of the Property, or any part thereof) by any governmental or other lawful authority for the taking, by condemnation or eminent domain, of all or any part of the Property (including any award from the United States government at any time after the allowance of a claim therefor, the ascertainment of the amount thereto, and the issuance of a warrant for payment thereof), are hereby assigned by Borrower to Lender, which Awards Lender is hereby authorized to collect and receive from the condemnation authorities, and Lender is hereby authorized to appear in and prosecute, in the name of and on behalf of Borrower, any action or proceeding to enforce any such cause of action in which an award in excess of the Threshold Amount is sought and to make any compromise or settlement in connection therewith and to give appropriate receipts and acquittance therefor in the name and in behalf of Borrower. Borrower shall give Lender immediate notice of the actual or threatened commencement of any condemnation or eminent domain proceedings affecting all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with any such proceedings. All reasonable costs and expenses incurred by Lender in the adjustment and collection of any such Awards (including without limitation reasonable attorneys' fees and expenses) shall be so much additional Indebtedness, and shall be reimbursed to Lender from any Award prior to any other application thereof. Borrower further agrees to make, execute and deliver to Lender, at any time upon request, free, clear, and discharged of any encumbrance of any kind whatsoever (other than Permitted Encumbrances), any and all further assignments and other instruments deemed necessary by Lender for the purpose of validly and sufficiently assigning all Awards in excess of the Threshold Amount and other compensation heretofore and hereafter made to Borrower for any permanent taking, under any such proceeding.

(b)    The proceeds of any Award received by Lender under the provisions of this Agreement or any instrument supplemental hereto shall be applied by Lender at its option as and for a prepayment of the Indebtedness, without a prepayment fee (whether or not the same is then due or otherwise adequately secured), or shall be disbursed for Restoration of the Property, in which event Lender shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the Indebtedness. If Lender elects to permit the use of the proceeds of an Award to restore such Improvements it may do all necessary acts to accomplish that purpose, including advancing additional funds, all such additional funds to constitute part of the Indebtedness. If Lender elects to make the proceeds of an Award available to Borrower for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such Improvements, any excess of such proceeds above the amount necessary to complete the Restoration shall be applied as and for a prepayment of the Indebtedness, without a prepayment fee or premium. No interest shall be payable to Borrower upon such proceeds held by Lender.

(c)    Notwithstanding the provisions of Section 7.28(b) above, Lender agrees to allow the Award to be disbursed for Restoration provided: (i) all conditions to the use of casualty proceeds under Section 7.27(d) have been satisfied, and (ii) the condemnation, in the judgment of

39

Lender, shall have no material adverse effect on the operation or value of the Property remaining after the condemnation is completed, and (iii) Borrower shall have satisfied such other conditions as Lender may in good faith determine to be appropriate.

(d)     So long as any Indebtedness shall be outstanding and unpaid, and whether or not Awards are available or sufficient therefor, Borrower shall promptly commence and complete, or cause to be commenced and completed, with all reasonable diligence the Restoration of the portion of the Property not so taken as nearly as possible to the same value, condition and character, which existed immediately prior to such taking in compliance with all legal requirements. Any Restoration of the Property shall be effected in accordance with Restoration Plans to be first submitted to and approved by Lender as provided in Section 7.29(c)(i) hereof. Borrower shall pay all costs of such Restoration to the extent the Award is not made available or is insufficient.

7.29    Disbursement of Insurance Proceeds and Awards.

(a)     All Insurance Proceeds and/or Awards received by Lender as provided in Section 7.27 or Section 7.28 hereof shall, after payment or reimbursement therefrom of all reasonable costs and expenses (including without limitation reasonable attorneys' fees and expenses) incurred by Lender in the adjustment and collection thereof (collectively, the "Net Insurance Proceeds"), shall be deposited with Lender, or such other depositary as may be designated by Lender, and applied as provided in this Section.

(b)     Lender may elect to apply the Net Insurance Proceeds to prepayment of the Indebtedness, whether then due or not. If the Indebtedness is not prepaid in full, then the Net Insurance Proceeds shall be applied to the installments of principal and interest in the inverse order of maturity.

(c)     All Net Insurance Proceeds which are not applied to the payment of the Indebtedness shall be applied to fund the payment of the costs, fees and expenses incurred for the Restoration of the Property as required under Section 7.27 or Section 7.28 hereof and such Net Insurance Proceeds shall be disbursed through the title company which has insured the lien of the Mortgage to complete the Restoration; provided that Lender shall receive the following:

(i)      Restoration Plans shall be subject to the reasonable approval of Lender prior to the commencement of the Restoration.

(ii)     Such architect's and engineer's certificates, waivers of lien, contractor's sworn statements, payment and performance bonds (if applicable), title insurance endorsements, plats of survey, opinions of counsel and such other evidences of cost, payment and performance as Lender may reasonably require and approve.

(d)     If Borrower shall fail to commence Restoration within thirty (30) days after the settlement of the claim involving loss or damage to the Property, and diligently proceed to complete Restoration in accordance with the Restoration Plans and Applicable Laws (as defined herein), or if any other Event of Default shall occur hereunder at any time (whether before or after the commencement of such Restoration), all or any portion of the Indebtedness may be declared to be immediately due and payable and such Net Insurance Proceeds, or any portion thereof, then held, or subsequently received, by Lender or other depositary hereunder may be applied, at the option and in the sole discretion of Lender, to the payment or prepayment of the Indebtedness in

whole or in part, or to the payment and performance of such obligations of Borrower as may then be in default hereunder.

(e)     Any surplus which may remain out of such Net Insurance Proceeds after payment of all costs, fees and expenses of such Restoration shall be applied to prepayment of the Indebtedness, without the payment of a prepayment fee or prepayment premium.

7.30     Cooperation with Regard to Liquor Licenses.  To the extent permitted by Applicable Laws, Borrower shall execute and deliver to Lender such additional documents, instruments, certificates, assignments and other writings reasonably requested by Lender, and otherwise provide such reasonable cooperation, in each case as may be necessary to transfer any Liquor License with respect to the Property into, or obtain the issuance of a new Liquor License in, the name of Lender or its designee during the continuance of an Event of Default.  Such cooperation shall include, without limitation, completing transfer requests, surrendering or cancelling any existing Liquor License, and making representatives of Borrower available for meetings with any applicable governmental authorities in connection with the transfer or issuance of such Liquor License, subject in all instances to Applicable laws.  Borrower shall not intentionally hinder or interfere in bad faith with the Liquor License transfers or issuances made or contemplated by this Agreement, or with efforts of Lender or its successors and assigns to obtain temporary or permanent Liquor License.  Effective during the continuance of an Event of Default, to the extent permitted by Applicable Laws, Borrower hereby irrevocably appoints Lender as its agent and attorney-in-fact to execute all such documents and instruments as Lender shall require or deem advisable in order to cause the transfer or issuance of such Liquor License as Lender may require and to cause a cancellation of such existing Liquor License as Lender may require.  The foregoing power of attorney is coupled with an interest and shall be irrevocable.  In addition to all other remedies which Lender may have at law or in equity for the enforcement of the terms and provisions of this Agreement, to the extent permitted by Applicable Laws, Borrower expressly agrees that Lender shall have the right to bring an action in specific performance to enforce each and every term and provision of this Section 7.30.

7.31     Refinance.  On or before December 1, 2020, Borrower shall deliver evidence satisfactory to Lender that Borrower has either (i) contracted with a mortgage broker for the refinance of the Loan or otherwise commenced the application for the refinance of the Loan, or (ii) listed the Property for sale with a reputable broker having experience in the sale of similarly situated properties in Denver.

8.     **EVENTS OF DEFAULT**.  The occurrence of any one or more of the following shall constitute an "Event of Default":

(a)     Failure by Borrower or any other Obligor to make any payment of principal or interest under the Note when due; or

(b)     Failure by Borrower to make any other payment under the Loan Documents within five (5) days of the date when due or, if no date is stated, five (5) days after demand (or such shorter period as may be expressly provided for herein or therein); or

(c)     Failure by Borrower to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower contained in this Agreement or any of the other Loan Documents and not specifically referred to elsewhere in this Section 8 and/or in said Loan Documents; provided, however, that if such failure by its nature can be cured, then so long as the continued operation and safety of the Property, and the priority, validity and enforceability of the liens created by this Agreement, the Mortgage or any of the other Loan Documents and the value of the Property is not impaired, threatened or jeopardized, then Borrower shall have a period ("Cure Period") of ten

(10) days after Borrower obtains actual knowledge of such failure or receives written notice of such failure to cure the same and an Event of Default shall not be deemed to exist during the Cure Period (provided, however, such period shall be limited to five (5) days if such failure can be cured by the payment of money); or

(d)    The existence of any material inaccuracy or untruth in any representation or warranty contained in this Agreement or any other Loan Documents, or of any statement or certification as to facts delivered to Lender by or on behalf of Borrower or the Guarantor; or

(e)    Borrower or Guarantor, or any successors or permitted assigns of any of them, shall:

(i)    file a voluntary petition in bankruptcy or an arrangement or reorganization under any federal or state bankruptcy, insolvency or debtor relief law or statute (hereinafter referred to as a "Bankruptcy Proceeding");

(ii)    file any answer in any Bankruptcy Proceeding or any other action or proceeding admitting insolvency or inability to pay his, her or its debts;

(iii)    fail to oppose, or fail to obtain a vacation or stay of, any involuntary Bankruptcy Proceeding within fifteen (15) days after the filing thereof;

(iv)    solicit or cause to be solicited petitioning creditors for any involuntary Bankruptcy Proceeding against Borrower or Guarantor;

(v)    be granted a decree or order for relief, or be adjudicated a bankrupt or declared insolvent in any Bankruptcy Proceeding, whether voluntary or involuntary;

(vi)    have a trustee or receiver appointed for or have any court take jurisdiction of its property, or the major part thereof, or all of any portion of the Property, in any voluntary or involuntary proceeding for the purpose of reorganization, arrangement, dissolution or liquidation, and, with respect to an involuntary proceeding only, such trustee or receiver is not discharged or such jurisdiction is not relinquished, vacated or stayed on appeal or otherwise, within ten (10) days after the commencement thereof;

(vii)    make an assignment for the benefit of creditors;

(viii)    consent to any appointment of a receiver or trustee or liquidator of all of its property, or the major part thereof, or all or any portion of the Property;

(ix)    have an attachment or execution levied with respect to, or other judicial seizure be effected for, all or substantially all of its assets or all or any portion of the Property, or the placing of any attachment, levy of execution, charging order, or other judicial seizure on the interest of the parent of Borrower; or

(f)    Any sale, transfer, lease, assignment, conveyance, financing, lien, encumbrance or other transaction made in violation of Sections 7.8, 7.11, 7.12 or 7.24 above; or

(g)    Failure of Borrower for a period of thirty (30) days after Lender's demand to procure the reversal, dismissal or disposition to Lender's satisfaction of any order enjoining or

otherwise preventing or declaring invalid or unlawful the occupancy, maintenance, operation or use of the Property, or any portion thereof, in the manner required by the terms of this Agreement, or of any proceedings which could or might affect the validity or priority of the lien of the Mortgage or any of the other security for the Loan, or which could materially affect Borrower's ability to perform its obligations under this Agreement or the other Loan Documents; or

(h)     The assignment or attempted assignment of this Agreement by Borrower without Lender's prior written consent; or

(i)     The filing or threatened filing of any condemnation or administrative proceeding or litigation against the Property or any casualty thereto; or

(j)     The filing of formal charges under any federal, state or local law, statute or ordinance for which Borrower's forfeiture of all or any portion of the Property is a potential penalty; or

(k)     The occurrence of the death or legal incompetency of the Guarantor; or

(l)     The occurrence of a material adverse change in the financial condition of Borrower, Guarantor, or the Property as determined by Lender in Lender's sole discretion, including, but not limited to, any material adverse change to the cash flow derived from the Property; or

(m)     The occurrence of an Event of Default under any of the other Loan Documents; or

(n)     The dissolution, termination or merger of the Borrower or Manager; or

(o)     Guarantor fails to perform any obligation (following any applicable notice and cure period) required to be performed by Guarantor under the Guaranty; or

(p)     The existence of any fraud, dishonesty or bad faith by or with the acquiescence of Borrower, Manager the other members of Borrower, such members' managers and members or Guarantor which in any way relates to or affects the Loan or the Property; or

(q)     The occurrence of a default under Section 7.4 or Section 7.29 hereof; or

(r)     The existence of any litigation, judgment(s), financing statement(s) or other finding(s) against or pertaining to Guarantor or Manager; or

(s)     Failure by Borrower to immediately satisfy all building violations affecting the Property now or in the future in any material manner, in Lender's sole but reasonable discretion; or

(t)     The failure by Borrower or Guarantor to pay when due any amount to Lender under any other loan or debt due from Borrower or Guarantor to Lender or any amount due under any other existing obligations whether to Lender or any other lender of Borrower or Guarantor.

(u)     The failure by Borrower or Guarantor to pay all real estate taxes and assessments when due;

43

(v)     If Borrower or Guarantor or any of their respective Affiliates (i) shall fail to pay any debt owed by any of them, or (ii) are in default under any agreement with Lender;

(w)     Borrower ceases to do business as a hotel at the Property or terminates such businsess for any reason whatsoever (other than as a result of a force majeure or a temporary cessation in connection with any continuous and diligent renovation or restoration of the Property in connection with the renovations or restorations following a casualty or condemnation); or

(x)     If, without Lender's prior written consent, the Liquor License or any other hotel and/or other material license required for the operation of the Property ceases to eb in full force and effect for a period of ten (10) Business Days.

9.      **REMEDIES**.

9.1     Remedies.  Upon the occurrence of any Event of Default, Lender, in addition to availing itself of any remedies conferred upon it at law or in equity and by the terms of the Note, the Mortgage and the other Loan Documents, may pursue any one or more of the following remedies first, concurrently or successively with each other and with any other available remedies, it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)     Take possession of the Property (or any portion thereof) and do anything necessary or desirable in Lender's sole judgment to fulfill the obligations of Borrower hereunder. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution to use portions of the Loan or other funds which may be reserved, escrowed or set aside for any purposes hereunder at any time to complete the Improvements; it being understood that the foregoing power of attorney is coupled with an interest and cannot be revoked.  All sums expended by Lender pursuant to this Article 9 shall be deemed to have been paid to Borrower and secured by the Mortgage and the other Loan Documents, and shall bear interest at the Default Rate until repaid to Lender.

(b)     Withhold further disbursements from the Reserves.

(c)     Apply the balance of any deposits made with Lender toward the repayment of the Loan.

(d)     Declare the outstanding Principal Balance of the Loan, together with all accrued interest thereon and other amounts owing in connection therewith, to be immediately due and payable in full, regardless of any other specified due date.

9.2     Cumulative Remedies, No Waiver.  Lender's rights and remedies under the Loan Documents are cumulative and in addition to all rights and remedies provided by Law from time to time. The exercise or direction to exercise by Lender of any right or remedy shall not constitute a cure or waiver of any default, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any other right or remedy.  No waiver of any default shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated.  No waiver of any default shall affect any default other than the default expressly waived, and any such waiver shall be operative only for the time and to the extent stated.  No waiver of any provision of any Loan Document shall be construed as a waiver of any subsequent breach of the same provision. The consent by Lender to any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary Lender's consent to or approval of any subsequent act.  Lender's

acceptance of the late performance of any obligation shall not constitute a waiver by Lender of the right to require prompt performance of all further obligations; Lender's acceptance of any performance following the sending or filing of any notice of default shall not constitute a waiver of Lender's right to proceed with the exercise of remedies for any unfulfilled obligations; and Lender's acceptance of any partial performance shall not constitute a waiver by Lender of any rights relating to the unfulfilled portion of the applicable obligation.

10.     **MISCELLANEOUS**.

10.1     Additional Indebtedness.  If any advances or payments made by Lender pursuant to this Agreement or any other Loan Document, together with disbursements of the Loan, shall exceed the aggregate face amount of the Note, all such advances and payments shall constitute additional Indebtedness secured by the Mortgage and all other security for the Loan, and shall bear interest at the Default Rate from the date advanced until paid.

10.2     Additional Acts.  Borrower shall, upon request, execute and deliver such further instruments and documents and do such further acts and things as may be reasonably required to provide to Lender the evidence of and security for the Loan contemplated by this Agreement.

10.3     Loan Agreement Governs.  In the event of any inconsistency between any provision of this Agreement and any provision of any other Loan Document, the provision of this Agreement shall govern; provided, however, that the provisions of all of the Loan Documents shall be construed as an integrated set of provisions governing the Loan and, accordingly, shall be interpreted and construed liberally to give the maximum validity, enforceability and effect to all of such provisions.

10.4     Additional Advances.  If an Event of Default shall occur, Lender may, but shall not be obligated to, take any and all actions to cure such default, and all amounts expended in so doing, all Loan Expenses and all other amounts paid or advanced by Lender pursuant to the Loan Documents, and all other amounts advanced by Lender in connection with preserving any security for the Loan, shall constitute additional advances of the Loan, shall be secured by the Mortgage and all other security for the Loan, and shall bear interest at the Default Rate from the date advanced until paid.

10.5     Amendment; Waiver; Approval.  This Agreement shall not be amended, modified or supplemented without the written agreement of Borrower and Lender at the time of such amendment, modification or supplement.  No waiver of any provision of this Agreement or any of the other Loan Documents shall be effective unless set forth in writing signed by the party making such waiver, and any such waiver shall be effective only to the extent therein set forth.  Failure by Lender to insist upon full and prompt performance of any provisions of this Agreement or any of the other Loan Documents, or to take action in the event of any breach of any such provision or upon the occurrence of any Event of Default, shall not constitute a waiver of any rights of Lender, and Lender may at any time thereafter exercise all available rights and remedies with respect to such breach or Event of Default.  Receipt by Lender of any instrument or document shall not constitute or be deemed to be an approval thereof.  Any approvals required under any of the other Loan Documents must be in writing, signed by Lender and directed to Borrower.

10.6     Notice.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth below in this Section or as such party may from time to time

designate by written notice to the other parties.  Either party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications. Notwithstanding the foregoing, Lender may provide Borrower written notices via electronic mail to Borrower's electronic mail address set forth below and such electronic mail shall be deemed validly delivered and received by Borrower at the time of dispatch by Lender:

|  |  |
|---|---|
| To Lender: | Pangea Mortgage Capital, LLC<br>549 W. Randolph Street, 2nd Floor<br>Chicago, Illinois  60661<br>Attn:  Scott Larson<br>Email: slarson@pangeare.com |
| With copy to: | Safarian Choi & Bolstad LLP<br>555 S. Flower Street, Suite 650<br>Los Angeles, California 90071<br>Attn:  Chris K. Safarian, Esq.<br>Email: csafarian@safarianchoi.com |
| To Borrower: | KDA Properties LLC<br>NATIV Denver LLC<br>1612 Wazee Street<br>Denver, Colorado 80202<br>Attn: Messrs. Suliaman and Ware<br>Email: amin@nativhospitality.com<br>kcware76@gmail.com |
| With copy to: | Bailey & Peterson, PC<br>7991 Shaffer Parkway, Suite 101<br>Littleton, Colorado 80127<br>Attn: James S. Bailey, Esq.<br>Email: bailey@b-p-law.com |

10.7   Benefit; Assignment.  The rights, powers and remedies of Lender under this Agreement shall inure to the benefit of Lender and its successors and assigns.  The rights and obligations of Borrower under this Agreement may not be assigned and any purported assignment by Borrower shall be null and void. Lender shall have the right to sell, assign or transfer portions of its right, title and/or interest in and to this Agreement and the other Loan Documents (including the sale of participation interests therein), without the consent or approval of Borrower, and Borrower agrees to cooperate and to cause the Guarantor to cooperate in all respects with Lender in connection therewith, including, without limitation, the execution of all documents and instruments reasonably requested by Lender or such transferee provided that such documents and instruments do not materially adversely affect any of Borrower's or Guarantor's duties or obligations under the Loan Documents. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in or assignments of the Loans to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more participants, purchasers or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loans, and Borrower hereby waives any rights to privacy or confidentiality Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the assignees and purchasers of any participation interests will be considered as the absolute owners of such interests in the Loans and will have all the rights granted under the participation agreement or agreements

46

governing the assignment of such Loans or the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any assignee or any purchaser of such participation interest and unconditionally agrees that either Lender, such assignee or such purchaser may enforce Borrower's obligation under the Loans irrespective of the failure or insolvency of any holder of any interest in any Loan. Borrower further agrees that any assignee or the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

10.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

10.9    Indemnity.  Borrower agrees to indemnify, defend and hold Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses (including court costs and reasonable attorneys' fees) of whatever kind or nature which may be imposed on, incurred by or asserted against Lender at any time which relate to or arise from the performance of the obligations of Borrower and Guarantors hereunder, the offer for sale or sale of any limited partnership interest, shareholder interest or membership interest in Borrower, the acquisition or sale or offer for sale of all or any portion of the Property and/or the ownership, use, operation or maintenance of the Property, including, without limitation, any brokerage commissions or finder's fees asserted against Lender with respect to the making of the Loan, the acquisition of the Property or other matters; provided, however, that the foregoing indemnity shall not extend to any liabilities, obligations, claims, losses, costs, damages or expenses resulting from the gross negligence or willful misconduct of Lender, as determined by a final non-appealable judgment by a court of competent jurisdiction.

10.10    Headings.  The titles and headings of the articles, sections and paragraphs of this Agreement have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

10.11    No Partnership or Joint Venture.  Lender, by executing and performing this Agreement shall not become a partner or joint venturer with Borrower or Guarantor or any of their respective associates or affiliates and all inspections of the Property herein provided for are for the sole benefit of Lender.

10.12    Time is of the Essence.  Time is of the essence of the payment of all amounts due Lender under the Loan Documents and performance and observance by Borrower of each covenant, agreement, provision and term of this Agreement and the other Loan Documents.

10.13    Invalid Provisions.  In the event that any provision of this Agreement is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Agreement and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

10.14    No Offset.  Borrower, Manager and Guarantor hereby fully and forever waive their rights to offset amounts that Lender or its affiliates may owe (or Borrower may claim that Lender or its affiliates owe) Borrower, Manager, Guarantor or their affiliates.  The obligations of Borrower, Manager and/or Guarantor, as applicable, under the Loan Documents shall be absolute and without right of offset.  This waiver shall be construed as broadly as possible and shall apply to damages suffered by Borrower, Manager, and/or Guarantor under the Loan Documents or any other damages or obligations.  Borrower, Manager and Guarantor knowingly and intelligently have waived the common law right of offset against amounts that it may owe under the Loan Documents.

10.15    Acts by Lender.  Notwithstanding anything herein contained to the contrary, Lender will not be required to make any disbursement or perform any other act under this Agreement if, as a result thereof, Lender will violate any law, statute, ordinance, rule, regulation or judicial decision applicable thereto.

10.16    Binding Provisions.  The covenants, warranties, agreements, obligations, liabilities and responsibilities of Borrower under this Agreement shall be binding upon and enforceable against Borrower and its legal representatives, administrators, successors and permitted assigns.

10.17    Counterparts.  This Agreement may be executed in counterparts, and all said counterparts when taken together shall constitute one and the same Agreement.

10.18    No Third Party Beneficiary.  This Agreement is only for the benefit of the parties hereto and their permitted successors and assigns.  No other Person or entity shall be entitled to rely on any matter set forth herein without the prior written consent of such parties.

10.19    Publicity.  Subject to compliance with Applicable Laws, Lender reserves the right to publicize the making of the Loan in any manner it deems appropriate.  In addition, Borrower agrees that Lender shall have the right to erect and maintain a sign at the Property in a prominent location for the duration of the term of the Loan stating that Lender is providing the financing for the Project.  The sign shall be furnished by Lender and the sign shall be located in a place selected by Lender, provided that such location does not interfere with performance of the Work.  If practicable, Borrower will name Lender as lender in Borrower's publicity and promotional materials pertaining to the Property.  So long as the Loan is outstanding, Borrower will identify Lender as Borrower's lender on any sign for the Property erected by Borrower.

10.20    Joint and Several Liability.  If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several. Each entity that constitutes Borrower (for purposes of this Section 10.33 only, each a "Borrower" and collectively, "Borrowers") acknowledges and agrees that it shall be jointly and severally liable for the Loan and all other obligations arising under this Agreement and/or any of the other Loan Documents.  In furtherance thereof, each Borrower acknowledges and agrees as follows:

(a)    For the purpose of implementing the joint borrower provisions of the Loan Documents, each Borrower hereby irrevocably appoints each other Borrower as its agent and attorney-in-fact for all purposes of the Loan Documents, including the giving and receiving of notices and other communications.

(b)    To induce Lender to make the Loan, and in consideration thereof, each Borrower hereby agrees to indemnify Lender against, and hold Lender harmless from, any and all liabilities, expenses, losses, damages and/or claims of damage or injury asserted against Lender by any Borrower or by any other Person arising from or incurred by reason of (i) reliance by Lender on any requests or instructions from any Borrower, or (ii) any other action taken by Lender in good faith with respect to this Agreement or the other Loan Documents.

(c)    Each Borrower acknowledges that the liens and security interests created or granted herein and by the other Loan Documents will secure the obligations of all Borrowers under the Loan Documents and, in full recognition of that fact, each Borrower consents and agrees that Lender may, at any time and from time to time, without notice or demand, and without affecting the enforceability or security hereof or of any other Loan Document:

       (i)     agree with any Borrower to supplement, modify, amend, extend, renew, accelerate, or otherwise change the time for payment or the terms of the obligations or any part thereof, including any increase or decrease of the rate(s) of interest thereon;

       (ii)    agree with any Borrower to supplement, modify, amend or waive, or enter into or give any agreement, approval or consent with respect to, the obligations or any part thereof or any of the Loan Documents or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder;

       (iii)   accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the obligations or any part thereof;

       (iv)   accept partial payments on the obligations;

       (v)    receive and hold additional security or guaranties for the obligations or any part thereof;

       (vi)   release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer and enforce any security for or guaranties of the obligations, and apply any security and direct the order or manner of sale thereof as Lender, in Lender's discretion may determine;

       (vii)   release any Person or any guarantor from any personal liability with respect to the obligations or any part thereof; or

       (viii)  settle, release on terms satisfactory to Lender or by operation of Applicable Laws or otherwise liquidate or enforce any obligations and any security therefor or guaranty thereof in any manner, consent to the transfer of any such security and bid and purchase at any sale; and consent to the merger, change or any other restructuring or termination of the corporate existence of any Borrower or any other Person, and correspondingly restructure the obligations of such Borrower or other Person, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing existence of any lien or security interest hereunder, under any other Loan Document to which any Borrower is a party or the enforceability hereof or thereof with respect to all or any part of the obligations.

      (d)    Upon the occurrence of and during the continuance of any Event of Default, Lender may enforce this Agreement and the other Loan Documents independently as to each Borrower and independently of any other remedy or security Lender at any time may have or hold in connection with the obligations, and in collecting on the Loan it shall not be necessary for Lender to marshal assets in favor of any Borrower or any other Person or to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce this Agreement and the other Loan Documents. Each Borrower expressly waives any right to require Lender, in connection with Lender's efforts to obtain repayment and performance of the obligations, to marshal assets in favor of any Borrower or any other Person or to proceed against any other Person or any collateral provided by any other Person, and agrees that Lender may proceed against any Persons and/or collateral in such order as Lender shall determine in Lender's discretion in connection with Lender's efforts to obtain repayment and performance of the obligations. Lender may file a separate action or actions against each Borrower to enforce the

obligations, whether action is brought or prosecuted with respect to any other security or against any other Person, or whether any other Person is joined in any such action or actions. Each Borrower agrees that Lender, each Borrower and/or any other Person may deal with each other in connection with the obligations or otherwise, or alter any contracts or agreements now or hereafter existing between any of them, in any manner whatsoever, all without in any way altering or affecting the security of this Agreement or the other Loan Documents. The rights of Lender hereunder and under the other Loan Documents shall be reinstated and revived, and the enforceability of this Agreement and the other Loan Documents shall continue, with respect to any amount at any time paid on account of the obligations which thereafter shall be required to be restored or returned by Lender as a result of the bankruptcy, insolvency or reorganization of any Borrower or any other Person, or otherwise, all as though such amount had not been paid. The enforceability of this Agreement and the other Loan Documents at all times shall remain effective even though any or all obligations, or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against any Borrower or any other Person and whether or not any Borrower or any other Person shall have any personal liability with respect thereto. Each Borrower expressly waives any and all defenses to the enforcement of Borrower's obligations under the Loan Documents now or hereafter arising or asserted by reason of (i) any disability or other defense of any Borrower or any other Person with respect to the obligations, (ii) the unenforceability or invalidity of any security or guaranty for the obligations or the lack of perfection or continuing perfection or failure of priority of any security for the obligations, (iii) the cessation for any cause whatsoever of the liability of any Borrower or any other Person (other than by reason of the full and final payment and performance of all obligations), (iv) any failure of Lender to marshal assets in favor of any of Borrower or any other Person, (v) any failure of Lender to give notice of sale or other disposition of any Collateral for the obligations to any Borrower or to any other Person or any defect in any notice that may be given in connection with any such sale or disposition, (vi) any failure of Lender to comply in any non-material respect with Applicable Laws in connection with the sale or other disposition of any collateral or other security for any obligation, (vii) any act or omission of Lender or others that directly or indirectly results in or aids the discharge or release of any Borrower or of any other Person or of any of the obligations or any other security or guaranty therefor by operation of law or otherwise, (viii) any law which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation, (ix) any failure of Lender to file or enforce a claim in any bankruptcy or similar proceeding with respect to any Person, (x) the election by Lender, in any bankruptcy or similar proceeding of any Person, of the application or non-application of Section 1111(b)(2) of the Bankruptcy Code, (xi) any extension of credit or the grant of any lien under Section 364 of the Bankruptcy Code except to the extent otherwise provided in this Agreement, (xii) any use of cash collateral under Section 363 of the Bankruptcy Code, (xiii) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy or similar proceeding of any Person, (xiv) the avoidance of any lien or security interest in favor of Lender securing the obligations for any reason, or (xv) any bankruptcy or similar proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any of the obligations (or any interest thereon) in or as a result of any such proceeding. Without in any way limiting the foregoing, with respect to the Loan Documents and the obligations, Borrower: (A) waives all rights and defenses arising out of an election of remedies by Lender even though that election of remedies, such as non-judicial foreclosure with respect to security for Borrowers' obligations, has destroyed each of their rights of subrogation and reimbursement against the other by the operation of Applicable Laws; and (B) waives any right to a fair value hearing or similar proceeding following a nonjudicial foreclosure of the obligations, arising under Applicable Laws.

(e)      Borrowers represent and warrant to Lender that they have established adequate means of obtaining from each other, on a continuing basis, financial and other information pertaining to their respective businesses, operations and condition (financial and otherwise) and their respective properties, and each now is and hereafter will be completely familiar with the businesses, operations and condition (financial and otherwise) of the other and their respective properties.  Each Borrower hereby expressly waives and relinquishes any duty on the part of Lender to disclose to such Borrower any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Borrowers or the other Borrowers' properties, whether now known or hereafter known by Lender during the life of this Agreement.  With respect to any of the obligations, Lender need not inquire into the powers of any Borrower or the officers, employees or other Persons acting or purporting to act on such Borrower's behalf.

(f)      Without limiting the foregoing, or anything else contained in this Agreement, each Borrower waives all rights and defenses that it may have because the obligations are secured by real property.  This means, among other things:

(i)      Lender may collect on the obligations from any Borrower without first foreclosing on any real or personal property collateral pledged by the other Borrowers; and

(ii)     If Lender foreclose on any real property collateral pledged by any Borrower for the obligations:  (A) the amount of the indebtedness owed by the other Borrowers may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Lender may collect from any Borrower even if Lender, by foreclosing on the real property collateral, has destroyed any right any Borrower may have to collect from the other Borrowers.

(iii)    This is an unconditional and irrevocable waiver of any rights and defenses each Borrower may have because the obligations are secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Applicable Laws.  Each Borrower expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property collateral provided by the other Borrowers to secure the obligations and failure to receive any such notice shall not impair or affect such Borrower's obligations hereunder or the enforceability of this Agreement or the other Loan Documents or any liens created or granted hereby or thereby.

(iv)     Notwithstanding anything contained herein or in any other Loan Document, with respect to the payment and performance of the obligations, each Borrower hereby waives with respect to the other Borrowers and their successors and assigns (including any surety) and any other Person any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to contribution, to set-off, to any other rights and defenses available to it (including those available under Applicable Laws), or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which each of them may have or hereafter acquire against the other or any other Person in connection with or as a result of such Borrower's execution, delivery and/or performance of this Agreement or any other Loan Document to which it is a party until the obligations are paid and performed in full.  Each Borrower agrees that it shall not have or assert any such rights against any other

Borrower or any other Borrower's successors and assigns or any other Person (including any surety), either directly or as an attempted set-off to any action commenced against such Borrower by any other Borrower (as borrower or in any other capacity) or any other Person until all the obligations are paid and performed in full. Each Borrower hereby acknowledges and agrees that this waiver is intended to benefit Lender and shall not limit or otherwise affect any Borrower's liability under this Agreement or any other Loan Document to which it is a party, or the enforceability hereof or thereof.

**EACH BORROWER WARRANTS AND AGREES THAT EACH OF THE WAIVERS AND CONSENTS SET FORTH HEREIN IS MADE WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND CONSEQUENCES, WITH THE UNDERSTANDING THAT EVENTS GIVING RISE TO ANY DEFENSE WAIVED MAY DIMINISH, DESTROY OR OTHERWISE ADVERSELY AFFECT RIGHTS WHICH EACH OTHERWISE MAY HAVE AGAINST THE OTHER, AGAINST LENDER OR OTHERS, OR AGAINST ANY COLLATERAL. IF ANY OF THE WAIVERS OR CONSENTS HEREIN IS DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS AND CONSENTS SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW.**

10.21   JURISDICTION AND VENUE.   **BORROWER HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN THE CIRCUIT COURT OF COOK COUNTY, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION.   BORROWER HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT.   BORROWER WAIVES ANY CLAIM THAT COOK COUNTY, ILLINOIS OR THE NORTHERN DISTRICT OF ILLINOIS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD BORROWER, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.   THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND BORROWER HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION. NOTWITHSTANDING THE FOREGOING, IN THE EVENT ANY ACTIONS OR PROCEEDINGS ARE REQUIRED TO BE LITIGATED IN THE JURISDICTION OF THE SITUS OF THE PROPERTY, THEN SUCH ACTIONS OR PROCEEDINGS SHALL BE LITIGATED IN COURT OF THE STATE OF COLORADO SITTING IN DENVER COUNTY.**

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

10.22   JURY WAIVER.   **BORROWER AND LENDER HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY RELATIONSHIP BETWEEN BORROWER AND LENDER.   THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE LOAN DESCRIBED HEREIN AND IN THE OTHER LOAN DOCUMENTS.**

10.23   ASSIGNMENTS AND PARTICIPATIONS.   Notwithstanding anything in the Loan Documents to the contrary, Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in or assignments of the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, Lender may at any time assign its rights in this Note and the Loan Documents, or any part thereof and transfer its rights in any or all of the collateral, and Lender thereafter shall be relieved from all liability with respect to such collateral. Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender. Notwithstanding anything in the Loan Documents to the contrary, Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in or assignments of the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more participants, purchasers or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy or confidentiality Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the assignees and purchasers of any participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the assignment of such Loan or the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any assignee or any purchaser of such participation interest and unconditionally agrees that either Lender, such assignee or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in any Loan. Borrower further agrees that any assignee or the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**11.   ELECTRONIC SIGNATURES.** With respect to any E-signed document:

An E-Signature is any form of signature provided on behalf of any Borrower other than an original handwritten signature, which could reasonably be interpreted as an indication of the signer's intent to sign the document.

Borrower understands and agrees that any E-Signatures are legally binding in connection with any document signed by any Borrower and received by Lender in connection with the underwriting, origination, transfer or servicing of the Loan.

Borrower waives all rights to repudiate the authenticity or validity of any E-Signature to the extent such repudiation is based in whole or in part on the fact that such signature is not in an original handwritten form.

Borrower agrees that the law governing E-Signatures will be the federal Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S. Code, Chapter 96) (E-SIGN) or the Uniform Electronic Transactions Act of 1999 as promulgated by the U.S. Uniform Law Commission for consideration and enactment by the States (UETA), and that under no circumstances with E-Signatures be governed by the Uniform Computer Information Transactions Act (UCITA).

[Signature page follows]

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.

**BORROWER:**                                                **LENDER:**

**KDA PROPERTIES LLC**,                                **PANGEA MORTGAGE CAPITAL, LLC**,
a Colorado limited liability company              an Illinois limited liability

By: _____                      By: _____
Name: Kenneth C. Ware                                       Name: Peter Martay
Its: Manager                                                         Title: Authorized Signatory

By: _____
Name: Amin Suliaman
Its: Manager


**NATIV DENVER LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Its: Manager

By: _____
Name: Amin Suliaman
Its: Manager

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.

**BORROWER:**

**KDA PROPERTIES LLC**,
a Colorado limited liability company


By:_____
Name: Kenneth C. Ware
Its: Manager


By:_____
Name: Amin Suliaman
Its: Manager



**NATIV DENVER LLC**,
a Colorado limited liability company


By:_____
Name: Kenneth C. Ware
Its: Manager


By:_____
Name: Amin Suliaman
Its: Manager

**LENDER:**

**PANGEA MORTGAGE CAPITAL, LLC**,
an Illinois limited liability


By:_____
   Name: Peter Martay
   Title:  Authorized Signatory

## <u>SCHEDULE OF EXHIBITS</u>

A    -    Legal Description

B    -    Permitted Exceptions

C    -    Insurance Requirements

## **EXHIBIT A**

Legal Description

All that certain real property situated in the County of Denver, State of Colorado, described as follows:

LOTS 13 AND 14, BLOCK 20, EAST DENVER,
CITY AND COUNTY OF DENVER, STATE OF COLORADO.

Commonly known as:  1612 Wazee Street, Denver, Colorado 80202

## **EXHIBIT B**

Permitted Exceptions

[Attached Immediately Following this Page]

**SCHEDULE B**

**EXCEPTIONS FROM COVERAGE**

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

**PART I**

1.      INTENTIONALLY DELETED.

2.      INTENTIONALLY DELETED.

3.      INTENTIONALLY DELETED.

4.      Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the Public Records.

5.      INTENTIONALLY DELETED.

6.      INTENTIONALLY DELETED.

7.      Taxes and assessments for the year 2019, a lien, now due and payable but not yet delinquent. Taxes and assessments for the year 2020, and all subsequent years. Taxes not yet due and payable.

8.      INTENTIONALLY DELETED.

9.      INTENTIONALLY DELETED

10.     INTENTIONALLY DELETED.

11.     ANY ASSESSMENT OR LIEN OF THE 16TH STREET PEDESTRIAN AND TRANSIT MALL LOCAL IMPROVEMENT DISTRICT BY ORDINANCE NO. 597, SERIES 1982, AS DISCLOSED BY THE INSTRUMENT RECORDED ON NOVEMBER 1, 1982 IN BOOK 2683 AT PAGE 140 AT RECEPTION NO. 32109.
(NONE DUE OR PAYABLE AS OF THE EFFECTIVE DATE OF THIS POLICY)

12.     ANY ASSESSMENT OR LIEN OF DOWNTOWN BUSINESS IMPROVEMENT DISTRICT, AS DISCLOSED BY ORDINANCE NO. 501, SERIES 1992 OF THE CITY AND COUNTY OF DENVER RECORDED ON AUGUST 5, 1992 AT RECEPTION NO. R-92-0089656.
(NONE DUE OR PAYABLE AS OF THE EFFECTIVE DATE OF THIS POLICY)

13.     ANY ASSESSMENT OR LIEN OF THE LOWER DOWNTOWN DISTRICT, AS DISCLOSED BY THE ORDINANCE NO. 311, SERIES 2002 INSTRUMENT RECORDED ON APRIL 29, 2002 AT RECEPTION NO. 2002078135.
(NONE DUE OR PAYABLE AS OF THE EFFECTIVE DATE OF THIS POLICY)

14.     TERMS, CONDITIONS, PROVISIONS, AGREEMENTS AND OBLIGATIONS SPECIFIED UNDER THE ADMINISTRATIVE MODIFICATION BY THE CITY AND COUNTY OF DENVER RECORDED ON JANUARY 2, 2002 AT RECEPTION NO. 2002000686.

15.     INTENTIONALLY DELETED.

16.     INTENTIONALLY DELETED.

17.   TERMS, CONDITIONS, PROVISIONS, AGREEMENTS AND OBLIGATIONS SPECIFIED UNDER THE AGREEMENT AFFECTING REAL PROPERTY BY AND BETWEEN LANI LEE PROPERTIES, LLC AND THE DEPARTMENT OF PUBLIC WORKS, BUILDING INSPECTION DIVISION, A GOVERNMENTAL AGENCY OF THE CITY AND COUNTY OF DENVER RECORDED ON DECEMBER 2, 1997 AT RECEPTION NO. 9700163041 AND RECEPTION NO. 9700163042.

18.   TERMS, CONDITIONS, PROVISIONS, AGREEMENTS AND OBLIGATIONS SPECIFIED UNDER THE ORDINANCE NO. 109, SERIES OF 1988 DESIGNATING THE LOWER DOWNTOWN PRESERVATION DISTRICT RECORDED ON MARCH 18, 1988 AT RECEPTION NO. 245871 AND RECEPTION NO. 247056.

19.   AN EASEMENT FOR UTILITIES AND INCIDENTAL PURPOSES GRANTED TO PUBLIC SERVICE COMPANY OF COLORADO BY THE INSTRUMENT RECORDED ON APRIL 14, 1998 AT RECEPTION NO. 9800056540 AND AS DELINEATED ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY CBM SURVEYS, INC., DATED FEBRUARY 25, 2020 JOB NO. 20-2567.

20.   THIS EXCEPTION HAS BEEM MOVED TO SCHEDULE B PART 2.

21.   THIS EXCEPTION HAS BEEM MOVED TO SCHEDULE B PART 2.

22.   THE FOLLOWING MATTERS DISCLOSED BY ALTA/NSPS LAND TITLE SURVEY PREPARED BY CBM SURVEYS, INC., DATED FEBRUARY 25, 2020 JOB NO. 20-2567 AS FOLLOWS:

A. ENCROACHMENT OF THE BUILDING OVER PUBLIC SERVICE COMPANY EASEMENT RECORDED AT RECEPTION NO. 9800056540.
B. ENCROACHMENT OF ARCHITECTURAL ELEMENTS EXTENDING INTO WAZEE STREET RIGHT OF WAY BY 0.2 FEET.
C. BRICK COLUMNS ON SOUTH SIDE OF BUILDING ENCROACHING ONTO ADJACENT PARKING LOT AND VARYING BETWEEN 0.5 FEET TO AS MUCH AS 1.1 FEET AS SHOWN.
D. ENCROACHMENT OF NEIGHBORING 1 STORY BRICK BUILDING LOCATED ON LOT 12 ONTO LOT 13 0.1 FEET INSIDE THE PROPERTY AT THE WAZEE STREET AREA AND 0.2 FEET AT THE ALLEY AREA.
E. ENCROACHMENT OF METAL RAILING ON RAISED PATIO ONTO CONCRETE SIDEWALK ON THE WAZEE STREET RIGHT OF WAY.

23.   TERMS, CONDITIONS, EASEMENTS, PROVISIONS, RESTRICTIONS AND OBLIGATIONS AS SET FORTH IN PARTITION AGREEMENT RECORDED MARCH 20, 1900 IN BOOK 1351 AT PAGE 70 OLD ARAPAHOE COUNTY RECORDS AND SHOWN ON ALTA/NSPS LAND TITLE SURVEY PREPARED BY CBM SURVEYS, INC., DATED FEBRUARY 25, 2020 JOB NO. 20-2567.

## EXHIBIT C

Insurance Requirements

### I.  POLICIES REQUIRED:

**Flood Insurance –** Required, if applicable, in at least maximum coverage per the National Flood Insurance Program (NFIP) (currently $500,000.00). A separate flood policy, declaration page(s), or signed application and proof of payment are acceptable as evidence of insurance for closing. Flood zones beginning with letter "A" or "V" are considered flood zones.

**Commercial General Liability –** required on a per occurrence basis, providing coverage for liabilities with primary coverage of not less than $1,000,000.00 per occurrence, and $2,000,000.00 general aggregate per year, covering liability due to personal and bodily injury or death and property damage arising from premises and operations, elevators, escalators, independent contractors, contractual liability, products and completed operations. The deductible or self-insured retention under such policy shall not exceed $5,000.00. Borrower should be shown as Named Insured and Lender and general contractor (if applicable) as Additional Insureds.

**Workman's Compensation Liability and Employer Liability –** as applicable, insurance should be included in accordance with state requirements. The deductible or self-insured retention under such policy shall not exceed $5,000.00. Since Lender cannot be named as additional insured, Lender should be shown as Certificate Holder.

**Builder's Risk –** If required, controlled Insurance Program or Wrap Up All-Risk or All Risk Policy purchased by Borrower which consists of Builder's Risk insurance for the projected value of the project and Commercial General Liability ($1,000,000.00 per occurrence and $2,000,000.00 for general aggregate). Individual policies are acceptable for the above.

**Ordinance or Law –** covering increased cost of construction, cost of demolition of undamaged portion of the property, and resulting loss of income.

**Contractors Liability Insurance Liability –** If General Contractor provides this policy, coverage is required on a per occurrence basis, providing coverage for those liabilities with primary coverage of not less than $1,000,000.00 per occurrence, and $5,000,000.00 general aggregate per year. Mortgagor and Agent should be shown as Additional Insureds.

**Dram Shop Liability Insurance –** $1,000,000 for business that serve, sell, distribute, manufactor or supply alcoholic beverages.

**Fidelity or Crime Coverage –** covering against losses resulting from dishonest or fraudulent acts committed by employees or agents providing services for or on behalf of Borrower.

### II.  ACCEPTABLE EVIDENCE OF INSURANCE:

____ Builder's Risk / property coverages on ACORD form 28 or 27 with detailed endorsements & coverages

____ Liability coverages on ACORD form 25 with additional insured endorsement attached

____ Proof of payment(s) provided

2

___ Carriers carry an AM BEST rating of A / VII or better (http//www.ambest.com)

___ Lender shown as Mortgagee and Loss Payee on Builder's Risk, property

___ Lender shown as Additional Insured on Liability coverages

___ Lender and Borrower shown as Additional Insured on General Contractor Liability coverages

___ Borrower Name shown as Named Insured or Additional Named Insured

___ If policies provided by a general contractor, Borrower and Lender shown as Additional Insureds

___ Policy Term should be 12 months for Builder's Risk and Liability coverages

___ Full Property Address(es) identified

___ Policy numbers must be provided

___ No co-insurance is accepted

___ Policy must be "special form"

### III.   ENDORSEMENTS (as applicable):

___ Course of construction coverage written on 100% non-reporting, completed value form

___ Replacement Cost – 100% of projected value; does not include land costs or building market value

___ Agreed Amount – if policies include coinsurance requirement

___ Delayed Income/Soft Costs

___ Permission to Occupy

___ In Transit

___ Soft and Hard costs

___ Deductible should be no more than $10,000.00

___ 30-day written notice of cancellation

___ 10-day written notice of non-payment

___ Additional Insured – liability policies

___ Mortgagee and Loss Payee – Builder's Risk and other property coverages

3

**General Liability (accord 25) (Lender named as Additional Insured) – addressed to:**

    Pangea Mortgage Capital, LLC
    Pangea Properties
    Pangea Equity Partners II, LP
    549 W. Randolph Street, 2nd Floor
    Chicago, Illinois  60661

    CIBC Bank USA and Trust ISAOA
    PO BOX 5034
    Troy, MI 48007-5034

**Property Certificate (accord 27 or 28) (Lender named as Mortgagee and Loss Payee) – addressed to:**

    Pangea Mortgage Capital, LLC
    Pangea Properties
    Pangea Equity Partners II, LP
    549 W. Randolph Street, 2nd Floor
    Chicago, Illinois  60661

    CIBC Bank USA and Trust ISAOA
    PO BOX 5034
    Troy, MI 48007-5034

## SCHEDULE I

[FORM OF PAYMENT DIRECTION LETTER]

[Borrower Letterhead]

_____ \_\_, 20\_\_

**VIA FedEx**

Tenant at **1612 Wazee Street, Denver CO 80202**

Re:      Payment Direction Letter for **1612 Wazee Street, Denver CO 80202**

Dear Tenant:

    **KDA PROPERTIES LLC** and **NATIV DENVER LLC** (individually and collectively, "*Owner*"), the owner of the above captioned property (the "*Property*"), has mortgaged the Property to **PANGEA MORTGAGE CAPITAL LLC**, an Illinois limited liability company (together with its successors and assigns, the "*Lender*") and has agreed that all rents and other income due for the Property will be paid directly to a bank selected by Lender.  Therefore, from and after the date hereof (until you are otherwise notified as provided below), all rent to be paid by you under your lease (the "*Lease*") should be sent by [wire or ACH <u>directly</u> to the Deposit Account described on <u>Exhibit A</u> attached hereto and made a part hereof] [by check or money order should be made <u>directly</u> to Deposit Account described on <u>Exhibit A</u> attached hereto and made a part hereof.]

    These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or Lender's agent ("*Servicer*"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all payments due under the Lease as directed above.  All such payments must be delivered no later than the day on which such amounts are due under the Lease.

    If you have any questions concerning this letter, please contact the persons identified for notice purposes in the Lease.  We appreciate your cooperation in this matter.

OWNER:

**[BOR SIG BLOCK]**

5

<u>EXHIBIT A</u>

<u>DEPOSIT ACCOUNT FOR WIRE OR ACH PAYMENTS</u>

OR

<u>EXHIBIT A</u>

<u>LOCKBOX ACCOUNT FOR PAYMENT BY CHECK OR MONEY ORDER</u>

## SCHEDULE II

[FORM OF CREDIT CARD DIRECTION LETTER]

[BORROWER LETTERHEAD]

_____ __, 20__

_____
_____
_____
_____

Re:   Credit Card Direction Letter for [KDA PROPERTIES LLC and NATIV DENVER LLC]
[NATIV Denver Hotel]

To Whom It May Concern:

**KDA PROPERTIES LLC and NATIV DENVER LLC**   (individually and collectively, "*Owner*"), the owner of the above captioned property (the "*Property*"), has mortgaged the Property to **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company (together with its successors and assigns, "*Lender*") and has agreed that all receipts received for the Property will be paid directly to a bank selected by Lender.  Therefore, from and after the date hereof (until you are otherwise notified as provided below), please remit all payments due to the [Owner] [Lessee] under that certain [REFERENCE AGREEMENT], dated [___], [____] (the "*Agreement*") between the [Owner] [Lessee] and you, as follows:

| | |
|---|---|
| Bank Name: | [_____] |
| ABA#: | [_____] |
| Attn: | [_____] |
| Fax: | [_____] |
| Account: | [_____] |

These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or Lender's agent ("*Servicer*"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all payments due under the Lease as directed above.  All such payments must be delivered no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact the persons identified for notice purposes in the Lease.  We appreciate your cooperation in this matter.

OWNER:

**[BOR SIG BLOCK]**



2020036070
Page: 1 of 37

03/12/2020 07:39 AM          R $193.00
City & County of Denver                        D $0.00
Electronically Recorded                  DOT

EXHIBIT 3

RECORDING REQUESTED
BY AND WHEN RECORDED
RETURN TO:

Safarian Choi & Bolstad LLP
555 S. Flower Street, Suite 650
Los Angeles, California 90071
Attention: Chris K. Safarian, Esq.

## DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS

by

**KDA PROPERTIES LLC**, a Colorado limited liability company,
and
**NATIV DENVER LLC**, a Colorado limited liability company,

collectively, jointly and severally, as Trustor,

to

**PUBLIC TRUSTEE OF DENVER COUNTY, COLORADO,**
as Trustee,

for the benefit of

**PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability,
as Beneficiary

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING AND IS TO BE INDEXED IN THE REAL PROPERTY RECORDS.

ATTENTION COUNTY RECORDER: THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9-501 OF THE COLORADO COMMERCIAL CODE. PORTIONS OF THE GOODS COMPOSING A PART OF THE REAL ESTATE PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE REAL ESTATE DESCRIBED IN EXHIBIT "A" HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE ADDRESSES OF TRUSTOR (DEBTOR) AND BENEFICIARY (SECURED PARTY) ARE SPECIFIED IN SECTION 25 OF THIS INSTRUMENT.

<u>NOTICE: SOME OF THE OBLIGATIONS SECURED HEREBY PROVIDE FOR PERIODIC INCREASES AND/OR DECREASES IN THE APPLICABLE INTEREST RATE.</u>

RECORDING REQUESTED
BY AND WHEN RECORDED
RETURN TO:

Safarian Choi & Bolstad LLP
555 S. Flower Street, Suite 650
Los Angeles, California 90071
Attention: Chris K. Safarian, Esq.

## DEED OF TRUST, SECURITY AGREEMENT,
## FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS

**by**

**KDA PROPERTIES LLC**, a Colorado limited liability company,
and
**NATIV DENVER LLC**, a Colorado limited liability company,

collectively, jointly and severally, as Trustor,

to

**PUBLIC TRUSTEE OF DENVER COUNTY, COLORADO,**
as Trustee,

for the benefit of

**PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability,
as Beneficiary

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING AND IS TO BE INDEXED IN THE REAL PROPERTY RECORDS.

ATTENTION COUNTY RECORDER: THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9-501 OF THE COLORADO COMMERCIAL CODE. PORTIONS OF THE GOODS COMPOSING A PART OF THE REAL ESTATE PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE REAL ESTATE DESCRIBED IN EXHIBIT "A" HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE ADDRESSES OF TRUSTOR (DEBTOR) AND BENEFICIARY (SECURED PARTY) ARE SPECIFIED IN SECTION 25 OF THIS INSTRUMENT.

<u>NOTICE: SOME OF THE OBLIGATIONS SECURED HEREBY PROVIDE FOR PERIODIC INCREASES AND/OR DECREASES IN THE APPLICABLE INTEREST RATE.</u>

## DEED OF TRUST, SECURITY AGREEMENT,
## FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS

**THIS DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS** (this "Deed of Trust") is made as of March 11, 2020, **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Trustor"), to **PUBLIC TRUSTEE OF DENVER COUNTY, COLORADO** ("Trustee"), for the benefit of PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company, and its successors and assigns (the "Beneficiary").

## WITNESSETH:

Beneficiary is making a loan to Trustor in an amount not to exceed **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00) (the "Loan") pursuant to that certain Loan Agreement of even date herewith by and between Trustor and Beneficiary, the provisions of which are incorporated herein by reference to the same extent as if fully set forth herein (said Loan Agreement and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "Loan Agreement"; any terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement). The Loan is evidenced by that certain Promissory Note dated as of even date herewith in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00) from Trustor to Beneficiary (as amended, modified, and restated from time to time, the "Note"). The Loan is due and payable in full on June 30, 2021, as may be extended pursuant to the terms of the Note (the "Maturity Date"), except as such date may be accelerated pursuant to the terms hereof or of any other Loan Document (as hereinafter defined).

This Deed of Trust encumbers certain real estate located in Denver County, Colorado, legally described on **Exhibit A** attached hereto, and payment of the Note is secured by this Deed of Trust, financing statements and other security documents (this Deed of Trust, the Note, the Loan Agreement, and all other documents evidencing or securing the Loan (as amended, modified, replaced or restated from time to time) are collectively hereinafter referred to as the "Loan Documents").

To secure (i) the payment when and as due and payable of the principal of and interest on the Loan or so much thereof as may be advanced from time to time, and any and all late charges and all other indebtedness evidenced by or owing under the Note and any of the other Loan Documents, together with any extensions, modifications, renewals or refinancings of any of the foregoing, (ii) the payment of all other indebtedness which this Deed of Trust by its terms secures, and (iii) the performance and observance of the covenants and agreements contained in this Deed of Trust, the Loan Agreement, the Note and each of the other Loan Documents, except for (1) the obligations of Amin Suliaman, an individual, and Kenneth C. Ware, an individual (collectively "Guarantor"), under that certain Guaranty of Payment dated as of the date hereof, and (2) the obligations of Trustor and Guarantor under that certain Environmental Indemnity Agreement ("Indemnity"), dated as of even date herewith, which obligations, notwithstanding anything to the contrary in this Deed of Trust, shall not be secured by this Deed of Trust (all of

2

such indebtedness, obligations and liabilities identified in (i), (ii), and (iii) above being hereinafter referred to as the "Debt"), the Trustor does hereby GRANT, BARGAIN, SELL, CONVEY, TRANSFER, ASSIGN, MORTGAGE, WARRANT and SET OVER unto the Trustee for the benefit of Beneficiary, its successors and assigns, and does hereby grant to Beneficiary, its successors and assigns a security interest in, all and singular the properties, rights, interests and privileges described in Granting Clauses I, II, III, IV, V, VI, VII, VIII and IX below, all of same being collectively referred to herein as the "Premises":

## GRANTING CLAUSE I:

THE LAND located in Denver County, Colorado, which is legally described on **Exhibit A** attached hereto and made a part hereof (the "Land");

## GRANTING CLAUSE II:

TOGETHER WITH all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements to or for any such buildings, structures and improvements and all of the right, title and interest of the Trustor now or hereafter acquired in and to any of the foregoing, including without limitation those certain improvements to be constructed on the Land in accordance with the Loan Agreement (the "Improvements");

## GRANTING CLAUSE III:

TOGETHER WITH all easements, rights of way, strips and gores of land, streets, ways, alleys, sidewalks, vaults, passages, sewer rights, waters, water courses, water drainage and reservoir rights and powers (whether or not appurtenant), all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, easements, franchises, appendages and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, whether now owned or hereafter acquired by the Trustor, including without limitation all existing and future mineral, oil and gas rights which are appurtenant to or which have been used in connection with the Land, all existing and future water stock relating to the Land or the Improvements, all existing and future share of stock respecting water and water rights pertaining to the Land or the Improvements or other evidence of ownership thereof, and the reversions and remainders thereof (the "Appurtenant Rights");

## GRANTING CLAUSE IV:

TOGETHER WITH all machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever, and all furniture, furnishings and other personal property now or hereafter owned by the Trustor and forming a part of, or used or obtained for use in connection with, the Land or the Improvements or any present or future operation, occupancy, maintenance or leasing thereof; including, but without limitation, any and all heating, ventilating and air conditioning equipment and systems, antennae, appliances, apparatus, awnings, basins, bathtubs, bidets, boilers, bookcases, cabinets, carpets, communication systems, coolers, curtains, dehumidifiers, dishwashers, disposals, doors, drapes, drapery rods, dryers, ducts, dynamos, elevators, engines, equipment, escalators, fans, fittings, floor coverings, furnaces, furnishings,

3

furniture, hardware, heaters, humidifiers, incinerators, lighting, machinery, motors, ovens, pipes, plumbing and electric equipment, pool equipment, pumps, radiators, ranges, recreational facilities and equipment, refrigerators, screens, sprinklers, stokers, stoves, shades, shelving, sinks, security systems, toilets, ventilators, wall coverings, washers, windows, window covering, wiring and all extensions, renewals or replacements thereof or substitutions therefor or additions thereto, whether or not the same are or shall be attached to the Land or the Improvements in any manner (collectively, the "Fixtures"); it being agreed that all of said property owned by the Trustor and placed on the Land or on or in the Improvements (whether affixed or annexed thereto or not) shall, so far as permitted by law, conclusively be deemed to be real property and conveyed hereby for purposes of this Deed of Trust;

## GRANTING CLAUSE V:

TOGETHER WITH the following (the "Personal Property"):

All personal property of every nature whatsoever (including all licenses and permits (including the Liquor License)) now or hereafter owned by Trustor or used in connection with the Land or the improvements thereon, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements thereof and all of the right, title and interest of Trustor in and to any such personal property together with the benefit of any deposits or payments now or hereafter made on such personal property by Trustor or on its behalf, including without limitation, any and all reserves, escrows and deposit accounts and Goods, Investment Property, Instruments, Chattel Paper, Documents, Letter of Credit Rights, reserves, escrow, Accounts, Deposit Accounts, Commercial Tort Claims and General Intangibles, each as defined in the Uniform Commercial Code of the State of Colorado (the "Code") located on the Land or in the Improvements which are now or in the future owned by Debtor and used or obtained for use in connection with the Land or the improvements or any present or future operation, occupancy, maintenance or leasing thereof, or any construction on or at the Land or the Improvements;

All proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceeds or the taking of the Land or improvements thereon or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Land or improvements thereon or proceeds of any sale, option or contract to sell the Land or improvements thereon or any portion thereof;

Any and all additions and accessories to all of the foregoing and any and all proceeds (including proceeds of insurance, eminent domain or other governmental takings and tort claims), renewals, replacements and substitutions of all of the foregoing;

All of the books and records pertaining to the foregoing;

## GRANTING CLAUSE VI:

TOGETHER WITH all right, title and interest which the Trustor hereafter may acquire in and to all leases and other agreements now or hereafter entered into for the occupancy or use of the Land, the Appurtenant Rights, the Improvements, the Fixtures and the Personal Property or

4

any portion thereof, whether written or oral (herein collectively referred to as the "Leases"), and all rents, issues, incomes and profits in any manner arising thereunder (including all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales (including mini bar revenues) and service charges) (herein collectively referred to as the "Rents"), all of which Trustor hereby absolutely and unconditionally assigns to Beneficiary, and all right, title and interest which the Trustor now has or hereafter may acquire in and to any bank accounts, security deposits, and any and all other amounts held as security under the Leases, all of which Trustor hereby absolutely and unconditionally assigns to Beneficiary, reserving to the Trustor any statutory rights;

### GRANTING CLAUSE VII:

TOGETHER WITH any and all Awards and Insurance Proceeds, as each are hereinafter respectively defined, or proceeds of any sale, option or contract to sell the Premises or any portion thereof (provided that, except as expressly set forth in the Loan Agreement, no right, consent or authority to sell the Premises or any portion thereof shall be inferred or deemed to exist by reason hereof or any other Loan Document); and the Trustor hereby authorizes, directs and empowers the Beneficiary, at its option, on the Trustor's behalf, or on behalf of the successors or assigns of the Trustor, to adjust, compromise, claim, collect and receive such proceeds; to give acquittances therefor; and, after deducting expenses of collection, including reasonable attorneys' fees, costs and disbursements, to apply the Net Proceeds, as hereinafter defined, to the extent not utilized for the Restoration of the Premises as provided in the Loan Agreement hereof, to payment of the Debt, notwithstanding the fact that the same may not then be due and payable or that the Debt is otherwise adequately secured; and the Trustor agrees to execute and deliver from time to time such further instruments as may be requested by the Beneficiary to confirm such assignment to the Beneficiary of any such proceeds;

### GRANTING CLAUSE VIII:

TOGETHER WITH all rights reserved to or granted to the developer or declarant under the provisions of any (i) declaration of restrictive covenants and easements affecting the Land or the Premises, or (ii) homeowners' declaration or other declarations affecting the Land or the Premises;

### GRANTING CLAUSE IX:

TOGETHER WITH all estate, right, title and interest, homestead or other claim or demand, as well in law as in equity, which the Trustor now has or hereafter may acquire of, in and to the Premises, or any part thereof, and any and all other property of every kind and nature from time to time hereafter (by delivery or by writing of any kind) conveyed, pledged, assigned or transferred as and for additional security hereunder by the Trustor or by anyone on behalf of the Trustor to the Beneficiary;

TO HAVE AND TO HOLD the Premises unto Trustee, and its successors and substitutes in this trust and to its and their successors and assigns, in trust, WITH POWER OF SALE AND

THE RIGHT OF RE-ENTRY AND POSSESSION, for the benefit of Beneficiary and its successors and assigns, upon the terms, provisions and conditions herein set forth; subject, however, to those encumbrances which the Beneficiary has approved in the Loan Agreement or otherwise approved in writing (the "Permitted Encumbrances");

UPON CONDITION that, subject to the terms hereof and until the occurrence of an Event of Default hereunder, the Trustor shall be permitted to possess and use the Premises;

SUBJECT to the covenants and conditions hereinafter set forth.

PROVIDED, NEVERTHELESS, that if (i) the Trustor shall pay and perform in full when due the Debt and shall duly and timely perform and observe all of the covenants and conditions herein and in the other Loan Documents required to be performed and observed by the Trustor, and (ii) the Beneficiary shall have no further obligation to make any further disbursements of the Loan to or for the benefit of Trustor under the provisions of the Loan Agreement, then the Beneficiary shall execute and deliver to the Trustor such instruments as may be reasonably requested by the Trustor which are sufficient to release this Deed of Trust.

THE TRUSTOR FURTHER COVENANTS AND AGREES AS FOLLOWS:

1.      Representations of Trustor.    Trustor hereby represents and warrants to the Beneficiary as follows:

(a)     Trustor (i) is a limited liability company duly formed and validly existing under the laws of the State of Colorado and has complied with all conditions prerequisite to its doing business in the State of Colorado; (ii) has the power and authority to own its property and to carry on its business as now being conducted; (iii) is qualified to do business in every jurisdiction in which the nature of its business or its property makes such qualification necessary; and (iv) is in compliance with all laws, regulations, ordinances and orders of public authorities applicable to it.

(b)     The Trustor has good and marketable title to an indefeasible fee simple estate in the Premises, subject to no liens, charges or encumbrances, other than the Permitted Encumbrances; that it has good, right and lawful authority to mortgage the Premises in the manner and form herein provided; that this Deed of Trust is and shall remain a valid and enforceable lien on the Premises subject only to the Permitted Encumbrances; that Trustor and its successors and assigns shall defend the same and the priority of this lien forever against the lawful claims and demands of all persons whomsoever, and that this covenant shall not be extinguished by any foreclosure hereof or by any disposition of the Premises, but shall run with the Land.

(c)     The Trustor has and shall maintain title to the collateral for the Loan, including any additions or replacements thereto, free of all security interests, liens, and encumbrances, other than the security interest hereunder.

(d)     No person who owns twenty percent (20.00%) or more of the equity interests in the Trustor, or otherwise controls the Trustor or any of its subsidiaries, is listed on the Specially Designated Nationals and Blocked Person List or other similar

6

lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, and the proceeds of the Loan will not violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto.

2.    Trustor's Covenants.

(a)    Payment of Debt.  The Trustor shall, prior to the expiration of any grace period: (i) pay the Debt when due, and (ii) duly and punctually perform and observe all of the covenants and conditions to be performed or observed by the Trustor as provided in the Note, the Loan Agreement, this Deed of Trust and the other Loan Documents.

(b)    Repair/Maintenance.    The Trustor shall (i) promptly repair, restore, replace or rebuild any portion of the Premises which may be damaged or destroyed whether or not Insurance Proceeds (as hereinafter defined) are available or sufficient for that purpose;  (ii) keep the Premises in good condition and repair, free from waste; (iii) pay all operating costs and expenses of the Premises when due; (iv) comply with all legal requirements applicable to all or any portion of the Premises, or the use and occupancy, thereof (subject to the right of the Trustor to contest the enforceability or applicability of any such legal requirements in good faith, diligently and at its expense by appropriate proceedings which shall not subject the Trustor or the Beneficiary to any risk of civil or criminal liability and which shall operate during the pendency thereof to prevent the imposition or foreclosure of any lien upon, or any interference with the availability, use or occupancy of, the Premises or any part thereof), and observe and comply with any conditions and requirements necessary to preserve and extend any and all rights, licenses, permits (including without limitation zoning variances, special exceptions and nonconforming uses), privileges, franchises and concessions that are applicable to all or any portion of the Premises or the use and occupancy thereof; (v) refrain from any action, and correct any condition known to the Trustor, which would materially increase the risk of fire or other hazard to the Premises or any portion thereof; and (vi) cause the Premises to be managed in a competent and professional manner.

(c)    Alteration of Premises.    Without the prior written consent of the Beneficiary, the Trustor shall not cause, suffer or permit (i) any material alteration of the Premises, except as required by any applicable legal requirement or as otherwise contemplated by the Loan Agreement; (ii) any change in the zoning classification or intended use or occupancy of the Premises, including without limitation any change which would increase any fire or other hazard; (iii) any change in the identity of the Trustor or the person or entity responsible for managing the Premises; or (iv) any modification of the licenses, permits, privileges, franchises, covenants, conditions or declarations of use applicable to the Premises, except as required to operate the Premises in the manner required hereunder.

(d)    Compliance with Laws.  The Trustor shall comply with all regulations, rules, ordinances, statutes, orders, and decrees of any governmental authority or court applicable to the Trustor or to the Premises or any part thereof.

3.    Liens, Contest and Defense of Title.

(a)    The Trustor shall not create or suffer or permit any lien, charge or encumbrance to attach to or be filed against the Premises or any part thereof, or interest thereon, or any other rights and properties conveyed, mortgaged, transferred and granted hereunder (except for Permitted Encumbrances), whether such lien, charge or encumbrance is on a parity, inferior or superior to the lien of this Deed of Trust, including liens for labor or materials with respect to the Premises ("Mechanic's Liens").

(b)    If the lien and security interest of the Beneficiary in or to the Premises, or any part thereof, shall be endangered or shall be attacked by Mechanic's Liens or otherwise, directly or indirectly, the Trustor shall immediately notify the Beneficiary and shall appear in and defend any action or proceeding purporting to affect the Premises, or any part thereof, and shall file and prosecute such proceedings and take all actions necessary to preserve and protect such title, lien and security interest in and to the Premises and, in any event the applicable Mechanic's Lien or other attack shall be fully paid and released no later than fifteen (15) days after the filing thereof.

4.    Payment and Contest of Taxes.

(a)    The Trustor shall pay or cause to be paid when due and before any penalty attaches, all general and special taxes, assessments, water charges, sewer charges, and other fees, taxes, charges and assessments of every kind and nature whatsoever levied or assessed against the Premises, or any part thereof, or any interest therein, or any income or revenue therefrom, or any obligation or instrument secured hereby, and all installments thereof (collectively, the "Taxes"), on or before the date such Taxes are due, except to the extent Beneficiary makes payments with Trustor's deposits under Section 21 hereof; and the Trustor shall discharge any claim or lien relating to Taxes upon the Premises.  The Trustor shall provide the Beneficiary with copies of paid receipts for Taxes, if requested by the Beneficiary, within ten (10) days after being requested to do so by the Beneficiary.

(b)    Notwithstanding paragraph (a) of this Section, the Trustor may, in good faith and with reasonable diligence, contest or cause to be contested the validity or amount of any such Taxes, provided that: (i) no Event of Default has occurred; (ii) such proceeding shall stay the collection of the applicable Taxes from Trustor and from the Premises or Trustor shall have paid all of the applicable Taxes under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Trustor is subject and shall not constitute a default thereunder, (iv) neither the Premises nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost so long as the contest is being pursued, and (v) Trustor shall have deposited with Beneficiary adequate reserves for the payment of the applicable Taxes, together with all interest and penalties thereon, unless Trustor has paid all of the applicable Taxes under protest, or Trustor shall have furnished such other security as may be accepted by Beneficiary, in its sole and absolute discretion, to insure the payment of any contested Taxes, together with all interest and penalties thereon. If the Trustor fails to prosecute such contest with reasonable diligence or fails to maintain sufficient funds as hereinabove provided, the Beneficiary may, at its

8

option, liquidate any securities and apply the monies then on deposit with the Beneficiary (or other depositary), in payment of, or on account of, such Taxes, or any portion thereof then unpaid, including all penalties and interest thereon according to any written bill, notice or statement, without inquiry as to the amount, validity or enforceability thereof. If the amount of money and any such security so deposited shall (in the Beneficiary's reasonable judgment) at any time be insufficient for the payment in full of such Taxes, together with all penalties and interest which are or might become due thereon, the Trustor shall forthwith, upon demand, either deposit with the Beneficiary (or other depositary designated by the Beneficiary) a sum (or such other security as shall be reasonably satisfactory to the Beneficiary) which when added to the funds then on deposit, shall (in the Beneficiary's reasonable judgment) be sufficient to make such payment in full, or, if the Beneficiary (or other depositary) has applied funds so deposited on account of such Taxes, restore such deposit to an amount satisfactory to the Beneficiary.  After final disposition of such contest and upon the Trustor's written request and delivery to the Beneficiary of an official bill for such Taxes, the Beneficiary (or other depositary) shall liquidate any securities and apply the monies, if any, then on deposit under this Section 4 to the payment of such Taxes or that part thereof then unpaid and the balance, if any, in excess of the amount required to be on deposit with the Beneficiary (or other depositary) under Section 21 hereof shall be refunded to the Trustor after such final disposition, provided that no Event of Default shall then exist.

5.   Change in Tax Laws.

(a)   If, by the laws of the United States of America, or of any state or municipality having jurisdiction over the Beneficiary, the Trustor or the Premises, any tax is imposed or becomes due in respect of the Note or this Deed of Trust (excluding income, excise or franchise taxes imposed upon the Beneficiary, except as provided in Section 5(c) below), or any liens on the Premises created thereby, then the Trustor shall pay such tax in the manner required by such law.

(b)   If any law, statute, rule, regulation, order or court decree effects a deduction from the value of the Premises for the purpose of taxation by creating any lien thereon, or imposing upon the Beneficiary any liability for the payment of all or any part of the Taxes required to be paid by the Trustor, or changing in any way the laws relating to the taxation of mortgages or deeds of trusts or debts secured by mortgages or deeds of trust or the interest of the Beneficiary in the Premises, or the manner of collection of Taxes so as to adversely affect this Deed of Trust, the Debt, or the Beneficiary, then, and in any such event, the Trustor, upon demand by the Beneficiary, shall pay such Taxes, or reimburse the Beneficiary therefor on demand, unless the Beneficiary determines, in the Beneficiary's sole judgment, that such payment or reimbursement by the Trustor is unlawful or that the payment might, in the Beneficiary's judgment, constitute usury or render the Debt wholly or partially usurious; in which event the Beneficiary may elect to declare the Debt to be due and payable within the lesser of (i) thirty (30) days after written notice, or (ii) such shorter period as may be required to ensure compliance by Beneficiary with applicable law.

(c)     Nothing contained herein shall require the Trustor to pay any income, franchise or excise tax imposed upon the Beneficiary, excepting only such income, franchise or excise tax which may be levied against the income of the Beneficiary as a complete or partial substitute for Taxes required to be paid by the Trustor hereunder.

6.     <u>Insurance Coverage</u>.  For so long as this Deed of Trust is in effect, Trustor shall continuously maintain insurance in accordance with the provisions of the Loan Agreement.

7.     <u>The Beneficiary's Performance of the Trustor's Obligations</u>.

(a)     Upon the occurrence of an Event of Default hereunder, the Beneficiary may, but without any obligation to do so, upon simultaneous notice to the Trustor, make any payment or perform any act which the Trustor is required to make or perform hereunder or under any other Loan Document (whether or not the Trustor is personally liable therefor) in any form and lawful manner deemed expedient to the Beneficiary, including without limitation, the right to enter into possession of the Premises, or any portion thereof, and to take any action (including without limitation the release of any information regarding the Premises, the Trustor and the obligations secured hereby) which the Beneficiary deems necessary or desirable in connection therewith, all at the sole cost and expense of the Trustor.  The Beneficiary, in addition to any rights or powers granted or conferred hereunder but without any obligation to do so, may complete construction of, rent, operate, and manage the Premises, or any part thereof, including payment of management fees and other operating costs and expenses, of every kind and nature in connection therewith, so that the Premises shall be operational and usable for their intended purposes.  All monies paid, and all reasonable expenses paid or incurred in connection therewith, including but not limited to reasonable costs of surveys, evidence of title, court costs and attorneys' fees and expenses and other monies advanced by the Beneficiary to protect the Premises and the lien hereof, to complete construction of, rent, operate and manage the Premises or to pay any such operating costs and expenses thereof or to keep the Premises operational and usable for their intended purposes shall be so much additional Debt, and shall become immediately due and payable on demand, and with interest thereon at the Default Rate.

(b)     The Beneficiary, in making any payment, may do so according to any written bill, notice, statement, or estimate, without inquiry into the amount, validity, or enforceability thereof.

(c)     Nothing contained herein shall be construed to require the Beneficiary to advance or expend monies for any purpose mentioned herein, or for any other purposes.

8.     <u>Security Agreement</u>.

(a)     <u>Grant of Security Interest</u>.  Trustor hereby grants to Beneficiary a security interest in the Personal Property to secure the Debt.  This Deed of Trust constitutes a security agreement with respect to all Personal Property in which Beneficiary is granted a security interest hereunder, and Beneficiary shall have all of the rights and remedies of a

secured party under the Code, as well as all other rights and remedies available at law or in equity.

(b) <u>Perfection</u>. Trustor hereby consents to any instrument that may be requested by Beneficiary to publish notice or protect, perfect, preserve, continue, extend, or maintain the security interest and lien, and the priority thereof, of this Deed of Trust or the interest of Beneficiary in the Premises, including, without limitation, deeds of trust, security agreements, financing statements, continuation statements, and instruments of similar character, and Trustor shall pay or cause to be paid (i) all filing and recording taxes and fees incident to each such filing or recording, (ii) all expenses, including without limitation, actual attorneys' fees and costs (of both in house and outside counsel), incurred by Beneficiary in connection with the preparation and acknowledgement of all such instruments, and (iii) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the delivery of such instruments. Trustor hereby consents to, and hereby ratifies, the filing of any financing statements relating to the Loan made prior to the date hereof. Trustor hereby irrevocably constitutes and appoints Beneficiary as the attorney-in-fact of Trustor, to file with the appropriate filing office any such instruments. In addition, Trustor hereby authorizes Beneficiary to cause any financing statement or fixture filing to be filed or recorded without the necessity of obtaining the consent of Trustor.

(c) <u>Place of Business</u>. Trustor maintains its chief executive office as set forth as the address of Trustor in Section 25 below, and Trustor will notify Beneficiary in writing of any change in its place of business within five (5) days of such change.

(d) <u>Fixture Filing</u>. This Deed of Trust is intended to be a financing statement within the purview of 9-501(a)(1)(B) and 9-502(c) of the Code and will be recorded as a "fixture filing" in accordance with the Code.

(e) <u>Representations and Warranties</u>. The Trustor represents and warrants that: (i) the Trustor is the record owner of the Premises; (ii) the Trustor's chief executive office is located in the State of Colorado; (iii) the Trustor's state of organization is the State of Colorado; (iv) the Trustor's exact legal name is as set forth on Page 1 of this Deed of Trust; (v) Trustor is the owner of the Personal Property subject to no liens, charges or encumbrances other than the lien hereof, (vi) the Personal Property will not be removed from the Premises without the consent of the Beneficiary, and (vii) no financing statement covering any of the Personal Property or any proceeds thereof is on file in any public office except pursuant hereto.

(f) <u>Additional Agreements of Trustor</u>. Trustor agrees that:

(i) Where Personal Property is in possession of a third party, Trustor will join with the Beneficiary in notifying the third party of the Beneficiary's interest and obtaining an acknowledgment from the third party that it is holding the Personal Property for the benefit of Beneficiary;

11

(ii)    If an Event of Default has occurred and remains continuing, at Beneficiary's request, Trustor will cooperate with the Beneficiary in obtaining control with respect to Personal Property consisting of:  deposit accounts, investment property, letter of credit rights and electronic chattel paper; and

(iii)    Until the Indebtedness is paid in full, Trustor will not change the state where it is located or change its company name without giving the Beneficiary at least 30 days' prior written notice in each instance.

(g)    <u>Additional Rights of Beneficiary</u>.  In addition to Beneficiary's rights under the Code, Beneficiary may, but shall not be obligated to, at any time and at the expense of Trustor (i) give notice to any person of Beneficiary's rights hereunder and enforce such rights; (ii) insure, protect, defend and preserve the Personal Property and any rights or interests of Beneficiary therein; (iii) inspect such Personal Property; and (iv) endorse, collect and receive any right to payment of money owing to Trustor under or from such Personal Property.  Beneficiary shall have no duty or obligation to make or give any presentments, demands for performance, notices of non-performance, notices of protest or notices of dishonor in connection with any of such Personal Property.

(h)    <u>No Derogation of Deed of Trust</u>.  Trustor and Beneficiary agree that the filing of a financing statement in the records normally having to do with personal property shall never be construed as in any way derogating from or impairing this Deed of Trust and the intention of the parties that everything used in connection with the production of income from the Premises or adapted for use therein or which is described or reflected in this Deed of Trust is, and at all times and for all purposes and in all proceedings both legal or equitable shall be regarded as, part of the real estate subject to the lien hereof, irrespective of whether (i) any such item is physically attached to improvements located on such real property or (ii) any such item is referred to or reflected in any financing statement so filed at any time.  Similarly, the mention in any such financing statement of (A) the rights in or the proceeds of any fire or hazard insurance policy or (B) any award in eminent domain proceedings for taking or for loss of value or for any cause of action or proceeds thereof in connection with any damage or injury to the Premises or any part thereof shall never be construed as in any way altering any of the rights of Beneficiary as determined by this instrument or impugning the priority of Beneficiary's lien granted hereby or by any other recorded document, but such mention in such financing statement is declared to be for the protection of Beneficiary in the event any court shall at any time hold with respect to matters (A) and (B) above that notice of Beneficiary's priority of interest, to be effective against a particular class of persons, including, without limitation, the Federal government and any subdivision or entity of the Federal government, must be filed in the personal property records or other commercial code records.

(i)    <u>Code Section 9-334</u>.  It is understood and agreed that, in order to protect Beneficiary from the effect of Code Section 9-334, as amended from time to time, in the event that (i) Trustor intends to purchase any goods which may become fixtures to the Land or Improvements, or any part thereof, and (ii) such goods will be subject to a security interest held by a seller or any other party, Trustor shall, before executing any

12

security agreement or other document evidencing such security interest, obtain the prior written approval of Beneficiary, and all requests for such written approval shall be in writing and contain the following information:

> (i)    A description of the fixtures to be replaced, added to installed or substituted;

> (ii)   The address at which the fixtures will be replaced, added to, installed or substituted; and

> (iii)  The name and address of the proposed holder and proposed amount of the security interest;

and any failure of Trustor to obtain such approval shall be a material breach of Trustor's covenants under this Deed of Trust, and shall, at the option of Beneficiary, entitle Beneficiary to all rights and remedies provided for herein upon default. No consent by Beneficiary pursuant to this section shall be deemed to constitute an agreement to subordinate any right of Beneficiary in fixtures or other property covered by this Deed of Trust. Beneficiary shall have the right to acquire by assignment from the holder of such security interest any and all contract rights, accounts receivable, negotiable or non-negotiable instruments or other evidence of Trustor's indebtedness for such personal property or fixtures and, upon acquiring such interest by assignment, shall have the right to enforce the security interest as assignee thereof in accordance with the terms and provisions of the Code then in effect and in accordance with any other provisions of law. If at any time Trustor fails to make any payment on an obligation secured by a security interest in such personal property or fixtures, Beneficiary, at its option, may at any time pay the amount secured by such security interest and the amount so paid shall be (i) secured by this Deed of Trust and shall be a lien on the Premises having the same priorities as the liens and security interests created by this Deed of Trust, and (ii) payable on demand with interest at the rate specified in the Note from the time of such payment. If Trustor shall fail to make such payment to Beneficiary within ten (10) days after demand, the entire principal sum secured thereby with all unpaid accrued interest and late charges or other amounts owing thereunder, shall, at the option of Beneficiary, become due and payable immediately.

9.    <u>Restrictions on Transfer</u>. For the purpose of protecting the Beneficiary's security, and keeping the Premises free from subordinate financing liens, the Trustor agrees that it, the members of Trustor, and the members, partners or stockholders of any entity controlling, directly or indirectly, Trustor, will not:

> (a)    sell, assign, transfer, hypothecate, grant a security interest in or convey title to (collectively, "<u>Transfer</u>") (i) the Premises or any part thereof, or (ii) any membership interest in Trustor, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Trustor;

(b)     obtain any financing, all or a part of which, will be secured by (i) the Premises, or (ii) any membership interest in Trustor, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Trustor; or

(c)     convert the Trustor from one type of legal entity into another type of legal entity,

without, in each instance, the Beneficiary's prior written consent.  Any violation of this Section 9 shall be deemed a "Prohibited Transfer."  Any transfers in favor of Beneficiary under the Loan Documents shall not be deemed Prohibited Transfers.

10.     Events of Default.  Any one or more of the following events shall constitute an "Event of Default" under this Deed of Trust:

(a)     If the Trustors shall fail (i) to make any payment of principal or interest under the Note when due, or (ii) to make any other payment under the Loan Documents within five (5) days of the date when due or, if no date is stated, five (5) days after demand (or such shorter period as may be expressly provided for herein or therein); or

(b)     If a Prohibited Transfer shall occur; or

(c)     Trustor fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Trustor contained in this Deed of Trust and not specifically referred to elsewhere in this Section 10; provided, however, that if such failure by its nature can be cured, then so long as the continued operation and safety of the Premises, and the priority, validity and enforceability of the liens created by this Deed of Trust or any of the other Loan Documents and the value of the Premises are not impaired, threatened or jeopardized, then Trustor shall have a period ("Cure Period") of ten (10) days after Trustor obtains actual knowledge of such failure or receives written notice of such failure to cure the same and an Event of Default shall not be deemed to exist during the Cure Period (provided, however, such period shall be limited to five (5) days if such failure can be cured by the payment of money); or

(d)     If any Event of Default occurs under any other Loan Document.

11.     Remedies and Application of Proceeds.  Upon the occurrence of an Event of Default (regardless of the pendency of any proceeding which has or might have the effect of preventing Trustor from complying with the terms of this instrument), and in addition to such other rights as may be available under any other Loan Document or under applicable law, but subject at all times to any mandatory legal requirements:

(a)     Acceleration.  Beneficiary may declare the outstanding principal balance of the Note and all unpaid indebtedness of Trustor hereby secured, including interest then accrued thereon, to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without other notice or demand of any kind; provided, however, if the Event of Default is under Section 8(d) of the Loan Agreement, all unpaid

14

indebtedness of Trustor hereby secured shall be immediately due and payable without any action by Beneficiary.

(b) <u>Uniform Commercial Code</u>. Beneficiary shall, with respect to the Personal Property, have all the rights, options, and remedies of a secured party under the Code, including without limitation, the right to the possession of any such property or any part thereof, and the right to enter with legal process any premises where any such property may be found. Any requirement of said Code for reasonable notification shall be met by mailing written notice to Trustor at its address set forth in Section 25 hereof at least ten (10) days prior to the sale or other event for which such notice is required. Any such sale may be held as part of and in conjunction with any foreclosure sale or other sale of the other properties and rights constituting the Premises in order that the Premises, including the Personal Property, may be sold as a single parcel if the Beneficiary elects. The Trustor hereby agrees that if the Beneficiary demands or attempts to take possession of the Personal Property or any portion thereof in exercise of its rights and remedies hereunder, the Trustor will promptly turn over and deliver possession thereof to the Beneficiary, and the Trustor authorizes, to the extent the Trustor may now or hereafter lawfully grant such authority, the Beneficiary, its employees and agents, and potential bidders or purchasers to enter upon the Premises or any other office, building or property where the Personal Property or any portion thereof may at the time be located (or believed to be located) and the Beneficiary may (i) remove the same therefrom or render the same inoperable (with or without removal from such location); (ii) repair, operate, use or manage the Personal Property or any portion thereof; (iii) maintain, repair or store the Personal Property or any portion thereof; (iv) view, inspect and prepare the Personal Property or any portion thereof for sale, lease or disposition; (v) sell, lease, dispose of or consume the same or bid thereon; or (vi) incorporate the Personal Property or any portion thereof into the Land or the Improvements or Fixtures and sell, convey or transfer the same. The expenses of retaking, selling and otherwise disposing of the Personal Property, including reasonable attorneys' fees and legal expenses incurred in connection therewith, shall constitute so much additional Debt and shall be payable upon demand with interest at the Default Rate.

(c) <u>Foreclosure</u>. Beneficiary may bring an action in any court of competent jurisdiction to foreclose this instrument or to enforce any of the covenants hereof.

(d) <u>Power of Sale</u>. Beneficiary may elect to sell by exercise of the power of sale herein contained by way of a public trustee sale pursuant to the provisions of Title 38, Colorado Revised Statutes, as currently in effect, as amended, or in any other manner then permitted by law, the Land and such other property which is Land and Improvements or which Beneficiary has elected to treat as Land and Improvements and, upon such election, such notice of Event of Default and election to sell shall be given as may then be required by law. Thereafter, upon the expiration of such time and the giving of such notice of sale as may then be required by law, at the time and place specified in the notice of sale, Trustee shall sell such Premises, or any portion thereof specified by Beneficiary, at public auction to the highest bidder for cash in lawful money of the United States. Trustee may, and upon request of Beneficiary shall, from time to time, postpone the sale by public announcement thereof at the time and place noticed therefor.

15

If the Premises consist of several lots, parcels, or interests, Beneficiary may designate the order in which the same shall be offered for sale or sold. Trustor waives all rights to direct the order in which any of the Premises will be sold in the event of any sale under this Deed of Trust, and also any of right to have any of the Premises marshaled upon any sale. In the case of a sale under this Deed of Trust, the said property, real, personal, and mixed, may be sold in one parcel or more than one parcel. Should Beneficiary desire that more than one such sale or other disposition be conducted, Beneficiary may, at its option, cause the same to be conducted simultaneously, or successively on the same day, or at such different days or times and in such order as Beneficiary may deem to be in its best interest. Any person, including Trustor, Trustee, or Beneficiary, may purchase at the sale. Beneficiary, from time to time before the trustee's sale pursuant to this section, may rescind any notice of Event of Default and of election to cause to be sold the Premises by executing and delivering to Trustee a written notice of such rescission, which notice, shall also constitute a cancellation of any prior Event of Default and demand for sale. The exercise by Beneficiary of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring or impair the right of Beneficiary to execute and deliver to Trustee, as above provided, other declarations of default and demand for sale, and notices of breach or default, nor otherwise affect any provision, covenant or condition of the Note and/or of this Deed of Trust or any of the rights, obligations or remedies of the parties thereunder or hereunder. Trustee shall deliver to such purchaser or purchasers thereof a certificate of purchase, which shall describe the property sold to such purchaser and shall state that upon the expiration of any applicable periods for redemption, the holder of such certificate will be entitled to a deed to the property described in the certificate. After the expiration of any applicable periods of redemption, the officer who conducted such sale shall, upon request, execute and deliver an appropriate deed to the holder of the certificate of purchase or the last certificate of redemption, as the case may be, and such deed shall operate to divest Borrower and all Persons claiming under Borrower of all right, title and interest, whether legal or equitable, in the property described in the deed. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers. Nothing in this section dealing with foreclosure procedures or specifying particular actions to be taken by Lender or by Trustee or any similar officer shall be deemed to contradict or add to the requirements and procedures now or hereafter specified by Colorado law, and any such inconsistency shall be resolved in favor of Colorado law applicable at the time of foreclosure.

(e)    Taking Possession; Appointment of Receiver; etc. Beneficiary may, in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of Beneficiary's security, enter without process of law upon and take possession of the Premises, or any part thereof, and do any acts which Beneficiary deems necessary or desirable to preserve the value, marketability or rentability of the Premises, or to increase the income therefrom or to protect the security hereof and, with or without taking possession of any of the Premises, sue for or otherwise collect all rents and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorneys' fees and expenses, upon the Indebtedness, all in such order as Beneficiary may

determine. The collection of rents and profits and the application thereof shall not cure or waive any Event of Default or notice thereof or invalidate any act done in response thereto or pursuant to such notice. In furtherance of the foregoing, to the fullest extent permitted by applicable law, following the occurrence of an Event of Default and during the continuance thereof, Beneficiary shall have the right to apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Premises as a matter of strict right and without regard to the value of the Premises or the adequacy of the security for the Debt, the existence of a declaration that the Debt is immediately due and payable, or the filing of a notice of default, and Trustor hereby consents to such appointment.

(f)     Indemnity.  The Trustor hereby agrees to indemnify, defend, protect and hold harmless the Beneficiary and its employees, officers and agents from and against any and all liabilities, claims and obligations which may be incurred, asserted or imposed upon them or any of them as a result of or in connection with any use, operation, or lease of any of the Premises, or any part thereof, or as a result of the Beneficiary seeking to obtain performance of any of the obligations due with respect to the Premises; provided, however, that the foregoing indemnity shall not extend to such liabilities, claims or obligations as result from the gross negligence or intentional misconduct of the Beneficiary, its employees, officers or agents.

(g)     [Reserved].

(h)     [Reserved].

(i)     Application of Escrowed Sums.  Beneficiary may apply any sums then held in escrow or otherwise by Beneficiary in accordance with the terms of this Deed of Trust or any other Loan Document to the payment of the Debt.

(j)     Application of Proceeds.   Except as otherwise required by law, Beneficiary may apply the proceeds of any foreclosure or disposition hereunder to payment of the following: (i) the expenses of such foreclosure or disposition, including, without limitation, the fees of Trustee and the costs of the Tests and Studies, (ii) the cost of any search or other evidence of title procured in connection therewith and revenue stamps on any deed or conveyance, (iii) all sums expended under the terms hereof, not then repaid, with accrued interest in the amount provided herein, (iv) all other sums secured hereby, and (v) the remainder, if any, to the person or persons legally entitled thereto.

(k)     Credit Bid.  Upon any sale or sales made under or by virtue of this section, whether made under the power of sale or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Beneficiary may bid for and acquire the Premises or any part thereof.  In lieu of paying cash for the Premises, Beneficiary may make settlement for the purchase price by crediting against the Indebtedness the sales price of the Premises, as adjusted for the expenses of sale and the costs of the action and any other sums for which Trustor is obligated to reimburse Trustee or Beneficiary under this Deed of Trust.

(l)     Repairs During Redemption Period.   In the event that Trustor has an equity of redemption and the Premises is sold pursuant to the power of sale or otherwise under or by virtue of this paragraph, the purchaser may, during any redemption period allowed, make such repairs or alterations (but not additions) on said Premises as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof.   Any sums so paid together with interest thereon from the time of such expenditures at the Default Rate (if not prohibited by law, otherwise at the highest lawful contract rate) shall be added to and become a part of the amount required to be paid for redemption from such sale.

12.     Waiver of Rights.  The Trustor hereby covenants and agrees that it will not at any time insist upon or plead, or in any manner claim or take any advantage of, any stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter in force providing for the valuation or appraisement of the Premises, or any part thereof, prior to any sale or sales thereof to be made pursuant to any provisions herein contained, or to decree, judgment or order of any court of competent jurisdiction; or, after such sale or sales, claim or exercise any rights under any statute now or hereafter in force to redeem the property so sold, or any part thereof, or relating to the marshalling thereof, upon foreclosure sale or other enforcement hereof; and without limiting the foregoing:

(a)     The Trustor hereby expressly waives any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Deed of Trust, on its own behalf and on behalf of each and every person, it being the intent hereof that any and all such rights of reinstatement and redemption of the Trustor and of all other persons are and shall be deemed to be hereby waived;

(b)     The Trustor will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to the Beneficiary but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(c)     If the Trustor is a trustee, Trustor represents that the provisions of this paragraph (including the waiver of reinstatement and redemption rights) were made at the express direction of Trustor's beneficiaries and the persons having the power of direction over Trustor, and are made on behalf of the trust estate of Trustor and all beneficiaries of Trustor, as well as all other persons mentioned above.

(d)     To the full extent Trustor may do so, Trustor agrees that Trustor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Trustor, for Trustor, Trustor's heirs, devisees, representatives, successors and assigns, and for any and all persons ever claiming any interest in the Premises, to the extent permitted by applicable law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the secured indebtedness, notice of election to mature or declare due the whole of the secured indebtedness and all rights to a marshaling of assets of

18

Trustor, including the Premises, or to a sale in inverse order of alienation in the event of foreclosure of the liens and/or security interests hereby created. Trustor shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents, or other matters whatever to defeat, reduce or affect the right of Beneficiary under the terms of this Deed of Trust to a sale of the Premises for the collection of the secured indebtedness without any prior or different resort for collection, or the right of Beneficiary under the terms of this Deed of Trust to the payment of the secured indebtedness out of the proceeds of sale of the Premises in preference to every other claimant whatever.

(e)     Trustor hereby waives all rights of a property owner under applicable laws, or any successor statute, providing for the allocation of condemnation proceeds between a property owner and a lienholder.

13.     Costs and Expenses of Foreclosure or Other Sale.  In any suit to foreclose the lien hereof or with respect to any sale under the power of sale herein, there shall be allowed and included as additional indebtedness therein all expenditures and expenses which may be paid or incurred by or on behalf of Beneficiary for appraiser's fees, outlays for documentary and expert evidence, stenographic charges, publication costs and costs (which may be estimated as to items to be expended after the entry of the decree) of procuring all such abstracts of title, title searches and examination, guarantee policies, and similar data and assurances with respect to title as Beneficiary may deem to be reasonably necessary either to prosecute any foreclosure action or to evidence to the bidder at any sale pursuant thereto or any other sale the true condition of the title to or the value of the Premises, and reasonable attorneys' fees, all of which expenditures shall become so much additional Debt which Trustor agrees to pay and all of such expenditures shall be immediately due and payable with interest thereon from the date of expenditure until paid at the Default Rate.

14.     Protective Advances.

(a)     Advances, disbursements and expenditures made by Beneficiary for the following purposes, whether before and during a foreclosure, and at any time prior to sale (whether pursuant to a foreclosure or the power of sale contained herein or otherwise), and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, shall, in addition to those otherwise authorized by this Deed of Trust, constitute "Protective Advances":

(i)     all advances by Beneficiary in accordance with the terms of this Deed of Trust to:  (A) preserve or maintain, repair, restore or rebuild the improvements upon the Premises; (B) preserve the lien of this Deed of Trust or the priority thereof; or (C) enforce this Deed of Trust;

(ii)     payments by Beneficiary of:  (A) when due, installments of principal, interest or other obligations in accordance with the terms of any prior lien or encumbrance; (B) when due, installments of Taxes and assessments, general and special and all other Taxes and assessments of any kind or nature

19

whatsoever which are assessed or imposed upon the Premises or any part thereof; (C) other obligations authorized by this Deed of Trust; or (D) any other amounts in connection with other liens, encumbrances or interests reasonably necessary to preserve the status of title to the Premises;

(iii)   advances by Beneficiary in settlement or compromise of any claims asserted by claimants under any prior liens;

(iv)   reasonable attorneys' fees and other costs incurred:   (A) in connection with the foreclosure of this Deed of Trust or the exercise of the power of sale contained herein; (B) in connection with any action, suit or proceeding brought by or against the Beneficiary for the enforcement of this Deed of Trust or arising from the interest of the Beneficiary hereunder or under any of the other Loan Documents; or (C) in the preparation for the commencement or defense of any such foreclosure or other action;

(v)   advances of any amount required to make up a deficiency in deposits for installments of Taxes and assessments and insurance Premiums as may be authorized by this Deed of Trust;

(vi)   expenses deductible from proceeds of sale in accordance with applicable law; and

(vii)   expenses incurred and expenditures made by Beneficiary for any one or more of the following:  (A) Premiums for casualty and liability insurance paid by Beneficiary whether or not Beneficiary or a receiver is in possession, if reasonably required, in reasonable amounts, and all renewals thereof, without regard to any limitation to maintaining of existing insurance in effect at the time any receiver or mortgagee takes possession of the Premises imposed by applicable law, if any; (B) repair or Restoration of damage or destruction in excess of available Insurance Proceeds or condemnation awards; (C) payments required or deemed by Beneficiary to be for the benefit of the Premises under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the Premises; (D) shared or common expense assessments payable to any association or corporation in which the owner of the Premises is a member in any way affecting the Premises; (E) pursuant to any lease or other agreement for occupancy of the Premises.

(b)   All Protective Advances shall be so much additional Debt, and shall become immediately due and payable without notice and with interest thereon from the date of the advance until paid at the Default Rate.

(c)   This Deed of Trust shall be a lien for all Protective Advances as to subsequent purchasers and judgment creditors from the time this Deed of Trust is recorded.

(d)     All Protective Advances shall, except to the extent, if any, that any of the same is clearly contrary to or inconsistent with the provisions of applicable law, apply to and be included in the:

(i)     determination of the amount of Debt at any time;

(ii)    indebtedness found due and owing to the Beneficiary in the judgment of foreclosure and any subsequent supplemental judgments, orders, adjudications or findings by the court of any additional indebtedness becoming due after such entry of judgment, it being agreed that in any foreclosure judgment, the court may reserve jurisdiction for such purpose;

(iii)   determination of amounts deductible from sale proceeds pursuant to applicable law;

(iv)    application of income in the hands of any receiver or mortgagee in possession; and

(v)     computation of any deficiency judgment.

15.   <u>Rights Cumulative</u>.

(a)     Each right, power and remedy herein conferred upon the Beneficiary is cumulative and in addition to every other right, power or remedy, express or implied, now or hereafter provided by law or in equity, and each and every right, power, and remedy herein set forth or otherwise so existing may be exercised from time to time concurrently or independently and as often and in such order as may be deemed expedient by the Beneficiary.

(b)     By accepting payment of any sums secured by this Deed of Trust after the due date thereof, by accepting performance of any of the Trustor's obligations hereunder after such performance is due, or by making any payment or performing any act on behalf of the Trustor which the Trustor was obligated but failed to perform or pay, the Beneficiary shall not waive, nor be deemed to have waived, its rights to require payment when due of all sums secured hereby and the due, punctual and complete performance of the Trustor's obligations under this Deed of Trust, the Note, and all other Loan Documents. No waiver or modification of any of the terms of this Deed of Trust shall be binding on the Beneficiary unless set forth in writing signed by the Beneficiary and any such waiver by the Beneficiary of any Event of Default by the Trustor under this Deed of Trust shall not constitute a waiver of any other Event of Default under the same or any other provision hereof. If the Beneficiary holds any additional security for any of the obligations secured hereby, it may pursue its rights or remedies with respect to such security at its option either before, contemporaneously with, or after a sale of the Premises or any portion thereof.

(c)     No act or omission by the Beneficiary shall release, discharge, modify, change or otherwise affect the liability of Trustor or any other Trustor under the Note, this Deed of Trust, or any of the other Loan Documents, or any other obligation of the

Trustor, or any subsequent purchaser of the Premises or any part thereof, or any maker, co-signer, endorser, surety or guarantor, or preclude the Beneficiary from exercising any right, power or privilege herein granted or intended to be granted in the event of any Event of Default then made or of any subsequent Event of Default, or alter the security interest or lien of this Deed of Trust or any of the other Loan Documents except as expressly provided in an instrument or instruments executed by the Beneficiary. The exercise of one right, power or remedy shall not be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy; and no delay or omission of the Beneficiary in the exercise of any right, power or remedy accruing hereunder or under any of the other Loan Documents or arising otherwise shall impair any such right, power or remedy, or be construed to be a waiver of any Event of Default or acquiescence therein. Except as otherwise specifically required herein, notice of the exercise of any right, remedy or power granted to the Beneficiary by this Deed of Trust is not required to be given.

16.     Successors and Assigns; Assignment.

(a)     This Deed of Trust and each and every provision hereof shall be binding upon the Trustor and its successors and assigns (including, without limitation, each and every record owner from time to time of the Premises or any other person having an interest therein), and shall inure to the benefit of the Beneficiary and its successors and assigns.

(b)     All of the covenants of this Deed of Trust shall run with the Land and be binding on any successor owners of the Land. In the event that the ownership of the Premises or any portion thereof becomes vested in a person or persons other than the Trustor, the Beneficiary may, without notice to the Trustor, deal with such successor or successors in interest of the Trustor with reference to this Deed of Trust and the Debt in the same manner as with the Trustor without in any way releasing or discharging the Trustor from its obligations hereunder. The Trustor will give immediate written notice to the Beneficiary of any conveyance, transfer or change of ownership of the Premises, but nothing in this Section shall vary or negate the provisions of Section 9 hereof.

(c)     The rights and obligations of Trustor under this Deed of Trust may not be assigned and any purported assignment by Trustor shall be null and void. Beneficiary shall have the right to sell, assign or transfer portions of its right, title and/or interest in and to this Deed of Trust and the other Loan Documents (including the sale of participation interests therein), without the consent or approval of Trustor, and Trustor agrees to cooperate in all respects with Beneficiary in connection therewith, including, without limitation, the execution of all documents and instruments reasonably requested by Beneficiary or such transferee provided that such documents and instruments do not materially adversely affect any of Trustor's duties or obligations under this Deed of Trust and the other Loan Documents.

17.     Execution of Separate Security Agreements, Financing Statements, Etc.; Estoppel Letter; Corrective Documents.

22

(a)     The Trustor will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, mortgages, security agreements, financing statements and assurances as the Beneficiary shall reasonably require for the better assuring, conveying, mortgaging, assigning and confirming unto the Beneficiary all property mortgaged hereby or property intended so to be, whether now owned by the Trustor or hereafter acquired. Without limitation of the foregoing, the Trustor will assign to the Beneficiary, upon request, as further security for the Debt, its interest in all agreements, contracts, licenses and permits affecting the Premises, such assignments to be made by instruments reasonably satisfactory to the Beneficiary, but no such assignment shall be construed as a consent by the Beneficiary to any agreement, contract, license or permit or to impose upon the Beneficiary any obligations with respect thereto.

(b)     From time to time, the Trustor will furnish or caused to be furnished, within ten (10) days after request from the Beneficiary, a written and duly acknowledged statement of the amount due under the Note and this Deed of Trust and whether any alleged offsets or defenses exist against the Debt.

(c)     The Trustor and the Beneficiary shall, at the request of the other, promptly correct any defect, error or omission which may be discovered in the contents of this Deed of Trust or in the execution or acknowledgment hereof or in any other instrument executed in connection herewith or in the execution or acknowledgment of such instrument and will execute and deliver any and all additional instruments as may be requested by the Beneficiary or the Trustor, as the case may be, to correct such defect, error or omission.

18.     Subrogation.  If any part of the Debt is used directly or indirectly to pay off, discharge or satisfy, in whole or in part, any prior lien or encumbrance upon the Premises or any part thereof, then by advancing the monies to make such payment, the Beneficiary shall be subrogated to the rights of the holder thereof in and to such other lien or encumbrance and any additional security held by such holder, and shall have the benefit of the priority of the same.

19.     Governing Law.  THIS DEED OF TRUST SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES; PROVIDED, HOWEVER, THAT TO THE EXTENT THE MANDATORY PROVISIONS OF THE LAWS OF ANOTHER JURISDICTION RELATING TO (I) THE CREATION, VALIDITY, PRIORITY, PERFECTION OR THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTERESTS IN ANY OF THE PREMISES, (II) THE LIEN, ENCUMBRANCE OR OTHER INTEREST IN THE PROPERTY GRANTED OR CONVEYED BY THIS DEED OF TRUST OR THE ENFORCEMENT THEREOF, OR (III) THE AVAILABILITY OF AND PROCEDURES RELATING TO ANY REMEDY HEREUNDER OR RELATED TO THIS DEED OF TRUST ARE REQUIRED TO BE GOVERNED BY SUCH OTHER JURISDICTION'S LAWS, THOSE OTHER LAWS SHALL BE DEEMED TO GOVERN AND CONTROL.

20.     Business Loan.

(a)     The Trustor declares, represents, certifies and agrees that the proceeds of the Note will be used solely for business purposes and that the loans are exempted transactions under the Truth in Lending Act, 15 U.S.C. Section 1601 et seq.

(b)     All rights, remedies and powers provided by this Deed of Trust may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law, and all the provisions of this Deed of Trust are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Deed of Trust invalid or unenforceable under the provisions of any applicable law.

21.     [Reserved].

22.     Assignment of Leases and Other Agreements Affecting the Premises.  In order to further secure payment of the Debt and the observance, performance and discharge of the Trustor's obligations under the Loan Documents, the Trustor hereby assigns to the Beneficiary all of the Trustor's right, title, interest and estate in, to and under all of the Leases and in and to all of the Rents and Profits (defined as all rents, income, issues and profits arising from any Leases other agreements affecting the use, enjoyment or occupancy of the Premises now or hereafter made affecting the Premises or any portion thereof), as more particularly described in that certain Assignment of Leases and Rents dated as of even herewith from Trustor to and for the benefit of Beneficiary.  Unless and until an Event of Default occurs, the Trustor shall be entitled to collect the Rents and Profits (except as otherwise provided in this Deed of Trust) as and when they become due and payable.   Neither these assignments nor Beneficiary's enforcement of the provisions of these assignments (including the receipt of the Rents) will operate to subordinate the lien of this Deed of Trust to any of the rights of any tenant, or to subject Beneficiary to any liability to any such tenant for the performance of any obligations of Trustor under any such Lease unless and until Beneficiary agrees to such subordination or assumes such liability by an appropriate written instrument.

23.     Inspection of Premises and Records.  The Beneficiary and its representatives and agents shall have the right to inspect the Premises and all books, records and documents relating thereto at all reasonable times, after giving reasonable notice to the Trustor, and access thereto, subject to the rights of tenants pursuant to Leases.  The Beneficiary shall use reasonable efforts to avoid disturbing business operations on the Premises during such inspections.  The Trustor or the Beneficiary thereof shall keep and maintain full and correct books and records showing in detail the income and expenses of the Premises and permit the Beneficiary or its agents to examine such books and records and all supporting vouchers and data at any time and from time to time on request at its offices at the address hereinafter identified or at such other location as may be mutually agreed upon.

24.     Financial Statements.   Trustor represents and warrants that the financial statements for Trustor and the Premises previously submitted to Beneficiary are true, complete and correct in all material respects, disclose all actual and contingent liabilities of Trustor or relating to the Premises and do not contain any untrue statement of a material fact or omit to state a fact material to such financial statements.  No material adverse change has occurred in the financial condition of Trustor or the Premises from the dates of said financial statements until the

date hereof. Trustor shall furnish to Beneficiary such financial information regarding Trustor, its constituent partners or members, as the case may be, the Premises, any Guarantor and/or the Tenant as may be required pursuant to the terms of the Loan Agreement.

25.   Environmental Matters.

(a)   Trustor acknowledges that concurrently herewith Trustor has executed and delivered to Beneficiary the Indemnity pursuant to which Trustor and Guarantor have fully indemnified Beneficiary for certain environmental matters concerning the Premises, as more particularly described therein. Trustor agrees to abide by all of the provisions of the Indemnity. This Deed of Trust shall not, however, secure the performance of Trustor's and Guarantor's obligations under the Environmental Indemnity.

(b)   In addition to Beneficiary's rights under Section 23, Trustor hereby authorizes Beneficiary, any prospective bidder at any foreclosure sale and their respective officers, directors, employees, agents and independent contractors to enter upon all or any portion of the Premises (including, without limitation, following the occurrence of a default hereunder) for the purpose of conducting such tests, inspections, inquiries, examinations, studies, analyses, samples, surveys, and other information gathering activities (collectively, the "Tests and Studies") with respect to the Premises as any of them may from time to time deem necessary or appropriate, including, without limitation, Tests and Studies with respect to the presence of Hazardous Materials in or around the Premises and the occurrence of any actual, proposed or threatened storage, existence, release, removal, remediation, handling or transportation of any Hazardous Substances in or around the Premises. Except in case of an emergency, or when the Trustor or any tenant has abandoned the Premises, or if it is impracticable to do so, Beneficiary shall give Trustor reasonable advance notice of Beneficiary's intent to enter the Premises and shall enter the Premises only during normal business hours. Trustor hereby covenants and agrees to cooperate fully with such parties in their efforts to conduct the Tests and Studies, and further covenants and agrees to make available to such parties such portions of the Premises as any of them may designate. If Beneficiary is refused the right of entry and inspection by the Trustor or any tenant of the Premises, or is otherwise unable to enter and conduct Tests and Studies on the Premises without a breach of peace, Beneficiary may obtain an order from a court of competent jurisdiction, the appointment of a receiver, or both, to enable Beneficiary to exercise its rights under this section. Beneficiary's rights and remedies set forth herein are in addition to. In that regard, the decision of Beneficiary as to whether there exists a release or threatened release of Hazardous Substances onto the Premises shall be deemed reasonable and conclusive as between the parties hereto. The results of all Tests and Studies shall be and at all times remain the property of Beneficiary and under no circumstances shall Beneficiary have any obligation whatsoever to disclose or otherwise make available to Trustor or any other party such results or any other information obtained by them in connection with such Tests and Studies.

(c)   Notwithstanding the provisions of subsection (a) above, Beneficiary hereby reserves the right, and Trustor hereby expressly authorizes Beneficiary to make available to any party (including, without limitation, any governmental agency or

25

authority and any prospective bidder at any foreclosure sale of the Premises), any and all information which Beneficiary may have with respect to the Premises, whether provided by Trustor or any third party or obtained as a result of Tests and Studies, including, without limitation, environmental reports, surveys and engineering reports. Trustor consents to Beneficiary notifying any party (either as part of a notice of sale or otherwise) of the availability of any or all of the Tests and Studies and the information contained therein. Trustor acknowledges that Beneficiary cannot control or otherwise assure the truthfulness or accuracy of the Tests and Studies, and that the release of Tests and Studies, or any information contained therein, to prospective bidders at any foreclosure sale of the Premises may have a material and adverse effect upon the amount which a party may bid at such sale. Trustor agrees that Beneficiary shall have no liability whatsoever as a result of delivering any or all of the Tests and Studies or any information contained therein to any third party, and Trustor hereby releases, remises and forever discharges Beneficiary from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the Tests and Studies or the delivery thereof.

(d) All costs and expenses incurred by Beneficiary pursuant to this paragraph, including, without limitation, costs of consultants and contractors, costs of repair of any physical injury to the Premises normal and customary to the Tests and Studies, court costs and attorneys' fees, whether incurred in litigation or not and whether before or after judgment, shall be payable by Trustor and, to the extent advanced or incurred by Beneficiary, shall be reimbursed to Beneficiary by Trustor upon demand. It is the parties' intention that Beneficiary be responsible only for the cost of repair of physical injury to the Premises that was not reasonable or necessary to the conducting of the Tests and Studies in accordance with normal and customary procedures. Any and all costs and expenses incurred or advanced by Beneficiary pursuant to this paragraph, together with interest thereon at the rate then applicable under the Note, shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note.

26.    Notices. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth below in this Section or as such party may from time to time designate by written notice to the other parties. Either party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications. Notwithstanding the foregoing, Lender may provide Borrower written notices via electronic mail to Borrower's electronic mail address set forth below and such electronic mail shall be deemed validly delivered and received by Borrower at the time of dispatch by Lender:

| To Beneficiary: | Pangea Mortgage Capital, LLC<br>549 West Randolph Street<br>2nd Floor<br>Chicago, Illinois 60661<br>Attn: Scott Larson<br>Email: slarson@pangeare.com |
| --- | --- |
| With copy to: | Safarian Choi & Bolstad LLP<br>555 South Flower Street, Suite 650<br>Los Angeles, California 90071<br>Attn: Chris K. Safarian, Esq.<br>Email: csafarian@safarianchoi.com |
| To Trustor: | KDA Properties LLC & NATIV Denver LLC<br>1612 Wazee Street<br>Denver, Colorado 80202<br>Attn: Messrs. Suiliaman and Ware<br>Email: amin@nativhospitality.com<br>Kcware76@gmail.com |
| With a copy to: | Bailey & Peterson, PC<br>7991 Shaffer Parkway, Suite 101<br>Littleton, Colorado 80127<br>Attn: James S. Bailey, Esq.<br>Email: bailey@b-p-law.com |

27.   Releases.

(a)   Upon payment in full of all sums due under the Note and this Deed of Trust and the other of the Loan Documents, the Beneficiary shall, upon the request of, and at the cost of, the Trustor, execute a proper release of this Deed of Trust.

(b)   The Beneficiary may, regardless of consideration, cause the release of any part of the Premises from the lien of this Deed of Trust without in any manner affecting or impairing the lien or priority of this Deed of Trust as to the remainder of the Premises not so released.

28.   Single Asset Trustor.   Trustor was organized solely for the purpose of owning, developing, managing, and disposing of the Premises and does not own any real property other than the Premises and does not operate any business other than the development, construction, ownership, management, and operation of the Premises. Trustor shall not during the term of the Loan, including any extensions, modifications, renewals or refinancings thereof, acquire any real property or assets other than the Premises, operate any business other than the acquisition, development, management and disposition of the Premises, or incur any liability or obligation other than those incurred in the ownership and operation of the Premises. Trustor will not commingle any of its funds or assets with those of any other entity and has held, and will hold, all of its assets and conduct all of its business in its own name. Trustor has paid and will pay all of its liabilities out of its own funds and assets. Trustor has allocated and will allocate fairly and

27

reasonably any overhead for shared office space and will use separate stationery, invoices, and checks in connection with the conduct of its business. Trustor has not entered into and will not enter into, or be a party to, any transaction with any of its equity interest holders or its affiliates, except in the ordinary course of its business and on terms which are intrinsically fair and no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party. Trustor will not engage in, seek, or consent to any dissolution, winding up or liquidation, without the express consent of Beneficiary. Trustor's operating agreement limit its purpose to the acquisition, development, management, operation and disposition of the Premises, and such purposes shall not be amended without the prior written consent of Beneficiary, which consent may be withheld by Beneficiary in its sole and absolute discretion.

29.   Indemnification by the Trustor.   The Trustor shall protect and indemnify the Beneficiary from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), imposed upon or incurred by or asserted against the Beneficiary or the members, partners, stockholders, directors, officers, agents or employees of the Beneficiary by reason of (a) ownership of the Premises or any interest therein, or receipt of any Rents or other sum therefrom, (b) any accident to, injury to or death of persons or loss of or damage to Premises occurring on or about the Premises or the adjoining sidewalks, curbs, vaults or vault space, if any, streets or ways, (c) any failure on the part of the Trustor or Guarantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in this Deed of Trust, the Note, any of the other Loan Documents, or any agreement, reimbursement agreement, guaranty, or any other agreements executed by the Trustor, Guarantor, or any other persons directly or indirectly liable for the payment of the Debt, (d) any failure on the part of the Trustor to perform or comply with (i) any other agreement executed by the Trustor or Guarantor, or (ii) any requirement of law, (e) payment of sums for the protection of the lien and security interest of the Beneficiary in and to the Premises, (f) performance of any labor or services or the furnishing of any materials or other Premises in respect of the Premises or any part thereof for construction or maintenance or otherwise, or (g) any action brought against the Beneficiary attacking the validity, priority or enforceability of this Deed of Trust, the Note, any other Loan Document, or any agreement, reimbursement agreement, guaranty, or any other agreements executed by the Trustor or any other persons directly or indirectly liable for the payment of the Debt.   Any amounts payable to the Beneficiary under this paragraph shall bear interest at the Default Rate and shall be secured by this Deed of Trust.   In the event any action, suit or proceeding is brought against the Beneficiary or the members, partners, stockholders, directors, officers, agents or employees of the Beneficiary by reason of any such occurrence, the Trustor, upon the request of the Beneficiary and at Trustor's sole expense, shall resist and defend such action, suit or proceeding or cause the same to be resisted and defended by counsel designated by Trustor and approved by the Beneficiary.   Such obligations under this paragraph shall survive the termination, satisfaction, or release of this Deed of Trust.

30.   OFAC Covenant.   Trustor shall ensure, and cause each of its subsidiaries to ensure, that (i) no person who owns twenty percent (20.00%) or more of the equity interests in the Trustor, or otherwise controls the Trustor or any of its subsidiaries is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the OFAC, the Department of the Treasury or included in any Executive Orders, (ii) the proceeds of the Loan do not violate any of the foreign asset control regulations of OFAC or any enabling

statute or Executive Order relating thereto, and (iii) it shall comply, and cause each of its subsidiaries to comply, with all applicable Bank Secrecy Act laws and regulations, as amended.

31.   Additional Agreements.

(a)   Beneficiary may substitute Trustee hereunder in any manner now or hereafter provided by law or, in lieu thereof, Beneficiary may from time to time, by an instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed and acknowledged by Beneficiary and recorded in the office of the Recorder of the county in which the Land and Improvements are situated, shall be conclusive proof of proper substitution of such successor Trustee, who shall thereupon and without conveyance from the predecessor Trustee, succeed to all its title, estate, rights, powers and duties.

(b)   Beneficiary shall furnish any statement required by law regarding the obligations secured hereby or regarding the amounts held in any trust or reserve fund hereunder. For any such statement, Beneficiary may charge a reasonable fee, not to exceed the maximum amount permitted by law at the time of the request thereof.

(c)   It is expressly stipulated and agreed to be the intent of Beneficiary and Trustor, at all times to comply with applicable laws governing the highest lawful rate or amount of interest payable on the Loan (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under applicable laws). If the applicable law is ever judicially interpreted so as to render usurious any amount called for under this Deed of Trust, the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved or received with respect to the Loan, or if Beneficiary's exercise of the option to accelerate the maturity of the Note or if any prepayment by Trustor results in Trustor having paid any interest in excess of that permitted by applicable law, then it is Trustor's and Beneficiary's express intent that all excess amounts theretofore collected by Beneficiary be credited on the principal balance of the Note (or, if the Note and all other obligations have been or would thereby be paid in full, refunded to Trustor), and the provisions of this Deed of Trust, the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Beneficiary for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the usury ceiling from time to time in effect and applicable to the Loan for so long as the any of the Loan are outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

32.   Miscellaneous.

29

(a)  Time is of the Essence.  Time is of the essence of this Deed of Trust.

(b)  Captions and Pronouns.  The captions and headings of the various Sections of this Deed of Trust are for convenience only, and are not to be construed as confining or limiting in any way the scope or intent of the provisions hereof.  Whenever the context requires or permits, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine and neuter shall be freely interchangeable.

(c)  The Trustor Not a Joint Venturer or Partner.  The Trustor and the Beneficiary acknowledge and agree that in no event shall the Beneficiary be deemed to be a partner or joint venturer with the Trustor.  Without limitation of the foregoing, the Beneficiary shall not be deemed to be such a partner or joint venturer on account of its becoming a mortgagee in possession or exercising any rights pursuant to this Deed of Trust or pursuant to any other instrument or document evidencing or securing any of the Debt, or otherwise.

(d)  Replacement of the Note.  Upon notice to the Trustor of the loss, theft, destruction or mutilation of the Note (or either of them), the Trustor will execute and deliver, in lieu thereof, a replacement note, identical in form and substance to the applicable Note and dated as of the date of such Note and upon such execution and delivery all references in any of the Loan Documents to such Note shall be deemed to refer to such replacement note.

(e)  Waiver of Consequential Damages.  The Trustor covenants and agrees that in no event shall the Beneficiary be liable for consequential damages, whatever the nature of a failure by the Beneficiary to perform its obligation(s), if any, under the Loan Documents, and the Trustor hereby expressly waives all claims that it now or may hereafter have against the Beneficiary for such consequential damages.

(f)  After Acquired Premises.  The lien hereof will automatically attach, without further act, to all after-acquired Premises attached to and/or used in connection with or in the operation of the Premises or any part thereof.

(g)  Severability.  If any provision hereof should be held unenforceable or void, then such provision shall be deemed separable from the remaining provisions and shall in no way affect the validity of this Deed of Trust except that if such provision relates to the payment of any monetary sum, then the Beneficiary may, at its option declare the Debt immediately due and payable.

(h)  Interpretation of Agreement.  Should any provision of this Deed of Trust require interpretation or construction in any judicial, administrative, or other proceeding or circumstance, it is agreed that the parties hereto intend that the court, administrative body, or other entity interpreting or construing the same shall not apply a presumption that the provisions hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of both

30

parties hereto have fully participated in the preparation of all provisions of this Deed of Trust, including, without limitation, all Exhibits attached to this Deed of Trust.

(i)   Joint and Several Obligations; Counterparts.  If this Deed of Trust is executed by more than one Trustor, (i) the obligations and liabilities of Trustor under this Deed of Trust shall be joint and several and shall be binding upon and enforceable against each Trustor and their respective successors and assigns, and (ii) this Deed of Trust may be executed in counterparts, and all said counterparts when taken together shall constitute one and the same Deed of Trust.

(j)   Effect of Extensions and Amendments.  If the payment of the Debt, or any part thereof, be extended or varied, or if any part of the security or guaranties therefor be released, all persons now or at any time hereafter liable therefor, or interested in the Premises shall be held to assent to such extension, variation or release, and their liability, and the lien, and all provisions hereof, shall continue in full force and effect; the right of recourse against all such persons being expressly reserved by the Beneficiary, notwithstanding any such extension, variation or release.

(k)   Mortgagee-in-Possession.  Nothing herein contained shall be construed as constituting the Beneficiary a mortgagee-in-possession in the absence of the actual taking of possession of the Premises by the Beneficiary pursuant to this Deed of Trust.

(l)   No Merger.  The parties hereto intend that the Deed of Trust and the lien hereof shall not merge in fee simple title to the Premises, and if the Beneficiary acquires any additional or other interest in or to the Premises or the ownership thereof, then, unless a contrary intent is manifested by the Beneficiary as evidenced by an express statement to that effect in an appropriate document duly recorded, this Deed of Trust and the lien hereof shall not merge in the fee simple title and this Deed of Trust may be foreclosed as if owned by a stranger to the fee simple title.

(m)   Complete Agreement.  This Deed of Trust, the Note and the other Loan Documents constitute the complete agreement between the parties with respect to the subject matter hereof and the Loan Documents may not be modified, altered or amended except by an agreement in writing signed by both the Trustor and the Beneficiary.

**33.**   JURISDICTION AND VENUE.  TRUSTOR HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY TRUSTOR AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS MORTGAGE SHALL BE LITIGATED IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR, IF BENEFICIARY INITIATES SUCH ACTION, ANY COURT IN WHICH BENEFICIARY SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION.  TRUSTOR HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY BENEFICIARY IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE

MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO TRUSTOR AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS MORTGAGE. TRUSTOR WAIVES ANY CLAIM THAT COOK COUNTY, ILLINOIS, OR THE NORTHERN DISTRICT OF ILLINOIS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD TRUSTOR, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, TRUSTOR SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY BENEFICIARY AGAINST TRUSTOR AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR TRUSTOR SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY BENEFICIARY OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY BENEFICIARY OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND TRUSTOR HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

34.   Waiver of Jury Trial.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRUSTOR AND BENEFICIARY HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG TRUSTOR AND BENEFICIARY ARISING OUT OF OR IN ANY WAY RELATED TO THIS DEED OF TRUST, ANY OTHER LOAN DOCUMENT, OR ANY RELATIONSHIP BETWEEN TRUSTOR AND BENEFICIARY. THIS PROVISION IS A MATERIAL INDUCEMENT TO BENEFICIARY TO PROVIDE THE LOAN DESCRIBED HEREIN AND IN THE OTHER LOAN DOCUMENTS.

35.   Additional Waivers.  TRUSTOR EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY BENEFICIARY ON THIS DEED OF TRUST, ANY AND EVERY RIGHT IT MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY BENEFICIARY.

36.   Compliance with Loan Agreement.  Trustor will abide by and comply with and be governed and restricted by all of the terms, covenants, provisions, restrictions and agreements contained in the Loan Agreement, and in each and every supplement thereto or amendment thereof which may at any time or from time to time be executed and delivered by the parties thereto or their successors and assigns.

37.   Provisions of Loan Agreement.  The proceeds of the Note are to be disbursed by the Beneficiary in accordance with the terms contained in the Loan Agreement, the provisions of

which are incorporated herein by reference to the same extent as if fully set forth herein. Trustor covenants that any and all monetary disbursements made in accordance with the Loan Agreement shall constitute adequate consideration to Trustor for the enforceability of this Deed of Trust and the Note, and that all advances and indebtedness arising and accruing under the Loan Agreement from time to time, whether or not the total amount thereof may exceed the face amount of the Note, shall be secured by this Deed of Trust; provided, however, that the total Debt shall not in any event exceed two hundred percent of the stated principal amount of the Note.

**38.** Joint and Several Liability. This Deed of Trust is made subject to the terms of Section 10.21 of the Loan Agreement and the terms of Section 10.21 of the Loan Agreement are hereby incorporated herein by this reference.

**39.** Counterparts. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together will constitute one and the same instrument. The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this letter agreement attached thereto.

**40.** Future Advances. This Deed of Trust shall secure not only existing indebtedness, but also such future advances, whether such advances are obligatory or to be made at the option of Beneficiary, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust. Any such future advances, whether obligatory or to be made at the option of the Beneficiary, or otherwise, may be made either prior to or after the due date of the Note or any other notes secured by this Deed of Trust. This Deed of Trust is given for the specific purpose of securing any and all indebtedness by the Trustor to Beneficiary in whatever manner this indebtedness may be evidenced or represented, until this Deed of Trust is satisfied of record. All covenants and agreements contained in this Deed of Trust shall be applicable to all further advances made by Beneficiary to Trustor under this future advance clause.

**TRUSTOR ACKNOWLEDGES THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY OR EXTEND CREDIT, ARE NOT ENFORCEABLE UNDER COLORADO LAW.**

**TRUSTOR PLEASE NOTE: UPON THE OCCURRENCE OF A DEFAULT, COLORADO PROCEDURE PERMITS THE TRUSTEE TO SELL THE PREMISES AT A SALE HELD WITHOUT SUPERVISION BY ANY COURT AFTER EXPIRATION OF A PERIOD PRESCRIBED BY LAW. UNLESS YOU PROVIDE AN ADDRESS FOR THE GIVING OF NOTICE, YOU MAY NOT BE ENTITLED TO NOTICE OF THE COMMENCEMENT OF SALE PROCEEDINGS. BY EXECUTION OF THIS DEED OF TRUST, YOU CONSENT TO SUCH PROCEDURE. BENEFICIARY URGES YOU TO GIVE PROMPT NOTICE OF ANY CHANGE IN YOUR ADDRESS SO THAT YOU MAY RECEIVE PROMPTLY ANY NOTICE GIVEN PURSUANT TO THIS DEED OF TRUST.**

**IN WITNESS WHEREOF**, the Trustor has caused this Deed of Trust to be duly executed and delivered as of the day and year first above written.

<u>**TRUSTOR:**</u>

**KDA PROPERTIES LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

**NATIV DENVER LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_____, manager on behalf of _KDA Properties LLC_ a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

```
KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020
```

_07-25-2020_____
(Commission Expiration)


State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_____, manager on behalf of _KDA Properties LLC_ a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

```
KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020
```

_07-25-2020_____
(Commission Expiration)

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_, manager on behalf of _Nativ Denver LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020

_07-25-2020_
(Commission Expiration)


State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_, manager on behalf of _Nativ Denver LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020

_07-25-2020_
(Commission Expiration)

## EXHIBIT "A"

## LEGAL DESCRIPTION

All that certain real property situated in the County of Denver, State of Colorado, described as follows:

LOTS 13 AND 14, BLOCK 20, EAST DENVER,
CITY AND COUNTY OF DENVER, STATE OF COLORADO.


Commonly known as:  1612 Wazee Street, Denver, Colorado 80202

2020036071
Page: 1 of 14

03/12/2020 07:39 AM          R $78.00          D $0.00
City & County of Denver                        ASR
Electronically Recorded

EXHIBIT 4

**RECORDING REQUESTED BY AND**
**WHEN RECORDED RETURN TO:**

Safarian Choi & Bolstad LLP
555 S. Flower Street, Suite 650
Los Angeles, California 90071
Attention: Chris K. Safarian, Esq.

## ASSIGNMENT OF LEASES AND RENTS

THIS **ASSIGNMENT OF LEASES AND RENTS** (this "Assignment") is made as of March 11, 2020, by and from **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Borrower"), to and for the benefit of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company, and its successors and assigns ("Lender").

### RECITALS:

A.      Borrower is the owner of certain real property located in Denver County, State of Colorado, more particularly described in **Exhibit A** attached hereto ("Property").

B.      Lender has agreed to make to Borrower a loan in the maximum principal amount of Six Million Six Hundred Fifty Thousand and No/100 Dollars ($6,650,000.00) (the "Loan") pursuant to that certain Loan Agreement dated as of even date herewith by and between Borrower and Lender, the provisions of which are incorporated herein by reference to the same extent as if fully set forth herein (said Loan Agreement and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "Loan Agreement"; any terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement). The Loan is evidenced by a Promissory Note of even date herewith from Borrower to Lender in the maximum principal amount of Six Million Six Hundred Fifty Thousand and No/100 Dollars ($6,650,000.00) No/100 Dollars ($0.00) (as amended, modified and restated from time to time, the "Note").

C.      The Loan is secured by: (i) that certain Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents of even date herewith which encumbers the Property (as amended, modified, and restated from time to time, the "Deed of Trust"), and (ii) certain other documents evidencing or securing the Loan (together with the Note, the Loan Agreement and the Deed of Trust, the "Loan Documents").

D.      The obligations of Borrower under the Loan Agreement, the Note, the Deed of Trust, this Assignment, and the other Loan Documents, other than the Indemnity (as defined in the Deed of Trust), are collectively referred to herein as the "Obligations".

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Safarian Choi & Bolstad LLP
555 S. Flower Street, Suite 650
Los Angeles, California 90071
Attention: Chris K. Safarian, Esq.

## ASSIGNMENT OF LEASES AND RENTS

**THIS ASSIGNMENT OF LEASES AND RENTS** (this "Assignment") is made as of March 11, 2020, by and from **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Borrower"), to and for the benefit of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company, and its successors and assigns ("Lender").

### RECITALS:

A.      Borrower is the owner of certain real property located in Denver County, State of Colorado, more particularly described in **Exhibit A** attached hereto ("Property").

B.      Lender has agreed to make to Borrower a loan in the maximum principal amount of Six Million Six Hundred Fifty Thousand and No/100 Dollars ($6,650,000.00) (the "Loan") pursuant to that certain Loan Agreement dated as of even date herewith by and between Borrower and Lender, the provisions of which are incorporated herein by reference to the same extent as if fully set forth herein (said Loan Agreement and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "Loan Agreement"; any terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement). The Loan is evidenced by a Promissory Note of even date herewith from Borrower to Lender in the maximum principal amount of Six Million Six Hundred Fifty Thousand and No/100 Dollars ($6,650,000.00) No/100 Dollars ($0.00) (as amended, modified and restated from time to time, the "Note").

C.      The Loan is secured by: (i) that certain Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents of even date herewith which encumbers the Property (as amended, modified, and restated from time to time, the "Deed of Trust"), and (ii) certain other documents evidencing or securing the Loan (together with the Note, the Loan Agreement and the Deed of Trust, the "Loan Documents").

D.      The obligations of Borrower under the Loan Agreement, the Note, the Deed of Trust, this Assignment, and the other Loan Documents, other than the Indemnity (as defined in the Deed of Trust), are collectively referred to herein as the "Obligations".

E.       Borrower is required as a condition to the making of the Loan to transfer and assign to Lender all of Borrower's right, title and interest in, to and under the Leases and Rents (as defined below).

## AGREEMENT:

**NOW, THEREFORE**, as an inducement for the making of the Loan, Borrower hereby represents, warrants, covenants, and agrees as follows:

1.       **Definitions**.   As used herein, the following terms shall have the following meanings:

"Event of Default" means an Event of Default, as defined in the Loan Agreement.

"Leases" means all leases, subleases, rental contracts, occupancy agreements, licenses and other arrangements (in each case whether existing now or in the future) pursuant to which any person or entity occupies or has the right to occupy or use any portion of the Property, and includes (a) any supplement, modification, amendment, renewal or extension of any Lease and (b) any security or guaranty for any Lease.

"Lessees" means the lessees under the Leases or any subtenants or occupants of the Property.

"Rents" means all rents, issues, income, revenues, royalties, profits and other amounts now or in the future payable under any of the Leases, including those past due and unpaid.

Capitalized terms used in this Assignment and not otherwise defined are used as defined in the Loan Agreement.

2.       **Assignment**.   As security for the payment and performance of the Obligations, Borrower hereby absolutely and unconditionally transfers, sets over and assigns to Lender all present and future right, title and interest of Borrower in, to and under the Leases and the Rents, together with all advance payments, security deposits and other amounts paid or payable to or deposited with Borrower under any of the Leases and all other rights and interests of Borrower under or in respect of any of the Leases.  This Assignment is intended to be and is an absolute present assignment from Borrower to Lender, it being intended hereby to establish a complete and present transfer of all Leases and Rents with the right, but without the obligation, to collect all Rents.

3.       **License**.  Except as hereinafter set forth, Borrower shall have a license to collect the Rents accruing under the Leases as they become due ("License"), but not more than thirty (30) days in advance, and to enforce the Leases.  Subject to Section 8.1 hereof, the License shall automatically terminate upon the occurrence of an Event of Default.  Borrower covenants and agrees that in exercising its License it shall hold all Rents in trust and shall apply the same first to the payment of the reasonable expenses of owning, maintaining, repairing, operating and renting the Property, and then to payment of the Obligations.

4.     **Representations and Warranties**.  Borrower hereby represents and warrants to Lender that:  (a) Borrower is the absolute owner of the entire lessor's interest in each of the Leases, with absolute right and title to assign the Leases and the Rents; (b) to Borrower's knowledge, the Leases are valid, enforceable and in full force and effect and have not been modified, amended or terminated; (c) there are no outstanding assignments or pledges of the Leases or of the Rents and no other party has any right, title or interest in the Leases or the Rents; (d) there are no existing defaults under the provisions of the Leases on the part of the lessor and to Borrower's knowledge, there are no existing defaults under the provisions of the Leases on the part of the Lessees thereunder; (e) to Borrower's knowledge, no Lessee has any defense, set-off or counterclaim against Borrower; (f) except as disclosed in writing to Lender, no Lessee has any purchase option or first refusal right or any right or option for additional space with respect to the Property; (g) Borrower has not accepted prepayments of installments of rent or any other charges under any Lease for a period of more than one (1) month in advance; and (h) to Borrower's knowledge, except as otherwise disclosed to Lender in writing, all work required to be performed by Borrower, as landlord, as of the date hereof under any Lease has been completed in accordance with the provisions of the Lease.

5.     **Covenants of Borrower**.

5.1     New Leases and Lease Terminations and Modifications.  Borrower shall not: (a) surrender or terminate (except as a result of a material default by Lessees thereunder and failure of such Lessee to cure the default within the applicable time periods set forth in the Lease); (b) materially (as determined in Lender's discretion) amend or modify any Lease to the detriment of Lender; (c) make any subsequent assignment or pledge of a Lease; (d) consent to the subordination of the interest of any Lessee in any Lease; (e) consent to any assignment by any Lessee or any subletting, without the prior written consent of Lender unless the Lessee has the right under the terms of the Lease (i) to assign or sublet to specified assignees or sublessees, in which event Borrower shall provide Lender with written notice of any such assignment or subletting, or (ii) to generally assign or sublet to unspecified assignees or sublessees with the prior consent of Borrower, as landlord, not to be unreasonably withheld, in which event the consent of Lender required under this clause (e) shall not be unreasonably withheld; (f) enter into any renewal or extension of any Lease other than upon exercise of an express option therefor contained in such Lease, or (g) enter into any new Lease or enter into any amendment, modification or termination of any existing Lease.  Any attempt to do any of the foregoing without the prior written consent of Lender (if such consent is required) shall be null and void.

5.2     Performance under Leases.  Borrower shall observe and perform all of the covenants, terms, conditions and agreements contained in the Leases to be observed or performed by the lessor thereunder, and Borrower shall not do or suffer to be done anything to impair the security thereof.  Borrower shall not (i) release the liability of any Lessee under any Lease or any guaranty thereof, (ii) consent to any Lessee's withholding of rent or making monetary advances and off-setting the same against future rentals, (iii) consent to any Lessee's claim of a total or partial eviction, (iv) consent to a termination or cancellation of any Lease, except as specifically provided above or in such Lease, or (v) enter into any oral Leases with respect to all or any portion of the Property.

5.3     Collection of Rents.  Borrower shall not collect any of the Rents, issues, income or profits assigned hereunder more than thirty (30) days in advance of the time when the same shall become due, except for security or similar deposits.

5.4     Further Assignment.  Borrower shall not make any other assignment of its entire or any part of its interest in or to any or all Leases, or any or all Rents, except as specifically permitted by the Loan Documents.

5.5     Lease Guaranty.  Borrower shall not alter, modify or change the terms of any guaranty of any Lease, or cancel or terminate any such guaranty or do or permit to be done anything which would terminate any such guaranty as a matter of law.

5.6     Waive Rental Payments.  Borrower shall not waive or excuse the obligation to pay rent under any Lease.

5.7     Defending Actions.  Borrower shall, at its sole cost and expense, appear in and defend any and all actions and proceedings arising under, relating to or in any manner connected with any Lease or the obligations, duties or liabilities of the lessor or any Lessee or guarantor thereunder, and shall pay all costs and expenses of Lender, including court costs and reasonable attorneys' fees, in any such action or proceeding in which Lender may appear;

5.8     Enforcement.  Borrower shall enforce the observance and performance of each covenant, term, condition, and agreement contained in each Lease to be observed and performed by the Lessees and guarantors thereunder.

5.9     Notice.  Borrower shall immediately notify Lender of any material breach by a Lessee or guarantor under any Lease.

5.10    Subordination.  Borrower shall not permit any of the Leases to become subordinate to any lien or liens other than liens securing the indebtedness secured hereby or liens for general real estate taxes not delinquent.

5.11    Bankruptcy of Lessee.  If any Lessee is or becomes the subject of any proceeding under the Federal Bankruptcy Code, as amended from time to time, or any other federal, state or local statute which provides for the possible termination or rejection of the Leases assigned hereby, Borrower covenants and agrees that if any such Lease is so terminated or rejected, no settlement for damages shall be made without the prior written consent of Lender, and any check in payment of damages for termination or rejection of any such Lease will be made payable both to Borrower and Lender.  Borrower hereby assigns any such payment to Lender and further covenants and agrees that upon the request of Lender, it will duly endorse to the order of Lender any such check.

5.12    Rent Rolls; Estoppel Certificates.  Upon Lender's request, Borrower shall deliver to Lender a certified rent roll for the Property or shall furnish an estoppel certificate from any Lessee in a form reasonably satisfactory to Lender.

6.      **Cancellation of Lease**.  In the event that any Lease permits cancellation thereof on payment of consideration and the privilege of cancellation is exercised, the payments made or

4

to be made by reason thereof are hereby assigned to Lender, and if an Event of Default has occurred, shall be applied, at the election of Lender, to the Obligations in whatever order Lender shall choose in its discretion or shall be held in trust by Lender as further security, without interest, for the payment of the Obligations. Prior to such Event of Default, Borrower may use and apply such termination payments to expenses of the Property.

7.   **Lender's Rights Upon Lessee Bankruptcy**. Upon the occurrence of an Event of Default, and if a Lessee under a Lease files or has filed against it any petition in bankruptcy or for reorganization, or undertakes or is subject to similar action, Lender shall have, and is hereby assigned by Borrower, all of the rights which would otherwise inure to the benefit of Borrower in such proceedings, including, without limitation, the right to seek "adequate protection" of its interests, to compel rejection of any Lease, and to seek such claims and awards as may be sought or granted in connection with the rejection of such Lease. Unless otherwise consented to by Lender in writing, Lender's exercise of any of the rights provided herein shall preclude Borrower from the pursuit and benefit thereof without any further action or proceeding of any nature. Lender, however, shall not be obligated to make timely filings of claims in any bankruptcy, reorganization, or similar action, or to otherwise pursue creditor's rights therein.

8.   **Default of Borrower**.

8.1   <u>Remedies</u>. Upon the occurrence of an Event of Default, Borrower's License to collect Rents shall immediately cease and terminate, unless Lender shall otherwise notify Borrower in writing that such License is not being terminated by Lender. Lender shall thereupon be authorized at its option to enter and take possession of all or part of the Property, in person or by agent, employee or court appointed receiver, and to perform all acts necessary for the operation and maintenance of the Property in the same manner and to the same extent that Borrower might reasonably so act. In furtherance thereof, Lender shall be authorized, but under no obligation, to collect the Rents arising from the Leases, and to enforce performance of any other terms of the Leases including, but not limited to, Borrower's rights to fix or modify rents, sue for possession of the leased premises, relet all or part of the leased premises, and collect all Rents under such new Leases. Borrower shall also pay to Lender, promptly upon any Event of Default: (a) all rent prepayments and security or other deposits paid to Borrower pursuant to any Lease assigned hereunder; and (b) all charges for services or facilities or for escalations which have theretofore been paid pursuant to any such Lease to the extent allocable to any period from and after such Event of Default. Lender will, after payment of all proper costs, charges and any damages, apply the net amount of such Rents to the Obligations. Lender shall have sole discretion as to the manner in which such Rents are to be applied, the reasonableness of the costs to which they are applied, and the items that will be credited thereby.

8.2   <u>Notice to Lessee</u>. Borrower hereby irrevocably authorizes each Lessee, upon demand and notice from Lender of the occurrence of an Event of Default, to pay all Rents under the Leases to Lender. Borrower agrees that each Lessee shall have the right to rely upon any notice from Lender directing such Lessee to pay all Rents to Lender, without any obligation to inquire as to the actual existence of an Event of Default, notwithstanding any notice from or claim of Borrower to the contrary. Borrower shall have no claim against any Lessee for any Rents paid by Lessee to Lender.

8.3     Assignment of Defaulting Borrower's Interest in Lease.  Lender shall have the right to assign Borrower's right, title and interest in and to the Leases to any person acquiring title to the Property through foreclosure or otherwise.  Such assignee shall not be liable to account to Borrower for the Rents thereafter accruing.

8.4     No Waiver.   Lender's failure to avail itself of any of its rights under this Assignment for any period of time, or at any time or times, shall not constitute a waiver thereof.  Lender's rights and remedies hereunder are cumulative, and not in lieu of, but in addition to, any other rights and remedies Lender has under the Loan Agreement, the Note, the Deed of Trust, and any of the other Loan Documents.  Lender's rights and remedies hereunder may be exercised as often as Lender deems expedient.

8.5     Costs and Expenses.  The cost and expenses (including any receiver's fees and fees) incurred by Lender pursuant to the powers contained in this Assignment shall be immediately reimbursed by Borrower to Lender on demand, shall be secured hereby and, if not paid by Borrower, shall bear interest from the date due at the Default Rate (as defined in the Note).  Lender shall not be liable to account to Borrower for any action taken pursuant hereto, other than to account for any Rents actually received by Lender.

9.     **Indemnification of Lender**.  Borrower hereby agrees to indemnify, defend, protect, and hold Lender harmless from and against any and all liability, loss, cost, expense, or damage (including reasonable attorney fees) that Lender may or might incur under the Leases or by reason of this Assignment.  Such indemnification shall also cover any and all claims and demands that may be asserted against Lender under the Leases or this Assignment.  Nothing in this section shall be construed to bind Lender to the performance of any Lease provisions, or to otherwise impose any liability upon Lender, including, without limitation, any liability under covenants of quiet enjoyment in the Leases in the event that any Lessee shall have been joined as party defendant in any action to foreclose the Deed of Trust and shall have been barred thereby of all right, title, interest, and equity of redemption in the Property.  This Assignment imposes no liability upon Lender for the operation and maintenance of the Property or for carrying out the terms of any Lease before Lender has entered and taken possession of the Property.  Any loss or liability incurred by Lender by reason of actual entry and taking possession under any Lease or this Assignment or in the defense of any claims shall, at Lender's request, be immediately reimbursed by Borrower.  Such reimbursement shall include interest at the Default Rate provided in the Note, costs, expenses and reasonable attorney fees.  Lender may, upon entry and taking of possession, collect the Rents and apply them to reimbursement for any such loss or liability.  The provisions of this Section 9 shall survive repayment of the Obligations and any termination or satisfaction of this Assignment.

10.     **Additions to, Changes in and Replacement of Obligations**.  Lender may take security in addition to the security already given Lender for the payment of the Obligations or release such other security, and may release any party primarily or secondarily liable on the Obligations, may grant or make extensions, renewals, modifications or indulgences with respect to the Obligations or the Deed of Trust and replacements thereof, which replacements of the Obligations or the Deed of Trust may be on the same terms as, or on terms different from, the present terms of the Obligations or the Deed of Trust, and may apply any other security held by it to the satisfaction of the Obligations, without prejudice to any of its rights hereunder.

11.    **Power of Attorney**.  In furtherance of the purposes of this Assignment, Borrower hereby appoints Lender as Borrower's attorney-in-fact, with full authority in the place of Borrower, at the option of Lender at any time after the occurrence of an Event of Default, and in the name of Borrower or Lender, to (a) collect, demand and receive the Rents and other amounts payable under any Lease, (b) bring suit and take other action to enforce the Leases, (c) enforce, supplement, modify, amend, renew, extend, terminate and otherwise administer the Leases and deal with Lessees in relation to the Leases, (d) give notices, receipts, releases and satisfactions with respect to the Leases and the Rents and other amounts payable under any Lease, and (e) take such other action as Lender may reasonably deem necessary or advisable in connection with the exercise of any right or remedy or any other action taken by Lender under this Assignment.

12.    **No Mortgagee in Possession; No Other Liability**.  The acceptance by Lender of this Assignment, with all of the rights, power, privileges and authority so created, shall not, prior to entry upon and taking of possession of the Property by Lender, be deemed or construed to:  (a) constitute Lender as a mortgagee in possession nor place any responsibility upon Lender for the care, control, management or repair of the Property, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by any Lessee, occupant or other party, or for any dangerous or defective condition of the Property, nor thereafter at any time or in any event obligate Lender to appear in or defend any action or proceeding relating to the Leases or to the Property; (b) require Lender to take any action hereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Leases; or (c) require Lender to assume any obligation or responsibility for any security deposits or other deposits delivered to Borrower by Lessees and not assigned and delivered to Lender.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person in or about the Property.

13.    **Termination of Assignment**.  Lender shall terminate and release this Assignment as to all or a portion of the Property to the same extent as the Deed of Trust is released in whole or in part.

14.    **Miscellaneous**.

14.1    <u>Severability</u>.  If any term of this Assignment or the application hereof to any person or set of circumstances, shall to any extent be invalid or unenforceable, the remainder of this Assignment, or the application of such provision or part thereof to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Assignment shall be valid and enforceable to the fullest extent consistent with applicable law.

14.2    <u>Captions</u>.  The captions or headings at the beginning of each section hereof are for the convenience of the parties only and are not part of this Assignment.

14.3    <u>Counterparts</u>.  This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, and all of which shall be construed together and shall constitute one instrument.  It shall not be necessary in making proof of this Assignment to produce or account for more than one such counterpart.

14.4     Notices.  All notices or other written communications hereunder shall be given in the manner set forth in the Loan Agreement.

14.5     Modification.  No amendment, modification, or cancellation of this Assignment or any part hereof shall be enforceable without Lender's prior written consent.

14.6     Governing Law.   THIS ASSIGNMENT SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES; PROVIDED, HOWEVER, THAT TO THE EXTENT THE MANDATORY PROVISIONS OF THE LAWS OF ANOTHER JURISDICTION RELATING TO (I) THE CREATION, VALIDITY, PRIORITY, PERFECTION OR THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTERESTS IN ANY OF THE PROPERTY, (II) THE LIEN, ENCUMBRANCE OR OTHER INTEREST IN THE PROPERTY GRANTED OR CONVEYED BY THIS ASSIGNMENT OR THE ENFORCEMENT THEREOF, OR (III) THE AVAILABILITY OF AND PROCEDURES RELATING TO ANY REMEDY HEREUNDER OR RELATED TO THIS ASSIGNMENT ARE REQUIRED TO BE GOVERNED BY SUCH OTHER JURISDICTION'S LAWS, THOSE OTHER LAWS SHALL BE DEEMED TO GOVERN AND CONTROL.

14.7     Successors and Assigns; Gender; Joint and Several Liability.   The terms, covenants, conditions and warranties contained herein and the powers granted hereby shall run with the land, shall inure to the benefit of and bind all parties hereto and their respective heirs, executors, administrators, successors and assigns, and all subsequent owners of the Property, and all subsequent holders of the Note and the Deed of Trust, subject in all events to the provisions of the Deed of Trust regarding transfers of the Property by Borrower.  In this Assignment, whenever the context so requires, the masculine gender shall include the feminine and/or neuter and the singular number shall include the plural and conversely in each case.  If there is more than one (1) party constituting Borrower, all obligations of each Borrower hereunder shall be joint and several.

14.8     Expenses.  Borrower shall pay on demand all costs and expenses incurred by Lender in connection with the review of Leases, including reasonable fees and expenses of Lender's outside counsel.

15.     **WAIVER OF JURY TRIAL**.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER, BY ITS ACCEPTANCE HEREOF, HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS ASSIGNMENT, ANY OTHER LOAN DOCUMENT, OR ANY RELATIONSHIP BETWEEN BORROWER AND LENDER.   THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE LOAN DESCRIBED HEREIN AND IN THE OTHER LOAN DOCUMENTS.

16. **JURISDICTION AND VENUE**. BORROWER HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS ASSIGNMENT SHALL BE LITIGATED IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION. BORROWER HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THE MORTGAGE. BORROWER WAIVES ANY CLAIM THAT COOK COUNTY, ILLINOIS, OR THE NORTHERN DISTRICT OF ILLINOIS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD BORROWER, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND BORROWER HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

17. **Notice to Tenants**. Borrower hereby authorizes and directs the tenants under the Leases or any other party obligated under any contracts to pay rents, issues and profits to Lender upon written demand by Lender after a default hereunder or under the terms of any Loan Document, without further consent of Borrower and regardless of whether Lender has taken possession of any other portion of the Property, and the tenants or any other party may rely upon any written statement delivered by Lender to the tenants or any other party. Any such payment to Lender shall constitute payment to Borrower under the Leases, and Borrower hereby appoints Lender as Borrower's lawful attorney-in-fact for giving, and Lender is hereby empowered to give acquittances to any tenants for such payments to Lender after a default. Notwithstanding anything contained herein or in any other Loan Documents to the contrary, possession of the Property by Lender shall not be a prerequisite to Lender's right to collect rents, issues and profits hereunder upon a default by Borrower and Borrower hereby declares that the Assignment set forth herein is absolute and unconditional and shall entitle Lender to collect all rents, issues and profits from the Property from and after the occurrence of any default under the Note, Deed of Trust or any other Loan Documents.

18.   <u>Joint and Several Liability</u>. This Assignment is made subject to the terms of Section 10.21 of the Loan Agreement and the terms of Section 10.21 of the Loan Agreement are hereby incorporated herein by this reference.

19.   <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together will constitute one and the same instrument. The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this letter agreement attached thereto.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Borrower has caused this Assignment of Leases and Rents to be duly executed as of the day and year first above written.

<u>**BORROWER:**</u>

**KDA PROPERTIES LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title: Manager

By: _____
Name: Amin Suliaman
Title: Manager


**NATIV DENVER LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title: Manager

By: _____
Name: Amin Suliaman
Title: Manager

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_____, manager on behalf of _KDA Properties LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

> KATHRYN AMBER BAILEY
> Notary Public
> State of Colorado
> Notary ID # 20164028160
> My Commission Expires 07-25-2020

_07-25 2020_____
(Commission Expiration)


State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_____, manager on behalf of _KDA Properties LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

> KATHRYN AMBER BAILEY
> Notary Public
> State of Colorado
> Notary ID # 20164028160
> My Commission Expires 07-25-2020

_07-25-2020_____
(Commission Expiration)

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_____, manager on behalf of _Nativ Denver LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

┌─────────────────────────────────────┐
│      KATHRYN AMBER BAILEY            │
│          Notary Public              │
│        State of Colorado            │
│      Notary ID # 20164028160        │
│  My Commission Expires 07-25-2020   │
└─────────────────────────────────────┘

_07-25-2020_
(Commission Expiration)




State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_____, manager on behalf of _Nativ Denver LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

┌─────────────────────────────────────┐
│      KATHRYN AMBER BAILEY            │
│          Notary Public              │
│        State of Colorado            │
│      Notary ID # 20164028160        │
│  My Commission Expires 07-25-2020   │
└─────────────────────────────────────┘

_07-25-2020_
(Commission Expiration)

## EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

All that certain real property situated in the County of Denver, State of Colorado, described as follows:

LOTS 13 AND 14, BLOCK 20, EAST DENVER,
CITY AND COUNTY OF DENVER, STATE OF COLORADO.

Commonly known as: 1612 Wazee Street, Denver, Colorado 80202

# UCC Financing Statement

**Colorado Secretary of State**
Date and Time: 03/16/2020 10:48:48 AM
Master ID: 20202026022
Validation Number: 20202026022
Amount: $8.00

| **Debtor: (Organization)** | | EXHIBIT 5 |
|---|---|---|

Name: KDA Properties LLC
Address1: 1612 Wazee Street
Address2:
City: Denver · State: CO · ZIP/Postal Code: 80202
Province: · Country: United States

| **Debtor: (Organization)** |
|---|

Name: Nativ Denver LLC
Address1: 1612 Wazee Street
Address2:
City: Denver · State: CO · ZIP/Postal Code: 80202
Province: · Country: United States

| **Secured Party: (Organization)** |
|---|

Name: Pangea Mortgage Capital, LLC
Address1: 549 W. Randolph Street, 2nd Floor
Address2:
City: Chicago · State: IL · ZIP/Postal Code: 60661
Province: · Country: United States

| **Collateral** |
|---|

**Description:**
SEE EXHIBIT A ATTACHED HERETO

# UCC Financing Statement 1

File name: 1 UCC.pdf                    Uploaded: 03/16/2020 10:45:54 AM

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

> Safarian Choi & Bolstad LLP
> 555 S. Flower Street, Suite 650
> Los Angeles, California 90071
> Attention: Chris K. Safarian, Esq.

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KDA PROPERTIES LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1612 Wazee Street | Denver | | CO | 80202 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| NATIV DENVER LLC | | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1612 Wazee Street | Denver | | CO | 80202 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE or ASSIGNOR SECURED PARTY) – Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| PANGEA MORTGAGE CAPITAL, LLC | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 549 W. Randolph Street, 2nd Floor | Chicago | | IL | 60661 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**SEE EXHIBIT A ATTACHED HERETO**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
For filing with the Secretary of State of Colorado

**International Association of Commercial Administrators (IACA)**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 04/20/11)

**EXHIBIT A**
**TO**
**UCC-1 FINANCING STATEMENT**

**COLLATERAL**

| | |
|---|---|
| **Debtor:** | **KDA PROPERTIES LLC,** a Colorado limited liability company, and **NATIV DENVER LLC,** a Colorado limited liability company, jointly and severally |
| **Secured Party:** | **PANGEA MORTGAGE CAPITAL, LLC,** an Illinois limited liability company |

Debtor does hereby GRANT, SELL, CONVEY, MORTGAGE and ASSIGN unto Secured Party, its successors and assigns, and does hereby grant to Secured Party, its successors and assigns a security interest in, all and singular the properties, rights, interests and privileges described below, all of same being collectively referred to herein as the "Mortgaged Property":

THE LAND located in Denver County, Colorado which is legally described on **Exhibit B** attached hereto and made a part hereof (the "Land").

TOGETHER WITH all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements to or for any such buildings, structures and improvements and all of the right, title and interest of Debtor now or hereafter acquired in and to any of the foregoing, including without limitation those certain improvements to be constructed on the Land in accordance with the Loan Agreement (the "Improvements");

TOGETHER WITH all easements, rights of way, strips and gores of land, streets, ways, alleys, sidewalks, vaults, passages, sewer rights, waters, water courses, water drainage and reservoir rights and powers (whether or not appurtenant), all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, easements, franchises, appendages and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, whether now owned or hereafter acquired by Debtor, including without limitation all existing and future mineral, oil and gas rights which are appurtenant to or which have been used in connection with the Land, all existing and future water stock relating to the Land or the Improvements, all existing and future share of stock respecting water and water rights pertaining to the Land or the Improvements or other evidence of ownership thereof, and the reversions and remainders thereof (the "Appurtenant Rights");

TOGETHER WITH all machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever, and all furniture, furnishings and other personal property now or hereafter owned by Debtor and forming a part of, or used or obtained for use in connection with, the Land or the Improvements or any present or future operation, occupancy, maintenance or leasing thereof; including, but without limitation, any and all heating, ventilating and air conditioning equipment and systems, antennae, appliances, apparatus, awnings, basins, bathtubs,

bidets, boilers, bookcases, cabinets, carpets, communication systems, coolers, curtains, dehumidifiers, dishwashers, disposals, doors, drapes, drapery rods, dryers, ducts, dynamos, elevators, engines, equipment, escalators, fans, fittings, floor coverings, furnaces, furnishings, furniture, hardware, heaters, humidifiers, incinerators, lighting, machinery, motors, ovens, pipes, plumbing and electric equipment, pool equipment, pumps, radiators, ranges, recreational facilities and equipment, refrigerators, screens, sprinklers, stokers, stoves, shades, shelving, sinks, security systems, toilets, ventilators, wall coverings, washers, windows, window covering, wiring and all extensions, renewals or replacements thereof or substitutions therefor or additions thereto, whether or not the same are or shall be attached to the Land or the Improvements in any manner (collectively, the "Fixtures"); it being agreed that all of said property owned by Debtor and placed on the Land or on or in the Improvements (whether affixed or annexed thereto or not) shall, so far as permitted by law, conclusively be deemed to be real property and conveyed hereby for purposes of this Mortgage.

TOGETHER WITH the following (the "Personal Property"):

All personal property of every nature whatsoever (including all licenses and permits (including the Liquor License)) now or hereafter owned by Debtor or used in connection with the Land or the improvements thereon, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements thereof and all of the right, title and interest of Debtor in and to any such personal property together with the benefit of any deposits or payments now or hereafter made on such personal property by Debtor or on its behalf, including without limitation, any and all reserves, escrows and deposit accounts and Goods, Investment Property, Instruments, Chattel Paper, Documents, Letter of Credit Rights, Accounts, Deposit Accounts, Commercial Tort Claims and General Intangibles, each as defined in the Uniform Commercial Code of the State of Colorado (the "Code") located on the Land or in the Improvements which are now or in the future owned by Debtor and used or obtained for use in connection with the Land or the improvements or any present or future operation, occupancy, maintenance or leasing thereof, or any construction on or at the Land or the Improvements;

All proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceeds or the taking of the Land or improvements thereon or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Land or improvements thereon or proceeds of any sale, option or contract to sell the Land or improvements thereon or any portion thereof;

Any and all additions and accessories to all of the foregoing and any and all proceeds (including proceeds of insurance, eminent domain or other governmental takings and tort claims), renewals, replacements and substitutions of all of the foregoing;

All of the books and records pertaining to the foregoing;

TOGETHER WITH all right, title and interest which Debtor hereafter may acquire in and to all leases and other agreements now or hereafter entered into for the occupancy or use of the Land, the Appurtenant Rights, the Improvements, the Fixtures and the Personal Property or any portion thereof, whether written or oral (herein collectively referred to as the "Leases"), and all

rents, issues, incomes and profits in any manner arising thereunder  (including all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales (including mini bar revenues) and service charges) (herein collectively referred to as the "Rents"), and all right, title and interest which Debtor now has or hereafter may acquire in and to any bank accounts, security deposits, and any and all other amounts held as security under the Leases, reserving to Debtor any statutory rights;

TOGETHER WITH any and all Awards and Insurance Proceeds or proceeds of any sale, option or contract to sell the Mortgaged Property or any portion thereof (provided that no right, consent or authority to sell the Mortgaged Property or any portion thereof shall be inferred or deemed to exist by reason hereof); and Debtor hereby authorizes, directs and empowers Secured Party, at its option, on Debtor's behalf, or on behalf of the successors or assigns of Debtor, to adjust, compromise, claim, collect and receive such proceeds; to give acquittances therefor; and, after deducting expenses of collection, including reasonable attorneys' fees, costs and disbursements, to apply the Net Proceeds, as hereinafter defined, to the extent not utilized for the Restoration of the Mortgaged Property as provided in the Loan Agreement hereof, to payment of the Debt, notwithstanding the fact that the same may not then be due and payable or that the Debt is otherwise adequately secured; and Debtor agrees to execute and deliver from time to time such further instruments as may be requested by Secured Party to confirm such assignment to Secured Party of any such proceeds;

TOGETHER WITH all rights reserved to or granted to the developer or declarant under the provisions of any (i) declaration of restrictive covenants and easements affecting the Land or the Premises, or (ii) homeowners' declaration or other declarations affecting the Land or the Premises;

TOGETHER WITH all estate, right, title and interest, homestead or other claim or demand, as well in law as in equity, which Debtor now has or hereafter may acquire of, in and to the Mortgaged Property, or any part thereof, and any and all other property of every kind and nature from time to time hereafter (by delivery or by writing of any kind) conveyed, pledged, assigned or transferred as and for additional security hereunder by Debtor or by anyone on behalf of Debtor to Secured Party.

Terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement dated as of February 18, 2020 (said Loan Agreement and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "Loan Agreement"), between Secured Party and Debtor.

**EXHIBIT B**
**TO**
**UCC-1 FINANCING STATEMENT**
**LEGAL DESCRIPTION**

All that certain real property situated in the County of Denver, State of Colorado, described as follows:

LOTS 13 AND 14, BLOCK 20, EAST DENVER,
CITY AND COUNTY OF DENVER, STATE OF COLORADO.


For Identification Purposes Only: 1612 Wazee St., Denver, CO 80202

EXHIBIT 6

## COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT

**THIS COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT** (this "Assignment") is made as of March 11, 2020 by **AMIN SULIAMAN**, an individual ("Assignor") to and in favor of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company ("Lender" or "Secured Party").

### RECITALS

A.       Pursuant to that certain Loan Agreement (as amended, modified and restated from time to time, the "Loan Agreement"), dated as of even date with this Assignment, by and between Secured Party **KDA PROPERTIES LLC**, a Colorado limited liability company ("Company") and **NATIV DENVER LLC**, a Colorado limited liability company, Secured Party has agreed to make a loan (the "Loan") to Company in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), which Loan is evidenced by that certain Promissory Note (as amended, modified and restated from time to time, the "Note"), dated as of even date herewith, in the original principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), made by the Company in favor of Secured Party.  In connection with the Loan, Amin Suliaman and Kenneth C. Ware have entered into that certain Guaranty of Payment dated as of even date herewith for the benefit of Secured Party (as amended, modified and restated from time to time, the "Guaranty").  The Note, the Guaranty, the Loan Agreement and the other documents securing the Loan, as amended, modified, restated and time to time, are herein together sometimes called the "Loan Documents."

B.       In order to secure the payment and performance of the indebtedness and obligations of Company under the Note, Assignor has agreed to assign and pledge to Secured Party, and grant Secured Party a first priority, properly perfected, valid and enforceable assignment of and security interest in, all of Assignor's ownership interests (as more particularly defined in Section 1.1, the "Ownership Interests") in the Company, on the terms and conditions set forth herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Assignor and Secured Party hereby agree as follows:

## 1.       DEFINITIONS

**1.1.     Definitions**.  All capitalized terms used in this Assignment, including, without limitation, the terms defined in the foregoing recitals, shall have the meanings set forth in this Assignment or, if said terms are not defined in this Assignment, shall have the meanings of the same defined terms set forth in the Loan Agreement, as the same may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time, which definitions are hereby incorporated in their entirety by this reference as though specifically set forth herein. In addition, the following capitalized terms shall have the meaning hereinafter set forth:

"Admission Date" shall mean the date on which Secured Party is or shall be fully admitted as a member of the Company, and assumes and agrees to be bound by, in writing, the Governing

1

Agreements.

"Articles of Organization" shall mean that certain Articles of Organization of the Company filed with the Secretary of State of the State of Colorado, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof.

"Assignment" shall mean this Collateral Assignment, Pledge and Security Agreement, as the same may be amended, modified, extended, restated or replaced from time to time.

"Assignment Documents" shall mean, collectively, this Assignment, the Financing Statements and all other documents, certificates, affidavits and instruments now or hereafter evidencing, securing or relating in any way to any of the foregoing executed by Assignor, the payment of the indebtedness or the observance or performance of the obligations evidenced and/or secured thereby, as said documents may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time.

"Bankruptcy Rights" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property, arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Code" shall mean the Uniform Commercial Code as enacted in the State of Colorado or Illinois, as applicable, and in each other jurisdiction having applicability to the perfection of the liens and security interests granted herein, as amended and/or re-enacted from time to time.

"Equity Distributions" shall mean collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership

2

Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Event of Default" shall mean the happening or occurrence of any event described in Section 5.1 hereof.

"Financing Statements" shall mean, individually and collectively, each and all of the UCC-1 Financing Statements executed, if necessary, and delivered by Assignor, as debtor therein, in favor of Secured Party, as secured creditor, pursuant to this Assignment, as the same may be amended, modified, extended, continued, restated or replaced from time to time in accordance with the Code.

"Governing Agreements" shall mean collectively (i) the Operating Agreement of the Company, as same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party to the extent required and (ii) the Articles of Organization of the Company.

"Governmental Authority" shall mean the United States of America, any State, any county, city or any other political subdivision, or any other political subdivision, agency or instrumentality exercising or claiming jurisdiction over Assignor or the Company.

"Indebtedness" shall mean any and all amounts owed by Amin Suliaman and Kenneth C. Ware to Secured Party pursuant to the Guaranty and the Loan Documents and/or any and all amounts owed by Company to Secured Party pursuant to the Note and the Loan Documents.

"Insolvency Proceeding" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally, and shall include: (a) any proceeding seeking to appoint or appointing a receiver or trustee for Company and/or its Legal Representatives (as defined in Section 7.4 of this Assignment), successors and assigns (collectively, the **"Borrower Parties"**); (b) any proceeding filed by or against any of the Borrower Parties under the Bankruptcy Code; (c) any assignment by any of the Borrower Parties of all or substantially all of their respective assets for the benefit of creditors; (d) any proceeding or other action wherein all or substantially all of any of the Borrower Parties' assets are attached, seized, subjected to a writ or distress warrant, or otherwise levied upon; and (e) any proceedings to set aside or avoid any transfer of an interest in property or obligations, whether denominated as a fraudulent conveyance, preferential transfer or otherwise, or to recover the value thereof or to charge, encumber or impose a lien thereon.

"Insolvent" shall have the meaning of the same terms under Sections 101(32) or 548 of the Bankruptcy Code.

"Legal Requirement" shall mean applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other written standard, requirement, policy or

3

procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority, including any judgment and all judicial decisions applying common law or interpreting any other Legal Requirement, in each case, as amended.

"Ownership Interests" shall mean collectively, whether now existing and hereafter arising or acquired: (a) forty-nine percent (49%) of the current and future membership interests in the Company under the Governing Agreements, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Person" shall mean any person or entity, whether an individual, sole proprietorship, trust, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, institution, business association, firm, joint venture, Governmental Authority or otherwise.

"Secured Obligations" shall have the meaning set forth in Section 2.1.

"Securities Laws" shall mean, individually and collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, and any and all other laws, regulations, rules, orders and decrees of any governmental authorities governing the issuance, sale, marketing, exchange or disposition of securities, as any of the foregoing are amended from time to time.

"Transfer Power" shall have the meaning given in Section 2.4 of this Assignment.

**1.2.** **Rules of Construction**.   Section captions used in this Assignment are for convenience only and shall not affect the construction of this Assignment. All references to "Sections," without reference to a document other than this Assignment, are intended to designate Sections of this Assignment, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Assignment as a whole and not to any particular Section, unless specifically designated otherwise. The use of the term "including" shall mean in all cases "including but not limited to," unless specifically designated otherwise. Pronouns of any gender shall include the other genders (including the neuter gender), and either the singular or plural shall include the other. No rules of construction against the drafter of this Assignment shall apply in any interpretation or enforcement of this Assignment, any documents or certificates executed pursuant thereto, or any provisions of any of the foregoing.

**2.**     **ASSIGNMENT AND GRANT**

**2.1.**   **Obligations Secured**.   This Assignment is made by Assignor in favor of Secured Party to secure irrevocable and unconditional payment and performance of the obligations, whether now existing or hereafter arising, by the Company under the Note and/or the Loan Documents and of Amin Suliaman and Kenneth C. Ware under the Guaranty and the Assignment Documents, including each and all of the representations, warranties, covenants, obligations, liabilities, indemnities and duties of the Company under the Note and Loan Documents (collectively, the "Secured Obligations").

4

**2.2.** **Assignment/Grant of Security Interest**. In order to secure the unconditional and irrevocable payment and performance of the Secured Obligations, Assignor does hereby unconditionally and irrevocably assign, convey, mortgage, pledge, hypothecate, transfer and set over to Secured Party, and does hereby grant to Secured Party, a properly perfected, valid and enforceable, assignment of and continuing security interest in the Ownership Interests. This Assignment is intended to be a security agreement under the Code with respect to all or any portion of the Ownership Interests and all products and cash and non-cash proceeds thereof to the full extent that, under applicable law, the Ownership Interests may be subject to a security interest under the Code, whether acquired as of the date of this Assignment or in the future.

**2.3.** **Financing Statements**. Assignor does hereby authorize Secured Party to file concurrently with the execution of this Assignment such UCC Financing Statements in such locations as are necessary, and to take all such other actions and make such further filings as Secured Party may request, in order to perfect Secured Party's continuing security interest in the Ownership Interests pursuant hereto. The Financing Statements shall be in form acceptable for filing in each jurisdiction in which the same are to be filed, shall comply in all respects with the Code and shall contain a description of "Collateral" that is substantially similar to the description set forth on attached **Exhibit B**. Assignor hereby agrees to pay all filing fees and other costs incurred in connection with the filing of such Financing Statements.

**2.4.** **Transfer Power and Certificate**. Contemporaneously with his execution of this Assignment, Assignor shall deliver to Secured Party the original transfer power (the "Transfer Power") substantially in the form of the attached **Exhibit C**, which Transfer Power shall be executed by such Assignor in blank and shall irrevocably sell, assign and transfer all of the Ownership Interests owned by Assignor, as a member of the Company. Secured Party shall be entitled to complete the Transfer Power at any time following the occurrence of an Event of Default in connection with its exercise of any of the remedies provided in Article 4 of this Assignment.

**2.5.** **Assignment to be Absolute**. Assignor expressly agrees that until the Indebtedness is paid and performed in full, and each and every term, covenant and condition of this Assignment is fully performed, Assignor shall not be released by or because of:

      (a) Any act or event which might otherwise discharge, reduce, limit or modify Assignor's obligations under this Assignment;

      (b) Any waiver, extension, modification, forbearance, delay or other act or omission of Secured Party, or its failure to proceed promptly or otherwise against Assignor or any security;

      (c) Any action, omission or circumstance which might increase the likelihood that Assignor may be called upon to perform under this Assignment; or

      (d) The existence of an Insolvency Proceeding and as a result thereof some or all of the Indebtedness being terminated, rejected, discharged, modified or abrogated.

Assignor hereby acknowledges that absent this Section 2.5, Assignor might have a defense to the enforcement of this Assignment as a result of one or more of the foregoing acts, omissions, agreements, waivers or matters. Assignor hereby expressly waives and surrenders any defense to

5

any liability under this Assignment based upon any of such acts, omissions, agreements, waivers or matters. It is the express intent of Assignor that Assignor's obligations under this Assignment are and shall be absolute, unconditional and irrevocable.

### 2.6.   Receipt of Equity Distributions/Exercise of Equity Rights.

(a)   **Generally**.   Secured Party shall have the sole right and authority to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions until the Indebtedness shall have been paid in full and all obligations under the Loan Documents have been satisfied.

(b)   **Bankruptcy Rights**.   In the event Assignor is the subject of any Insolvency Proceeding which is not dismissed within the applicable cure period set forth in the Loan Documents, if any, and regardless of whether there has occurred an Event of Default, Secured Party shall have sole right and authority, to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions, exercising all Bankruptcy Rights, and exercising all other Equity Rights in such manner as Secured Party elects, in its sole and absolute discretion, and Secured Party shall have no obligation or liability whatsoever to Assignor on account of Secured Party's receipt of any Ownership Interests, Equity Distributions or exercise of, or failure to exercise, any Equity Rights or Bankruptcy Rights. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact, such appointment being coupled with an interest, with authority to exercise each and all of the Bankruptcy Rights in the place and stead of Assignor in such manner as Secured Party shall elect in its sole discretion. Further, Assignor hereby agrees that Secured Party shall have no liability whatsoever for exercising or failing to exercise any of the Bankruptcy Rights.

### 2.7.   No Assumption by Secured Party.   Notwithstanding any of the foregoing, irrespective of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, neither this Assignment, receipt by Secured Party of any Equity Distributions, exercise by Secured Party of any Equity Rights nor any exercise by Secured Party of any of its rights and remedies hereunder shall in any way obligate Secured Party to assume, or constitute or be deemed to constitute an assumption of, any of Assignor's obligations, duties, expenses or liabilities with respect to the Ownership Interests. Assignor acknowledges and agrees that it shall at all times remain liable for performance of all obligations, duties, expenses or liabilities with respect to the Ownership Interests, regardless of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, and that Secured Party shall in no event be liable therefor or deemed to have assumed the same.

### 3.   REPRESENTATIONS AND WARRANTIES

Assignor hereby makes the following representations and warranties for the benefit of Secured Party, all of which representations and warranties shall be deemed to be continuing and continually remade until the full, unconditional and irrevocable payment and performance of all

6

Secured Obligations:

**3.1.** <u>**Organizational Status**</u>.   The Company is a limited liability company, duly organized, validly existing and in good standing and qualified to conduct its business in the State of Colorado and in good standing and qualified to conduct its business in the State of Colorado and each other jurisdiction in which it does business.

**3.2.** <u>**Power and Authority; Residency**</u>.   Assignor has full power and authority to enter into and perform this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and each and all of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Further, Assignor has, by all necessary action, validly authorized the execution, delivery and performance of this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Assignor's principal place of residency is in the State of Colorado.

**3.3.** <u>**Assignment Binding**</u>.   This Assignment, each of the documents and certificates executed and delivered, or to be executed and delivered, by Assignor are, or will be when executed and delivered, the legal, valid and binding obligations of Assignor, enforceable against it in accordance with the terms hereof and thereof.   The Consent of the Company attached to this Assignment (the "<u>Company Consent</u>") is, or will be when executed and delivered, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and the terms of this Assignment.

**3.4.** <u>**Actions Against the Company**</u>.   Assignor has no knowledge of any action, proceeding or Insolvency Proceeding pending or threatened against the Company that would affect or impair the agreements made by Company in the Company Consent.

**3.5.** <u>**Approvals**</u>.   Neither the execution nor delivery of this Assignment, the documents and certificates to be executed and delivered in connection herewith, the other Assignment Documents, nor the consummation or performance of the transactions contemplated hereby or thereby, require the consent or approval of any Governmental Authority or any other Person other than the Company.

**3.6.** <u>**No Duress**</u>.   This Assignment is made voluntarily without any duress or undue influence of any kind.

**3.7.** <u>**No Violation of Laws, etc**</u>.   Neither this Assignment, any of the other documents or certificates to be executed in connection herewith or any of the other Assignment Documents or transactions contemplated thereby violate or are in contravention of: (a) the Governing Agreements; (b) to the knowledge of Assignor, any Legal Requirements applicable to Assignor or any of the assets of Assignor; or (c) to the knowledge of Assignor, any other mortgage, pledge, indenture, lease, security agreement or other agreement to which Assignor is a party.

**3.8.** <u>**Solvency; No Fraudulent Conveyance**</u>.   Assignor represents and warrants that it is not Insolvent and will not become Insolvent as a result of entering into this Assignment or the

transactions contemplated hereby; that this Assignment is not being made by Assignor with any intent to hinder, delay or defraud any creditors to which Assignor is or may hereafter become indebted; that Assignor is not engaged in business or any transactions, including the transactions contemplated hereunder, or is about to engage in any business or any transactions, for which any of his remaining property is unreasonably small capital; and that he does not intend to incur or believe that he will incur, debts that would be beyond his ability to pay as such debts mature. Assignor acknowledges that he is receiving new, fair, reasonably equivalent value in exchange for this Assignment and the transactions contemplated hereby, and affirmatively represents that neither his entry into this Assignment nor the consummation of the transactions contemplated hereby constitutes a fraudulent conveyance or preferential transfer under the Bankruptcy Code or any other federal, state or local laws affecting the rights of creditors generally.

**3.9.   Ownership of Ownership Interests**.  Assignor is the legal, record and beneficial owner of, and has good and marketable title to, the Ownership Interests, as the same are set forth on **Exhibit A** attached hereto, subject to no lien or encumbrance other than the lien and security interest created hereby. Assignor is the sole legal, record and beneficial owner of, and has good and marketable title to, forty-nine percent (49%) of all of the Ownership Interests in and to the Company. Except for the assignment to Secured Party pursuant hereto, there has been no prior Transfer (as defined in Section 4.1) of any of the Ownership Interests.

**3.10.   No Certificates**.  The Ownership Interests are evidenced and represented by the Operating Agreement of the Company and the books and records of the Company for purposes of registering the ownership of Ownership Interests.  No certificates have been issued and/or are outstanding with regard to the Ownership Interests.  No certificates may be issued by the Company without Secured Party's prior written consent.

**3.11.   Security Interest/Place of Business**.  Upon the execution and delivery hereof and the filing of the Financing Statements in the locations shown on the attached **Exhibit B**, this Assignment will create in favor of Secured Party a valid and enforceable, properly perfected lien on all of the Ownership Interests, subject to no lien or other encumbrance other than as created hereby. Further, the lien and security interest granted to Secured Party pursuant hereto shall at all times be and remain a properly perfected, valid and enforceable lien on the Ownership Interests subject to no other lien.

**3.12.   Governing Agreements**.  Assignor is not in default of any of its obligations under the Governing Agreements; Assignor has delivered to Secured Party a true, correct and complete copy of the Governing Agreements (including all amendments thereto) and all other agreements, if any, governing the operation or affairs of the Company; and the Governing Agreements are in full force and effect in accordance with their terms.

# 4.   COVENANTS

Until such time as the Secured Obligations are fully, unconditionally and irrevocably paid and performed in full, Assignor hereby covenant and agree as follows:

**4.1.   No Assignment**.  There shall be no conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance, charge or alienation (or any agreement

8

to do any of the foregoing) of, in or to any of the Ownership Interests, whether directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise ("Transfer"), without the prior written consent of Secured Party, which consent may be granted, conditioned or withheld in Secured Party's sole discretion. Assignor hereby acknowledges and agrees that no Transfer of any of the Ownership Interests, whether or not consented to by Secured Party (no consent to any such sale, assignment, pledge, hypothecation, conveyance or other transfer being implied hereby) shall be effective unless and until such transferee or successor executes, delivers, files and records, as applicable, an assumption agreement, in the form and content satisfactory to Secured Party, in its sole discretion, agreeing to assign the Ownership Interests to be transferred in accordance with the provisions of this Assignment and assume, be bound by and to comply with and join in the terms and conditions of this Assignment and the Financing Statements, and further takes such other actions and delivers such other documents, instruments and certificates as Secured Party may request for purposes of preserving, maintaining, continuing and perfecting the valid and enforceable, lien and security interest created hereby in such Ownership Interests. Further, Assignor hereby covenants and agrees that it will not consent to the admission of any new or substitute member in the Company unless the foregoing conditions have been fully satisfied. Assignor hereby covenants and agrees that any attempted Transfer of any Ownership Interest not in accordance with the foregoing shall be ineffective and deemed null and void, ab initio.

**4.2.** **Company Books and Records**.  Assignor shall take, or cause to be taken, all such actions as are necessary to cause the Company and Assignor to mark their respective books and records with a notation that Assignor has assigned and pledged its Ownership Interests to Secured Party pursuant hereto and to keep as a part of such books and records a fully signed copy of this Assignment and each of the other Assignment Documents.

**4.3.** **Compliance with Securities Laws**.  Assignor shall take all such actions as are necessary, and shall cause the Company, to comply in all respects with all applicable Securities Laws.

**4.4.** **No Consent to Reorganization, etc**.  Assignor shall not consent to any dissolution, consolidation, merger, transfer, reorganization, reclassification or other similar action by the Company without the express written consent of Secured Party, which consent may be withheld, conditioned or delayed in Secured Party's sole and absolute discretion.

**4.5.** **Protection of Ownership Interests**.  Assignor will protect and defend Secured Party's right, title, claim of possession, lien and security interest in and to the Ownership Interests against the claims and demands of all Persons whomsoever. Further, Assignor shall pay and discharge as and when due all liens, claims, charges, taxes, other governmental charges and contractual obligations that may affect his Ownership Interests or any portion thereof

**4.6.** **Performance under Governing Agreements**.  Assignor shall fully and timely perform each and all of his obligations under the Governing Agreements in accordance with the terms thereof, and shall provide Secured Party with written notice of any default by Assignor under the Governing Agreements promptly upon the occurrence of such default. This Section 4.6 shall be deemed to amend and modify the Governing Agreements to provide that the Ownership Interests in the Company constitute securities subject to the provisions of Article 8 of the Code to designate Secured Party as a "protected purchaser" pursuant to Section 8-303 of the Code.

Assignor covenants and agrees that, until such time as the Indebtedness is paid in full, Assignor will not amend any of the Governing Agreements to "opt out" of Article 8 or to indicate that the Ownership Interests in the Company are not securities subject to the provisions of said Article 8.

**4.7.** **Notice of Default**. Assignor shall notify Secured Party of the existence of any Event of Default, or any event or condition which with the giving of notice, the passages of time or both could reasonably constitute an Event of Default, promptly upon obtaining knowledge of the existence thereof

**4.8.** **Change of Address**. No later than thirty (30) days prior to any change in address or principal place of business, as applicable, by Assignor from the address or principal place of business set forth on **Exhibit A** attached hereto, Assignor shall notify Secured Party in writing of such change in address or principal place of business, as applicable, and include in such notice the full and complete new address and principal place of business for Assignor.

**4.9.** **No Joint Venture**. Assignor hereby covenants and agrees that, until the Admission Date, neither Assignor nor any Person claiming by, through or under any of them, will assert or make a claim against Secured Party that Secured Party is a shareholder, member, member, insider or joint venturer of the Company or Assignor. Assignor hereby agrees to indemnify, defend and hold Secured Party harmless from and against any and all claims, demands, losses, costs (including reasonable attorneys' fees, whether incurred in connection with nonjudicial action, prior to trial, at trial or on appeal or review, including in any Insolvency Proceeding), damages (including special and consequential) and expenses incurred or suffered by Secured Party as a result of any assertion by the Company or Assignor, either directly or indirectly, or any Person claiming by, through or under any of them, or if Assignor assists any Person in asserting, that Secured Party was at any time a shareholder, member, partner, insider or joint venturer of the Company or Assignor prior to the Admission Date by virtue of this Assignment, the transactions contemplated thereby or otherwise.

**4.10.** **Delivery of Certificates**. Assignor hereby agrees: (a) to deliver to Secured Party, immediately upon receipt thereof, any and all instruments, certificates or other documents, whether now or hereafter existing, evidencing any of the Ownership Interests; and (b) to execute and deliver a notice of Secured Party's first priority, perfected, exclusive and continuing security interest in the Ownership Interests (which notice shall be in form and substance satisfactory to Secured Party and may require an acknowledgement from the addressee), to any third party which now has or may have the ability under applicable law or the terms of any agreement to record transfers of, or to transfer, any of the Ownership Interests (whether at the discretion of the Assignor or otherwise). Assignor hereby irrevocably and unconditionally appoints Secured Party as Assignor's attorney-in-fact with authority at any time or times from and after an Event of Default to take any of the foregoing actions on behalf of Assignor, such appointment being coupled with an interest.

**5.    DEFAULTS/REMEDIES**

**5.1.** **Events of Default**. The occurrence at any time of any of the following events, shall constitute an "Event of Default" hereunder:

(a)    if any of the Equity Distributions are collected, received, handled, applied and disbursed other than strictly in accordance with the terms of this Assignment;

(b)    if there occurs any default in the due observance or performance of any of non-monetary or other covenants or obligations in this Assignment (except as may be otherwise specified herein) or breach in any material respect of any representation or warranty set forth herein, and the same is not cured within ten (10) days after the giving of written notice by Secured Party;

(c)    this Assignment and the Transfer Power shall cease to be an exclusive valid and enforceable, properly perfected lien upon and security interest in the Ownership Interests, or shall fail to give Secured Party the benefit of the liens, security interests, rights, powers and benefits created thereby in accordance with the terms hereof;

(d)    there occurs an event of insolvency with respect to Assignor or Assignor is the subject of an Insolvency Proceeding (except that involuntary bankruptcy filings may be vacated or withdrawn within fifteen (15) days prior to being deemed an Event of Default); and/or

(e)    the occurrence of an Event of Default or Default under the Loan Documents, it being expressly understood that the term "Event of Default" or "Default" as used herein shall have each and all of the meanings assigned thereto in Loan Documents, all of which are hereby incorporated into this Assignment by this reference.

**5.2.    Remedies**.  Upon the occurrence of an Event of Default, Secured Party shall have the right, at its sole option, to exercise from time to time any or all of the rights and remedies provided for herein, in the other Assignment Documents, at law or in equity, including the following:

(a)    the rights and remedies of a secured creditor under the Code;

(b)    the right to receive directly any and all amounts payable in respect of the Ownership Interests, including all Equity Distributions, and the right to exercise all Equity Rights;

(c)    the right to sell (or resell in the event of a default under any sale) all or any portion of the Ownership Interests, at any public or private sale on such terms and conditions as Secured Party deems appropriate and as may be otherwise required under the Code or applicable law in accordance with this Assignment, and Assignor shall cooperate and cause the Company to cooperate with Secured Party and shall execute and deliver all documents and take any and all actions as may be necessary or requested by Secured Party to assign all of the Ownership Interests to Secured Party or any designee and/or to any purchaser of the Ownership Interests at such sale, to admit Secured Party or any designee and/or any such purchaser as a member of the Company, and comply with all Securities Laws in connection therewith;

(d)    recover from Assignor any and all losses, damages (of whatsoever kind or nature), costs (including reasonable attorneys' fees) and expenses suffered or incurred by Secured Party as a result of any default or Event of Default, and Assignor hereby agrees to indemnify Secured Party for the same;

(e)     seek specific performance of, including declaratory and injunctive relief to enforce, the terms and provisions of this Assignment and the other Assignment Documents;

(f)     exercise any and all other rights and remedies which may be available against Assignor, the Company or any other Person under this Assignment, any of the other Assignment Documents and/or otherwise afforded by law or in equity, subject to the applicable limitations on liability set forth in the Assignment Documents; and

(g)     apply to any court having jurisdiction for the appointment of a receiver for the Ownership Interests to take any or all of the actions set forth in this Section and if Secured Party elects to seek the appointment of a receiver at any time after an Event of Default has occurred and is continuing, Assignor and the Company, by their execution of this Assignment, expressly consent to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law; and immediately upon appointment of a receiver, Assignor shall surrender possession of the Ownership Interests to the receiver, and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Ownership Interests.

**5.3.**    **Sales**.  The following shall apply to any sale(s) (or resale(s)) of the Ownership Interests conducted by Secured Party pursuant to this Assignment.

(a)     **Restrictions Permitted**. Secured Party may restrict the number of potential bidders and purchasers in any such sale(s) and also may impose in any sale(s) such restrictions as Secured Party deems necessary or appropriate in order to cause such sales(s) to comply with all applicable laws, including Securities Laws. Such restrictions may include, without limitation, restricting purchasers and bidders to those who will represent and agree that they are purchasing the Ownership Interests for their own account, for investment purposes only, and not with a view to the distribution or resale of the Ownership Interests.

(b)     **Private Sales**. Assignor hereby acknowledges and agrees that, notwithstanding that a higher price may be obtained at a public sale of the Ownership Interests rather than a private sale thereof, a public sale of the Ownership Interests may be subject to registration requirements under Securities Laws and similar other legal restrictions which would make a public sale of the Ownership Interests impractical. Accordingly, Assignor hereby agrees that Secured Party shall be entitled to sell the Ownership Interests at a private sale on such terms and conditions as Secured Party deems acceptable and are otherwise commercially reasonable. Secured Party shall have no obligation to conduct a public sale of the Ownership Interests. Assignor hereby waives, to the fullest extent permitted by applicable, law, any right to require that the Ownership Interests be sold at a public sale and any claims that Assignor may have against Secured Party arising by reason of the fact that the price at which the Ownership Interests, or any part thereof may have been sold at a private sale was less than the price obtainable at a public sale.

(c)     **No Obligation to Sell/Notice**. Secured Party shall not be obligated to make any sale(s) of the Ownership Interests regardless of any notice of sale having been given, and Secured Party may adjourn any public or private sale from time to time and such sale may be made at the time and place to which it was adjourned. Assignor hereby agrees that to the extent notice of any such sale is required under the Code (notwithstanding the waiver thereof set forth herein),

a period of ten (10) days from the time the notice is sent shall be a reasonable period of notification of a sale or other disposition of Ownership Interests by Secured Party.

(d) **No Liability**. Secured Party shall have no liability as a result of the manner or terms of sale of the Ownership Interests, or any part thereof, at a public or private sale conducted in a manner and on terms that are commercially reasonable. All sales conducted by Secured Party shall be deemed to be commercially reasonable and, in any dispute as to the same, it shall be Assignor's burden to prove that the manner or terms of such sale were not commercially reasonable.

(e) **Consummation of Sale**. Any sale of, or other realization upon, any of the Ownership Interests shall operate to divest all of Assignor's right, title, interest, claim and demand, either at law or in equity, in and to the Ownership Interests and each and every portion thereof, and each purchaser at any sale of the Ownership Interests shall hold the Ownership Interests so sold absolutely free from any claim or right of Assignor whatsoever, including any right of redemption, which right has been waived pursuant to this Assignment. Further, after any sale(s) of the Ownership Interests, Assignor hereby agrees to take such actions and execute such documents as may be necessary or appropriate to transfer the Ownership Interests to the purchaser and substitute such purchaser as a member in the Company, including executing and delivering any necessary transfer documents and amendments to the Governing Agreements as may be required. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact to take such actions and execute such documents, such appointment being coupled with an interest. No purchaser shall be obligated to assume or perform any obligations under the Governing Agreements except for the period from and after such purchaser's admission as a member and then only after all actions necessary to effect its admission as a member have been consummated.

5.4. **Waiver of Rights by Assignor**.  Assignor, on behalf of itself and any Persons claiming by, through or under Assignor, hereby knowingly, intentionally and voluntarily waives: (a) presentment, demand, protest or any notice of any kind in connection with this Assignment; (b) notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof; (c) all claims, demands, liabilities and damages occasioned by such taking of possession or disposition; (d) all other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder; and (e) all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof.

5.5. **Rights Continuing**.  The rights and powers of Secured Party hereunder shall continue and remain in full force and effect until all Secured Obligations have been irrevocably and unconditionally paid and performed in full, and shall continue after sale of the Ownership Interests until expiration of any right of redemption, notwithstanding sale of the Ownership Interests to a purchaser other than Secured Party. Further, Assignor hereby acknowledges and agrees that Secured Party shall not be required to exercise its rights against any Person other than Assignor that is liable for all or any portion of the Secured Obligations or against any collateral for the Secured Obligations other than the Ownership Interests prior to exercising its rights and remedies against Assignor and the Ownership Interests pursuant hereto. Without affecting the

13

liability of Assignor for payment and performance of the Secured Obligations and without affecting Secured Party's lien and security interests in the Ownership Interests created hereby, Secured Party may release, at any time and from time to time, any Person liable for, or any security or other collateral for, the Secured Obligations.

**5.6.     Expenses of Default**.  Assignor agrees to pay on demand the amount of all costs and expenses incurred by Secured Party in protecting and realizing on its interest in the Ownership Interests, and further agrees that if this Assignment is referred to an attorney for protecting or defending the priority of Secured Party's interest in or lien on the Ownership Interests or for collecting or realizing thereon, Assignor shall pay upon demand all of Secured Party's expenses, including reasonable attorneys' fees and costs (whether incurred in connection with non-judicial action, prior to trial, at trial, or on appeal or review, including in any Insolvency Proceeding), other professional fees and costs, and expenses of title search and all court costs and costs of public officials. Assignor hereby further agrees that his obligation to pay such amounts shall be secured hereby and constitute a part of the Secured Obligations.

**5.7.     No Waiver**.  The exercise by Secured Party of any one right or remedy hereunder, under any of the other Assignment Documents, or the other Loan Documents, or any other guaranty, at law or in equity shall not be a waiver of Secured Party's right to exercise at the same time or thereafter any other right or remedy, and no delay in exercising or failing to exercise any rights or remedies of Secured Party hereunder, under any of the other Assignment Documents or any of the other Loan Documents, at law or in equity, following any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, in any one or more instances, or acceptance by Secured Party of partial payments or partial performance, shall constitute, or be deemed to constitute, a waiver of any such Event of Default, a waiver of the right to exercise any such rights or remedies at any time thereafter or upon the occurrence of any subsequent Event of Default, or a release, satisfaction or discharge of the terms hereof, of any of the other Assignment Documents or other Loan Documents, all such rights, remedies, terms and documents remaining continuously in force. Any waiver or release by Secured Party of any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, or any waiver of rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity (no obligation or agreement to waive or release or discharge any of the foregoing being implied hereby), may be effected only through a written document executed by Secured Party and then only to the extent of any waiver, release, discharge or satisfaction specifically set forth therein. A waiver or release in connection with any one event or any particular right or remedy shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity. Secured Party shall not be required to give notice of the exercise of these rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity, all such notice having been waived by the Assignor pursuant hereto.

**5.8.     Remedies Cumulative**.  The remedies of Secured Party provided for herein, in any of the other Assignment Documents or any of the other Loan Documents, at law or in equity upon the occurrence of an Event of Default shall be cumulative and concurrent, and may be pursued

singularly, successively or together, at the sole discretion of Secured Party, and may be exercised as often as occasion therefor shall arise, as determined by Secured Party in its sole discretion.

**5.9.**    **Revival and Reinstatement.**  If Secured Party is required to pay, return or restore to Assignor or any other person any amounts previously paid on the Indebtedness because of any Insolvency Proceeding of Assignor, any stop notice or any other reason, the obligations of Assignor shall be reinstated and revived and the rights of Secured Party shall continue with regard to such amounts, all as though they had never been paid, and this Assignment shall continue to be effective or be reinstated, as the case may be.

**6.**    **RIGHTS OF LENDER; WAIVERS**

**6.1.**    **Rights of Lender.**  Assignor authorizes Secured Party to perform any or all of the following acts at any time in its sole discretion, all without notice to Assignor and without affecting Secured Party's rights or Assignor's obligations under this Assignment:

(a)    Secured Party may alter any terms of the Note, the or the other Loan Documents, including renewing, compromising, modifying, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Indebtedness or any part of it;

(b)    Secured Party may take and hold security for the Indebtedness, accept additional or substitute security for the Indebtedness, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security;

(c)    Secured Party may direct the order and manner of any sale of all or any part of any security now or later to be held for the Indebtedness, and Secured Party may also bid at any such sale and may apply all or any part of the Indebtedness against the amount so bid;

(d)    Secured Party may apply any payments or recoveries from Assignor or any other source, and any proceeds of any security, to the Indebtedness in any manner, order and priority as Secured Party may elect, whether that obligation is secured by this Assignment or not at the time of the application;

(e)    Secured Party may substitute, add or release any one or more makers, Assignor, Amin Suliaman, Kenneth C. Ware, any other guarantors or endorsers; and

(f)    In addition to the Note, Secured Party may extend other credit to Assignor, and may take and hold security for the credit so extended, whether or not such security is also security for the Indebtedness, all without affecting Secured Party's rights or Assignor's liability under this Assignment.

**6.2.**    **Assignor's Waivers.**  Assignor waives:

(a)    All statutes of limitations as a defense to any action or proceeding brought against Assignor by Secured Party, to the fullest extent permitted by law;

(b)      Any right Assignor may have to require Secured Party to proceed against any other party, proceed against or exhaust any security held from any other party, or pursue any other remedy in Secured Party's power to pursue;

(c)      To the extent permitted by applicable law, all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof;

(d)      Any defense based on any claim that Assignor's obligations exceed or are more burdensome than those of the Company;

(e)      Any defense based on: (i) any legal disability of Assignor or the Company, (ii) any release, discharge, modification, impairment or limitation of the liability of Assignor or the Company to Secured Party from any cause, whether consented to by Secured Party or arising by operation of law or from any Insolvency Proceeding and (iii) any rejection, disallowance or disaffirmance of the Indebtedness, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(f)      Any defense based on any action taken or omitted by Secured Party in any Insolvency Proceeding involving Assignor or the Company, including, without limitation, filing, defending, settling or obtaining a judgment or order on any proof of claim or any adversary proceeding, making any election to have Secured Party's claim allowed as being secured, partially secured or unsecured, including any election under 11 U.S.C. Section 1111(b), seeking relief from the automatic stay or adequate protection, including submitting an appraisal of any security, voting to reject or accept or failing to vote on any reorganization plan, making any extension of credit by Secured Party to Assignor or the Company in any Insolvency Proceeding, and the taking and holding by Secured Party of any security for any such extension of credit, whether or not such security is also security for the Indebtedness;

(g)      All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Assignment and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind;

(h)      Any defense based on or arising out of any defense that the Company or Assignor may have to the payment or performance of the Indebtedness or any part of it;

(i)      Notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof;

(j)      All claims, demands, liabilities and damages occasioned by such taking of possession or disposition; and

(k)      All other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder.

**6.3.** **Waivers of Subrogation and Other Rights and Defenses**.

(a)     The obligations of Assignor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought against Assignor, regardless of whether action or suit is brought against the Company, or whether Assignor or the Company are joined in any such action or actions. At the option of Secured Party, Assignor may be joined in any action or proceeding commenced by Secured Party against the Company in connection with or based on the Indebtedness or any security for such obligation, and recovery may be had against Assignor in such action or proceeding without any requirement that Secured Party first assert, prosecute or exhaust any remedy or claim against the Company.

(b)     Upon a default by Assignor, Secured Party in its sole discretion, without prior notice to or consent of Assignor, may elect to: (i) foreclose either judicially or nonjudicially against any real or personal property security that Secured Party may hold for the Indebtedness other than the Ownership Interests hereby encumbered, (ii) accept a transfer of any such security in lieu of foreclosure, (iii) compromise or adjust the Indebtedness or any part of it or make any other accommodation with Assignor or the Company, or (iv) exercise any other remedy against Assignor or the Company or any security other than the Ownership Interests hereby encumbered. With respect to security other than the Ownership Interests hereby encumbered, no such action by Secured Party shall release or limit the liability of Assignor, who shall remain liable under this Assignment after the action, even if the effect of the action is to deprive Assignor of any subrogation rights, rights of indemnity, rights of contribution, or other rights to collect reimbursement from the Company or any other Person for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law or otherwise. After any foreclosure or deed in lieu of foreclosure of any real or personal property pledged to secure the Indebtedness, Assignor shall under no circumstances be deemed to have any right, title, interest or claim in or to such property, whether it is held by Secured Party or any third party.

(c)     Regardless of whether Secured Party may have recovered against Assignor, Assignor hereby waives: (i) all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement or contribution from the Company or any other party for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute) or otherwise (collectively, "Reimbursement Rights"), (ii) all rights to enforce any remedy that Secured Party may have against the Company, and (iii) all rights to participate in any security now or later to be held by Secured Party for the Indebtedness. To the extent Assignor's waiver of Reimbursement Rights is found by a court of competent jurisdiction to be void or voidable for any reason, any Reimbursement Rights Assignor may have against the Company or any collateral or security shall be junior and subordinate to any rights Secured Party may have against the Company and to all right, title and interest Secured Party may have in any such collateral or security. If any amount should be paid to Assignor on account of any Reimbursement Rights at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for Secured Party and shall immediately be paid over to Secured Party to be credited and applied against the Indebtedness, whether matured or unmatured, in accordance with the terms of the Guaranty. The covenants and waivers of Assignor set forth in this Section 6.3(c) shall be effective until the Indebtedness has been paid and performed in full and are made solely for the benefit of Secured Party.

(d)     No provision or waiver in this Assignment shall be construed as limiting the generality of any other provision or waiver contained in this Assignment.

## 7.    MISCELLANEOUS

**7.1.    No Limitation of Liability**.  Assignor acknowledges that Secured Party has agreed to make the Loan in reliance upon Assignor's representations, warranties and covenants in this Assignment, all of which shall be deemed continuing and continually remade at all times. It is the intention of Assignor and Secured Party that the provisions of this Assignment shall be controlling over any provisions in the Note or the Guaranty which in any way limit the personal liability of Assignor, Amin Suliaman, Kenneth C. Ware, the Company, any of the Borrower Parties or any other Person, and that Assignor shall be personally liable for any and all of the obligations arising under this Assignment, even if the amount of liability incurred exceeds the amount of the Note.

**7.2.    Notices**.  Notices under this Assignment shall be provided in the manner provided in the Loan Agreement, including that any party may change its address for notices hereunder by written notice to the other parties given in accordance with provisions of the Loan Agreement.

**7.3.    Agent for Service of Process**.  As a further inducement to Secured Party to make the Loan and in consideration thereof, Assignor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the foregoing Section 7.2, Assignor hereby waiving personal service thereof, and Assignor agrees that within thirty (30) days after such mailing, it shall appear or answer to any summons and complaint or other process, and should it fail to appear or answer within said thirty-day period, it shall be deemed in default in any summons and complaint or other process so served.

**7.4.    Damage Lawsuit, Consent to Jurisdiction**.  The sole and exclusive remedy of Assignor for any and all adverse claims against Secured Party is a Damage Lawsuit (hereinafter defined). Assignor hereby represents and warrants to Secured Party that as of the date hereof no such adverse claims exist against Secured Party. Any such Damage Lawsuit, regardless of the procedural form in which it is alleged, will be severed from any enforcement by Secured Party of its legal, equitable and contractual rights, and the Damage Lawsuit cannot be asserted by Assignor as a defense, set-off, recoupment, or grounds for delay, stay, subordination or injunction against any enforcement by Secured Party of its legal, equitable and contractual rights under the Loan Documents, the Guaranty or otherwise. It is understood and agreed that the designated, exclusive and proper venue of any legal dispute, question or interpretation, claim, declaratory judgment action, bankruptcy or other litigation regarding: (a) any proceeding under the Bankruptcy Code brought by or against Assignor; (b) the enforcement of Secured Party's rights under or relating in any way to the Loan, the Note, or the other Loan Documents; (c) the prosecution of any Damage Lawsuit alleged against Secured Party by any of the Affiliated Parties; and (d) any other matter regarding this Assignment or the Guaranty or any of the other Loan Documents shall be exclusively and solely decided by the federal court in the State of Illinois or state circuit or district courts sitting in the State of Illinois (provided, that, in the event actions or proceedings are required to be litigated in the jurisdiction of the situs of the Property, then such actions or proceedings shall be litigated in the courts of the State of Colorado sitting in Denver County); and Assignor hereby consents to the exercise or personal jurisdiction over Assignor by, and consents to the laying of venue in, and exclusive jurisdiction of, such courts. As used herein, the term "Affiliated Parties"

18

shall mean individually and collectively, Assignor and all of his Legal Representatives, successors and assigns; the term "Damage Lawsuit" shall mean an action for monetary damages; and the term "Legal Representatives" shall mean any trustee, receiver, custodian and/or any other person appointed or authorized to act in a representative capacity by a court or governmental entity, whether appointed pursuant to the Bankruptcy Code or otherwise.

**7.5.** **No Third-Party Beneficiary**. The provisions of this Assignment are solely for the benefit of Secured Party and its successors and assigns. No provision of this Assignment or of the Loan Documents shall be construed as creating in any party other than the Company, Assignor and Secured Party, and their successors and assigns, any rights of any nature whatsoever.

**7.6.** **Further Assurances**. Upon request by Secured Party, Assignor, at his sole cost and expense, at any time and from time to time, shall, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, mortgages, security agreements, financing statements and other documents and assurances as Secured Party shall request to protect and preserve the security for the Loan, the priority of the liens created by this Assignment, or Assignor's performance of his obligations hereunder, or for the better assuring, conveying, mortgaging, assigning and confirming unto Secured Party all property subject to the lien of or a security interest provided for in the Loan Documents or property intended so to be, whether now owned by the Company or Assignor, or hereafter acquired. Such acts or assurances shall include, without limitation, recordation of such documents and instruments, at Assignor's sole cost and expense, as Secured Party may request.

**7.7.** **Secured Party's Right to Assign**. Secured Party shall have the right any time and from time to time, in accordance with any applicable provisions of the Loan Documents, to sell, assign, participate, pledge, transfer, securitize, syndicate, or otherwise dispose of the Loan, the Note, the Guaranty, or any of the other Loan Documents, or any interests therein and/or the Secured Obligations. From and after the date of any such sale, assignment, participation, pledge, transfer, securitization, syndication or other disposition, such transferee shall be entitled to exercise any and all rights and remedies of Secured Party hereunder as fully and with the same force and effect as if such transferee had been named the Secured Party hereunder. Assignor shall not assign, convey or otherwise transfer any of his rights and obligations hereunder.

**7.8.** **Successors and Assigns**. Subject to the provisions of Section 4.1, all of the terms, covenants and conditions contained herein shall apply and be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and permitted assigns of Assignor and Secured Party, respectively, and all Persons claiming by, under or through them.

**7.9.** **Severability**. If any provision in this Assignment is found by a court of competent jurisdiction to be in violation of any applicable law, and if such court should declare such provision of this Assignment to be unlawful, void, illegal or unenforceable in any respect, the remainder of this Assignment shall be construed as if such unlawful, void, illegal or unenforceable provision were not contained therein, and the rights, obligations and interests of the parties hereto under the remainder of this Assignment shall continue in full force and effect undisturbed and unmodified in any way.

**7.10.** <u>Modification</u>. This Assignment and the terms hereof may not be changed, waived, modified, canceled, discharged or terminated orally, but only by an instrument or instruments in writing signed by Assignor and Secured Party.

**7.11.** <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF.

**7.12.** <u>Incorporation of Recitals/Exhibits</u>. The recitals set forth at the beginning of this Assignment are true and correct in all respects and are hereby incorporated in their entirety by this reference. The exhibits attached hereto are hereby incorporated in their entirety by this reference.

**7.13.** <u>WAIVER OF TRIAL BY JURY</u>. ASSIGNOR, FOR HIMSELF AND ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER HIM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS HE MAY HAVE TO TRIAL BY JURY IN ANY LITIGATION OR ACTION BROUGHT ON, UNDER OR BY VIRTUE OR RELATING IN ANY WAY TO THIS ASSIGNMENT, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO. THIS WAIVER MAY BE FILED WITH THE CLERK OR JUDGE OF ANY COURT AS A WRITTEN CONSENT TO WAIVER OF JURY TRIAL. ASSIGNOR ACKNOWLEDGES THAT HE HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR SECURED PARTY'S ENTERING INTO THE LOAN. THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE INDEBTEDNESS.

**7.14.** <u>Joint and Several Liability</u>. The obligations of Assignor and any and all other Borrowing Parties that may be liable hereunder are joint and several.

**7.15.** <u>Time is of the Essence</u>. TIME IS OF THE ESSENCE under this Assignment and each and every provision hereof and thereof.

**7.16.** <u>Effective Date</u>. The effective date of this Assignment shall be the date on the first page hereof and thereof, respectively, notwithstanding the fact that this Assignment may have been executed on a date prior or subsequent thereto.

**7.17.** <u>Counterparts</u>. This Assignment may be executed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute but one original. This Assignment shall not be effective unless and until executed and delivered by each of the named Assignor and Secured Party in one or more counterparts. Facsimile signatures hereon shall be treated the same as and provided the same legal significance as original signatures hereon.

**7.18.** <u>Counsel</u>. Assignor acknowledges that he has had adequate opportunity to carefully read this Assignment and to consult with an attorney of such Assignor's choice prior to signing it.

**7.19.** <u>Integration</u>. No course of prior dealing, usage of trade, parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof. This Assignment is intended by the parties to be a fully integrated and final expression of their agreement. This

Assignment, the Note, the Guaranty and the other documents securing the Note incorporate all negotiations of the parties and constitute the parties' entire agreement. Assignor represents that it is relying on no written or oral agreement, representation, warranty or understanding, of any kind made by Secured Party or any employee, attorney or agent of Secured Party except for the agreements of Secured Party set forth herein.

**7.20.** **Amendment to Governing Agreements**.

(a)    Assignor hereby acknowledges and agrees that notwithstanding any provisions of the Governing Agreements to the contrary, Assignor:

(i)    consents to this Assignment, including the pledge and assignment of the Ownership Interests and all other benefits to which the holders of such Ownership Interests may be entitled pursuant to the terms of the Governing Agreements, and Secured Party's exercise and enforcement of any of its rights and remedies hereunder or otherwise afforded by law or in equity;

(ii)    consents to the absolute and unconditional transfer and assignment of the Ownership Interests and all other benefits to which the holders of such interests may be entitled pursuant to the terms of this Assignment, the Note, the Guaranty and the other Loan Documents, and Secured Party's exercise and enforcement of its rights and remedies hereunder or otherwise afforded by law or in equity;

(iii)    agrees that transfers of the Ownership Interests and all other benefits to Secured Party hereunder and upon the exercise of any rights and remedies by Secured Party, including one or more sales of the Ownership Interests to Secured Party, its designee and any other purchasers pursuant to this Assignment or any other exercise of Secured Party's rights and remedies, shall be deemed permissible transfers under the Governing Agreements for all purposes and are hereby irrevocably and unconditionally consented to, without the necessity of obtaining any further consents or approvals, and further without the necessity of complying with any other provision of the Governing Agreements that might otherwise be construed to condition, limit, prohibit, impair or modify in any respect this Assignment or the exercise of Secured Party's rights and remedies hereunder, at law or in equity, including any options to purchase and any rights of first offer, first opportunity, first refusal and redemption;

(iv)    agrees that, upon written notice to Assignor from Secured Party of its election under this Assignment to exercise all or any portion of the Equity Rights and Bankruptcy Rights, and collect directly any Equity Distributions or other amounts payable to any Assignor in respect of the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice) on account of the Ownership Interests, all such distributions and other amounts shall be paid directly to Secured Party and Secured Party shall automatically be entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements (including all distributions of available cash or other distributions or payments or any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice), Assignor hereby irrevocably and unconditionally consenting thereto; and

21

(v)     agrees that, upon written notice to Assignor, from Secured Party of Secured Party's election to be, or to have its designee or any purchaser, substituted as the holder of any Ownership Interest or portion thereof pursuant to this Assignment, Secured Party, its designee and/or such purchaser, as applicable, shall automatically be deemed to be admitted as a substitute member for such transferring member to the extent of the Ownership Interests so transferred and a member and entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements, including the right to exercise the Equity Rights and Bankruptcy Rights and receive any Equity Distributions or other amounts payable to a member in respect of the Ownership Interests under the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date so transferred), and all such amounts shall be paid as so directed by Secured Party, Assignor hereby irrevocably and unconditionally consenting thereto.

(b)     In the event Secured Party elects to be admitted as a substitute member and/or new member, Secured Party shall be deemed to have assumed and agreed to perform all obligations of the transferring member under the Governing Agreements relating solely to the Assignor's interest so transferred or the new membership interest from and after the effective date of the transfer or acquisition of such new interest by Secured Party, its designee and/or purchaser and not for the period or to the extent arising prior thereto, and without the necessity of obtaining any further consents or approvals from any other members of the Company (or any other future member of the Company, no consent thereto being implied hereby) or the Company or complying with any of the conditions of the Governing Agreements. Upon receipt of such notice, Assignor shall take (or shall cause the Company to take) such actions as are contemplated in the Governing Agreements, as modified hereby, and otherwise to register and further assure such transfers, admission and/or new acquisition, without cost to Secured Party, its designees and purchasers.

(c)     Assignor hereby covenants to execute and deliver any documents and instruments reasonably required by Secured Party to effectuate the provisions of this Section 7.20, and should Assignor fail to execute and deliver such documents or instruments within five (5) days after request therefor by Secured Party, Assignor hereby appoints Secured Party as his true and lawful attorney-in-fact (which appointment is deemed to be coupled with an interest) to execute and deliver any such documents and instruments as is reasonably necessary to effectuate the provisions of this Section 7.20.

(d)     This Section 7.20 shall be deemed to amend and modify the Governing Agreements until all Secured Obligations have been irrevocably and unconditionally paid and performed in full.

[Signature Page Follows]

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

**SECURED PARTY**:

PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company

By: _____

Name:  Peter Martay

Title:  Authorized Signatory

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

**ASSIGNOR:**

**AMIN SULIAMAN**, an individual

## CONSENT OF COMPANY

**KDA PROPERTIES LLC**, Colorado limited liability company (the "Company"), has reviewed the foregoing Assignment and hereby unconditionally and irrevocably consents to and agrees to be bound by the terms and conditions thereof. The Company agrees that the Ownership Interests are securities subject to the provisions of Article 8 of the Code. The Company hereby has marked its books and records (including the membership interest register) to reflect the delivery of the Transfer Power, to Secured Party, and the existence of this Assignment, each of the other Assignment Documents, and the assignments, liens and security and investment property interests created hereby and thereby, and to maintain at all times a copy of this Assignment and each of the other Assignment Documents as a part of its books and records. Upon request of Secured Party, whether pursuant to a sale of one or more Ownership Interests under Section 5.3 of this Assignment or otherwise, the Company shall immediately cause the admission of Secured Party or its designee or any other purchaser to be registered in the books and records of the Company and take all such other actions as may be necessary or requested to effect the transfer and issuance of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser as a member of the Company as contemplated by the Assignment, and further to take all such actions as may be necessary to comply in all respects with applicable Securities Laws in connection with the sale or other transfer of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser. The Company further agrees that, upon request by Secured Party, the Company will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts and instruments as may be required to effectuate the transaction contemplated by this Assignment.

KDA PROPERTIES LLC,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:   Manager

By: _____
Name: Amin Suliaman
Title:   Manager

## EXHIBIT A

### Description of Pledged Ownership Interests

| NAMES AND ADDRESSES | TYPE OF INTEREST | OWNERSHIP INTEREST | FILING LOCATION |
|---|---|---|---|
| Amin Suliaman<br>c/o KDA Properties LLC<br>1612 Wazee Street<br>Denver, CO 80202 | Membership | 49% | Secretary of State of Colorado |

**EXHIBIT B**

Debtor (Pledgor): Amin Suliaman, an individual

Secured Party:  Pangea Mortgage Capital, LLC, an Illinois limited liability company

**1.      DESCRIPTION OF COLLATERAL**. The Collateral covered by the UCC-1 financing statement or Security Agreement (as defined below) to which this **Exhibit** is attached (the "UCC-1"), and constituting the Collateral in which Debtor grants a perfected security interest to Secured Party pursuant to the Security Agreement to which this **Exhibit** is attached, consists of the "Collateral," as defined below. A complete description of all such Collateral is hereby included and incorporated by reference in the UCC-1 or Security Agreement, as if the entirety of this description of Collateral were set forth in full on the face of the UCC-l.

**2.      DEFINITIONS**. For purposes of the foregoing, the following terms shall have the following meanings:

2.1 "Bankruptcy Rights" means, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding (as defined in the Security Agreement), voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.2      "Company" means **KDA PROPERTIES LLC**, Colorado limited liability company.

2.3      "Collateral" means the Ownership Interests.

2.4      "Documents" means all certificates or documents representing Debtor's interest in and rights with respect to the Company.

2.5      "Equity Distributions" means collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with

any of the foregoing.

2.6     "Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.7     "Operating Agreement" means that certain Operating Agreement of the Company dated as of March 16, 2018, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party.

2.8     "Ownership Interests" means collectively, whether now existing and hereafter arising or acquired: (a) one hundred percent (49%) of the current and future interests of the Debtor under the Operating Agreement, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.9     "Proceeds" shall include the following, whether in cash or not in cash:

2.9.1   Certain Payments. Any proceeds, products, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions, and replacements of any Collateral;

2.9.2   Dispositions. Whatever is received by Debtor upon the sale, exchange, collection or other disposition of any item of Collateral, whether such proceeds constitute inventory, accounts, accounts receivable, general intangibles, instruments, securities, credits, documents, letters of credit, chattel paper, documents of title, warehouse receipts, leases, deposit accounts, money, contract rights, goods or equipment;

2.9.3   Applications of Proceeds. Any such items that are now or hereafter acquired by Debtor with any proceeds of any Collateral hereunder; and

2.9.4   Insurance. Any insurance proceeds payable by reason of loss or damage to any item of Collateral or any proceeds thereof

2.10    "Security Agreement" means that certain Collateral Assignment, Pledge and Security Agreement, dated as of March 11, 2020, given by the Debtor to the benefit of the Secured Party, as the same may be amended, modified, extended, restated or replaced from time to time.

**3.**     **LIMITATION OF LIABILITY**.    Notwithstanding anything to the contrary in the foregoing, Secured Party shall have no obligations or liability with respect to the Ownership Interests unless and until Secured Party has succeeded to the ownership of the Ownership Interests. Even if the Secured Party shall acquire ownership of the Ownership Interests, Secured Party's liability shall: (a) terminate if and when Secured Party has transferred or abandoned such Ownership Interests; and (b) under all circumstances be limited to Secured Party's interest in the Ownership Interests.

## EXHIBIT C

### Irrevocable Transfer Power

FOR VALUE RECEIVED, **AMIN SULIAMAN**, an individual, does hereby sell, assign and transfer 49% of membership interests (the "Ownership Interests") in **KDA PROPERTIES LLC**, a Colorado limited liability company (the "Company"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

EXHIBIT C

**IN WITNESS WHEREOF** the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

_____

**AMIN SULIAMAN**, an individual

**EXHIBIT D**

Filing Locations for UCC Financing Statements: Secretary of State of Colorado

EXHIBIT 7

## COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT

**THIS COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT** (this "Assignment") is made as of March 11, 2020 by **KENNETH C. WARE**, an individual ("Assignor") to and in favor of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company ("Lender" or "Secured Party").

## RECITALS

A.     Pursuant to that certain Loan Agreement (as amended, modified and restated from time to time, the "Loan Agreement"), dated as of even date with this Assignment, by and between Secured Party **KDA PROPERTIES LLC**, a Colorado limited liability company ("Company") and **NATIV DENVER LLC**, a Colorado limited liability company, Secured Party has agreed to make a loan (the "Loan") to Company in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), which Loan is evidenced by that certain Promissory Note (as amended, modified and restated from time to time, the "Note"), dated as of even date herewith, in the original principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), made by the Company in favor of Secured Party.  In connection with the Loan, Amin Suliaman and Kenneth C. Ware have entered into that certain Guaranty of Payment dated as of even date herewith for the benefit of Secured Party (as amended, modified and restated from time to time, the "Guaranty").  The Note, the Guaranty, the Loan Agreement and the other documents securing the Loan, as amended, modified, restated and time to time, are herein together sometimes called the "Loan Documents."

B.     In order to secure the payment and performance of the indebtedness and obligations of Company under the Note, Assignor has agreed to assign and pledge to Secured Party, and grant Secured Party a first priority, properly perfected, valid and enforceable assignment of and security interest in, all of Assignor's ownership interests (as more particularly defined in Section 1.1, the "Ownership Interests") in the Company, on the terms and conditions set forth herein.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Assignor and Secured Party hereby agree as follows:

## 1.     DEFINITIONS

**1.1.     Definitions**.  All capitalized terms used in this Assignment, including, without limitation, the terms defined in the foregoing recitals, shall have the meanings set forth in this Assignment or, if said terms are not defined in this Assignment, shall have the meanings of the same defined terms set forth in the Loan Agreement, as the same may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time, which definitions are hereby incorporated in their entirety by this reference as though specifically set forth herein. In addition, the following capitalized terms shall have the meaning hereinafter set forth:

"Admission Date" shall mean the date on which Secured Party is or shall be fully admitted as a member of the Company, and assumes and agrees to be bound by, in writing, the Governing

1

Agreements.

"Articles of Organization" shall mean that certain Articles of Organization of the Company filed with the Secretary of State of the State of Colorado, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof.

"Assignment" shall mean this Collateral Assignment, Pledge and Security Agreement, as the same may be amended, modified, extended, restated or replaced from time to time.

"Assignment Documents" shall mean, collectively, this Assignment, the Financing Statements and all other documents, certificates, affidavits and instruments now or hereafter evidencing, securing or relating in any way to any of the foregoing executed by Assignor, the payment of the indebtedness or the observance or performance of the obligations evidenced and/or secured thereby, as said documents may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time.

"Bankruptcy Rights" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property, arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Code" shall mean the Uniform Commercial Code as enacted in the State of Colorado or Illinois, as applicable, and in each other jurisdiction having applicability to the perfection of the liens and security interests granted herein, as amended and/or re-enacted from time to time.

"Equity Distributions" shall mean collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership

Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Event of Default" shall mean the happening or occurrence of any event described in Section 5.1 hereof.

"Financing Statements" shall mean, individually and collectively, each and all of the UCC-1 Financing Statements executed, if necessary, and delivered by Assignor, as debtor therein, in favor of Secured Party, as secured creditor, pursuant to this Assignment, as the same may be amended, modified, extended, continued, restated or replaced from time to time in accordance with the Code.

"Governing Agreements" shall mean collectively (i) the Operating Agreement of the Company, as same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party to the extent required and (ii) the Articles of Organization of the Company.

"Governmental Authority" shall mean the United States of America, any State, any county, city or any other political subdivision, or any other political subdivision, agency or instrumentality exercising or claiming jurisdiction over Assignor or the Company.

"Indebtedness" shall mean any and all amounts owed by Amin Suliaman and Kenneth C. Ware to Secured Party pursuant to the Guaranty and the Loan Documents and/or any and all amounts owed by Company to Secured Party pursuant to the Note and the Loan Documents.

"Insolvency Proceeding" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally, and shall include: (a) any proceeding seeking to appoint or appointing a receiver or trustee for Company and/or its Legal Representatives (as defined in Section 7.4 of this Assignment), successors and assigns (collectively, the "**Borrower Parties**"); (b) any proceeding filed by or against any of the Borrower Parties under the Bankruptcy Code; (c) any assignment by any of the Borrower Parties of all or substantially all of their respective assets for the benefit of creditors; (d) any proceeding or other action wherein all or substantially all of any of the Borrower Parties' assets are attached, seized, subjected to a writ or distress warrant, or otherwise levied upon; and (e) any proceedings to set aside or avoid any transfer of an interest in property or obligations, whether denominated as a fraudulent conveyance, preferential transfer or otherwise, or to recover the value thereof or to charge, encumber or impose a lien thereon.

"Insolvent" shall have the meaning of the same terms under Sections 101(32) or 548 of the Bankruptcy Code.

"Legal Requirement" shall mean applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other written standard, requirement, policy or

procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority, including any judgment and all judicial decisions applying common law or interpreting any other Legal Requirement, in each case, as amended.

"Ownership Interests" shall mean collectively, whether now existing and hereafter arising or acquired: (a) fifty-one percent (51%) of the current and future membership interests in the Company under the Governing Agreements, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Person" shall mean any person or entity, whether an individual, sole proprietorship, trust, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, institution, business association, firm, joint venture, Governmental Authority or otherwise.

"Secured Obligations" shall have the meaning set forth in Section 2.1.

"Securities Laws" shall mean, individually and collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, and any and all other laws, regulations, rules, orders and decrees of any governmental authorities governing the issuance, sale, marketing, exchange or disposition of securities, as any of the foregoing are amended from time to time.

"Transfer Power" shall have the meaning given in Section 2.4 of this Assignment.

**1.2.** **Rules of Construction**.   Section captions used in this Assignment are for convenience only and shall not affect the construction of this Assignment. All references to "Sections," without reference to a document other than this Assignment, are intended to designate Sections of this Assignment, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Assignment as a whole and not to any particular Section, unless specifically designated otherwise. The use of the term "including" shall mean in all cases "including but not limited to," unless specifically designated otherwise. Pronouns of any gender shall include the other genders (including the neuter gender), and either the singular or plural shall include the other. No rules of construction against the drafter of this Assignment shall apply in any interpretation or enforcement of this Assignment, any documents or certificates executed pursuant thereto, or any provisions of any of the foregoing.

## 2.   ASSIGNMENT AND GRANT

**2.1.** **Obligations Secured**.   This Assignment is made by Assignor in favor of Secured Party to secure irrevocable and unconditional payment and performance of the obligations, whether now existing or hereafter arising, by the Company under the Note and/or the Loan Documents and of Amin Suliaman and Kenneth C. Ware under the Guaranty and the Assignment Documents, including each and all of the representations, warranties, covenants, obligations, liabilities, indemnities and duties of the Company under the Note and Loan Documents (collectively, the "Secured Obligations").

4

**2.2.** **Assignment/Grant of Security Interest**.  In order to secure the unconditional and irrevocable payment and performance of the Secured Obligations, Assignor does hereby unconditionally and irrevocably assign, convey, mortgage, pledge, hypothecate, transfer and set over to Secured Party, and does hereby grant to Secured Party, a properly perfected, valid and enforceable, assignment of and continuing security interest in the Ownership Interests. This Assignment is intended to be a security agreement under the Code with respect to all or any portion of the Ownership Interests and all products and cash and non-cash proceeds thereof to the full extent that, under applicable law, the Ownership Interests may be subject to a security interest under the Code, whether acquired as of the date of this Assignment or in the future.

**2.3.** **Financing Statements**.  Assignor does hereby authorize Secured Party to file concurrently with the execution of this Assignment such UCC Financing Statements in such locations as are necessary, and to take all such other actions and make such further filings as Secured Party may request, in order to perfect Secured Party's continuing security interest in the Ownership Interests pursuant hereto. The Financing Statements shall be in form acceptable for filing in each jurisdiction in which the same are to be filed, shall comply in all respects with the Code and shall contain a description of "Collateral" that is substantially similar to the description set forth on attached **Exhibit B**. Assignor hereby agrees to pay all filing fees and other costs incurred in connection with the filing of such Financing Statements.

**2.4.** **Transfer Power and Certificate**.  Contemporaneously with his execution of this Assignment, Assignor shall deliver to Secured Party the original transfer power (the "Transfer Power") substantially in the form of the attached **Exhibit C**, which Transfer Power shall be executed by such Assignor in blank and shall irrevocably sell, assign and transfer all of the Ownership Interests owned by Assignor, as a member of the Company. Secured Party shall be entitled to complete the Transfer Power at any time following the occurrence of an Event of Default in connection with its exercise of any of the remedies provided in Article 4 of this Assignment.

**2.5.** **Assignment to be Absolute**.  Assignor expressly agrees that until the Indebtedness is paid and performed in full, and each and every term, covenant and condition of this Assignment is fully performed, Assignor shall not be released by or because of:

(a)     Any act or event which might otherwise discharge, reduce, limit or modify Assignor's obligations under this Assignment;

(b)     Any waiver, extension, modification, forbearance, delay or other act or omission of Secured Party, or its failure to proceed promptly or otherwise against Assignor or any security;

(c)     Any action, omission or circumstance which might increase the likelihood that Assignor may be called upon to perform under this Assignment; or

(d)     The existence of an Insolvency Proceeding and as a result thereof some or all of the Indebtedness being terminated, rejected, discharged, modified or abrogated.

Assignor hereby acknowledges that absent this Section 2.5, Assignor might have a defense to the enforcement of this Assignment as a result of one or more of the foregoing acts, omissions, agreements, waivers or matters. Assignor hereby expressly waives and surrenders any defense to

5

any liability under this Assignment based upon any of such acts, omissions, agreements, waivers or matters. It is the express intent of Assignor that Assignor's obligations under this Assignment are and shall be absolute, unconditional and irrevocable.

### 2.6. <u>Receipt of Equity Distributions/Exercise of Equity Rights</u>.

(a)   **<u>Generally</u>**.  Secured Party shall have the sole right and authority to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions until the Indebtedness shall have been paid in full and all obligations under the Loan Documents have been satisfied.

(b)   **<u>Bankruptcy Rights</u>**.  In the event Assignor is the subject of any Insolvency Proceeding which is not dismissed within the applicable cure period set forth in the Loan Documents, if any, and regardless of whether there has occurred an Event of Default, Secured Party shall have sole right and authority, to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions, exercising all Bankruptcy Rights, and exercising all other Equity Rights in such manner as Secured Party elects, in its sole and absolute discretion, and Secured Party shall have no obligation or liability whatsoever to Assignor on account of Secured Party's receipt of any Ownership Interests, Equity Distributions or exercise of, or failure to exercise, any Equity Rights or Bankruptcy Rights. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact, such appointment being coupled with an interest, with authority to exercise each and all of the Bankruptcy Rights in the place and stead of Assignor in such manner as Secured Party shall elect in its sole discretion. Further, Assignor hereby agrees that Secured Party shall have no liability whatsoever for exercising or failing to exercise any of the Bankruptcy Rights.

### 2.7. <u>No Assumption by Secured Party</u>.   Notwithstanding any of the foregoing, irrespective of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, neither this Assignment, receipt by Secured Party of any Equity Distributions, exercise by Secured Party of any Equity Rights nor any exercise by Secured Party of any of its rights and remedies hereunder shall in any way obligate Secured Party to assume, or constitute or be deemed to constitute an assumption of, any of Assignor's obligations, duties, expenses or liabilities with respect to the Ownership Interests. Assignor acknowledges and agrees that it shall at all times remain liable for performance of all obligations, duties, expenses or liabilities with respect to the Ownership Interests, regardless of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, and that Secured Party shall in no event be liable therefor or deemed to have assumed the same.

## 3.   REPRESENTATIONS AND WARRANTIES

Assignor hereby makes the following representations and warranties for the benefit of Secured Party, all of which representations and warranties shall be deemed to be continuing and continually remade until the full, unconditional and irrevocable payment and performance of all

Secured Obligations:

**3.1.    Organizational Status.**   The Company is a limited liability company, duly organized, validly existing and in good standing and qualified to conduct its business in the State of Colorado and in good standing and qualified to conduct its business in the State of Colorado and each other jurisdiction in which it does business.

**3.2.    Power and Authority; Residency.**   Assignor has full power and authority to enter into and perform this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and each and all of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Further, Assignor has, by all necessary action, validly authorized the execution, delivery and performance of this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Assignor's principal place of residency is in the State of Colorado.

**3.3.    Assignment Binding.**   This Assignment, each of the documents and certificates executed and delivered, or to be executed and delivered, by Assignor are, or will be when executed and delivered, the legal, valid and binding obligations of Assignor, enforceable against it in accordance with the terms hereof and thereof.   The Consent of the Company attached to this Assignment (the "Company Consent") is, or will be when executed and delivered, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and the terms of this Assignment.

**3.4.    Actions Against the Company.**   Assignor has no knowledge of any action, proceeding or Insolvency Proceeding pending or threatened against the Company that would affect or impair the agreements made by Company in the Company Consent.

**3.5.    Approvals.**   Neither the execution nor delivery of this Assignment, the documents and certificates to be executed and delivered in connection herewith, the other Assignment Documents, nor the consummation or performance of the transactions contemplated hereby or thereby, require the consent or approval of any Governmental Authority or any other Person other than the Company.

**3.6.    No Duress.**   This Assignment is made voluntarily without any duress or undue influence of any kind.

**3.7.    No Violation of Laws, etc.**   Neither this Assignment, any of the other documents or certificates to be executed in connection herewith or any of the other Assignment Documents or transactions contemplated thereby violate or are in contravention of: (a) the Governing Agreements; (b) to the knowledge of Assignor, any Legal Requirements applicable to Assignor or any of the assets of Assignor; or (c) to the knowledge of Assignor, any other mortgage, pledge, indenture, lease, security agreement or other agreement to which Assignor is a party.

**3.8.    Solvency; No Fraudulent Conveyance.**   Assignor represents and warrants that it is not Insolvent and will not become Insolvent as a result of entering into this Assignment or the

7

transactions contemplated hereby; that this Assignment is not being made by Assignor with any intent to hinder, delay or defraud any creditors to which Assignor is or may hereafter become indebted; that Assignor is not engaged in business or any transactions, including the transactions contemplated hereunder, or is about to engage in any business or any transactions, for which any of his remaining property is unreasonably small capital; and that he does not intend to incur or believe that he will incur, debts that would be beyond his ability to pay as such debts mature. Assignor acknowledges that he is receiving new, fair, reasonably equivalent value in exchange for this Assignment and the transactions contemplated hereby, and affirmatively represents that neither his entry into this Assignment nor the consummation of the transactions contemplated hereby constitutes a fraudulent conveyance or preferential transfer under the Bankruptcy Code or any other federal, state or local laws affecting the rights of creditors generally.

**3.9.** **Ownership of Ownership Interests**. Assignor is the legal, record and beneficial owner of, and has good and marketable title to, the Ownership Interests, as the same are set forth on **Exhibit A** attached hereto, subject to no lien or encumbrance other than the lien and security interest created hereby. Assignor is the sole legal, record and beneficial owner of, and has good and marketable title to, fifty-one percent (51%) of all of the Ownership Interests in and to the Company. Except for the assignment to Secured Party pursuant hereto, there has been no prior Transfer (as defined in Section 4.1) of any of the Ownership Interests.

**3.10.** **No Certificates**. The Ownership Interests are evidenced and represented by the Operating Agreement of the Company and the books and records of the Company for purposes of registering the ownership of Ownership Interests. No certificates have been issued and/or are outstanding with regard to the Ownership Interests. No certificates may be issued by the Company without Secured Party's prior written consent.

**3.11.** **Security Interest/Place of Business**. Upon the execution and delivery hereof and the filing of the Financing Statements in the locations shown on the attached **Exhibit B**, this Assignment will create in favor of Secured Party a valid and enforceable, properly perfected lien on all of the Ownership Interests, subject to no lien or other encumbrance other than as created hereby. Further, the lien and security interest granted to Secured Party pursuant hereto shall at all times be and remain a properly perfected, valid and enforceable lien on the Ownership Interests subject to no other lien.

**3.12.** **Governing Agreements**. Assignor is not in default of any of its obligations under the Governing Agreements; Assignor has delivered to Secured Party a true, correct and complete copy of the Governing Agreements (including all amendments thereto) and all other agreements, if any, governing the operation or affairs of the Company; and the Governing Agreements are in full force and effect in accordance with their terms.

## 4. COVENANTS

Until such time as the Secured Obligations are fully, unconditionally and irrevocably paid and performed in full, Assignor hereby covenant and agree as follows:

**4.1.** **No Assignment**. There shall be no conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance, charge or alienation (or any agreement

8

to do any of the foregoing) of, in or to any of the Ownership Interests, whether directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise ("Transfer"), without the prior written consent of Secured Party, which consent may be granted, conditioned or withheld in Secured Party's sole discretion. Assignor hereby acknowledges and agrees that no Transfer of any of the Ownership Interests, whether or not consented to by Secured Party (no consent to any such sale, assignment, pledge, hypothecation, conveyance or other transfer being implied hereby) shall be effective unless and until such transferee or successor executes, delivers, files and records, as applicable, an assumption agreement, in the form and content satisfactory to Secured Party, in its sole discretion, agreeing to assign the Ownership Interests to be transferred in accordance with the provisions of this Assignment and assume, be bound by and to comply with and join in the terms and conditions of this Assignment and the Financing Statements, and further takes such other actions and delivers such other documents, instruments and certificates as Secured Party may request for purposes of preserving, maintaining, continuing and perfecting the valid and enforceable, lien and security interest created hereby in such Ownership Interests. Further, Assignor hereby covenants and agrees that it will not consent to the admission of any new or substitute member in the Company unless the foregoing conditions have been fully satisfied. Assignor hereby covenants and agrees that any attempted Transfer of any Ownership Interest not in accordance with the foregoing shall be ineffective and deemed null and void, ab initio.

      **4.2.**    **Company Books and Records**.  Assignor shall take, or cause to be taken, all such actions as are necessary to cause the Company and Assignor to mark their respective books and records with a notation that Assignor has assigned and pledged its Ownership Interests to Secured Party pursuant hereto and to keep as a part of such books and records a fully signed copy of this Assignment and each of the other Assignment Documents.

      **4.3.**    **Compliance with Securities Laws**.  Assignor shall take all such actions as are necessary, and shall cause the Company, to comply in all respects with all applicable Securities Laws.

      **4.4.**    **No Consent to Reorganization, etc**.  Assignor shall not consent to any dissolution, consolidation, merger, transfer, reorganization, reclassification or other similar action by the Company without the express written consent of Secured Party, which consent may be withheld, conditioned or delayed in Secured Party's sole and absolute discretion.

      **4.5.**    **Protection of Ownership Interests**.  Assignor will protect and defend Secured Party's right, title, claim of possession, lien and security interest in and to the Ownership Interests against the claims and demands of all Persons whomsoever. Further, Assignor shall pay and discharge as and when due all liens, claims, charges, taxes, other governmental charges and contractual obligations that may affect his Ownership Interests or any portion thereof

      **4.6.**    **Performance under Governing Agreements**.  Assignor shall fully and timely perform each and all of his obligations under the Governing Agreements in accordance with the terms thereof, and shall provide Secured Party with written notice of any default by Assignor under the Governing Agreements promptly upon the occurrence of such default. This Section 4.6 shall be deemed to amend and modify the Governing Agreements to provide that the Ownership Interests in the Company constitute securities subject to the provisions of Article 8 of the Code to designate Secured Party as a "protected purchaser" pursuant to Section 8-303 of the Code.

Assignor covenants and agrees that, until such time as the Indebtedness is paid in full, Assignor will not amend any of the Governing Agreements to "opt out" of Article 8 or to indicate that the Ownership Interests in the Company are not securities subject to the provisions of said Article 8.

**4.7.** **Notice of Default**. Assignor shall notify Secured Party of the existence of any Event of Default, or any event or condition which with the giving of notice, the passages of time or both could reasonably constitute an Event of Default, promptly upon obtaining knowledge of the existence thereof

**4.8.** **Change of Address**. No later than thirty (30) days prior to any change in address or principal place of business, as applicable, by Assignor from the address or principal place of business set forth on **Exhibit A** attached hereto, Assignor shall notify Secured Party in writing of such change in address or principal place of business, as applicable, and include in such notice the full and complete new address and principal place of business for Assignor.

**4.9.** **No Joint Venture**. Assignor hereby covenants and agrees that, until the Admission Date, neither Assignor nor any Person claiming by, through or under any of them, will assert or make a claim against Secured Party that Secured Party is a shareholder, member, member, insider or joint venturer of the Company or Assignor. Assignor hereby agrees to indemnify, defend and hold Secured Party harmless from and against any and all claims, demands, losses, costs (including reasonable attorneys' fees, whether incurred in connection with nonjudicial action, prior to trial, at trial or on appeal or review, including in any Insolvency Proceeding), damages (including special and consequential) and expenses incurred or suffered by Secured Party as a result of any assertion by the Company or Assignor, either directly or indirectly, or any Person claiming by, through or under any of them, or if Assignor assists any Person in asserting, that Secured Party was at any time a shareholder, member, partner, insider or joint venturer of the Company or Assignor prior to the Admission Date by virtue of this Assignment, the transactions contemplated thereby or otherwise.

**4.10.** **Delivery of Certificates**. Assignor hereby agrees: (a) to deliver to Secured Party, immediately upon receipt thereof, any and all instruments, certificates or other documents, whether now or hereafter existing, evidencing any of the Ownership Interests; and (b) to execute and deliver a notice of Secured Party's first priority, perfected, exclusive and continuing security interest in the Ownership Interests (which notice shall be in form and substance satisfactory to Secured Party and may require an acknowledgement from the addressee), to any third party which now has or may have the ability under applicable law or the terms of any agreement to record transfers of, or to transfer, any of the Ownership Interests (whether at the discretion of the Assignor or otherwise). Assignor hereby irrevocably and unconditionally appoints Secured Party as Assignor's attorney-in-fact with authority at any time or times from and after an Event of Default to take any of the foregoing actions on behalf of Assignor, such appointment being coupled with an interest.

**5.** **DEFAULTS/REMEDIES**

**5.1.** **Events of Default**. The occurrence at any time of any of the following events, shall constitute an "Event of Default" hereunder:

(a)     if any of the Equity Distributions are collected, received, handled, applied and disbursed other than strictly in accordance with the terms of this Assignment;

(b)     if there occurs any default in the due observance or performance of any of non-monetary or other covenants or obligations in this Assignment (except as may be otherwise specified herein) or breach in any material respect of any representation or warranty set forth herein, and the same is not cured within ten (10) days after the giving of written notice by Secured Party;

(c)     this Assignment and the Transfer Power shall cease to be an exclusive valid and enforceable, properly perfected lien upon and security interest in the Ownership Interests, or shall fail to give Secured Party the benefit of the liens, security interests, rights, powers and benefits created thereby in accordance with the terms hereof;

(d)     there occurs an event of insolvency with respect to Assignor or Assignor is the subject of an Insolvency Proceeding (except that involuntary bankruptcy filings may be vacated or withdrawn within fifteen (15) days prior to being deemed an Event of Default); and/or

(e)     the occurrence of an Event of Default or Default under the Loan Documents, it being expressly understood that the term "Event of Default" or "Default" as used herein shall have each and all of the meanings assigned thereto in Loan Documents, all of which are hereby incorporated into this Assignment by this reference.

**5.2.**     **Remedies**.  Upon the occurrence of an Event of Default, Secured Party shall have the right, at its sole option, to exercise from time to time any or all of the rights and remedies provided for herein, in the other Assignment Documents, at law or in equity, including the following:

(a)     the rights and remedies of a secured creditor under the Code;

(b)     the right to receive directly any and all amounts payable in respect of the Ownership Interests, including all Equity Distributions, and the right to exercise all Equity Rights;

(c)     the right to sell (or resell in the event of a default under any sale) all or any portion of the Ownership Interests, at any public or private sale on such terms and conditions as Secured Party deems appropriate and as may be otherwise required under the Code or applicable law in accordance with this Assignment, and Assignor shall cooperate and cause the Company to cooperate with Secured Party and shall execute and deliver all documents and take any and all actions as may be necessary or requested by Secured Party to assign all of the Ownership Interests to Secured Party or any designee and/or to any purchaser of the Ownership Interests at such sale, to admit Secured Party or any designee and/or any such purchaser as a member of the Company, and comply with all Securities Laws in connection therewith;

(d)     recover from Assignor any and all losses, damages (of whatsoever kind or nature), costs (including reasonable attorneys' fees) and expenses suffered or incurred by Secured Party as a result of any default or Event of Default, and Assignor hereby agrees to indemnify Secured Party for the same;

11

(e)     seek specific performance of, including declaratory and injunctive relief to enforce, the terms and provisions of this Assignment and the other Assignment Documents;

(f)     exercise any and all other rights and remedies which may be available against Assignor, the Company or any other Person under this Assignment, any of the other Assignment Documents and/or otherwise afforded by law or in equity, subject to the applicable limitations on liability set forth in the Assignment Documents; and

(g)     apply to any court having jurisdiction for the appointment of a receiver for the Ownership Interests to take any or all of the actions set forth in this Section and if Secured Party elects to seek the appointment of a receiver at any time after an Event of Default has occurred and is continuing, Assignor and the Company, by their execution of this Assignment, expressly consent to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law; and immediately upon appointment of a receiver, Assignor shall surrender possession of the Ownership Interests to the receiver, and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Ownership Interests.

**5.3.   Sales**.  The following shall apply to any sale(s) (or resale(s)) of the Ownership Interests conducted by Secured Party pursuant to this Assignment.

(a)     **Restrictions Permitted**. Secured Party may restrict the number of potential bidders and purchasers in any such sale(s) and also may impose in any sale(s) such restrictions as Secured Party deems necessary or appropriate in order to cause such sales(s) to comply with all applicable laws, including Securities Laws. Such restrictions may include, without limitation, restricting purchasers and bidders to those who will represent and agree that they are purchasing the Ownership Interests for their own account, for investment purposes only, and not with a view to the distribution or resale of the Ownership Interests.

(b)     **Private Sales**. Assignor hereby acknowledges and agrees that, notwithstanding that a higher price may be obtained at a public sale of the Ownership Interests rather than a private sale thereof, a public sale of the Ownership Interests may be subject to registration requirements under Securities Laws and similar other legal restrictions which would make a public sale of the Ownership Interests impractical. Accordingly, Assignor hereby agrees that Secured Party shall be entitled to sell the Ownership Interests at a private sale on such terms and conditions as Secured Party deems acceptable and are otherwise commercially reasonable. Secured Party shall have no obligation to conduct a public sale of the Ownership Interests. Assignor hereby waives, to the fullest extent permitted by applicable, law, any right to require that the Ownership Interests be sold at a public sale and any claims that Assignor may have against Secured Party arising by reason of the fact that the price at which the Ownership Interests, or any part thereof may have been sold at a private sale was less than the price obtainable at a public sale.

(c)     **No Obligation to Sell/Notice**. Secured Party shall not be obligated to make any sale(s) of the Ownership Interests regardless of any notice of sale having been given, and Secured Party may adjourn any public or private sale from time to time and such sale may be made at the time and place to which it was adjourned. Assignor hereby agrees that to the extent notice of any such sale is required under the Code (notwithstanding the waiver thereof set forth herein),

a period of ten (10) days from the time the notice is sent shall be a reasonable period of notification of a sale or other disposition of Ownership Interests by Secured Party.

(d) **No Liability**. Secured Party shall have no liability as a result of the manner or terms of sale of the Ownership Interests, or any part thereof, at a public or private sale conducted in a manner and on terms that are commercially reasonable. All sales conducted by Secured Party shall be deemed to be commercially reasonable and, in any dispute as to the same, it shall be Assignor's burden to prove that the manner or terms of such sale were not commercially reasonable.

(e) **Consummation of Sale**. Any sale of, or other realization upon, any of the Ownership Interests shall operate to divest all of Assignor's right, title, interest, claim and demand, either at law or in equity, in and to the Ownership Interests and each and every portion thereof, and each purchaser at any sale of the Ownership Interests shall hold the Ownership Interests so sold absolutely free from any claim or right of Assignor whatsoever, including any right of redemption, which right has been waived pursuant to this Assignment. Further, after any sale(s) of the Ownership Interests, Assignor hereby agrees to take such actions and execute such documents as may be necessary or appropriate to transfer the Ownership Interests to the purchaser and substitute such purchaser as a member in the Company, including executing and delivering any necessary transfer documents and amendments to the Governing Agreements as may be required. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact to take such actions and execute such documents, such appointment being coupled with an interest. No purchaser shall be obligated to assume or perform any obligations under the Governing Agreements except for the period from and after such purchaser's admission as a member and then only after all actions necessary to effect its admission as a member have been consummated.

5.4. **Waiver of Rights by Assignor**. Assignor, on behalf of itself and any Persons claiming by, through or under Assignor, hereby knowingly, intentionally and voluntarily waives: (a) presentment, demand, protest or any notice of any kind in connection with this Assignment; (b) notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof; (c) all claims, demands, liabilities and damages occasioned by such taking of possession or disposition; (d) all other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder; and (e) all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof.

5.5. **Rights Continuing**. The rights and powers of Secured Party hereunder shall continue and remain in full force and effect until all Secured Obligations have been irrevocably and unconditionally paid and performed in full, and shall continue after sale of the Ownership Interests until expiration of any right of redemption, notwithstanding sale of the Ownership Interests to a purchaser other than Secured Party. Further, Assignor hereby acknowledges and agrees that Secured Party shall not be required to exercise its rights against any Person other than Assignor that is liable for all or any portion of the Secured Obligations or against any collateral for the Secured Obligations other than the Ownership Interests prior to exercising its rights and remedies against Assignor and the Ownership Interests pursuant hereto. Without affecting the

13

liability of Assignor for payment and performance of the Secured Obligations and without affecting Secured Party's lien and security interests in the Ownership Interests created hereby, Secured Party may release, at any time and from time to time, any Person liable for, or any security or other collateral for, the Secured Obligations.

 **5.6.** <u>**Expenses of Default**</u>. Assignor agrees to pay on demand the amount of all costs and expenses incurred by Secured Party in protecting and realizing on its interest in the Ownership Interests, and further agrees that if this Assignment is referred to an attorney for protecting or defending the priority of Secured Party's interest in or lien on the Ownership Interests or for collecting or realizing thereon, Assignor shall pay upon demand all of Secured Party's expenses, including reasonable attorneys' fees and costs (whether incurred in connection with non-judicial action, prior to trial, at trial, or on appeal or review, including in any Insolvency Proceeding), other professional fees and costs, and expenses of title search and all court costs and costs of public officials. Assignor hereby further agrees that his obligation to pay such amounts shall be secured hereby and constitute a part of the Secured Obligations.

 **5.7.** <u>**No Waiver**</u>. The exercise by Secured Party of any one right or remedy hereunder, under any of the other Assignment Documents, or the other Loan Documents, or any other guaranty, at law or in equity shall not be a waiver of Secured Party's right to exercise at the same time or thereafter any other right or remedy, and no delay in exercising or failing to exercise any rights or remedies of Secured Party hereunder, under any of the other Assignment Documents or any of the other Loan Documents, at law or in equity, following any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, in any one or more instances, or acceptance by Secured Party of partial payments or partial performance, shall constitute, or be deemed to constitute, a waiver of any such Event of Default, a waiver of the right to exercise any such rights or remedies at any time thereafter or upon the occurrence of any subsequent Event of Default, or a release, satisfaction or discharge of the terms hereof, of any of the other Assignment Documents or other Loan Documents, all such rights, remedies, terms and documents remaining continuously in force. Any waiver or release by Secured Party of any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, or any waiver of rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity (no obligation or agreement to waive or release or discharge any of the foregoing being implied hereby), may be effected only through a written document executed by Secured Party and then only to the extent of any waiver, release, discharge or satisfaction specifically set forth therein. A waiver or release in connection with any one event or any particular right or remedy shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity. Secured Party shall not be required to give notice of the exercise of these rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity, all such notice having been waived by the Assignor pursuant hereto.

 **5.8.** <u>**Remedies Cumulative**</u>. The remedies of Secured Party provided for herein, in any of the other Assignment Documents or any of the other Loan Documents, at law or in equity upon the occurrence of an Event of Default shall be cumulative and concurrent, and may be pursued

singularly, successively or together, at the sole discretion of Secured Party, and may be exercised as often as occasion therefor shall arise, as determined by Secured Party in its sole discretion.

**5.9.    Revival and Reinstatement.** If Secured Party is required to pay, return or restore to Assignor or any other person any amounts previously paid on the Indebtedness because of any Insolvency Proceeding of Assignor, any stop notice or any other reason, the obligations of Assignor shall be reinstated and revived and the rights of Secured Party shall continue with regard to such amounts, all as though they had never been paid, and this Assignment shall continue to be effective or be reinstated, as the case may be.

## 6.    RIGHTS OF LENDER; WAIVERS

**6.1.    Rights of Lender.** Assignor authorizes Secured Party to perform any or all of the following acts at any time in its sole discretion, all without notice to Assignor and without affecting Secured Party's rights or Assignor's obligations under this Assignment:

(a)    Secured Party may alter any terms of the Note, the or the other Loan Documents, including renewing, compromising, modifying, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Indebtedness or any part of it;

(b)    Secured Party may take and hold security for the Indebtedness, accept additional or substitute security for the Indebtedness, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security;

(c)    Secured Party may direct the order and manner of any sale of all or any part of any security now or later to be held for the Indebtedness, and Secured Party may also bid at any such sale and may apply all or any part of the Indebtedness against the amount so bid;

(d)    Secured Party may apply any payments or recoveries from Assignor or any other source, and any proceeds of any security, to the Indebtedness in any manner, order and priority as Secured Party may elect, whether that obligation is secured by this Assignment or not at the time of the application;

(e)    Secured Party may substitute, add or release any one or more makers, Assignor, Amin Suliaman, Kenneth C. Ware, any other guarantors or endorsers; and

(f)    In addition to the Note, Secured Party may extend other credit to Assignor, and may take and hold security for the credit so extended, whether or not such security is also security for the Indebtedness, all without affecting Secured Party's rights or Assignor's liability under this Assignment.

**6.2.    Assignor's Waivers.** Assignor waives:

(a)    All statutes of limitations as a defense to any action or proceeding brought against Assignor by Secured Party, to the fullest extent permitted by law;

(b)     Any right Assignor may have to require Secured Party to proceed against any other party, proceed against or exhaust any security held from any other party, or pursue any other remedy in Secured Party's power to pursue;

(c)     To the extent permitted by applicable law, all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof;

(d)     Any defense based on any claim that Assignor's obligations exceed or are more burdensome than those of the Company;

(e)     Any defense based on: (i) any legal disability of Assignor or the Company, (ii) any release, discharge, modification, impairment or limitation of the liability of Assignor or the Company to Secured Party from any cause, whether consented to by Secured Party or arising by operation of law or from any Insolvency Proceeding and (iii) any rejection, disallowance or disaffirmance of the Indebtedness, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(f)     Any defense based on any action taken or omitted by Secured Party in any Insolvency Proceeding involving Assignor or the Company, including, without limitation, filing, defending, settling or obtaining a judgment or order on any proof of claim or any adversary proceeding, making any election to have Secured Party's claim allowed as being secured, partially secured or unsecured, including any election under 11 U.S.C. Section 1111(b), seeking relief from the automatic stay or adequate protection, including submitting an appraisal of any security, voting to reject or accept or failing to vote on any reorganization plan, making any extension of credit by Secured Party to Assignor or the Company in any Insolvency Proceeding, and the taking and holding by Secured Party of any security for any such extension of credit, whether or not such security is also security for the Indebtedness;

(g)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Assignment and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind;

(h)     Any defense based on or arising out of any defense that the Company or Assignor may have to the payment or performance of the Indebtedness or any part of it;

(i)     Notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof;

(j)     All claims, demands, liabilities and damages occasioned by such taking of possession or disposition; and

(k)     All other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder.

**6.3.**    **Waivers of Subrogation and Other Rights and Defenses**.

(a)    The obligations of Assignor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought against Assignor, regardless of whether action or suit is brought against the Company, or whether Assignor or the Company are joined in any such action or actions. At the option of Secured Party, Assignor may be joined in any action or proceeding commenced by Secured Party against the Company in connection with or based on the Indebtedness or any security for such obligation, and recovery may be had against Assignor in such action or proceeding without any requirement that Secured Party first assert, prosecute or exhaust any remedy or claim against the Company.

(b)    Upon a default by Assignor, Secured Party in its sole discretion, without prior notice to or consent of Assignor, may elect to: (i) foreclose either judicially or nonjudicially against any real or personal property security that Secured Party may hold for the Indebtedness other than the Ownership Interests hereby encumbered, (ii) accept a transfer of any such security in lieu of foreclosure, (iii) compromise or adjust the Indebtedness or any part of it or make any other accommodation with Assignor or the Company, or (iv) exercise any other remedy against Assignor or the Company or any security other than the Ownership Interests hereby encumbered. With respect to security other than the Ownership Interests hereby encumbered, no such action by Secured Party shall release or limit the liability of Assignor, who shall remain liable under this Assignment after the action, even if the effect of the action is to deprive Assignor of any subrogation rights, rights of indemnity, rights of contribution, or other rights to collect reimbursement from the Company or any other Person for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law or otherwise. After any foreclosure or deed in lieu of foreclosure of any real or personal property pledged to secure the Indebtedness, Assignor shall under no circumstances be deemed to have any right, title, interest or claim in or to such property, whether it is held by Secured Party or any third party.

(c)    Regardless of whether Secured Party may have recovered against Assignor, Assignor hereby waives: (i) all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement or contribution from the Company or any other party for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute) or otherwise (collectively, "Reimbursement Rights"), (ii) all rights to enforce any remedy that Secured Party may have against the Company, and (iii) all rights to participate in any security now or later to be held by Secured Party for the Indebtedness. To the extent Assignor's waiver of Reimbursement Rights is found by a court of competent jurisdiction to be void or voidable for any reason, any Reimbursement Rights Assignor may have against the Company or any collateral or security shall be junior and subordinate to any rights Secured Party may have against the Company and to all right, title and interest Secured Party may have in any such collateral or security. If any amount should be paid to Assignor on account of any Reimbursement Rights at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for Secured Party and shall immediately be paid over to Secured Party to be credited and applied against the Indebtedness, whether matured or unmatured, in accordance with the terms of the Guaranty. The covenants and waivers of Assignor set forth in this Section 6.3(c) shall be effective until the Indebtedness has been paid and performed in full and are made solely for the benefit of Secured Party.

(d)     No provision or waiver in this Assignment shall be construed as limiting the generality of any other provision or waiver contained in this Assignment.

## 7.     MISCELLANEOUS

**7.1.     No Limitation of Liability**.  Assignor acknowledges that Secured Party has agreed to make the Loan in reliance upon Assignor's representations, warranties and covenants in this Assignment, all of which shall be deemed continuing and continually remade at all times. It is the intention of Assignor and Secured Party that the provisions of this Assignment shall be controlling over any provisions in the Note or the Guaranty which in any way limit the personal liability of Assignor, Amin Suliaman, Kenneth C. Ware, the Company, any of the Borrower Parties or any other Person, and that Assignor shall be personally liable for any and all of the obligations arising under this Assignment, even if the amount of liability incurred exceeds the amount of the Note.

**7.2.     Notices**.  Notices under this Assignment shall be provided in the manner provided in the Loan Agreement, including that any party may change its address for notices hereunder by written notice to the other parties given in accordance with provisions of the Loan Agreement.

**7.3.     Agent for Service of Process**.  As a further inducement to Secured Party to make the Loan and in consideration thereof, Assignor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the foregoing Section 7.2, Assignor hereby waiving personal service thereof, and Assignor agrees that within thirty (30) days after such mailing, it shall appear or answer to any summons and complaint or other process, and should it fail to appear or answer within said thirty-day period, it shall be deemed in default in any summons and complaint or other process so served.

**7.4.     Damage Lawsuit, Consent to Jurisdiction**.  The sole and exclusive remedy of Assignor for any and all adverse claims against Secured Party is a Damage Lawsuit (hereinafter defined). Assignor hereby represents and warrants to Secured Party that as of the date hereof no such adverse claims exist against Secured Party. Any such Damage Lawsuit, regardless of the procedural form in which it is alleged, will be severed from any enforcement by Secured Party of its legal, equitable and contractual rights, and the Damage Lawsuit cannot be asserted by Assignor as a defense, set-off, recoupment, or grounds for delay, stay, subordination or injunction against any enforcement by Secured Party of its legal, equitable and contractual rights under the Loan Documents, the Guaranty or otherwise. It is understood and agreed that the designated, exclusive and proper venue of any legal dispute, question or interpretation, claim, declaratory judgment action, bankruptcy or other litigation regarding: (a) any proceeding under the Bankruptcy Code brought by or against Assignor; (b) the enforcement of Secured Party's rights under or relating in any way to the Loan, the Note, or the other Loan Documents; (c) the prosecution of any Damage Lawsuit alleged against Secured Party by any of the Affiliated Parties; and (d) any other matter regarding this Assignment or the Guaranty or any of the other Loan Documents shall be exclusively and solely decided by the federal court in the State of Illinois or state circuit or district courts sitting in the State of Illinois (provided, that, in the event actions or proceedings are required to be litigated in the jurisdiction of the situs of the Property, then such actions or proceedings shall be litigated in the courts of the State of Colorado sitting in Denver County); and Assignor hereby consents to the exercise or personal jurisdiction over Assignor by, and consents to the laying of venue in, and exclusive jurisdiction of, such courts. As used herein, the term "Affiliated Parties"

18

shall mean individually and collectively, Assignor and all of his Legal Representatives, successors and assigns; the term "Damage Lawsuit" shall mean an action for monetary damages; and the term "Legal Representatives" shall mean any trustee, receiver, custodian and/or any other person appointed or authorized to act in a representative capacity by a court or governmental entity, whether appointed pursuant to the Bankruptcy Code or otherwise.

**7.5.** **No Third-Party Beneficiary**. The provisions of this Assignment are solely for the benefit of Secured Party and its successors and assigns. No provision of this Assignment or of the Loan Documents shall be construed as creating in any party other than the Company, Assignor and Secured Party, and their successors and assigns, any rights of any nature whatsoever.

**7.6.** **Further Assurances**. Upon request by Secured Party, Assignor, at his sole cost and expense, at any time and from time to time, shall, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, mortgages, security agreements, financing statements and other documents and assurances as Secured Party shall request to protect and preserve the security for the Loan, the priority of the liens created by this Assignment, or Assignor's performance of his obligations hereunder, or for the better assuring, conveying, mortgaging, assigning and confirming unto Secured Party all property subject to the lien of or a security interest provided for in the Loan Documents or property intended so to be, whether now owned by the Company or Assignor, or hereafter acquired. Such acts or assurances shall include, without limitation, recordation of such documents and instruments, at Assignor's sole cost and expense, as Secured Party may request.

**7.7.** **Secured Party's Right to Assign**. Secured Party shall have the right any time and from time to time, in accordance with any applicable provisions of the Loan Documents, to sell, assign, participate, pledge, transfer, securitize, syndicate, or otherwise dispose of the Loan, the Note, the Guaranty, or any of the other Loan Documents, or any interests therein and/or the Secured Obligations. From and after the date of any such sale, assignment, participation, pledge, transfer, securitization, syndication or other disposition, such transferee shall be entitled to exercise any and all rights and remedies of Secured Party hereunder as fully and with the same force and effect as if such transferee had been named the Secured Party hereunder. Assignor shall not assign, convey or otherwise transfer any of his rights and obligations hereunder.

**7.8.** **Successors and Assigns**. Subject to the provisions of Section 4.1, all of the terms, covenants and conditions contained herein shall apply and be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and permitted assigns of Assignor and Secured Party, respectively, and all Persons claiming by, under or through them.

**7.9.** **Severability**. If any provision in this Assignment is found by a court of competent jurisdiction to be in violation of any applicable law, and if such court should declare such provision of this Assignment to be unlawful, void, illegal or unenforceable in any respect, the remainder of this Assignment shall be construed as if such unlawful, void, illegal or unenforceable provision were not contained therein, and the rights, obligations and interests of the parties hereto under the remainder of this Assignment shall continue in full force and effect undisturbed and unmodified in any way.

**7.10.** __Modification__. This Assignment and the terms hereof may not be changed, waived, modified, canceled, discharged or terminated orally, but only by an instrument or instruments in writing signed by Assignor and Secured Party.

**7.11.** __GOVERNING LAW__. THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF.

**7.12.** __Incorporation of Recitals/Exhibits__. The recitals set forth at the beginning of this Assignment are true and correct in all respects and are hereby incorporated in their entirety by this reference. The exhibits attached hereto are hereby incorporated in their entirety by this reference.

**7.13.** __WAIVER OF TRIAL BY JURY__. ASSIGNOR, FOR HIMSELF AND ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER HIM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS HE MAY HAVE TO TRIAL BY JURY IN ANY LITIGATION OR ACTION BROUGHT ON, UNDER OR BY VIRTUE OR RELATING IN ANY WAY TO THIS ASSIGNMENT, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO. THIS WAIVER MAY BE FILED WITH THE CLERK OR JUDGE OF ANY COURT AS A WRITTEN CONSENT TO WAIVER OF JURY TRIAL. ASSIGNOR ACKNOWLEDGES THAT HE HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR SECURED PARTY'S ENTERING INTO THE LOAN. THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE INDEBTEDNESS.

**7.14.** __Joint and Several Liability__. The obligations of Assignor and any and all other Borrowing Parties that may be liable hereunder are joint and several.

**7.15.** __Time is of the Essence__. TIME IS OF THE ESSENCE under this Assignment and each and every provision hereof and thereof.

**7.16.** __Effective Date__. The effective date of this Assignment shall be the date on the first page hereof and thereof, respectively, notwithstanding the fact that this Assignment may have been executed on a date prior or subsequent thereto.

**7.17.** __Counterparts__. This Assignment may be executed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute but one original. This Assignment shall not be effective unless and until executed and delivered by each of the named Assignor and Secured Party in one or more counterparts. Facsimile signatures hereon shall be treated the same as and provided the same legal significance as original signatures hereon.

**7.18.** __Counsel__. Assignor acknowledges that he has had adequate opportunity to carefully read this Assignment and to consult with an attorney of such Assignor's choice prior to signing it.

**7.19.** __Integration__. No course of prior dealing, usage of trade, parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof. This Assignment is intended by the parties to be a fully integrated and final expression of their agreement. This

20

Assignment, the Note, the Guaranty and the other documents securing the Note incorporate all negotiations of the parties and constitute the parties' entire agreement. Assignor represents that it is relying on no written or oral agreement, representation, warranty or understanding, of any kind made by Secured Party or any employee, attorney or agent of Secured Party except for the agreements of Secured Party set forth herein.

**7.20.**    <u>**Amendment to Governing Agreements**</u>.

(a)      Assignor hereby acknowledges and agrees that notwithstanding any provisions of the Governing Agreements to the contrary, Assignor:

(i)      consents to this Assignment, including the pledge and assignment of the Ownership Interests and all other benefits to which the holders of such Ownership Interests may be entitled pursuant to the terms of the Governing Agreements, and Secured Party's exercise and enforcement of any of its rights and remedies hereunder or otherwise afforded by law or in equity;

(ii)      consents to the absolute and unconditional transfer and assignment of the Ownership Interests and all other benefits to which the holders of such interests may be entitled pursuant to the terms of this Assignment, the Note, the Guaranty and the other Loan Documents, and Secured Party's exercise and enforcement of its rights and remedies hereunder or otherwise afforded by law or in equity;

(iii)      agrees that transfers of the Ownership Interests and all other benefits to Secured Party hereunder and upon the exercise of any rights and remedies by Secured Party, including one or more sales of the Ownership Interests to Secured Party, its designee and any other purchasers pursuant to this Assignment or any other exercise of Secured Party's rights and remedies, shall be deemed permissible transfers under the Governing Agreements for all purposes and are hereby irrevocably and unconditionally consented to, without the necessity of obtaining any further consents or approvals, and further without the necessity of complying with any other provision of the Governing Agreements that might otherwise be construed to condition, limit, prohibit, impair or modify in any respect this Assignment or the exercise of Secured Party's rights and remedies hereunder, at law or in equity, including any options to purchase and any rights of first offer, first opportunity, first refusal and redemption;

(iv)      agrees that, upon written notice to Assignor from Secured Party of its election under this Assignment to exercise all or any portion of the Equity Rights and Bankruptcy Rights, and collect directly any Equity Distributions or other amounts payable to any Assignor in respect of the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice) on account of the Ownership Interests, all such distributions and other amounts shall be paid directly to Secured Party and Secured Party shall automatically be entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements (including all distributions of available cash or other distributions or payments or any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice), Assignor hereby irrevocably and unconditionally consenting thereto; and

(v)      agrees that, upon written notice to Assignor, from Secured Party of Secured Party's election to be, or to have its designee or any purchaser, substituted as the holder of any Ownership Interest or portion thereof pursuant to this Assignment, Secured Party, its designee and/or such purchaser, as applicable, shall automatically be deemed to be admitted as a substitute member for such transferring member to the extent of the Ownership Interests so transferred and a member and entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements, including the right to exercise the Equity Rights and Bankruptcy Rights and receive any Equity Distributions or other amounts payable to a member in respect of the Ownership Interests under the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date so transferred), and all such amounts shall be paid as so directed by Secured Party, Assignor hereby irrevocably and unconditionally consenting thereto.

(b)      In the event Secured Party elects to be admitted as a substitute member and/or new member, Secured Party shall be deemed to have assumed and agreed to perform all obligations of the transferring member under the Governing Agreements relating solely to the Assignor's interest so transferred or the new membership interest from and after the effective date of the transfer or acquisition of such new interest by Secured Party, its designee and/or purchaser and not for the period or to the extent arising prior thereto, and without the necessity of obtaining any further consents or approvals from any other members of the Company (or any other future member of the Company, no consent thereto being implied hereby) or the Company or complying with any of the conditions of the Governing Agreements. Upon receipt of such notice, Assignor shall take (or shall cause the Company to take) such actions as are contemplated in the Governing Agreements, as modified hereby, and otherwise to register and further assure such transfers, admission and/or new acquisition, without cost to Secured Party, its designees and purchasers.

(c)      Assignor hereby covenants to execute and deliver any documents and instruments reasonably required by Secured Party to effectuate the provisions of this Section 7.20, and should Assignor fail to execute and deliver such documents or instruments within five (5) days after request therefor by Secured Party, Assignor hereby appoints Secured Party as his true and lawful attorney-in-fact (which appointment is deemed to be coupled with an interest) to execute and deliver any such documents and instruments as is reasonably necessary to effectuate the provisions of this Section 7.20.

(d)      This Section 7.20 shall be deemed to amend and modify the Governing Agreements until all Secured Obligations have been irrevocably and unconditionally paid and performed in full.

[Signature Page Follows]

22

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

**SECURED PARTY**:

PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company

By: _____

Name:  Peter Martay

Title:  Authorized Signatory

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

ASSIGNOR:

_____

**KENNETH C. WARE**, an individual

## CONSENT OF COMPANY

**KDA PROPERTIES LLC**, Colorado limited liability company (the "Company"), has reviewed the foregoing Assignment and hereby unconditionally and irrevocably consents to and agrees to be bound by the terms and conditions thereof. The Company agrees that the Ownership Interests are securities subject to the provisions of Article 8 of the Code. The Company hereby has marked its books and records (including the membership interest register) to reflect the delivery of the Transfer Power, to Secured Party, and the existence of this Assignment, each of the other Assignment Documents, and the assignments, liens and security and investment property interests created hereby and thereby, and to maintain at all times a copy of this Assignment and each of the other Assignment Documents as a part of its books and records. Upon request of Secured Party, whether pursuant to a sale of one or more Ownership Interests under Section 5.3 of this Assignment or otherwise, the Company shall immediately cause the admission of Secured Party or its designee or any other purchaser to be registered in the books and records of the Company and take all such other actions as may be necessary or requested to effect the transfer and issuance of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser as a member of the Company as contemplated by the Assignment, and further to take all such actions as may be necessary to comply in all respects with applicable Securities Laws in connection with the sale or other transfer of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser. The Company further agrees that, upon request by Secured Party, the Company will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts and instruments as may be required to effectuate the transaction contemplated by this Assignment.

**KDA PROPERTIES LLC**,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:   Manager

By: _____
Name: Amin Suliaman
Title:   Manager

## EXHIBIT A

### Description of Pledged Ownership Interests

| NAMES AND ADDRESSES | TYPE OF INTEREST | OWNERSHIP INTEREST | FILING LOCATION |
|---|---|---|---|
| Kenneth C. Ware<br>7225 S. Xanthia Street<br>Centennial, CO 80112 | Membership | 51% | Secretary of State of Colorado |

# EXHIBIT B

Debtor (Pledgor): Kenneth C. Ware, an individual

Secured Party: Pangea Mortgage Capital, LLC, an Illinois limited liability company

**1.     DESCRIPTION OF COLLATERAL**. The Collateral covered by the UCC-1 financing statement or Security Agreement (as defined below) to which this **Exhibit** is attached (the "UCC-1"), and constituting the Collateral in which Debtor grants a perfected security interest to Secured Party pursuant to the Security Agreement to which this **Exhibit** is attached, consists of the "Collateral," as defined below. A complete description of all such Collateral is hereby included and incorporated by reference in the UCC-1 or Security Agreement, as if the entirety of this description of Collateral were set forth in full on the face of the UCC-l.

**2.     DEFINITIONS**. For purposes of the foregoing, the following terms shall have the following meanings:

2.1 "Bankruptcy Rights" means, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding (as defined in the Security Agreement), voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.2     "Company" means **KDA PROPERTIES LLC**, Colorado limited liability company.

2.3     "Collateral" means the Ownership Interests.

2.4     "Documents" means all certificates or documents representing Debtor's interest in and rights with respect to the Company.

2.5     "Equity Distributions" means collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with

any of the foregoing.

2.6     "Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.7     "Operating Agreement" means that certain Operating Agreement of the Company dated as of March 16, 2018, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party.

2.8     "Ownership Interests" means collectively, whether now existing and hereafter arising or acquired: (a) fifty-one percent (51%) of the current and future interests of the Debtor under the Operating Agreement, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.9     "Proceeds" shall include the following, whether in cash or not in cash:

2.9.1     Certain Payments. Any proceeds, products, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions, and replacements of any Collateral;

2.9.2     Dispositions. Whatever is received by Debtor upon the sale, exchange, collection or other disposition of any item of Collateral, whether such proceeds constitute inventory, accounts, accounts receivable, general intangibles, instruments, securities, credits, documents, letters of credit, chattel paper, documents of title, warehouse receipts, leases, deposit accounts, money, contract rights, goods or equipment;

2.9.3     Applications of Proceeds. Any such items that are now or hereafter acquired by Debtor with any proceeds of any Collateral hereunder; and

2.9.4     Insurance. Any insurance proceeds payable by reason of loss or damage to any item of Collateral or any proceeds thereof

2.10     "Security Agreement" means that certain Collateral Assignment, Pledge and Security Agreement, dated as of March 11, 2020, given by the Debtor to the benefit of the Secured Party, as the same may be amended, modified, extended, restated or replaced from time to time.

**3.**     **LIMITATION OF LIABILITY**.   Notwithstanding anything to the contrary in the foregoing, Secured Party shall have no obligations or liability with respect to the Ownership Interests unless and until Secured Party has succeeded to the ownership of the Ownership Interests. Even if the Secured Party shall acquire ownership of the Ownership Interests, Secured Party's liability shall: (a) terminate if and when Secured Party has transferred or abandoned such Ownership Interests; and (b) under all circumstances be limited to Secured Party's interest in the Ownership Interests.

## EXHIBIT C

### Irrevocable Transfer Power

FOR VALUE RECEIVED, **KENNETH C. WARE**, an individual, does hereby sell, assign and transfer 51% of membership interests (the "Ownership Interests") in **KDA PROPERTIES LLC**, a Colorado limited liability company (the "Company"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

EXHIBIT C

**IN WITNESS WHEREOF** the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

_____
**KENNETH C. WARE**, an individual

**EXHIBIT D**

Filing Locations for UCC Financing Statements: Secretary of State of Colorado

EXHIBIT 8

## COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT

**THIS COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT** (this "Assignment") is made as of March 11, 2020 by **AMIN SULIAMAN**, an individual ("Assignor") to and in favor of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company ("Lender" or "Secured Party").

### RECITALS

A.     Pursuant to that certain Loan Agreement (as amended, modified and restated from time to time, the "Loan Agreement"), dated as of even date with this Assignment, by and between Secured Party **NATIV DENVER LLC**, a Colorado limited liability company ("Company") and **KDA PROPERTIES LLC**, a Colorado limited liability company, Secured Party has agreed to make a loan (the "Loan") to Company in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), which Loan is evidenced by that certain Promissory Note (as amended, modified and restated from time to time, the "Note"), dated as of even date herewith, in the original principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), made by the Company in favor of Secured Party.  In connection with the Loan, Amin Suliaman and Kenneth C. Ware have entered into that certain Guaranty of Payment dated as of even date herewith for the benefit of Secured Party (as amended, modified and restated from time to time, the "Guaranty").  The Note, the Guaranty, the Loan Agreement and the other documents securing the Loan, as amended, modified and restated and time to time, are herein together sometimes called the "Loan Documents."

B.     In order to secure the payment and performance of the indebtedness and obligations of Company under the Note, Assignor has agreed to assign and pledge to Secured Party, and grant Secured Party a first priority, properly perfected, valid and enforceable assignment of and security interest in, all of Assignor's ownership interests (as more particularly defined in Section 1.1, the "Ownership Interests") in the Company, on the terms and conditions set forth herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Assignor and Secured Party hereby agree as follows:

## 1.     DEFINITIONS

**1.1.     Definitions**.  All capitalized terms used in this Assignment, including, without limitation, the terms defined in the foregoing recitals, shall have the meanings set forth in this Assignment or, if said terms are not defined in this Assignment, shall have the meanings of the same defined terms set forth in the Loan Agreement, as the same may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time, which definitions are hereby incorporated in their entirety by this reference as though specifically set forth herein. In addition, the following capitalized terms shall have the meaning hereinafter set forth:

"Admission Date" shall mean the date on which Secured Party is or shall be fully admitted as a member of the Company, and assumes and agrees to be bound by, in writing, the Governing

1

Agreements.

"Articles of Organization" shall mean that certain Articles of Organization of the Company filed with the Secretary of State of the State of Colorado, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof.

"Assignment" shall mean this Collateral Assignment, Pledge and Security Agreement, as the same may be amended, modified, extended, restated or replaced from time to time.

"Assignment Documents" shall mean, collectively, this Assignment, the Financing Statements and all other documents, certificates, affidavits and instruments now or hereafter evidencing, securing or relating in any way to any of the foregoing executed by Assignor, the payment of the indebtedness or the observance or performance of the obligations evidenced and/or secured thereby, as said documents may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time.

"Bankruptcy Rights" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property, arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Code" shall mean the Uniform Commercial Code as enacted in the State of Colorado or Illinois, as applicable, and in each other jurisdiction having applicability to the perfection of the liens and security interests granted herein, as amended and/or re-enacted from time to time.

"Equity Distributions" shall mean collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership

Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Event of Default" shall mean the happening or occurrence of any event described in Section 5.1 hereof.

"Financing Statements" shall mean, individually and collectively, each and all of the UCC-1 Financing Statements executed, if necessary, and delivered by Assignor, as debtor therein, in favor of Secured Party, as secured creditor, pursuant to this Assignment, as the same may be amended, modified, extended, continued, restated or replaced from time to time in accordance with the Code.

"Governing Agreements" shall mean collectively (i) the Operating Agreement of the Company, as same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party to the extent required and (ii) the Articles of Organization of the Company.

"Governmental Authority" shall mean the United States of America, any State, any county, city or any other political subdivision, or any other political subdivision, agency or instrumentality exercising or claiming jurisdiction over Assignor or the Company.

"Indebtedness" shall mean any and all amounts owed by Amin Suliaman and Kenneth C. Ware to Secured Party pursuant to the Guaranty and the Loan Documents and/or any and all amounts owed by Company to Secured Party pursuant to the Note and the Loan Documents.

"Insolvency Proceeding" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally, and shall include: (a) any proceeding seeking to appoint or appointing a receiver or trustee for Company and/or its Legal Representatives (as defined in Section 7.4 of this Assignment), successors and assigns (collectively, the "**Borrower Parties**"); (b) any proceeding filed by or against any of the Borrower Parties under the Bankruptcy Code; (c) any assignment by any of the Borrower Parties of all or substantially all of their respective assets for the benefit of creditors; (d) any proceeding or other action wherein all or substantially all of any of the Borrower Parties' assets are attached, seized, subjected to a writ or distress warrant, or otherwise levied upon; and (e) any proceedings to set aside or avoid any transfer of an interest in property or obligations, whether denominated as a fraudulent conveyance, preferential transfer or otherwise, or to recover the value thereof or to charge, encumber or impose a lien thereon.

"Insolvent" shall have the meaning of the same terms under Sections 101(32) or 548 of the Bankruptcy Code.

"Legal Requirement" shall mean applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other written standard, requirement, policy or

3

procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority, including any judgment and all judicial decisions applying common law or interpreting any other Legal Requirement, in each case, as amended.

"<u>Ownership Interests</u>" shall mean collectively, whether now existing and hereafter arising or acquired: (a) fifty-four percent (54%) of the current and future membership interests in the Company under the Governing Agreements, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"<u>Person</u>" shall mean any person or entity, whether an individual, sole proprietorship, trust, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, institution, business association, firm, joint venture, Governmental Authority or otherwise.

"<u>Secured Obligations</u>" shall have the meaning set forth in <u>Section 2.1</u>.

"<u>Securities Laws</u>" shall mean, individually and collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, and any and all other laws, regulations, rules, orders and decrees of any governmental authorities governing the issuance, sale, marketing, exchange or disposition of securities, as any of the foregoing are amended from time to time.

"<u>Transfer Power</u>" shall have the meaning given in <u>Section 2.4</u> of this Assignment.

**1.2.   Rules of Construction**.   Section captions used in this Assignment are for convenience only and shall not affect the construction of this Assignment. All references to "Sections," without reference to a document other than this Assignment, are intended to designate Sections of this Assignment, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Assignment as a whole and not to any particular Section, unless specifically designated otherwise. The use of the term "including" shall mean in all cases "including but not limited to," unless specifically designated otherwise. Pronouns of any gender shall include the other genders (including the neuter gender), and either the singular or plural shall include the other. No rules of construction against the drafter of this Assignment shall apply in any interpretation or enforcement of this Assignment, any documents or certificates executed pursuant thereto, or any provisions of any of the foregoing.

**2.   ASSIGNMENT AND GRANT**

**2.1.   Obligations Secured**. This Assignment is made by Assignor in favor of Secured Party to secure irrevocable and unconditional payment and performance of the obligations, whether now existing or hereafter arising, by the Company under the Note and/or the Loan Documents and of Amin Suliaman and Kenneth C. Ware under the Guaranty and the Assignment Documents, including each and all of the representations, warranties, covenants, obligations, liabilities, indemnities and duties of the Company under the Note and Loan Documents (collectively, the "<u>Secured Obligations</u>").

4

**2.2.** **Assignment/Grant of Security Interest**.  In order to secure the unconditional and irrevocable payment and performance of the Secured Obligations, Assignor does hereby unconditionally and irrevocably assign, convey, mortgage, pledge, hypothecate, transfer and set over to Secured Party, and does hereby grant to Secured Party, a properly perfected, valid and enforceable, assignment of and continuing security interest in the Ownership Interests. This Assignment is intended to be a security agreement under the Code with respect to all or any portion of the Ownership Interests and all products and cash and non-cash proceeds thereof to the full extent that, under applicable law, the Ownership Interests may be subject to a security interest under the Code, whether acquired as of the date of this Assignment or in the future.

**2.3.** **Financing Statements**.  Assignor does hereby authorize Secured Party to file concurrently with the execution of this Assignment such UCC Financing Statements in such locations as are necessary, and to take all such other actions and make such further filings as Secured Party may request, in order to perfect Secured Party's continuing security interest in the Ownership Interests pursuant hereto. The Financing Statements shall be in form acceptable for filing in each jurisdiction in which the same are to be filed, shall comply in all respects with the Code and shall contain a description of "Collateral" that is substantially similar to the description set forth on attached **Exhibit B**. Assignor hereby agrees to pay all filing fees and other costs incurred in connection with the filing of such Financing Statements.

**2.4.** **Transfer Power and Certificate**.  Contemporaneously with his execution of this Assignment, Assignor shall deliver to Secured Party the original transfer power (the "Transfer Power") substantially in the form of the attached **Exhibit C**, which Transfer Power shall be executed by such Assignor in blank and shall irrevocably sell, assign and transfer all of the Ownership Interests owned by Assignor, as a member of the Company. Secured Party shall be entitled to complete the Transfer Power at any time following the occurrence of an Event of Default in connection with its exercise of any of the remedies provided in Article 4 of this Assignment.

**2.5.** **Assignment to be Absolute**. Assignor expressly agrees that until the Indebtedness is paid and performed in full, and each and every term, covenant and condition of this Assignment is fully performed, Assignor shall not be released by or because of:

(a)     Any act or event which might otherwise discharge, reduce, limit or modify Assignor's obligations under this Assignment;

(b)     Any waiver, extension, modification, forbearance, delay or other act or omission of Secured Party, or its failure to proceed promptly or otherwise against Assignor or any security;

(c)     Any action, omission or circumstance which might increase the likelihood that Assignor may be called upon to perform under this Assignment; or

(d)     The existence of an Insolvency Proceeding and as a result thereof some or all of the Indebtedness being terminated, rejected, discharged, modified or abrogated.

Assignor hereby acknowledges that absent this Section 2.5, Assignor might have a defense to the enforcement of this Assignment as a result of one or more of the foregoing acts, omissions, agreements, waivers or matters. Assignor hereby expressly waives and surrenders any defense to

5

any liability under this Assignment based upon any of such acts, omissions, agreements, waivers or matters. It is the express intent of Assignor that Assignor's obligations under this Assignment are and shall be absolute, unconditional and irrevocable.

### 2.6.    Receipt of Equity Distributions/Exercise of Equity Rights.

(a)    **Generally**.  Secured Party shall have the sole right and authority to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions until the Indebtedness shall have been paid in full and all obligations under the Loan Documents have been satisfied.

(b)    **Bankruptcy Rights**.  In the event Assignor is the subject of any Insolvency Proceeding which is not dismissed within the applicable cure period set forth in the Loan Documents, if any, and regardless of whether there has occurred an Event of Default, Secured Party shall have sole right and authority, to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions, exercising all Bankruptcy Rights, and exercising all other Equity Rights in such manner as Secured Party elects, in its sole and absolute discretion, and Secured Party shall have no obligation or liability whatsoever to Assignor on account of Secured Party's receipt of any Ownership Interests, Equity Distributions or exercise of, or failure to exercise, any Equity Rights or Bankruptcy Rights. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact, such appointment being coupled with an interest, with authority to exercise each and all of the Bankruptcy Rights in the place and stead of Assignor in such manner as Secured Party shall elect in its sole discretion. Further, Assignor hereby agrees that Secured Party shall have no liability whatsoever for exercising or failing to exercise any of the Bankruptcy Rights.

### 2.7.    No Assumption by Secured Party.   Notwithstanding any of the foregoing, irrespective of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, neither this Assignment, receipt by Secured Party of any Equity Distributions, exercise by Secured Party of any Equity Rights nor any exercise by Secured Party of any of its rights and remedies hereunder shall in any way obligate Secured Party to assume, or constitute or be deemed to constitute an assumption of, any of Assignor's obligations, duties, expenses or liabilities with respect to the Ownership Interests. Assignor acknowledges and agrees that it shall at all times remain liable for performance of all obligations, duties, expenses or liabilities with respect to the Ownership Interests, regardless of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, and that Secured Party shall in no event be liable therefor or deemed to have assumed the same.

## 3.    REPRESENTATIONS AND WARRANTIES

Assignor hereby makes the following representations and warranties for the benefit of Secured Party, all of which representations and warranties shall be deemed to be continuing and continually remade until the full, unconditional and irrevocable payment and performance of all

Secured Obligations:

**3.1.** **Organizational Status**.  The Company is a limited liability company, duly organized, validly existing and in good standing and qualified to conduct its business in the State of Colorado and in good standing and qualified to conduct its business in the State of Colorado and each other jurisdiction in which it does business.

**3.2.** **Power and Authority; Residency**.  Assignor has full power and authority to enter into and perform this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and each and all of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.  Further, Assignor has, by all necessary action, validly authorized the execution, delivery and performance of this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.  Assignor's principal place of residency is in the State of Colorado.

**3.3.** **Assignment Binding**.  This Assignment, each of the documents and certificates executed and delivered, or to be executed and delivered, by Assignor are, or will be when executed and delivered, the legal, valid and binding obligations of Assignor, enforceable against it in accordance with the terms hereof and thereof.  The Consent of the Company attached to this Assignment (the "Company Consent") is, or will be when executed and delivered, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and the terms of this Assignment.

**3.4.** **Actions Against the Company**.  Assignor has no knowledge of any action, proceeding or Insolvency Proceeding pending or threatened against the Company that would affect or impair the agreements made by Company in the Company Consent.

**3.5.** **Approvals**.  Neither the execution nor delivery of this Assignment, the documents and certificates to be executed and delivered in connection herewith, the other Assignment Documents, nor the consummation or performance of the transactions contemplated hereby or thereby, require the consent or approval of any Governmental Authority or any other Person other than the Company.

**3.6.** **No Duress**.  This Assignment is made voluntarily without any duress or undue influence of any kind.

**3.7.** **No Violation of Laws, etc**.  Neither this Assignment, any of the other documents or certificates to be executed in connection herewith or any of the other Assignment Documents or transactions contemplated thereby violate or are in contravention of: (a) the Governing Agreements; (b) to the knowledge of Assignor, any Legal Requirements applicable to Assignor or any of the assets of Assignor; or (c) to the knowledge of Assignor, any other mortgage, pledge, indenture, lease, security agreement or other agreement to which Assignor is a party.

**3.8.** **Solvency; No Fraudulent Conveyance**.  Assignor represents and warrants that it is not Insolvent and will not become Insolvent as a result of entering into this Assignment or the

transactions contemplated hereby; that this Assignment is not being made by Assignor with any intent to hinder, delay or defraud any creditors to which Assignor is or may hereafter become indebted; that Assignor is not engaged in business or any transactions, including the transactions contemplated hereunder, or is about to engage in any business or any transactions, for which any of his remaining property is unreasonably small capital; and that he does not intend to incur or believe that he will incur, debts that would be beyond his ability to pay as such debts mature. Assignor acknowledges that he is receiving new, fair, reasonably equivalent value in exchange for this Assignment and the transactions contemplated hereby, and affirmatively represents that neither his entry into this Assignment nor the consummation of the transactions contemplated hereby constitutes a fraudulent conveyance or preferential transfer under the Bankruptcy Code or any other federal, state or local laws affecting the rights of creditors generally.

**3.9.** **Ownership of Ownership Interests**.  Assignor is the legal, record and beneficial owner of, and has good and marketable title to, the Ownership Interests, as the same are set forth on **Exhibit A** attached hereto, subject to no lien or encumbrance other than the lien and security interest created hereby. Assignor is the sole legal, record and beneficial owner of, and has good and marketable title to, fifty-four percent (54%) of all of the Ownership Interests in and to the Company. Except for the assignment to Secured Party pursuant hereto, there has been no prior Transfer (as defined in Section 4.1) of any of the Ownership Interests.

**3.10.** **No Certificates**.  The Ownership Interests are evidenced and represented by the Operating Agreement of the Company and the books and records of the Company for purposes of registering the ownership of Ownership Interests. No certificates have been issued and/or are outstanding with regard to the Ownership Interests. No certificates may be issued by the Company without Secured Party's prior written consent.

**3.11.** **Security Interest/Place of Business**.  Upon the execution and delivery hereof and the filing of the Financing Statements in the locations shown on the attached **Exhibit B**, this Assignment will create in favor of Secured Party a valid and enforceable, properly perfected lien on all of the Ownership Interests, subject to no lien or other encumbrance other than as created hereby. Further, the lien and security interest granted to Secured Party pursuant hereto shall at all times be and remain a properly perfected, valid and enforceable lien on the Ownership Interests subject to no other lien.

**3.12.** **Governing Agreements**.  Assignor is not in default of any of its obligations under the Governing Agreements; Assignor has delivered to Secured Party a true, correct and complete copy of the Governing Agreements (including all amendments thereto) and all other agreements, if any, governing the operation or affairs of the Company; and the Governing Agreements are in full force and effect in accordance with their terms.

**4.** **COVENANTS**

Until such time as the Secured Obligations are fully, unconditionally and irrevocably paid and performed in full, Assignor hereby covenant and agree as follows:

**4.1.** **No Assignment**.  There shall be no conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance, charge or alienation (or any agreement

8

to do any of the foregoing) of, in or to any of the Ownership Interests, whether directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise ("Transfer"), without the prior written consent of Secured Party, which consent may be granted, conditioned or withheld in Secured Party's sole discretion. Assignor hereby acknowledges and agrees that no Transfer of any of the Ownership Interests, whether or not consented to by Secured Party (no consent to any such sale, assignment, pledge, hypothecation, conveyance or other transfer being implied hereby) shall be effective unless and until such transferee or successor executes, delivers, files and records, as applicable, an assumption agreement, in the form and content satisfactory to Secured Party, in its sole discretion, agreeing to assign the Ownership Interests to be transferred in accordance with the provisions of this Assignment and assume, be bound by and to comply with and join in the terms and conditions of this Assignment and the Financing Statements, and further takes such other actions and delivers such other documents, instruments and certificates as Secured Party may request for purposes of preserving, maintaining, continuing and perfecting the valid and enforceable, lien and security interest created hereby in such Ownership Interests. Further, Assignor hereby covenants and agrees that it will not consent to the admission of any new or substitute member in the Company unless the foregoing conditions have been fully satisfied. Assignor hereby covenants and agrees that any attempted Transfer of any Ownership Interest not in accordance with the foregoing shall be ineffective and deemed null and void, ab initio.

**4.2.** **Company Books and Records**. Assignor shall take, or cause to be taken, all such actions as are necessary to cause the Company and Assignor to mark their respective books and records with a notation that Assignor has assigned and pledged its Ownership Interests to Secured Party pursuant hereto and to keep as a part of such books and records a fully signed copy of this Assignment and each of the other Assignment Documents.

**4.3.** **Compliance with Securities Laws**. Assignor shall take all such actions as are necessary, and shall cause the Company, to comply in all respects with all applicable Securities Laws.

**4.4.** **No Consent to Reorganization, etc**. Assignor shall not consent to any dissolution, consolidation, merger, transfer, reorganization, reclassification or other similar action by the Company without the express written consent of Secured Party, which consent may be withheld, conditioned or delayed in Secured Party's sole and absolute discretion.

**4.5.** **Protection of Ownership Interests**. Assignor will protect and defend Secured Party's right, title, claim of possession, lien and security interest in and to the Ownership Interests against the claims and demands of all Persons whomsoever. Further, Assignor shall pay and discharge as and when due all liens, claims, charges, taxes, other governmental charges and contractual obligations that may affect his Ownership Interests or any portion thereof

**4.6.** **Performance under Governing Agreements**. Assignor shall fully and timely perform each and all of his obligations under the Governing Agreements in accordance with the terms thereof, and shall provide Secured Party with written notice of any default by Assignor under the Governing Agreements promptly upon the occurrence of such default. This Section 4.6 shall be deemed to amend and modify the Governing Agreements to provide that the Ownership Interests in the Company constitute securities subject to the provisions of Article 8 of the Code to designate Secured Party as a "protected purchaser" pursuant to Section 8-303 of the Code.

Assignor covenants and agrees that, until such time as the Indebtedness is paid in full, Assignor will not amend any of the Governing Agreements to "opt out" of Article 8 or to indicate that the Ownership Interests in the Company are not securities subject to the provisions of said Article 8.

**4.7.** **Notice of Default**. Assignor shall notify Secured Party of the existence of any Event of Default, or any event or condition which with the giving of notice, the passages of time or both could reasonably constitute an Event of Default, promptly upon obtaining knowledge of the existence thereof

**4.8.** **Change of Address**. No later than thirty (30) days prior to any change in address or principal place of business, as applicable, by Assignor from the address or principal place of business set forth on **Exhibit A** attached hereto, Assignor shall notify Secured Party in writing of such change in address or principal place of business, as applicable, and include in such notice the full and complete new address and principal place of business for Assignor.

**4.9.** **No Joint Venture**. Assignor hereby covenants and agrees that, until the Admission Date, neither Assignor nor any Person claiming by, through or under any of them, will assert or make a claim against Secured Party that Secured Party is a shareholder, member, member, insider or joint venturer of the Company or Assignor. Assignor hereby agrees to indemnify, defend and hold Secured Party harmless from and against any and all claims, demands, losses, costs (including reasonable attorneys' fees, whether incurred in connection with nonjudicial action, prior to trial, at trial or on appeal or review, including in any Insolvency Proceeding), damages (including special and consequential) and expenses incurred or suffered by Secured Party as a result of any assertion by the Company or Assignor, either directly or indirectly, or any Person claiming by, through or under any of them, or if Assignor assists any Person in asserting, that Secured Party was at any time a shareholder, member, partner, insider or joint venturer of the Company or Assignor prior to the Admission Date by virtue of this Assignment, the transactions contemplated thereby or otherwise.

**4.10.** **Delivery of Certificates**. Assignor hereby agrees: (a) to deliver to Secured Party, immediately upon receipt thereof, any and all instruments, certificates or other documents, whether now or hereafter existing, evidencing any of the Ownership Interests; and (b) to execute and deliver a notice of Secured Party's first priority, perfected, exclusive and continuing security interest in the Ownership Interests (which notice shall be in form and substance satisfactory to Secured Party and may require an acknowledgement from the addressee), to any third party which now has or may have the ability under applicable law or the terms of any agreement to record transfers of, or to transfer, any of the Ownership Interests (whether at the discretion of the Assignor or otherwise). Assignor hereby irrevocably and unconditionally appoints Secured Party as Assignor's attorney-in-fact with authority at any time or times from and after an Event of Default to take any of the foregoing actions on behalf of Assignor, such appointment being coupled with an interest.

## 5.   DEFAULTS/REMEDIES

**5.1.** **Events of Default**. The occurrence at any time of any of the following events, shall constitute an "Event of Default" hereunder:

10

(a)    if any of the Equity Distributions are collected, received, handled, applied and disbursed other than strictly in accordance with the terms of this Assignment;

(b)    if there occurs any default in the due observance or performance of any of non-monetary or other covenants or obligations in this Assignment (except as may be otherwise specified herein) or breach in any material respect of any representation or warranty set forth herein, and the same is not cured within ten (10) days after the giving of written notice by Secured Party;

(c)    this Assignment and the Transfer Power shall cease to be an exclusive valid and enforceable, properly perfected lien upon and security interest in the Ownership Interests, or shall fail to give Secured Party the benefit of the liens, security interests, rights, powers and benefits created thereby in accordance with the terms hereof;

(d)    there occurs an event of insolvency with respect to Assignor or Assignor is the subject of an Insolvency Proceeding (except that involuntary bankruptcy filings may be vacated or withdrawn within fifteen (15) days prior to being deemed an Event of Default); and/or

(e)    the occurrence of an Event of Default or Default under the Loan Documents, it being expressly understood that the term "Event of Default" or "Default" as used herein shall have each and all of the meanings assigned thereto in Loan Documents, all of which are hereby incorporated into this Assignment by this reference.

**5.2.    Remedies**.  Upon the occurrence of an Event of Default, Secured Party shall have the right, at its sole option, to exercise from time to time any or all of the rights and remedies provided for herein, in the other Assignment Documents, at law or in equity, including the following:

(a)    the rights and remedies of a secured creditor under the Code;

(b)    the right to receive directly any and all amounts payable in respect of the Ownership Interests, including all Equity Distributions, and the right to exercise all Equity Rights;

(c)    the right to sell (or resell in the event of a default under any sale) all or any portion of the Ownership Interests, at any public or private sale on such terms and conditions as Secured Party deems appropriate and as may be otherwise required under the Code or applicable law in accordance with this Assignment, and Assignor shall cooperate and cause the Company to cooperate with Secured Party and shall execute and deliver all documents and take any and all actions as may be necessary or requested by Secured Party to assign all of the Ownership Interests to Secured Party or any designee and/or to any purchaser of the Ownership Interests at such sale, to admit Secured Party or any designee and/or any such purchaser as a member of the Company, and comply with all Securities Laws in connection therewith;

(d)    recover from Assignor any and all losses, damages (of whatsoever kind or nature), costs (including reasonable attorneys' fees) and expenses suffered or incurred by Secured Party as a result of any default or Event of Default, and Assignor hereby agrees to indemnify Secured Party for the same;

(e)     seek specific performance of, including declaratory and injunctive relief to enforce, the terms and provisions of this Assignment and the other Assignment Documents;

(f)     exercise any and all other rights and remedies which may be available against Assignor, the Company or any other Person under this Assignment, any of the other Assignment Documents and/or otherwise afforded by law or in equity, subject to the applicable limitations on liability set forth in the Assignment Documents; and

(g)     apply to any court having jurisdiction for the appointment of a receiver for the Ownership Interests to take any or all of the actions set forth in this Section and if Secured Party elects to seek the appointment of a receiver at any time after an Event of Default has occurred and is continuing, Assignor and the Company, by their execution of this Assignment, expressly consent to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law; and immediately upon appointment of a receiver, Assignor shall surrender possession of the Ownership Interests to the receiver, and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Ownership Interests.

**5.3.   Sales**.  The following shall apply to any sale(s) (or resale(s)) of the Ownership Interests conducted by Secured Party pursuant to this Assignment.

(a)     **Restrictions Permitted**. Secured Party may restrict the number of potential bidders and purchasers in any such sale(s) and also may impose in any sale(s) such restrictions as Secured Party deems necessary or appropriate in order to cause such sales(s) to comply with all applicable laws, including Securities Laws. Such restrictions may include, without limitation, restricting purchasers and bidders to those who will represent and agree that they are purchasing the Ownership Interests for their own account, for investment purposes only, and not with a view to the distribution or resale of the Ownership Interests.

(b)     **Private Sales**.  Assignor hereby acknowledges and agrees that, notwithstanding that a higher price may be obtained at a public sale of the Ownership Interests rather than a private sale thereof, a public sale of the Ownership Interests may be subject to registration requirements under Securities Laws and similar other legal restrictions which would make a public sale of the Ownership Interests impractical. Accordingly, Assignor hereby agrees that Secured Party shall be entitled to sell the Ownership Interests at a private sale on such terms and conditions as Secured Party deems acceptable and are otherwise commercially reasonable. Secured Party shall have no obligation to conduct a public sale of the Ownership Interests. Assignor hereby waives, to the fullest extent permitted by applicable, law, any right to require that the Ownership Interests be sold at a public sale and any claims that Assignor may have against Secured Party arising by reason of the fact that the price at which the Ownership Interests, or any part thereof may have been sold at a private sale was less than the price obtainable at a public sale.

(c)     **No Obligation to Sell/Notice**. Secured Party shall not be obligated to make any sale(s) of the Ownership Interests regardless of any notice of sale having been given, and Secured Party may adjourn any public or private sale from time to time and such sale may be made at the time and place to which it was adjourned. Assignor hereby agrees that to the extent notice of any such sale is required under the Code (notwithstanding the waiver thereof set forth herein),

a period of ten (10) days from the time the notice is sent shall be a reasonable period of notification of a sale or other disposition of Ownership Interests by Secured Party.

(d) **No Liability**. Secured Party shall have no liability as a result of the manner or terms of sale of the Ownership Interests, or any part thereof, at a public or private sale conducted in a manner and on terms that are commercially reasonable. All sales conducted by Secured Party shall be deemed to be commercially reasonable and, in any dispute as to the same, it shall be Assignor's burden to prove that the manner or terms of such sale were not commercially reasonable.

(e) **Consummation of Sale**. Any sale of, or other realization upon, any of the Ownership Interests shall operate to divest all of Assignor's right, title, interest, claim and demand, either at law or in equity, in and to the Ownership Interests and each and every portion thereof, and each purchaser at any sale of the Ownership Interests shall hold the Ownership Interests so sold absolutely free from any claim or right of Assignor whatsoever, including any right of redemption, which right has been waived pursuant to this Assignment. Further, after any sale(s) of the Ownership Interests, Assignor hereby agrees to take such actions and execute such documents as may be necessary or appropriate to transfer the Ownership Interests to the purchaser and substitute such purchaser as a member in the Company, including executing and delivering any necessary transfer documents and amendments to the Governing Agreements as may be required. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact to take such actions and execute such documents, such appointment being coupled with an interest. No purchaser shall be obligated to assume or perform any obligations under the Governing Agreements except for the period from and after such purchaser's admission as a member and then only after all actions necessary to effect its admission as a member have been consummated.

5.4. **Waiver of Rights by Assignor**. Assignor, on behalf of itself and any Persons claiming by, through or under Assignor, hereby knowingly, intentionally and voluntarily waives: (a) presentment, demand, protest or any notice of any kind in connection with this Assignment; (b) notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof; (c) all claims, demands, liabilities and damages occasioned by such taking of possession or disposition; (d) all other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder; and (e) all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof.

5.5. **Rights Continuing**. The rights and powers of Secured Party hereunder shall continue and remain in full force and effect until all Secured Obligations have been irrevocably and unconditionally paid and performed in full, and shall continue after sale of the Ownership Interests until expiration of any right of redemption, notwithstanding sale of the Ownership Interests to a purchaser other than Secured Party. Further, Assignor hereby acknowledges and agrees that Secured Party shall not be required to exercise its rights against any Person other than Assignor that is liable for all or any portion of the Secured Obligations or against any collateral for the Secured Obligations other than the Ownership Interests prior to exercising its rights and remedies against Assignor and the Ownership Interests pursuant hereto. Without affecting the

13

liability of Assignor for payment and performance of the Secured Obligations and without affecting Secured Party's lien and security interests in the Ownership Interests created hereby, Secured Party may release, at any time and from time to time, any Person liable for, or any security or other collateral for, the Secured Obligations.

**5.6.** **Expenses of Default**. Assignor agrees to pay on demand the amount of all costs and expenses incurred by Secured Party in protecting and realizing on its interest in the Ownership Interests, and further agrees that if this Assignment is referred to an attorney for protecting or defending the priority of Secured Party's interest in or lien on the Ownership Interests or for collecting or realizing thereon, Assignor shall pay upon demand all of Secured Party's expenses, including reasonable attorneys' fees and costs (whether incurred in connection with non-judicial action, prior to trial, at trial, or on appeal or review, including in any Insolvency Proceeding), other professional fees and costs, and expenses of title search and all court costs and costs of public officials. Assignor hereby further agrees that his obligation to pay such amounts shall be secured hereby and constitute a part of the Secured Obligations.

**5.7.** **No Waiver**. The exercise by Secured Party of any one right or remedy hereunder, under any of the other Assignment Documents, or the other Loan Documents, or any other guaranty, at law or in equity shall not be a waiver of Secured Party's right to exercise at the same time or thereafter any other right or remedy, and no delay in exercising or failing to exercise any rights or remedies of Secured Party hereunder, under any of the other Assignment Documents or any of the other Loan Documents, at law or in equity, following any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, in any one or more instances, or acceptance by Secured Party of partial payments or partial performance, shall constitute, or be deemed to constitute, a waiver of any such Event of Default, a waiver of the right to exercise any such rights or remedies at any time thereafter or upon the occurrence of any subsequent Event of Default, or a release, satisfaction or discharge of the terms hereof, of any of the other Assignment Documents or other Loan Documents, all such rights, remedies, terms and documents remaining continuously in force. Any waiver or release by Secured Party of any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, or any waiver of rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity (no obligation or agreement to waive or release or discharge any of the foregoing being implied hereby), may be effected only through a written document executed by Secured Party and then only to the extent of any waiver, release, discharge or satisfaction specifically set forth therein. A waiver or release in connection with any one event or any particular right or remedy shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity. Secured Party shall not be required to give notice of the exercise of these rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity, all such notice having been waived by the Assignor pursuant hereto.

**5.8.** **Remedies Cumulative**. The remedies of Secured Party provided for herein, in any of the other Assignment Documents or any of the other Loan Documents, at law or in equity upon the occurrence of an Event of Default shall be cumulative and concurrent, and may be pursued

singularly, successively or together, at the sole discretion of Secured Party, and may be exercised as often as occasion therefor shall arise, as determined by Secured Party in its sole discretion.

**5.9.** **Revival and Reinstatement.** If Secured Party is required to pay, return or restore to Assignor or any other person any amounts previously paid on the Indebtedness because of any Insolvency Proceeding of Assignor, any stop notice or any other reason, the obligations of Assignor shall be reinstated and revived and the rights of Secured Party shall continue with regard to such amounts, all as though they had never been paid, and this Assignment shall continue to be effective or be reinstated, as the case may be.

## 6. RIGHTS OF LENDER; WAIVERS

**6.1.** **Rights of Lender.** Assignor authorizes Secured Party to perform any or all of the following acts at any time in its sole discretion, all without notice to Assignor and without affecting Secured Party's rights or Assignor's obligations under this Assignment:

(a) Secured Party may alter any terms of the Note, the or the other Loan Documents, including renewing, compromising, modifying, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Indebtedness or any part of it;

(b) Secured Party may take and hold security for the Indebtedness, accept additional or substitute security for the Indebtedness, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security;

(c) Secured Party may direct the order and manner of any sale of all or any part of any security now or later to be held for the Indebtedness, and Secured Party may also bid at any such sale and may apply all or any part of the Indebtedness against the amount so bid;

(d) Secured Party may apply any payments or recoveries from Assignor or any other source, and any proceeds of any security, to the Indebtedness in any manner, order and priority as Secured Party may elect, whether that obligation is secured by this Assignment or not at the time of the application;

(e) Secured Party may substitute, add or release any one or more makers, Assignor, Amin Suliaman, Kenneth C. Ware, any other guarantors or endorsers; and

(f) In addition to the Note, Secured Party may extend other credit to Assignor, and may take and hold security for the credit so extended, whether or not such security is also security for the Indebtedness, all without affecting Secured Party's rights or Assignor's liability under this Assignment.

**6.2.** **Assignor's Waivers.** Assignor waives:

(a) All statutes of limitations as a defense to any action or proceeding brought against Assignor by Secured Party, to the fullest extent permitted by law;

15

(b)     Any right Assignor may have to require Secured Party to proceed against any other party, proceed against or exhaust any security held from any other party, or pursue any other remedy in Secured Party's power to pursue;

(c)     To the extent permitted by applicable law, all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof;

(d)     Any defense based on any claim that Assignor's obligations exceed or are more burdensome than those of the Company;

(e)     Any defense based on: (i) any legal disability of Assignor or the Company, (ii) any release, discharge, modification, impairment or limitation of the liability of Assignor or the Company to Secured Party from any cause, whether consented to by Secured Party or arising by operation of law or from any Insolvency Proceeding and (iii) any rejection, disallowance or disaffirmance of the Indebtedness, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(f)     Any defense based on any action taken or omitted by Secured Party in any Insolvency Proceeding involving Assignor or the Company, including, without limitation, filing, defending, settling or obtaining a judgment or order on any proof of claim or any adversary proceeding, making any election to have Secured Party's claim allowed as being secured, partially secured or unsecured, including any election under 11 U.S.C. Section 1111(b), seeking relief from the automatic stay or adequate protection, including submitting an appraisal of any security, voting to reject or accept or failing to vote on any reorganization plan, making any extension of credit by Secured Party to Assignor or the Company in any Insolvency Proceeding, and the taking and holding by Secured Party of any security for any such extension of credit, whether or not such security is also security for the Indebtedness;

(g)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Assignment and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind;

(h)     Any defense based on or arising out of any defense that the Company or Assignor may have to the payment or performance of the Indebtedness or any part of it;

(i)     Notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof;

(j)     All claims, demands, liabilities and damages occasioned by such taking of possession or disposition; and

(k)     All other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder.

16

**6.3.**     <u>Waivers of Subrogation and Other Rights and Defenses</u>.

(a)     The obligations of Assignor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought against Assignor, regardless of whether action or suit is brought against the Company, or whether Assignor or the Company are joined in any such action or actions. At the option of Secured Party, Assignor may be joined in any action or proceeding commenced by Secured Party against the Company in connection with or based on the Indebtedness or any security for such obligation, and recovery may be had against Assignor in such action or proceeding without any requirement that Secured Party first assert, prosecute or exhaust any remedy or claim against the Company.

(b)     Upon a default by Assignor, Secured Party in its sole discretion, without prior notice to or consent of Assignor, may elect to: (i) foreclose either judicially or nonjudicially against any real or personal property security that Secured Party may hold for the Indebtedness other than the Ownership Interests hereby encumbered, (ii) accept a transfer of any such security in lieu of foreclosure, (iii) compromise or adjust the Indebtedness or any part of it or make any other accommodation with Assignor or the Company, or (iv) exercise any other remedy against Assignor or the Company or any security other than the Ownership Interests hereby encumbered. With respect to security other than the Ownership Interests hereby encumbered, no such action by Secured Party shall release or limit the liability of Assignor, who shall remain liable under this Assignment after the action, even if the effect of the action is to deprive Assignor of any subrogation rights, rights of indemnity, rights of contribution, or other rights to collect reimbursement from the Company or any other Person for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law or otherwise. After any foreclosure or deed in lieu of foreclosure of any real or personal property pledged to secure the Indebtedness, Assignor shall under no circumstances be deemed to have any right, title, interest or claim in or to such property, whether it is held by Secured Party or any third party.

(c)     Regardless of whether Secured Party may have recovered against Assignor, Assignor hereby waives: (i) all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement or contribution from the Company or any other party for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute) or otherwise (collectively, "<u>Reimbursement Rights</u>"), (ii) all rights to enforce any remedy that Secured Party may have against the Company, and (iii) all rights to participate in any security now or later to be held by Secured Party for the Indebtedness. To the extent Assignor's waiver of Reimbursement Rights is found by a court of competent jurisdiction to be void or voidable for any reason, any Reimbursement Rights Assignor may have against the Company or any collateral or security shall be junior and subordinate to any rights Secured Party may have against the Company and to all right, title and interest Secured Party may have in any such collateral or security. If any amount should be paid to Assignor on account of any Reimbursement Rights at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for Secured Party and shall immediately be paid over to Secured Party to be credited and applied against the Indebtedness, whether matured or unmatured, in accordance with the terms of the Guaranty. The covenants and waivers of Assignor set forth in this <u>Section 6.3(c)</u> shall be effective until the Indebtedness has been paid and performed in full and are made solely for the benefit of Secured Party.

(d)      No provision or waiver in this Assignment shall be construed as limiting the generality of any other provision or waiver contained in this Assignment.

## 7.    MISCELLANEOUS

**7.1.    No Limitation of Liability**. Assignor acknowledges that Secured Party has agreed to make the Loan in reliance upon Assignor's representations, warranties and covenants in this Assignment, all of which shall be deemed continuing and continually remade at all times. It is the intention of Assignor and Secured Party that the provisions of this Assignment shall be controlling over any provisions in the Note or the Guaranty which in any way limit the personal liability of Assignor, Amin Suliaman, Kenneth C. Ware, the Company, any of the Borrower Parties or any other Person, and that Assignor shall be personally liable for any and all of the obligations arising under this Assignment, even if the amount of liability incurred exceeds the amount of the Note.

**7.2.    Notices**. Notices under this Assignment shall be provided in the manner provided in the Loan Agreement, including that any party may change its address for notices hereunder by written notice to the other parties given in accordance with provisions of the Loan Agreement.

**7.3.    Agent for Service of Process**. As a further inducement to Secured Party to make the Loan and in consideration thereof, Assignor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the foregoing Section 7.2, Assignor hereby waiving personal service thereof, and Assignor agrees that within thirty (30) days after such mailing, it shall appear or answer to any summons and complaint or other process, and should it fail to appear or answer within said thirty-day period, it shall be deemed in default in any summons and complaint or other process so served.

**7.4.    Damage Lawsuit, Consent to Jurisdiction**. The sole and exclusive remedy of Assignor for any and all adverse claims against Secured Party is a Damage Lawsuit (hereinafter defined). Assignor hereby represents and warrants to Secured Party that as of the date hereof no such adverse claims exist against Secured Party. Any such Damage Lawsuit, regardless of the procedural form in which it is alleged, will be severed from any enforcement by Secured Party of its legal, equitable and contractual rights, and the Damage Lawsuit cannot be asserted by Assignor as a defense, set-off, recoupment, or grounds for delay, stay, subordination or injunction against any enforcement by Secured Party of its legal, equitable and contractual rights under the Loan Documents, the Guaranty or otherwise. It is understood and agreed that the designated, exclusive and proper venue of any legal dispute, question or interpretation, claim, declaratory judgment action, bankruptcy or other litigation regarding: (a) any proceeding under the Bankruptcy Code brought by or against Assignor; (b) the enforcement of Secured Party's rights under or relating in any way to the Loan, the Note, or the other Loan Documents; (c) the prosecution of any Damage Lawsuit alleged against Secured Party by any of the Affiliated Parties; and (d) any other matter regarding this Assignment or the Guaranty or any of the other Loan Documents shall be exclusively and solely decided by the federal court in the State of Illinois or state circuit or district courts sitting in the State of Illinois (provided, that, in the event actions or proceedings are required to be litigated in the jurisdiction of the situs of the Property, then such actions or proceedings shall be litigated in the courts of the State of Colorado sitting in Denver County); and Assignor hereby consents to the exercise or personal jurisdiction over Assignor by, and consents to the laying of venue in, and exclusive jurisdiction of, such courts. As used herein, the term "Affiliated Parties"

shall mean individually and collectively, Assignor and all of his Legal Representatives, successors and assigns; the term "Damage Lawsuit" shall mean an action for monetary damages; and the term "Legal Representatives" shall mean any trustee, receiver, custodian and/or any other person appointed or authorized to act in a representative capacity by a court or governmental entity, whether appointed pursuant to the Bankruptcy Code or otherwise.

   **7.5.   No Third-Party Beneficiary**.  The provisions of this Assignment are solely for the benefit of Secured Party and its successors and assigns. No provision of this Assignment or of the Loan Documents shall be construed as creating in any party other than the Company, Assignor and Secured Party, and their successors and assigns, any rights of any nature whatsoever.

   **7.6.   Further Assurances**.  Upon request by Secured Party, Assignor, at his sole cost and expense, at any time and from time to time, shall, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, mortgages, security agreements, financing statements and other documents and assurances as Secured Party shall request to protect and preserve the security for the Loan, the priority of the liens created by this Assignment, or Assignor's performance of his obligations hereunder, or for the better assuring, conveying, mortgaging, assigning and confirming unto Secured Party all property subject to the lien of or a security interest provided for in the Loan Documents or property intended so to be, whether now owned by the Company or Assignor, or hereafter acquired. Such acts or assurances shall include, without limitation, recordation of such documents and instruments, at Assignor's sole cost and expense, as Secured Party may request.

   **7.7.   Secured Party's Right to Assign**.  Secured Party shall have the right any time and from time to time, in accordance with any applicable provisions of the Loan Documents, to sell, assign, participate, pledge, transfer, securitize, syndicate, or otherwise dispose of the Loan, the Note, the Guaranty, or any of the other Loan Documents, or any interests therein and/or the Secured Obligations. From and after the date of any such sale, assignment, participation, pledge, transfer, securitization, syndication or other disposition, such transferee shall be entitled to exercise any and all rights and remedies of Secured Party hereunder as fully and with the same force and effect as if such transferee had been named the Secured Party hereunder. Assignor shall not assign, convey or otherwise transfer any of his rights and obligations hereunder.

   **7.8.   Successors and Assigns**.  Subject to the provisions of Section 4.1, all of the terms, covenants and conditions contained herein shall apply and be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and permitted assigns of Assignor and Secured Party, respectively, and all Persons claiming by, under or through them.

   **7.9.   Severability**.  If any provision in this Assignment is found by a court of competent jurisdiction to be in violation of any applicable law, and if such court should declare such provision of this Assignment to be unlawful, void, illegal or unenforceable in any respect, the remainder of this Assignment shall be construed as if such unlawful, void, illegal or unenforceable provision were not contained therein, and the rights, obligations and interests of the parties hereto under the remainder of this Assignment shall continue in full force and effect undisturbed and unmodified in any way.

**7.10.** **Modification**. This Assignment and the terms hereof may not be changed, waived, modified, canceled, discharged or terminated orally, but only by an instrument or instruments in writing signed by Assignor and Secured Party.

**7.11.** **GOVERNING LAW**. THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF.

**7.12.** **Incorporation of Recitals/Exhibits**. The recitals set forth at the beginning of this Assignment are true and correct in all respects and are hereby incorporated in their entirety by this reference. The exhibits attached hereto are hereby incorporated in their entirety by this reference.

**7.13.** **WAIVER OF TRIAL BY JURY**. ASSIGNOR, FOR HIMSELF AND ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER HIM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS HE MAY HAVE TO TRIAL BY JURY IN ANY LITIGATION OR ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS ASSIGNMENT, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO. THIS WAIVER MAY BE FILED WITH THE CLERK OR JUDGE OF ANY COURT AS A WRITTEN CONSENT TO WAIVER OF JURY TRIAL. ASSIGNOR ACKNOWLEDGES THAT HE HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR SECURED PARTY'S ENTERING INTO THE LOAN. THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE INDEBTEDNESS.

**7.14.** **Joint and Several Liability**. The obligations of Assignor and any and all other Borrowing Parties that may be liable hereunder are joint and several.

**7.15.** **Time is of the Essence**. TIME IS OF THE ESSENCE under this Assignment and each and every provision hereof and thereof.

**7.16.** **Effective Date**. The effective date of this Assignment shall be the date on the first page hereof and thereof, respectively, notwithstanding the fact that this Assignment may have been executed on a date prior or subsequent thereto.

**7.17.** **Counterparts**. This Assignment may be executed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute but one original. This Assignment shall not be effective unless and until executed and delivered by each of the named Assignor and Secured Party in one or more counterparts. Facsimile signatures hereon shall be treated the same as and provided the same legal significance as original signatures hereon.

**7.18.** **Counsel**. Assignor acknowledges that he has had adequate opportunity to carefully read this Assignment and to consult with an attorney of such Assignor's choice prior to signing it.

**7.19.** **Integration**. No course of prior dealing, usage of trade, parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof. This Assignment is intended by the parties to be a fully integrated and final expression of their agreement. This

Assignment, the Note, the Guaranty and the other documents securing the Note incorporate all negotiations of the parties and constitute the parties' entire agreement. Assignor represents that it is relying on no written or oral agreement, representation, warranty or understanding, of any kind made by Secured Party or any employee, attorney or agent of Secured Party except for the agreements of Secured Party set forth herein.

**7.20.** <u>**Amendment to Governing Agreements**</u>.

(a)     Assignor hereby acknowledges and agrees that notwithstanding any provisions of the Governing Agreements to the contrary, Assignor:

(i)     consents to this Assignment, including the pledge and assignment of the Ownership Interests and all other benefits to which the holders of such Ownership Interests may be entitled pursuant to the terms of the Governing Agreements, and Secured Party's exercise and enforcement of any of its rights and remedies hereunder or otherwise afforded by law or in equity;

(ii)     consents to the absolute and unconditional transfer and assignment of the Ownership Interests and all other benefits to which the holders of such interests may be entitled pursuant to the terms of this Assignment, the Note, the Guaranty and the other Loan Documents, and Secured Party's exercise and enforcement of its rights and remedies hereunder or otherwise afforded by law or in equity;

(iii)     agrees that transfers of the Ownership Interests and all other benefits to Secured Party hereunder and upon the exercise of any rights and remedies by Secured Party, including one or more sales of the Ownership Interests to Secured Party, its designee and any other purchasers pursuant to this Assignment or any other exercise of Secured Party's rights and remedies, shall be deemed permissible transfers under the Governing Agreements for all purposes and are hereby irrevocably and unconditionally consented to, without the necessity of obtaining any further consents or approvals, and further without the necessity of complying with any other provision of the Governing Agreements that might otherwise be construed to condition, limit, prohibit, impair or modify in any respect this Assignment or the exercise of Secured Party's rights and remedies hereunder, at law or in equity, including any options to purchase and any rights of first offer, first opportunity, first refusal and redemption;

(iv)     agrees that, upon written notice to Assignor from Secured Party of its election under this Assignment to exercise all or any portion of the Equity Rights and Bankruptcy Rights, and collect directly any Equity Distributions or other amounts payable to any Assignor in respect of the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice) on account of the Ownership Interests, all such distributions and other amounts shall be paid directly to Secured Party and Secured Party shall automatically be entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements (including all distributions of available cash or other distributions or payments or any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice), Assignor hereby irrevocably and unconditionally consenting thereto; and

(v)     agrees that, upon written notice to Assignor, from Secured Party of Secured Party's election to be, or to have its designee or any purchaser, substituted as the holder of any Ownership Interest or portion thereof pursuant to this Assignment, Secured Party, its designee and/or such purchaser, as applicable, shall automatically be deemed to be admitted as a substitute member for such transferring member to the extent of the Ownership Interests so transferred and a member and entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements, including the right to exercise the Equity Rights and Bankruptcy Rights and receive any Equity Distributions or other amounts payable to a member in respect of the Ownership Interests under the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date so transferred), and all such amounts shall be paid as so directed by Secured Party, Assignor hereby irrevocably and unconditionally consenting thereto.

(b)     In the event Secured Party elects to be admitted as a substitute member and/or new member, Secured Party shall be deemed to have assumed and agreed to perform all obligations of the transferring member under the Governing Agreements relating solely to the Assignor's interest so transferred or the new membership interest from and after the effective date of the transfer or acquisition of such new interest by Secured Party, its designee and/or purchaser and not for the period or to the extent arising prior thereto, and without the necessity of obtaining any further consents or approvals from any other members of the Company (or any other future member of the Company, no consent thereto being implied hereby) or the Company or complying with any of the conditions of the Governing Agreements. Upon receipt of such notice, Assignor shall take (or shall cause the Company to take) such actions as are contemplated in the Governing Agreements, as modified hereby, and otherwise to register and further assure such transfers, admission and/or new acquisition, without cost to Secured Party, its designees and purchasers.

(c)     Assignor hereby covenants to execute and deliver any documents and instruments reasonably required by Secured Party to effectuate the provisions of this Section 7.20, and should Assignor fail to execute and deliver such documents or instruments within five (5) days after request therefor by Secured Party, Assignor hereby appoints Secured Party as his true and lawful attorney-in-fact (which appointment is deemed to be coupled with an interest) to execute and deliver any such documents and instruments as is reasonably necessary to effectuate the provisions of this Section 7.20.

(d)     This Section 7.20 shall be deemed to amend and modify the Governing Agreements until all Secured Obligations have been irrevocably and unconditionally paid and performed in full.

[Signature Page Follows]

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

SECURED PARTY:

PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company

By: _____
Name: Peter Martay
Title: Authorized Signatory

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

ASSIGNOR:

**AMIN SULIAMAN**, an individual

## CONSENT OF COMPANY

**NATIV DENVER LLC**, Colorado limited liability company (the "Company"), has reviewed the foregoing Assignment and hereby unconditionally and irrevocably consents to and agrees to be bound by the terms and conditions thereof. The Company agrees that the Ownership Interests are securities subject to the provisions of Article 8 of the Code. The Company hereby has marked its books and records (including the membership interest register) to reflect the delivery of the Transfer Power, to Secured Party, and the existence of this Assignment, each of the other Assignment Documents, and the assignments, liens and security and investment property interests created hereby and thereby, and to maintain at all times a copy of this Assignment and each of the other Assignment Documents as a part of its books and records. Upon request of Secured Party, whether pursuant to a sale of one or more Ownership Interests under Section 5.3 of this Assignment or otherwise, the Company shall immediately cause the admission of Secured Party or its designee or any other purchaser to be registered in the books and records of the Company and take all such other actions as may be necessary or requested to effect the transfer and issuance of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser as a member of the Company as contemplated by the Assignment, and further to take all such actions as may be necessary to comply in all respects with applicable Securities Laws in connection with the sale or other transfer of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser. The Company further agrees that, upon request by Secured Party, the Company will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts and instruments as may be required to effectuate the transaction contemplated by this Assignment.

NATIV DENVER LLC,
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title: Manager

By: _____
Name: Amin Suliaman
Title: Manager

**EXHIBIT A**

**Description of Pledged Ownership Interests**

| NAMES AND ADDRESSES | TYPE OF INTEREST | OWNERSHIP INTEREST | FILING LOCATION |
|---|---|---|---|
| Amin Suliaman<br>c/o KDA Properties LLC<br>1612 Wazee Street<br>Denver, CO 80202 | Membership | 54% | Secretary of State of Colorado |

**EXHIBIT B**

Debtor (Pledgor): Amin Suliaman, an individual

Secured Party: Pangea Mortgage Capital, LLC, an Illinois limited liability company

**1.      DESCRIPTION OF COLLATERAL**. The Collateral covered by the UCC-1 financing statement or Security Agreement (as defined below) to which this **Exhibit** is attached (the "UCC-1"), and constituting the Collateral in which Debtor grants a perfected security interest to Secured Party pursuant to the Security Agreement to which this **Exhibit** is attached, consists of the "Collateral," as defined below. A complete description of all such Collateral is hereby included and incorporated by reference in the UCC-1 or Security Agreement, as if the entirety of this description of Collateral were set forth in full on the face of the UCC-l.

**2.      DEFINITIONS**. For purposes of the foregoing, the following terms shall have the following meanings:

2.1 "Bankruptcy Rights" means, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding (as defined in the Security Agreement), voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.2      "Company" means **NATIV DENVER LLC**, Colorado limited liability company.

2.3      "Collateral" means the Ownership Interests.

2.4      "Documents" means all certificates or documents representing Debtor's interest in and rights with respect to the Company.

2.5      "Equity Distributions" means collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.6    "Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.7    "Operating Agreement" means that certain Operating Agreement of the Company dated as of March 23, 2018, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party.

2.8    "Ownership Interests" means collectively, whether now existing and hereafter arising or acquired: (a) fifty-four percent (54%) of the current and future interests of the Debtor under the Operating Agreement, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.9    "Proceeds" shall include the following, whether in cash or not in cash:

2.9.1    Certain Payments. Any proceeds, products, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions, and replacements of any Collateral;

2.9.2    Dispositions. Whatever is received by Debtor upon the sale, exchange, collection or other disposition of any item of Collateral, whether such proceeds constitute inventory, accounts, accounts receivable, general intangibles, instruments, securities, credits, documents, letters of credit, chattel paper, documents of title, warehouse receipts, leases, deposit accounts, money, contract rights, goods or equipment;

2.9.3    Applications of Proceeds. Any such items that are now or hereafter acquired by Debtor with any proceeds of any Collateral hereunder; and

2.9.4    Insurance. Any insurance proceeds payable by reason of loss or damage to any item of Collateral or any proceeds thereof

2.10    "Security Agreement" means that certain Collateral Assignment, Pledge and Security Agreement, dated as of March 11, 2020, given by the Debtor to the benefit of the Secured Party, as the same may be amended, modified, extended, restated or replaced from time to time.

3.    **LIMITATION OF LIABILITY**.   Notwithstanding anything to the contrary in the foregoing, Secured Party shall have no obligations or liability with respect to the Ownership Interests unless and until Secured Party has succeeded to the ownership of the Ownership Interests.

Even if the Secured Party shall acquire ownership of the Ownership Interests, Secured Party's liability shall: (a) terminate if and when Secured Party has transferred or abandoned such Ownership Interests; and (b) under all circumstances be limited to Secured Party's interest in the Ownership Interests.

# EXHIBIT C

## Irrevocable Transfer Power

FOR VALUE RECEIVED, **AMIN SULIAMAN**, an individual, does hereby sell, assign and transfer 54% of membership interests (the "Ownership Interests") in **NATIV DENVER LLC**, a Colorado limited liability company (the "Company"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

EXHIBIT C

**IN WITNESS WHEREOF** the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

_____

**AMIN SULIAMAN**, an individual

# EXHIBIT D

Filing Locations for UCC Financing Statements: Secretary of State of Colorado

EXHIBIT 9

## COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT

**THIS COLLATERAL ASSIGNMENT, PLEDGE AND SECURITY AGREEMENT** (this "Assignment") is made as of March 11, 2020 by **KENNETH C. WARE**, an individual("Assignor") to and in favor of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company ("Lender" or "Secured Party").

### RECITALS

A.     Pursuant to that certain Loan Agreement (as amended, modified and restated from time to time, the "Loan Agreement"), dated as of even date with this Assignment, by and between Secured Party **NATIV DENVER LLC**, a Colorado limited liability company ("Company") and **KDA PROPERTIES LLC**, a Colorado limited liability company, Secured Party has agreed to make a loan (the "Loan") to Company in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), which Loan is evidenced by that certain Promissory Note (as amended, modified and restated from time to time, the "Note"), dated as of even date herewith, in the original principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00), made by the Company in favor of Secured Party.  In connection with the Loan, Amin Suliaman and Kenneth C. Ware have entered into that certain Guaranty of Payment dated as of even date herewith for the benefit of Secured Party (as amended, modified and restated from time to time, the "Guaranty").  The Note, the Guaranty, the Loan Agreement and the other documents securing the Loan, as amended, modified, restated and time to time, are herein together sometimes called the "Loan Documents."

B.     In order to secure the payment and performance of the indebtedness and obligations of Company under the Note, Assignor has agreed to assign and pledge to Secured Party, and grant Secured Party a first priority, properly perfected, valid and enforceable assignment of and security interest in, all of Assignor's ownership interests (as more particularly defined in Section 1.1, the "Ownership Interests") in the Company, on the terms and conditions set forth herein.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Assignor and Secured Party hereby agree as follows:

**1.     DEFINITIONS**

**1.1.     Definitions**.  All capitalized terms used in this Assignment, including, without limitation, the terms defined in the foregoing recitals, shall have the meanings set forth in this Assignment or, if said terms are not defined in this Assignment, shall have the meanings of the same defined terms set forth in the Loan Agreement, as the same may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time, which definitions are hereby incorporated in their entirety by this reference as though specifically set forth herein.  In addition, the following capitalized terms shall have the meaning hereinafter set forth:

"Admission Date" shall mean the date on which Secured Party is or shall be fully admitted as a member of the Company, and assumes and agrees to be bound by, in writing, the Governing

1

Agreements.

"Articles of Organization" shall mean that certain Articles of Organization of the Company filed with the Secretary of State of the State of Colorado, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof.

"Assignment" shall mean this Collateral Assignment, Pledge and Security Agreement, as the same may be amended, modified, extended, restated or replaced from time to time.

"Assignment Documents" shall mean, collectively, this Assignment, the Financing Statements and all other documents, certificates, affidavits and instruments now or hereafter evidencing, securing or relating in any way to any of the foregoing executed by Assignor, the payment of the indebtedness or the observance or performance of the obligations evidenced and/or secured thereby, as said documents may be amended, modified, extended, spread, consolidated, restated, increased or replaced from time to time.

"Bankruptcy Rights" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property, arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Code" shall mean the Uniform Commercial Code as enacted in the State of Colorado or Illinois, as applicable, and in each other jurisdiction having applicability to the perfection of the liens and security interests granted herein, as amended and/or re-enacted from time to time.

"Equity Distributions" shall mean collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership

2

Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Event of Default" shall mean the happening or occurrence of any event described in Section 5.1 hereof.

"Financing Statements" shall mean, individually and collectively, each and all of the UCC-1 Financing Statements executed, if necessary, and delivered by Assignor, as debtor therein, in favor of Secured Party, as secured creditor, pursuant to this Assignment, as the same may be amended, modified, extended, continued, restated or replaced from time to time in accordance with the Code.

"Governing Agreements" shall mean collectively (i) the Operating Agreement of the Company, as same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party to the extent required and (ii) the Articles of Organization of the Company.

"Governmental Authority" shall mean the United States of America, any State, any county, city or any other political subdivision, or any other political subdivision, agency or instrumentality exercising or claiming jurisdiction over Assignor or the Company.

"Indebtedness" shall mean any and all amounts owed by Amin Suliaman and Kenneth C. Ware to Secured Party pursuant to the Guaranty and the Loan Documents and/or any and all amounts owed by Company to Secured Party pursuant to the Note and the Loan Documents.

"Insolvency Proceeding" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally, and shall include: (a) any proceeding seeking to appoint or appointing a receiver or trustee for Company and/or its Legal Representatives (as defined in Section 7.4 of this Assignment), successors and assigns (collectively, the "**Borrower Parties**"); (b) any proceeding filed by or against any of the Borrower Parties under the Bankruptcy Code; (c) any assignment by any of the Borrower Parties of all or substantially all of their respective assets for the benefit of creditors; (d) any proceeding or other action wherein all or substantially all of any of the Borrower Parties' assets are attached, seized, subjected to a writ or distress warrant, or otherwise levied upon; and (e) any proceedings to set aside or avoid any transfer of an interest in property or obligations, whether denominated as a fraudulent conveyance, preferential transfer or otherwise, or to recover the value thereof or to charge, encumber or impose a lien thereon.

"Insolvent" shall have the meaning of the same terms under Sections 101(32) or 548 of the Bankruptcy Code.

"Legal Requirement" shall mean applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other written standard, requirement, policy or

3

procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority, including any judgment and all judicial decisions applying common law or interpreting any other Legal Requirement, in each case, as amended.

"Ownership Interests" shall mean collectively, whether now existing and hereafter arising or acquired: (a) forty-six percent (46%) of the current and future membership interests in the Company under the Governing Agreements, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

"Person" shall mean any person or entity, whether an individual, sole proprietorship, trust, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, institution, business association, firm, joint venture, Governmental Authority or otherwise.

"Secured Obligations" shall have the meaning set forth in Section 2.1.

"Securities Laws" shall mean, individually and collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, and any and all other laws, regulations, rules, orders and decrees of any governmental authorities governing the issuance, sale, marketing, exchange or disposition of securities, as any of the foregoing are amended from time to time.

"Transfer Power" shall have the meaning given in Section 2.4 of this Assignment.

**1.2.**   **Rules of Construction**.   Section captions used in this Assignment are for convenience only and shall not affect the construction of this Assignment. All references to "Sections," without reference to a document other than this Assignment, are intended to designate Sections of this Assignment, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Assignment as a whole and not to any particular Section, unless specifically designated otherwise. The use of the term "including" shall mean in all cases "including but not limited to," unless specifically designated otherwise. Pronouns of any gender shall include the other genders (including the neuter gender), and either the singular or plural shall include the other. No rules of construction against the drafter of this Assignment shall apply in any interpretation or enforcement of this Assignment, any documents or certificates executed pursuant thereto, or any provisions of any of the foregoing.

## 2.   ASSIGNMENT AND GRANT

**2.1.**   **Obligations Secured**.   This Assignment is made by Assignor in favor of Secured Party to secure irrevocable and unconditional payment and performance of the obligations, whether now existing or hereafter arising, by the Company under the Note and/or the Loan Documents and of Amin Suliaman and Kenneth C. Ware under the Guaranty and the Assignment Documents, including each and all of the representations, warranties, covenants, obligations, liabilities, indemnities and duties of the Company under the Note and Loan Documents (collectively, the "Secured Obligations").

4

**2.2.** **Assignment/Grant of Security Interest**. In order to secure the unconditional and irrevocable payment and performance of the Secured Obligations, Assignor does hereby unconditionally and irrevocably assign, convey, mortgage, pledge, hypothecate, transfer and set over to Secured Party, and does hereby grant to Secured Party, a properly perfected, valid and enforceable, assignment of and continuing security interest in the Ownership Interests. This Assignment is intended to be a security agreement under the Code with respect to all or any portion of the Ownership Interests and all products and cash and non-cash proceeds thereof to the full extent that, under applicable law, the Ownership Interests may be subject to a security interest under the Code, whether acquired as of the date of this Assignment or in the future.

**2.3.** **Financing Statements**. Assignor does hereby authorize Secured Party to file concurrently with the execution of this Assignment such UCC Financing Statements in such locations as are necessary, and to take all such other actions and make such further filings as Secured Party may request, in order to perfect Secured Party's continuing security interest in the Ownership Interests pursuant hereto. The Financing Statements shall be in form acceptable for filing in each jurisdiction in which the same are to be filed, shall comply in all respects with the Code and shall contain a description of "Collateral" that is substantially similar to the description set forth on attached **Exhibit B**. Assignor hereby agrees to pay all filing fees and other costs incurred in connection with the filing of such Financing Statements.

**2.4.** **Transfer Power and Certificate**. Contemporaneously with his execution of this Assignment, Assignor shall deliver to Secured Party the original transfer power (the "Transfer Power") substantially in the form of the attached **Exhibit C**, which Transfer Power shall be executed by such Assignor in blank and shall irrevocably sell, assign and transfer all of the Ownership Interests owned by Assignor, as a member of the Company. Secured Party shall be entitled to complete the Transfer Power at any time following the occurrence of an Event of Default in connection with its exercise of any of the remedies provided in Article 4 of this Assignment.

**2.5.** **Assignment to be Absolute**. Assignor expressly agrees that until the Indebtedness is paid and performed in full, and each and every term, covenant and condition of this Assignment is fully performed, Assignor shall not be released by or because of:

      (a)     Any act or event which might otherwise discharge, reduce, limit or modify Assignor's obligations under this Assignment;

      (b)     Any waiver, extension, modification, forbearance, delay or other act or omission of Secured Party, or its failure to proceed promptly or otherwise against Assignor or any security;

      (c)     Any action, omission or circumstance which might increase the likelihood that Assignor may be called upon to perform under this Assignment; or

      (d)     The existence of an Insolvency Proceeding and as a result thereof some or all of the Indebtedness being terminated, rejected, discharged, modified or abrogated.

Assignor hereby acknowledges that absent this Section 2.5, Assignor might have a defense to the enforcement of this Assignment as a result of one or more of the foregoing acts, omissions, agreements, waivers or matters. Assignor hereby expressly waives and surrenders any defense to

5

any liability under this Assignment based upon any of such acts, omissions, agreements, waivers or matters. It is the express intent of Assignor that Assignor's obligations under this Assignment are and shall be absolute, unconditional and irrevocable.

**2.6.** **Receipt of Equity Distributions/Exercise of Equity Rights.**

(a) **Generally.** Secured Party shall have the sole right and authority to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions until the Indebtedness shall have been paid in full and all obligations under the Loan Documents have been satisfied.

(b) **Bankruptcy Rights.** In the event Assignor is the subject of any Insolvency Proceeding which is not dismissed within the applicable cure period set forth in the Loan Documents, if any, and regardless of whether there has occurred an Event of Default, Secured Party shall have sole right and authority, to collect, receive and exercise all rights and enjoy all benefits arising from or as a result of the Ownership Interests and/or Assignor's status as an equity security holder in the Company, including receiving all Equity Distributions, exercising all Bankruptcy Rights, and exercising all other Equity Rights in such manner as Secured Party elects, in its sole and absolute discretion, and Secured Party shall have no obligation or liability whatsoever to Assignor on account of Secured Party's receipt of any Ownership Interests, Equity Distributions or exercise of, or failure to exercise, any Equity Rights or Bankruptcy Rights. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact, such appointment being coupled with an interest, with authority to exercise each and all of the Bankruptcy Rights in the place and stead of Assignor in such manner as Secured Party shall elect in its sole discretion. Further, Assignor hereby agrees that Secured Party shall have no liability whatsoever for exercising or failing to exercise any of the Bankruptcy Rights.

**2.7.** **No Assumption by Secured Party.** Notwithstanding any of the foregoing, irrespective of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, neither this Assignment, receipt by Secured Party of any Equity Distributions, exercise by Secured Party of any Equity Rights nor any exercise by Secured Party of any of its rights and remedies hereunder shall in any way obligate Secured Party to assume, or constitute or be deemed to constitute an assumption of, any of Assignor's obligations, duties, expenses or liabilities with respect to the Ownership Interests. Assignor acknowledges and agrees that it shall at all times remain liable for performance of all obligations, duties, expenses or liabilities with respect to the Ownership Interests, regardless of whether there has occurred an Event of Default and whether or not Secured Party shall have foreclosed or otherwise realized on the Ownership Interests, and that Secured Party shall in no event be liable therefor or deemed to have assumed the same.

**3.** **REPRESENTATIONS AND WARRANTIES**

Assignor hereby makes the following representations and warranties for the benefit of Secured Party, all of which representations and warranties shall be deemed to be continuing and continually remade until the full, unconditional and irrevocable payment and performance of all

Secured Obligations:

**3.1.    Organizational Status**.   The Company is a limited liability company, duly organized, validly existing and in good standing and qualified to conduct its business in the State of Colorado and in good standing and qualified to conduct its business in the State of Colorado and each other jurisdiction in which it does business.

**3.2.    Power and Authority; Residency**.   Assignor has full power and authority to enter into and perform this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and each and all of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Further, Assignor has, by all necessary action, validly authorized the execution, delivery and performance of this Assignment, each and all of the documents and certificates executed or to be executed and delivered by Assignor in connection herewith, each of the other Assignment Documents and the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof.   Assignor's principal place of residency is in the State of Colorado.

**3.3.    Assignment Binding**.   This Assignment, each of the documents and certificates executed and delivered, or to be executed and delivered, by Assignor are, or will be when executed and delivered, the legal, valid and binding obligations of Assignor, enforceable against it in accordance with the terms hereof and thereof.   The Consent of the Company attached to this Assignment (the "Company Consent") is, or will be when executed and delivered, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and the terms of this Assignment.

**3.4.    Actions Against the Company**.   Assignor has no knowledge of any action, proceeding or Insolvency Proceeding pending or threatened against the Company that would affect or impair the agreements made by Company in the Company Consent.

**3.5.    Approvals**.   Neither the execution nor delivery of this Assignment, the documents and certificates to be executed and delivered in connection herewith, the other Assignment Documents, nor the consummation or performance of the transactions contemplated hereby or thereby, require the consent or approval of any Governmental Authority or any other Person other than the Company.

**3.6.    No Duress**.   This Assignment is made voluntarily without any duress or undue influence of any kind.

**3.7.    No Violation of Laws, etc**.   Neither this Assignment, any of the other documents or certificates to be executed in connection herewith or any of the other Assignment Documents or transactions contemplated thereby violate or are in contravention of: (a) the Governing Agreements; (b) to the knowledge of Assignor, any Legal Requirements applicable to Assignor or any of the assets of Assignor; or (c) to the knowledge of Assignor, any other mortgage, pledge, indenture, lease, security agreement or other agreement to which Assignor is a party.

**3.8.    Solvency; No Fraudulent Conveyance**.   Assignor represents and warrants that it is not Insolvent and will not become Insolvent as a result of entering into this Assignment or the

7

transactions contemplated hereby; that this Assignment is not being made by Assignor with any intent to hinder, delay or defraud any creditors to which Assignor is or may hereafter become indebted; that Assignor is not engaged in business or any transactions, including the transactions contemplated hereunder, or is about to engage in any business or any transactions, for which any of his remaining property is unreasonably small capital; and that he does not intend to incur or believe that he will incur, debts that would be beyond his ability to pay as such debts mature. Assignor acknowledges that he is receiving new, fair, reasonably equivalent value in exchange for this Assignment and the transactions contemplated hereby, and affirmatively represents that neither his entry into this Assignment nor the consummation of the transactions contemplated hereby constitutes a fraudulent conveyance or preferential transfer under the Bankruptcy Code or any other federal, state or local laws affecting the rights of creditors generally.

**3.9.** __Ownership of Ownership Interests__.  Assignor is the legal, record and beneficial owner of, and has good and marketable title to, the Ownership Interests, as the same are set forth on **Exhibit A** attached hereto, subject to no lien or encumbrance other than the lien and security interest created hereby. Assignor is the sole legal, record and beneficial owner of, and has good and marketable title to, forty-six percent (46%) of all of the Ownership Interests in and to the Company. Except for the assignment to Secured Party pursuant hereto, there has been no prior Transfer (as defined in Section 4.1) of any of the Ownership Interests.

**3.10.** __No Certificates__.  The Ownership Interests are evidenced and represented by the Operating Agreement of the Company and the books and records of the Company for purposes of registering the ownership of Ownership Interests.  No certificates have been issued and/or are outstanding with regard to the Ownership Interests.  No certificates may be issued by the Company without Secured Party's prior written consent.

**3.11.** __Security Interest/Place of Business__.  Upon the execution and delivery hereof and the filing of the Financing Statements in the locations shown on the attached **Exhibit B**, this Assignment will create in favor of Secured Party a valid and enforceable, properly perfected lien on all of the Ownership Interests, subject to no lien or other encumbrance other than as created hereby. Further, the lien and security interest granted to Secured Party pursuant hereto shall at all times be and remain a properly perfected, valid and enforceable lien on the Ownership Interests subject to no other lien.

**3.12.** __Governing Agreements__.  Assignor is not in default of any of its obligations under the Governing Agreements; Assignor has delivered to Secured Party a true, correct and complete copy of the Governing Agreements (including all amendments thereto) and all other agreements, if any, governing the operation or affairs of the Company; and the Governing Agreements are in full force and effect in accordance with their terms.

**4.**     **COVENANTS**

Until such time as the Secured Obligations are fully, unconditionally and irrevocably paid and performed in full, Assignor hereby covenant and agree as follows:

**4.1.** __No Assignment__.  There shall be no conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance, charge or alienation (or any agreement

8

to do any of the foregoing) of, in or to any of the Ownership Interests, whether directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise ("Transfer"), without the prior written consent of Secured Party, which consent may be granted, conditioned or withheld in Secured Party's sole discretion. Assignor hereby acknowledges and agrees that no Transfer of any of the Ownership Interests, whether or not consented to by Secured Party (no consent to any such sale, assignment, pledge, hypothecation, conveyance or other transfer being implied hereby) shall be effective unless and until such transferee or successor executes, delivers, files and records, as applicable, an assumption agreement, in the form and content satisfactory to Secured Party, in its sole discretion, agreeing to assign the Ownership Interests to be transferred in accordance with the provisions of this Assignment and assume, be bound by and to comply with and join in the terms and conditions of this Assignment and the Financing Statements, and further takes such other actions and delivers such other documents, instruments and certificates as Secured Party may request for purposes of preserving, maintaining, continuing and perfecting the valid and enforceable, lien and security interest created hereby in such Ownership Interests. Further, Assignor hereby covenants and agrees that it will not consent to the admission of any new or substitute member in the Company unless the foregoing conditions have been fully satisfied. Assignor hereby covenants and agrees that any attempted Transfer of any Ownership Interest not in accordance with the foregoing shall be ineffective and deemed null and void, ab initio.

**4.2.** **Company Books and Records**.  Assignor shall take, or cause to be taken, all such actions as are necessary to cause the Company and Assignor to mark their respective books and records with a notation that Assignor has assigned and pledged its Ownership Interests to Secured Party pursuant hereto and to keep as a part of such books and records a fully signed copy of this Assignment and each of the other Assignment Documents.

**4.3.** **Compliance with Securities Laws**.  Assignor shall take all such actions as are necessary, and shall cause the Company, to comply in all respects with all applicable Securities Laws.

**4.4.** **No Consent to Reorganization, etc**.  Assignor shall not consent to any dissolution, consolidation, merger, transfer, reorganization, reclassification or other similar action by the Company without the express written consent of Secured Party, which consent may be withheld, conditioned or delayed in Secured Party's sole and absolute discretion.

**4.5.** **Protection of Ownership Interests**.  Assignor will protect and defend Secured Party's right, title, claim of possession, lien and security interest in and to the Ownership Interests against the claims and demands of all Persons whomsoever. Further, Assignor shall pay and discharge as and when due all liens, claims, charges, taxes, other governmental charges and contractual obligations that may affect his Ownership Interests or any portion thereof

**4.6.** **Performance under Governing Agreements**.  Assignor shall fully and timely perform each and all of his obligations under the Governing Agreements in accordance with the terms thereof, and shall provide Secured Party with written notice of any default by Assignor under the Governing Agreements promptly upon the occurrence of such default. This Section 4.6 shall be deemed to amend and modify the Governing Agreements to provide that the Ownership Interests in the Company constitute securities subject to the provisions of Article 8 of the Code to designate Secured Party as a "protected purchaser" pursuant to Section 8-303 of the Code.

Assignor covenants and agrees that, until such time as the Indebtedness is paid in full, Assignor will not amend any of the Governing Agreements to "opt out" of Article 8 or to indicate that the Ownership Interests in the Company are not securities subject to the provisions of said Article 8.

**4.7.** **Notice of Default**. Assignor shall notify Secured Party of the existence of any Event of Default, or any event or condition which with the giving of notice, the passages of time or both could reasonably constitute an Event of Default, promptly upon obtaining knowledge of the existence thereof

**4.8.** **Change of Address**. No later than thirty (30) days prior to any change in address or principal place of business, as applicable, by Assignor from the address or principal place of business set forth on **Exhibit A** attached hereto, Assignor shall notify Secured Party in writing of such change in address or principal place of business, as applicable, and include in such notice the full and complete new address and principal place of business for Assignor.

**4.9.** **No Joint Venture**. Assignor hereby covenants and agrees that, until the Admission Date, neither Assignor nor any Person claiming by, through or under any of them, will assert or make a claim against Secured Party that Secured Party is a shareholder, member, member, insider or joint venturer of the Company or Assignor. Assignor hereby agrees to indemnify, defend and hold Secured Party harmless from and against any and all claims, demands, losses, costs (including reasonable attorneys' fees, whether incurred in connection with nonjudicial action, prior to trial, at trial or on appeal or review, including in any Insolvency Proceeding), damages (including special and consequential) and expenses incurred or suffered by Secured Party as a result of any assertion by the Company or Assignor, either directly or indirectly, or any Person claiming by, through or under any of them, or if Assignor assists any Person in asserting, that Secured Party was at any time a shareholder, member, partner, insider or joint venturer of the Company or Assignor prior to the Admission Date by virtue of this Assignment, the transactions contemplated thereby or otherwise.

**4.10.** **Delivery of Certificates**. Assignor hereby agrees: (a) to deliver to Secured Party, immediately upon receipt thereof, any and all instruments, certificates or other documents, whether now or hereafter existing, evidencing any of the Ownership Interests; and (b) to execute and deliver a notice of Secured Party's first priority, perfected, exclusive and continuing security interest in the Ownership Interests (which notice shall be in form and substance satisfactory to Secured Party and may require an acknowledgement from the addressee), to any third party which now has or may have the ability under applicable law or the terms of any agreement to record transfers of, or to transfer, any of the Ownership Interests (whether at the discretion of the Assignor or otherwise). Assignor hereby irrevocably and unconditionally appoints Secured Party as Assignor's attorney-in-fact with authority at any time or times from and after an Event of Default to take any of the foregoing actions on behalf of Assignor, such appointment being coupled with an interest.

**5.** **DEFAULTS/REMEDIES**

**5.1.** **Events of Default**. The occurrence at any time of any of the following events, shall constitute an "Event of Default" hereunder:

(a)      if any of the Equity Distributions are collected, received, handled, applied and disbursed other than strictly in accordance with the terms of this Assignment;

(b)      if there occurs any default in the due observance or performance of any of non-monetary or other covenants or obligations in this Assignment (except as may be otherwise specified herein) or breach in any material respect of any representation or warranty set forth herein, and the same is not cured within ten (10) days after the giving of written notice by Secured Party;

(c)      this Assignment and the Transfer Power shall cease to be an exclusive valid and enforceable, properly perfected lien upon and security interest in the Ownership Interests, or shall fail to give Secured Party the benefit of the liens, security interests, rights, powers and benefits created thereby in accordance with the terms hereof;

(d)      there occurs an event of insolvency with respect to Assignor or Assignor is the subject of an Insolvency Proceeding (except that involuntary bankruptcy filings may be vacated or withdrawn within fifteen (15) days prior to being deemed an Event of Default); and/or

(e)      the occurrence of an Event of Default or Default under the Loan Documents, it being expressly understood that the term "Event of Default" or "Default" as used herein shall have each and all of the meanings assigned thereto in Loan Documents, all of which are hereby incorporated into this Assignment by this reference.

**5.2.**    **Remedies**.  Upon the occurrence of an Event of Default, Secured Party shall have the right, at its sole option, to exercise from time to time any or all of the rights and remedies provided for herein, in the other Assignment Documents, at law or in equity, including the following:

(a)      the rights and remedies of a secured creditor under the Code;

(b)      the right to receive directly any and all amounts payable in respect of the Ownership Interests, including all Equity Distributions, and the right to exercise all Equity Rights;

(c)      the right to sell (or resell in the event of a default under any sale) all or any portion of the Ownership Interests, at any public or private sale on such terms and conditions as Secured Party deems appropriate and as may be otherwise required under the Code or applicable law in accordance with this Assignment, and Assignor shall cooperate and cause the Company to cooperate with Secured Party and shall execute and deliver all documents and take any and all actions as may be necessary or requested by Secured Party to assign all of the Ownership Interests to Secured Party or any designee and/or to any purchaser of the Ownership Interests at such sale, to admit Secured Party or any designee and/or any such purchaser as a member of the Company, and comply with all Securities Laws in connection therewith;

(d)      recover from Assignor any and all losses, damages (of whatsoever kind or nature), costs (including reasonable attorneys' fees) and expenses suffered or incurred by Secured Party as a result of any default or Event of Default, and Assignor hereby agrees to indemnify Secured Party for the same;

11

(e)     seek specific performance of, including declaratory and injunctive relief to enforce, the terms and provisions of this Assignment and the other Assignment Documents;

(f)     exercise any and all other rights and remedies which may be available against Assignor, the Company or any other Person under this Assignment, any of the other Assignment Documents and/or otherwise afforded by law or in equity, subject to the applicable limitations on liability set forth in the Assignment Documents; and

(g)     apply to any court having jurisdiction for the appointment of a receiver for the Ownership Interests to take any or all of the actions set forth in this Section and if Secured Party elects to seek the appointment of a receiver at any time after an Event of Default has occurred and is continuing, Assignor and the Company, by their execution of this Assignment, expressly consent to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law; and immediately upon appointment of a receiver, Assignor shall surrender possession of the Ownership Interests to the receiver, and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Ownership Interests.

**5.3.    Sales**.  The following shall apply to any sale(s) (or resale(s)) of the Ownership Interests conducted by Secured Party pursuant to this Assignment.

(a)     **Restrictions Permitted**. Secured Party may restrict the number of potential bidders and purchasers in any such sale(s) and also may impose in any sale(s) such restrictions as Secured Party deems necessary or appropriate in order to cause such sales(s) to comply with all applicable laws, including Securities Laws. Such restrictions may include, without limitation, restricting purchasers and bidders to those who will represent and agree that they are purchasing the Ownership Interests for their own account, for investment purposes only, and not with a view to the distribution or resale of the Ownership Interests.

(b)     **Private Sales**.  Assignor hereby acknowledges and agrees that, notwithstanding that a higher price may be obtained at a public sale of the Ownership Interests rather than a private sale thereof, a public sale of the Ownership Interests may be subject to registration requirements under Securities Laws and similar other legal restrictions which would make a public sale of the Ownership Interests impractical. Accordingly, Assignor hereby agrees that Secured Party shall be entitled to sell the Ownership Interests at a private sale on such terms and conditions as Secured Party deems acceptable and are otherwise commercially reasonable. Secured Party shall have no obligation to conduct a public sale of the Ownership Interests. Assignor hereby waives, to the fullest extent permitted by applicable, law, any right to require that the Ownership Interests be sold at a public sale and any claims that Assignor may have against Secured Party arising by reason of the fact that the price at which the Ownership Interests, or any part thereof may have been sold at a private sale was less than the price obtainable at a public sale.

(c)     **No Obligation to Sell/Notice**. Secured Party shall not be obligated to make any sale(s) of the Ownership Interests regardless of any notice of sale having been given, and Secured Party may adjourn any public or private sale from time to time and such sale may be made at the time and place to which it was adjourned. Assignor hereby agrees that to the extent notice of any such sale is required under the Code (notwithstanding the waiver thereof set forth herein),

a period of ten (10) days from the time the notice is sent shall be a reasonable period of notification of a sale or other disposition of Ownership Interests by Secured Party.

(d) **No Liability**. Secured Party shall have no liability as a result of the manner or terms of sale of the Ownership Interests, or any part thereof, at a public or private sale conducted in a manner and on terms that are commercially reasonable. All sales conducted by Secured Party shall be deemed to be commercially reasonable and, in any dispute as to the same, it shall be Assignor's burden to prove that the manner or terms of such sale were not commercially reasonable.

(e) **Consummation of Sale**. Any sale of, or other realization upon, any of the Ownership Interests shall operate to divest all of Assignor's right, title, interest, claim and demand, either at law or in equity, in and to the Ownership Interests and each and every portion thereof, and each purchaser at any sale of the Ownership Interests shall hold the Ownership Interests so sold absolutely free from any claim or right of Assignor whatsoever, including any right of redemption, which right has been waived pursuant to this Assignment. Further, after any sale(s) of the Ownership Interests, Assignor hereby agrees to take such actions and execute such documents as may be necessary or appropriate to transfer the Ownership Interests to the purchaser and substitute such purchaser as a member in the Company, including executing and delivering any necessary transfer documents and amendments to the Governing Agreements as may be required. Assignor hereby irrevocably and unconditionally appoints Secured Party as its attorney-in-fact to take such actions and execute such documents, such appointment being coupled with an interest. No purchaser shall be obligated to assume or perform any obligations under the Governing Agreements except for the period from and after such purchaser's admission as a member and then only after all actions necessary to effect its admission as a member have been consummated.

5.4. **Waiver of Rights by Assignor**. Assignor, on behalf of itself and any Persons claiming by, through or under Assignor, hereby knowingly, intentionally and voluntarily waives: (a) presentment, demand, protest or any notice of any kind in connection with this Assignment; (b) notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof; (c) all claims, demands, liabilities and damages occasioned by such taking of possession or disposition; (d) all other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder; and (e) all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof.

5.5. **Rights Continuing**. The rights and powers of Secured Party hereunder shall continue and remain in full force and effect until all Secured Obligations have been irrevocably and unconditionally paid and performed in full, and shall continue after sale of the Ownership Interests until expiration of any right of redemption, notwithstanding sale of the Ownership Interests to a purchaser other than Secured Party. Further, Assignor hereby acknowledges and agrees that Secured Party shall not be required to exercise its rights against any Person other than Assignor that is liable for all or any portion of the Secured Obligations or against any collateral for the Secured Obligations other than the Ownership Interests prior to exercising its rights and remedies against Assignor and the Ownership Interests pursuant hereto. Without affecting the

liability of Assignor for payment and performance of the Secured Obligations and without affecting Secured Party's lien and security interests in the Ownership Interests created hereby, Secured Party may release, at any time and from time to time, any Person liable for, or any security or other collateral for, the Secured Obligations.

     **5.6.**   **Expenses of Default**.  Assignor agrees to pay on demand the amount of all costs and expenses incurred by Secured Party in protecting and realizing on its interest in the Ownership Interests, and further agrees that if this Assignment is referred to an attorney for protecting or defending the priority of Secured Party's interest in or lien on the Ownership Interests or for collecting or realizing thereon, Assignor shall pay upon demand all of Secured Party's expenses, including reasonable attorneys' fees and costs (whether incurred in connection with non-judicial action, prior to trial, at trial, or on appeal or review, including in any Insolvency Proceeding), other professional fees and costs, and expenses of title search and all court costs and costs of public officials. Assignor hereby further agrees that his obligation to pay such amounts shall be secured hereby and constitute a part of the Secured Obligations.

     **5.7.**   **No Waiver**.  The exercise by Secured Party of any one right or remedy hereunder, under any of the other Assignment Documents, or the other Loan Documents, or any other guaranty, at law or in equity shall not be a waiver of Secured Party's right to exercise at the same time or thereafter any other right or remedy, and no delay in exercising or failing to exercise any rights or remedies of Secured Party hereunder, under any of the other Assignment Documents or any of the other Loan Documents, at law or in equity, following any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, in any one or more instances, or acceptance by Secured Party of partial payments or partial performance, shall constitute, or be deemed to constitute, a waiver of any such Event of Default, a waiver of the right to exercise any such rights or remedies at any time thereafter or upon the occurrence of any subsequent Event of Default, or a release, satisfaction or discharge of the terms hereof, of any of the other Assignment Documents or other Loan Documents, all such rights, remedies, terms and documents remaining continuously in force. Any waiver or release by Secured Party of any Event of Default, or any event which, with the giving of notice or the passage of time or both would constitute an Event of Default, or any waiver of rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity (no obligation or agreement to waive or release or discharge any of the foregoing being implied hereby), may be effected only through a written document executed by Secured Party and then only to the extent of any waiver, release, discharge or satisfaction specifically set forth therein. A waiver or release in connection with any one event or any particular right or remedy shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, subsequent event or as a bar to any subsequent exercise of Secured Party's rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity. Secured Party shall not be required to give notice of the exercise of these rights or remedies hereunder, under any of the other Assignment Documents, or the other Loan Documents, at law or in equity, all such notice having been waived by the Assignor pursuant hereto.

     **5.8.**   **Remedies Cumulative**.  The remedies of Secured Party provided for herein, in any of the other Assignment Documents or any of the other Loan Documents, at law or in equity upon the occurrence of an Event of Default shall be cumulative and concurrent, and may be pursued

singularly, successively or together, at the sole discretion of Secured Party, and may be exercised as often as occasion therefor shall arise, as determined by Secured Party in its sole discretion.

**5.9.** **Revival and Reinstatement**. If Secured Party is required to pay, return or restore to Assignor or any other person any amounts previously paid on the Indebtedness because of any Insolvency Proceeding of Assignor, any stop notice or any other reason, the obligations of Assignor shall be reinstated and revived and the rights of Secured Party shall continue with regard to such amounts, all as though they had never been paid, and this Assignment shall continue to be effective or be reinstated, as the case may be.

## 6. RIGHTS OF LENDER; WAIVERS

**6.1.** **Rights of Lender**. Assignor authorizes Secured Party to perform any or all of the following acts at any time in its sole discretion, all without notice to Assignor and without affecting Secured Party's rights or Assignor's obligations under this Assignment:

(a) Secured Party may alter any terms of the Note, the or the other Loan Documents, including renewing, compromising, modifying, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Indebtedness or any part of it;

(b) Secured Party may take and hold security for the Indebtedness, accept additional or substitute security for the Indebtedness, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security;

(c) Secured Party may direct the order and manner of any sale of all or any part of any security now or later to be held for the Indebtedness, and Secured Party may also bid at any such sale and may apply all or any part of the Indebtedness against the amount so bid;

(d) Secured Party may apply any payments or recoveries from Assignor or any other source, and any proceeds of any security, to the Indebtedness in any manner, order and priority as Secured Party may elect, whether that obligation is secured by this Assignment or not at the time of the application;

(e) Secured Party may substitute, add or release any one or more makers, Assignor, Amin Suliaman, Kenneth C. Ware, any other guarantors or endorsers; and

(f) In addition to the Note, Secured Party may extend other credit to Assignor, and may take and hold security for the credit so extended, whether or not such security is also security for the Indebtedness, all without affecting Secured Party's rights or Assignor's liability under this Assignment.

**6.2.** **Assignor's Waivers**. Assignor waives:

(a) All statutes of limitations as a defense to any action or proceeding brought against Assignor by Secured Party, to the fullest extent permitted by law;

(b)     Any right Assignor may have to require Secured Party to proceed against any other party, proceed against or exhaust any security held from any other party, or pursue any other remedy in Secured Party's power to pursue;

(c)     To the extent permitted by applicable law, all rights, if any, of redemption, appraisement, valuation, marshalling, stay, execution or moratorium now or hereafter in force under applicable law in order to prevent or delay the enforcement of this Assignment or any of the other Assignment Documents or the absolute sale of the Ownership Interests or any portion thereof;

(d)     Any defense based on any claim that Assignor's obligations exceed or are more burdensome than those of the Company;

(e)     Any defense based on: (i) any legal disability of Assignor or the Company, (ii) any release, discharge, modification, impairment or limitation of the liability of Assignor or the Company to Secured Party from any cause, whether consented to by Secured Party or arising by operation of law or from any Insolvency Proceeding and (iii) any rejection, disallowance or disaffirmance of the Indebtedness, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(f)     Any defense based on any action taken or omitted by Secured Party in any Insolvency Proceeding involving Assignor or the Company, including, without limitation, filing, defending, settling or obtaining a judgment or order on any proof of claim or any adversary proceeding, making any election to have Secured Party's claim allowed as being secured, partially secured or unsecured, including any election under 11 U.S.C. Section 1111(b), seeking relief from the automatic stay or adequate protection, including submitting an appraisal of any security, voting to reject or accept or failing to vote on any reorganization plan, making any extension of credit by Secured Party to Assignor or the Company in any Insolvency Proceeding, and the taking and holding by Secured Party of any security for any such extension of credit, whether or not such security is also security for the Indebtedness;

(g)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Assignment and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind;

(h)     Any defense based on or arising out of any defense that the Company or Assignor may have to the payment or performance of the Indebtedness or any part of it;

(i)     Notice in connection with Secured Party's taking possession or disposing of all of any part of the Ownership Interests, including notice of any sale (or resale) thereof;

(j)     All claims, demands, liabilities and damages occasioned by such taking of possession or disposition; and

(k)     All other requirements as to the times, place and terms of sale and other requirements with respect to Secured Party's enforcement of its rights hereunder.

### 6.3.   Waivers of Subrogation and Other Rights and Defenses.

(a)   The obligations of Assignor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought against Assignor, regardless of whether action or suit is brought against the Company, or whether Assignor or the Company are joined in any such action or actions. At the option of Secured Party, Assignor may be joined in any action or proceeding commenced by Secured Party against the Company in connection with or based on the Indebtedness or any security for such obligation, and recovery may be had against Assignor in such action or proceeding without any requirement that Secured Party first assert, prosecute or exhaust any remedy or claim against the Company.

(b)   Upon a default by Assignor, Secured Party in its sole discretion, without prior notice to or consent of Assignor, may elect to: (i) foreclose either judicially or nonjudicially against any real or personal property security that Secured Party may hold for the Indebtedness other than the Ownership Interests hereby encumbered, (ii) accept a transfer of any such security in lieu of foreclosure, (iii) compromise or adjust the Indebtedness or any part of it or make any other accommodation with Assignor or the Company, or (iv) exercise any other remedy against Assignor or the Company or any security other than the Ownership Interests hereby encumbered. With respect to security other than the Ownership Interests hereby encumbered, no such action by Secured Party shall release or limit the liability of Assignor, who shall remain liable under this Assignment after the action, even if the effect of the action is to deprive Assignor of any subrogation rights, rights of indemnity, rights of contribution, or other rights to collect reimbursement from the Company or any other Person for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law or otherwise. After any foreclosure or deed in lieu of foreclosure of any real or personal property pledged to secure the Indebtedness, Assignor shall under no circumstances be deemed to have any right, title, interest or claim in or to such property, whether it is held by Secured Party or any third party.

(c)   Regardless of whether Secured Party may have recovered against Assignor, Assignor hereby waives: (i) all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement or contribution from the Company or any other party for any recovery by Secured Party against Assignor, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute) or otherwise (collectively, "Reimbursement Rights"), (ii) all rights to enforce any remedy that Secured Party may have against the Company, and (iii) all rights to participate in any security now or later to be held by Secured Party for the Indebtedness. To the extent Assignor's waiver of Reimbursement Rights is found by a court of competent jurisdiction to be void or voidable for any reason, any Reimbursement Rights Assignor may have against the Company or any collateral or security shall be junior and subordinate to any rights Secured Party may have against the Company and to all right, title and interest Secured Party may have in any such collateral or security. If any amount should be paid to Assignor on account of any Reimbursement Rights at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for Secured Party and shall immediately be paid over to Secured Party to be credited and applied against the Indebtedness, whether matured or unmatured, in accordance with the terms of the Guaranty. The covenants and waivers of Assignor set forth in this Section 6.3(c) shall be effective until the Indebtedness has been paid and performed in full and are made solely for the benefit of Secured Party.

(d)      No provision or waiver in this Assignment shall be construed as limiting the generality of any other provision or waiver contained in this Assignment.

## 7.      MISCELLANEOUS

**7.1.      No Limitation of Liability**.  Assignor acknowledges that Secured Party has agreed to make the Loan in reliance upon Assignor's representations, warranties and covenants in this Assignment, all of which shall be deemed continuing and continually remade at all times. It is the intention of Assignor and Secured Party that the provisions of this Assignment shall be controlling over any provisions in the Note or the Guaranty which in any way limit the personal liability of Assignor, Amin Suliaman, Kenneth C. Ware, the Company, any of the Borrower Parties or any other Person, and that Assignor shall be personally liable for any and all of the obligations arising under this Assignment, even if the amount of liability incurred exceeds the amount of the Note.

**7.2.      Notices**.  Notices under this Assignment shall be provided in the manner provided in the Loan Agreement, including that any party may change its address for notices hereunder by written notice to the other parties given in accordance with provisions of the Loan Agreement.

**7.3.      Agent for Service of Process**.  As a further inducement to Secured Party to make the Loan and in consideration thereof, Assignor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the foregoing Section 7.2, Assignor hereby waiving personal service thereof, and Assignor agrees that within thirty (30) days after such mailing, it shall appear or answer to any summons and complaint or other process, and should it fail to appear or answer within said thirty-day period, it shall be deemed in default in any summons and complaint or other process so served.

**7.4.      Damage Lawsuit, Consent to Jurisdiction**.  The sole and exclusive remedy of Assignor for any and all adverse claims against Secured Party is a Damage Lawsuit (hereinafter defined). Assignor hereby represents and warrants to Secured Party that as of the date hereof no such adverse claims exist against Secured Party. Any such Damage Lawsuit, regardless of the procedural form in which it is alleged, will be severed from any enforcement by Secured Party of its legal, equitable and contractual rights, and the Damage Lawsuit cannot be asserted by Assignor as a defense, set-off, recoupment, or grounds for delay, stay, subordination or injunction against any enforcement by Secured Party of its legal, equitable and contractual rights under the Loan Documents, the Guaranty or otherwise. It is understood and agreed that the designated, exclusive and proper venue of any legal dispute, question or interpretation, claim, declaratory judgment action, bankruptcy or other litigation regarding: (a) any proceeding under the Bankruptcy Code brought by or against Assignor; (b) the enforcement of Secured Party's rights under or relating in any way to the Loan, the Note, or the other Loan Documents; (c) the prosecution of any Damage Lawsuit alleged against Secured Party by any of the Affiliated Parties; and (d) any other matter regarding this Assignment or the Guaranty or any of the other Loan Documents shall be exclusively and solely decided by the federal court in the State of Illinois or state circuit or district courts sitting in the State of Illinois (provided, that, in the event actions or proceedings are required to be litigated in the jurisdiction of the situs of the Property, then such actions or proceedings shall be litigated in the courts of the State of Colorado sitting in Denver County); and Assignor hereby consents to the exercise or personal jurisdiction over Assignor by, and consents to the laying of venue in, and exclusive jurisdiction of, such courts. As used herein, the term "Affiliated Parties"

shall mean individually and collectively, Assignor and all of his Legal Representatives, successors and assigns; the term "Damage Lawsuit" shall mean an action for monetary damages; and the term "Legal Representatives" shall mean any trustee, receiver, custodian and/or any other person appointed or authorized to act in a representative capacity by a court or governmental entity, whether appointed pursuant to the Bankruptcy Code or otherwise.

**7.5.** **No Third-Party Beneficiary**. The provisions of this Assignment are solely for the benefit of Secured Party and its successors and assigns. No provision of this Assignment or of the Loan Documents shall be construed as creating in any party other than the Company, Assignor and Secured Party, and their successors and assigns, any rights of any nature whatsoever.

**7.6.** **Further Assurances**. Upon request by Secured Party, Assignor, at his sole cost and expense, at any time and from time to time, shall, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, mortgages, security agreements, financing statements and other documents and assurances as Secured Party shall request to protect and preserve the security for the Loan, the priority of the liens created by this Assignment, or Assignor's performance of his obligations hereunder, or for the better assuring, conveying, mortgaging, assigning and confirming unto Secured Party all property subject to the lien of or a security interest provided for in the Loan Documents or property intended so to be, whether now owned by the Company or Assignor, or hereafter acquired. Such acts or assurances shall include, without limitation, recordation of such documents and instruments, at Assignor's sole cost and expense, as Secured Party may request.

**7.7.** **Secured Party's Right to Assign**. Secured Party shall have the right any time and from time to time, in accordance with any applicable provisions of the Loan Documents, to sell, assign, participate, pledge, transfer, securitize, syndicate, or otherwise dispose of the Loan, the Note, the Guaranty, or any of the other Loan Documents, or any interests therein and/or the Secured Obligations. From and after the date of any such sale, assignment, participation, pledge, transfer, securitization, syndication or other disposition, such transferee shall be entitled to exercise any and all rights and remedies of Secured Party hereunder as fully and with the same force and effect as if such transferee had been named the Secured Party hereunder. Assignor shall not assign, convey or otherwise transfer any of his rights and obligations hereunder.

**7.8.** **Successors and Assigns**. Subject to the provisions of Section 4.1, all of the terms, covenants and conditions contained herein shall apply and be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and permitted assigns of Assignor and Secured Party, respectively, and all Persons claiming by, under or through them.

**7.9.** **Severability**. If any provision in this Assignment is found by a court of competent jurisdiction to be in violation of any applicable law, and if such court should declare such provision of this Assignment to be unlawful, void, illegal or unenforceable in any respect, the remainder of this Assignment shall be construed as if such unlawful, void, illegal or unenforceable provision were not contained therein, and the rights, obligations and interests of the parties hereto under the remainder of this Assignment shall continue in full force and effect undisturbed and unmodified in any way.

**7.10.** __Modification__. This Assignment and the terms hereof may not be changed, waived, modified, canceled, discharged or terminated orally, but only by an instrument or instruments in writing signed by Assignor and Secured Party.

**7.11.** __GOVERNING LAW__. THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF.

**7.12.** __Incorporation of Recitals/Exhibits__. The recitals set forth at the beginning of this Assignment are true and correct in all respects and are hereby incorporated in their entirety by this reference. The exhibits attached hereto are hereby incorporated in their entirety by this reference.

**7.13.** __WAIVER OF TRIAL BY JURY__. ASSIGNOR, FOR HIMSELF AND ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER HIM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS HE MAY HAVE TO TRIAL BY JURY IN ANY LITIGATION OR ACTION BROUGHT ON, UNDER OR BY VIRTUE OR RELATING IN ANY WAY TO THIS ASSIGNMENT, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO. THIS WAIVER MAY BE FILED WITH THE CLERK OR JUDGE OF ANY COURT AS A WRITTEN CONSENT TO WAIVER OF JURY TRIAL. ASSIGNOR ACKNOWLEDGES THAT HE HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR SECURED PARTY'S ENTERING INTO THE LOAN. THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE INDEBTEDNESS.

**7.14.** __Joint and Several Liability__. The obligations of Assignor and any and all other Borrowing Parties that may be liable hereunder are joint and several.

**7.15.** __Time is of the Essence__. TIME IS OF THE ESSENCE under this Assignment and each and every provision hereof and thereof.

**7.16.** __Effective Date__. The effective date of this Assignment shall be the date on the first page hereof and thereof, respectively, notwithstanding the fact that this Assignment may have been executed on a date prior or subsequent thereto.

**7.17.** __Counterparts__. This Assignment may be executed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute but one original. This Assignment shall not be effective unless and until executed and delivered by each of the named Assignor and Secured Party in one or more counterparts. Facsimile signatures hereon shall be treated the same as and provided the same legal significance as original signatures hereon.

**7.18.** __Counsel__. Assignor acknowledges that he has had adequate opportunity to carefully read this Assignment and to consult with an attorney of such Assignor's choice prior to signing it.

**7.19.** __Integration__. No course of prior dealing, usage of trade, parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof. This Assignment is intended by the parties to be a fully integrated and final expression of their agreement. This

Assignment, the Note, the Guaranty and the other documents securing the Note incorporate all negotiations of the parties and constitute the parties' entire agreement. Assignor represents that it is relying on no written or oral agreement, representation, warranty or understanding, of any kind made by Secured Party or any employee, attorney or agent of Secured Party except for the agreements of Secured Party set forth herein.

**7.20.   <u>Amendment to Governing Agreements</u>.**

(a)   Assignor hereby acknowledges and agrees that notwithstanding any provisions of the Governing Agreements to the contrary, Assignor:

(i)   consents to this Assignment, including the pledge and assignment of the Ownership Interests and all other benefits to which the holders of such Ownership Interests may be entitled pursuant to the terms of the Governing Agreements, and Secured Party's exercise and enforcement of any of its rights and remedies hereunder or otherwise afforded by law or in equity;

(ii)   consents to the absolute and unconditional transfer and assignment of the Ownership Interests and all other benefits to which the holders of such interests may be entitled pursuant to the terms of this Assignment, the Note, the Guaranty and the other Loan Documents, and Secured Party's exercise and enforcement of its rights and remedies hereunder or otherwise afforded by law or in equity;

(iii)   agrees that transfers of the Ownership Interests and all other benefits to Secured Party hereunder and upon the exercise of any rights and remedies by Secured Party, including one or more sales of the Ownership Interests to Secured Party, its designee and any other purchasers pursuant to this Assignment or any other exercise of Secured Party's rights and remedies, shall be deemed permissible transfers under the Governing Agreements for all purposes and are hereby irrevocably and unconditionally consented to, without the necessity of obtaining any further consents or approvals, and further without the necessity of complying with any other provision of the Governing Agreements that might otherwise be construed to condition, limit, prohibit, impair or modify in any respect this Assignment or the exercise of Secured Party's rights and remedies hereunder, at law or in equity, including any options to purchase and any rights of first offer, first opportunity, first refusal and redemption;

(iv)   agrees that, upon written notice to Assignor from Secured Party of its election under this Assignment to exercise all or any portion of the Equity Rights and Bankruptcy Rights, and collect directly any Equity Distributions or other amounts payable to any Assignor in respect of the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice) on account of the Ownership Interests, all such distributions and other amounts shall be paid directly to Secured Party and Secured Party shall automatically be entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements (including all distributions of available cash or other distributions or payments or any kind, to the extent not previously paid, whether attributable to the period prior to or after the date of such notice), Assignor hereby irrevocably and unconditionally consenting thereto; and

(v)     agrees that, upon written notice to Assignor, from Secured Party of Secured Party's election to be, or to have its designee or any purchaser, substituted as the holder of any Ownership Interest or portion thereof pursuant to this Assignment, Secured Party, its designee and/or such purchaser, as applicable, shall automatically be deemed to be admitted as a substitute member for such transferring member to the extent of the Ownership Interests so transferred and a member and entitled to receive and exercise all rights and benefits to which the holder thereof is entitled pursuant to the terms of the Governing Agreements, including the right to exercise the Equity Rights and Bankruptcy Rights and receive any Equity Distributions or other amounts payable to a member in respect of the Ownership Interests under the Governing Agreements (including all distributions of available cash or other distributions or payments of any kind, to the extent not previously paid, whether attributable to the period prior to or after the date so transferred), and all such amounts shall be paid as so directed by Secured Party, Assignor hereby irrevocably and unconditionally consenting thereto.

(b)     In the event Secured Party elects to be admitted as a substitute member and/or new member, Secured Party shall be deemed to have assumed and agreed to perform all obligations of the transferring member under the Governing Agreements relating solely to the Assignor's interest so transferred or the new membership interest from and after the effective date of the transfer or acquisition of such new interest by Secured Party, its designee and/or purchaser and not for the period or to the extent arising prior thereto, and without the necessity of obtaining any further consents or approvals from any other members of the Company (or any other future member of the Company, no consent thereto being implied hereby) or the Company or complying with any of the conditions of the Governing Agreements. Upon receipt of such notice, Assignor shall take (or shall cause the Company to take) such actions as are contemplated in the Governing Agreements, as modified hereby, and otherwise to register and further assure such transfers, admission and/or new acquisition, without cost to Secured Party, its designees and purchasers.

(c)     Assignor hereby covenants to execute and deliver any documents and instruments reasonably required by Secured Party to effectuate the provisions of this Section 7.20, and should Assignor fail to execute and deliver such documents or instruments within five (5) days after request therefor by Secured Party, Assignor hereby appoints Secured Party as his true and lawful attorney-in-fact (which appointment is deemed to be coupled with an interest) to execute and deliver any such documents and instruments as is reasonably necessary to effectuate the provisions of this Section 7.20.

(d)     This Section 7.20 shall be deemed to amend and modify the Governing Agreements until all Secured Obligations have been irrevocably and unconditionally paid and performed in full.

[Signature Page Follows]

22

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

> **SECURED PARTY**:
>
> PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company
>
> By: _____
> Name:  Peter Martay
> Title:  Authorized Signatory

**IN WITNESS WHEREOF** the parties have executed this Assignment as of the date first written above.

ASSIGNOR:

_____

**KENNETH C. WARE**, an individual

## CONSENT OF COMPANY

**NATIV DENVER LLC**, Colorado limited liability company (the "Company"), has reviewed the foregoing Assignment and hereby unconditionally and irrevocably consents to and agrees to be bound by the terms and conditions thereof. The Company agrees that the Ownership Interests are securities subject to the provisions of Article 8 of the Code. The Company hereby has marked its books and records (including the membership interest register) to reflect the delivery of the Transfer Power, to Secured Party, and the existence of this Assignment, each of the other Assignment Documents, and the assignments, liens and security and investment property interests created hereby and thereby, and to maintain at all times a copy of this Assignment and each of the other Assignment Documents as a part of its books and records. Upon request of Secured Party, whether pursuant to a sale of one or more Ownership Interests under Section 5.3 of this Assignment or otherwise, the Company shall immediately cause the admission of Secured Party or its designee or any other purchaser to be registered in the books and records of the Company and take all such other actions as may be necessary or requested to effect the transfer and issuance of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser as a member of the Company as contemplated by the Assignment, and further to take all such actions as may be necessary to comply in all respects with applicable Securities Laws in connection with the sale or other transfer of such Ownership Interests and the admission of Secured Party or its designee or any other purchaser. The Company further agrees that, upon request by Secured Party, the Company will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts and instruments as may be required to effectuate the transaction contemplated by this Assignment.

**NATIV DENVER LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

# EXHIBIT A

## Description of Pledged Ownership Interests

| NAMES AND ADDRESSES | TYPE OF INTEREST | OWNERSHIP INTEREST | FILING LOCATION |
|---|---|---|---|
| Kenneth C. Ware<br>7225 S. Xanthia Street<br>Centennial, CO 80112 | Membership | 46% | Secretary of State of Colorado |

## EXHIBIT B

Debtor (Pledgor): Kenneth C. Ware, an individual

Secured Party: Pangea Mortgage Capital, LLC, an Illinois limited liability company

**1.      DESCRIPTION OF COLLATERAL**. The Collateral covered by the UCC-1 financing statement or Security Agreement (as defined below) to which this **Exhibit** is attached (the "UCC-1"), and constituting the Collateral in which Debtor grants a perfected security interest to Secured Party pursuant to the Security Agreement to which this **Exhibit** is attached, consists of the "Collateral," as defined below. A complete description of all such Collateral is hereby included and incorporated by reference in the UCC-1 or Security Agreement, as if the entirety of this description of Collateral were set forth in full on the face of the UCC-l.

**2.      DEFINITIONS**. For purposes of the foregoing, the following terms shall have the following meanings:

2.1 "Bankruptcy Rights" means, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding (as defined in the Security Agreement), voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.2      "Company" means **NATIV DENVER LLC**, Colorado limited liability company.

2.3      "Collateral" means the Ownership Interests.

2.4      "Documents" means all certificates or documents representing Debtor's interest in and rights with respect to the Company.

2.5      "Equity Distributions" means collectively, whether now existing or hereafter arising or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, which are now or may hereafter become due as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.6     "Equity Rights" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.7     "Operating Agreement" means that certain Operating Agreement of the Company dated as of March 23, 2018, as the same may be amended, modified, extended, restated or replaced from time to time in accordance with the terms thereof, with the approval of Secured Party.

2.8     "Ownership Interests" means collectively, whether now existing and hereafter arising or acquired: (a) forty-six percent (46%) of the current and future interests of the Debtor under the Operating Agreement, (b) all Equity Distributions; (c) all Equity Rights; (d) all Bankruptcy Rights; and (e) all proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Secured Party, may be necessary or advisable in connection with any of the foregoing.

2.9     "Proceeds" shall include the following, whether in cash or not in cash:

2.9.1   Certain Payments. Any proceeds, products, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions, and replacements of any Collateral;

2.9.2   Dispositions. Whatever is received by Debtor upon the sale, exchange, collection or other disposition of any item of Collateral, whether such proceeds constitute inventory, accounts, accounts receivable, general intangibles, instruments, securities, credits, documents, letters of credit, chattel paper, documents of title, warehouse receipts, leases, deposit accounts, money, contract rights, goods or equipment;

2.9.3   Applications of Proceeds. Any such items that are now or hereafter acquired by Debtor with any proceeds of any Collateral hereunder; and

2.9.4   Insurance. Any insurance proceeds payable by reason of loss or damage to any item of Collateral or any proceeds thereof

2.10    "Security Agreement" means that certain Collateral Assignment, Pledge and Security Agreement, dated as of March 11, 2020, given by the Debtor to the benefit of the Secured Party, as the same may be amended, modified, extended, restated or replaced from time to time.

**3.      LIMITATION OF LIABILITY**.  Notwithstanding anything to the contrary in the foregoing, Secured Party shall have no obligations or liability with respect to the Ownership Interests unless and until Secured Party has succeeded to the ownership of the Ownership Interests.

Even if the Secured Party shall acquire ownership of the Ownership Interests, Secured Party's liability shall: (a) terminate if and when Secured Party has transferred or abandoned such Ownership Interests; and (b) under all circumstances be limited to Secured Party's interest in the Ownership Interests.

EXHIBIT B

## EXHIBIT C

### Irrevocable Transfer Power

FOR VALUE RECEIVED, **KENNETH C. WARE,** an individual, does hereby sell, assign and transfer 46% of membership interests (the "Ownership Interests") in **NATIV DENVER LLC,** a Colorado limited liability company (the "Company"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL, LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

EXHIBIT C

**IN WITNESS WHEREOF** the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

_____

**KENNETH C. WARE**, an individual

**EXHIBIT D**

Filing Locations for UCC Financing Statements: Secretary of State of Colorado

<u>**IRREVOCABLE TRANSFER POWER**</u>          EXHIBIT 10

FOR VALUE RECEIVED, **AMIN SULIAMAN**, an individual does hereby sell, assign and transfer 49% of his membership interests (the "<u>**Ownership Interests**</u>") in **KDA PROPERTIES LLC**, a Colorado limited liability company (the "<u>**Company**</u>"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

**AMIN SULIAMAN**, an individual

## IRREVOCABLE TRANSFER POWER

FOR VALUE RECEIVED, **KENNETH C. WARE**, an individual does hereby sell, assign and transfer 51% of his membership interests (the "**Ownership Interests**") in **KDA PROPERTIES LLC**, a Colorado limited liability company (the "**Company**"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated: March 11, 2020

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

**KENNETH C. WARE**, an individual

## IRREVOCABLE TRANSFER POWER

FOR VALUE RECEIVED, **AMIN SULIAMAN**, an individual does hereby sell, assign and transfer 54% of his membership interests (the "**Ownership Interests**") in **NATIV DENVER LLC**, a Colorado limited liability company (the "**Company**"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

_____

**AMIN SULIAMAN**, an individual

## <u>IRREVOCABLE TRANSFER POWER</u>

EXHIBIT 11

FOR VALUE RECEIVED, **KENNETH C. WARE**, an individual does hereby sell, assign and transfer 46% of his membership interests (the "**<u>Ownership Interests</u>**") in **NATIV DENVER LLC**, a Colorado limited liability company (the "**<u>Company</u>**"), to _____.

The undersigned does hereby irrevocably constitute and appoint PANGEA MORTGAGE CAPITAL LLC, an Illinois limited liability company, as attorney in fact to transfer the said Ownership Interests on the books of said Company, with full power and substitution in the premises.

Dated:  March 11, 2020

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned has duly executed this Irrevocable Transfer Power as of the date first written above.

**KENNETH C. WARE**, an individual

EXHIBIT 12

## ASSIGNMENT OF AGREEMENTS AFFECTING REAL ESTATE

**THIS ASSIGNMENT OF AGREEMENTS AFFECTING REAL ESTATE** (this "Assignment"), is made as of March 11, 2020, by **KDA PROPERTIES LLC**, a Colorado limited liability company, and **NATIV DENVER LLC**, a Colorado limited liability company (individually and collectively (as the context shall require) referred to herein as "Borrower"), to and for the benefit of **PANGEA MORTGAGE CAPITAL, LLC,** an Illinois limited liability company, and its successors and assigns ("Lender").

## W I T N E S S E T H:

WHEREAS, Borrower has executed and delivered to Lender a Promissory Note dated as of even date herewith payable to Lender in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00) (said Promissory Note and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "Note"); and

WHEREAS, the Note evidences an indebtedness of Borrower to Lender arising from a loan (the "Loan") in the maximum principal amount of **SIX MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 DOLLARS** ($6,650,000.00) from Lender to Borrower in connection with the acquisition of the Land (as defined in the Loan Agreement (as further defined herein)) and construction of the Improvements (as defined in the Loan Agreement) at the property described in the Mortgage (as defined below) (the "Property"), which Loan is evidenced by and made pursuant to the terms of a certain Loan Agreement dated as of even date herewith by and between Lender and Borrower (as amended, modified and restated from time to time, the "Loan Agreement"); and

WHEREAS, the Loan is secured, inter alia, by a certain Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents of even date herewith from Borrower in favor of Lender encumbering the Property (as amended, modified and restated from time to time, the "Mortgage"), and by certain other instruments (such other documents evidencing or securing the Loan, together with the Note, the Loan Agreement and the Mortgage, as the same may be amended, modified, replaced or restated from time to time, are hereinafter collectively referred to as the "Loan Documents"; any terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement); and

WHEREAS, Lender is unwilling to make the Loan unless Borrower executes this Assignment and Borrower desires to give this Assignment to Lender to induce Lender to make the Loan.

NOW, THEREFORE, in consideration of the Loan and to further secure the payment of the Loan and performance of Borrower's obligations under the Loan Agreement, the Mortgage and each of the other Loan Documents, and as an essential and integral part of the security therefor, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower does hereby immediately and absolutely convey, assign, transfer and set over unto Lender all right, title, and interest and all benefits and privileges which Borrower as owner, contract party, developer and/or otherwise has and may have in, from or with respect to

any and all of the Additional Collateral (as hereinafter defined), including without limitation, all of the rents, issues, income, revenue and profits due and becoming due therefrom and proceeds thereof.

1.     **Additional Collateral Defined**.   The items which shall be the subject of this Assignment, and which are sometimes collectively referred to as "Additional Collateral" are as follows:

(a)     Permits and Licenses.   To the extent the same are assignable under law (provided that Borrower will pursue obtaining consents to such assignments with due diligence), all permits, licenses, approvals, orders, certificates and agreements with, from or issued by any board, agency, authority, department, governmental or otherwise (collectively, the "Governmental Authorities"), relating directly or indirectly to the ownership, use, development, operation or maintenance of the Property, or the construction of improvements on the Property, whether heretofore or hereafter issued or executed, together with all letters of credit, certificates of deposit, bonds or other agreements securing or guaranteeing payment or performance thereunder (collectively, the "Permits").

(b)     Contracts.   All contracts, subcontracts, agreements, utility agreements, service agreements, management agreements, warranties and purchase orders which have heretofore been or will hereafter be executed by or on behalf of Borrower, or which have been or will be entered into by Borrower, in connection with the acquisition, development, use, operation and maintenance of the Property, or the development, construction, installation, repair or rehabilitation of improvements on the Property, together with any deposits, fees or advance payments thereunder (collectively, the "Contracts").   The parties with whom Contracts have been or will be entered into are hereinafter collectively referred to as the "Contractors."

(c)     Other.   All other documents, contracts, and agreements relating to all or any portion of the Property.

2.     **Borrower's Limited License**.   So long as no Event of Default (as defined in the Loan Agreement) under the Loan Agreement, Mortgage, or any other Loan Document has occurred, Borrower shall have the right under a license granted hereby (but limited as provided in this Assignment) to retain, use and enjoy the benefits and privileges of the Additional Collateral.   After the occurrence of any such Event of Default, Lender may enforce this Assignment, with or without order of any court and with or without appointment of a receiver, and upon demand by or on behalf of Lender, Borrower shall immediately deliver all originals of each and every document, instrument, and agreement referred to in Section 1 above to Lender.

3.     **Borrower's Representations and Warranties**.   Borrower warrants and represents that:  (a) except for those Permits which by their nature are not transferable, it has full right and title to assign the Additional Collateral as provided herein; (b) no other assignment, pledge, transfer or hypothecation of Borrower's interest in any of the Additional Collateral, or grant of any security interest therein, has been made; (c) there are no defaults by Borrower or another party thereto under the provisions of any existing Additional Collateral, and none of Borrower's rights in, to and under  the Additional Collateral is subject to any defenses, set-offs

2

or counterclaims; and (d) Borrower has delivered to Lender true, correct and complete copies of all of the Additional Collateral.

4.  **Lender's Rights: Limitation of Liability**.

(a)      Borrower hereby authorizes Lender, by its employees or agents, at its option, after the occurrence of an Event of Default, or an event which with the giving of notice or lapse of time or both would constitute an Event of Default under the Loan Documents, without notice and without regard to the adequacy, value or condition of the security, and with or without court action, or by a receiver, to terminate the aforesaid license granted to Borrower, exercise any and all of Lender's rights and remedies hereunder with respect to the Additional Collateral, without any interference or objection from Borrower.  In such event, Lender may take over and enjoy the benefits of the Additional Collateral, exercise Borrower's rights under the Additional Collateral and perform all acts in the same manner and to the same extent as Borrower might do.   In connection with any and all of the foregoing powers, and without limiting the same, Lender may effect new Additional Collateral, cancel or surrender existing Additional Collateral, alter and amend the terms of and renew existing Additional Collateral, make concessions to Governmental Authorities, Contractors, and others, bring or defend suits in connection with the Additional Collateral and Lender's possession of the Property in its own name or in Borrower's name, collect rents, income, issues, revenues and profits, and do or not do any and all things Lender deems desirable in its sole discretion. Borrower further agrees that it will facilitate in all reasonable ways Lender's use and enjoyment of the benefits of the Additional Collateral and the collection of said rents, income, issues, revenues and profits, and will, upon request by Lender, execute a written notice of this Assignment to each of the Governmental Authorities, Contractors, and all other appropriate persons.

(b)      Borrower also hereby authorizes Lender upon such entry pursuant to Section (a) above, at Lender's option, in Lender's own name or in the name of Borrower, to take over and assume the management, operation, repair, maintenance and improvement of the Property and to perform such other acts in connection therewith as Lender in Lender's sole discretion may deem desirable, including without limitation, to expend so much of the income of the Property as may be needed in connection therewith, in the same manner and to the same extent as Borrower theretofore might do, including without limitation the right to employ and engage contractors, management agents, sales agents, brokers, accountants and attorneys, and the right to expend moneys for the repair, maintenance, renovation, rehabilitation, remodeling, improvement, replacement, refurbishment or other alteration (structural or non-structural) of the Property.

(c)      Lender shall be under no obligation to take any action authorized herein and shall have no liability for failure to take any such action or for any action taken pursuant hereto, except for its willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction; and Borrower hereby waives and releases any and all claims against Lender arising out of or in connection with such management, operation, repair and/or maintenance, alteration or other action or inaction, except for Lender's willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction, and excepting the liability of Lender to account as hereinafter set forth.

(d)     All of the foregoing rights and powers herein granted to Lender shall be liberally construed.  Lender need not expend its own funds in the exercise of such powers, but if it does, such amounts shall be considered as advances for and on behalf of Borrower evidenced by the Loan Agreement and secured by this Assignment, by the Mortgage, and by the other Loan Documents.  Any amounts so advanced shall bear interest at the Default Rate.

(e)     Borrower shall indemnify Lender against, and save Lender harmless from and against, any and all liability or claims arising from or in connection with any Additional Collateral or this Assignment, and/or the control, care, operation, improvement or management of the Property.  Lender shall not be liable for any loss, cost, damage or expense sustained by Borrower or Governmental Authorities, Contractors, or any other party resulting from any act or omission of Lender, unless such loss is caused by the willful misconduct of Lender as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, Lender shall not be liable for any failure to sell or improve all or any part of the Property, nor shall Lender be obligated to perform or discharge, nor does Lender hereby undertake to perform or discharge, any term, covenant, agreement, obligation, duty or liability under any Additional Collateral or under or by reason of this Assignment, nor shall Lender be responsible for the control, care, management or improvement of the Property or any part thereof; nor for the performance of any term, covenant or condition of any of the Additional Collateral; nor for any waste committed on the Property or any part thereof by any other person, nor for any dangerous or defective condition of the Property or any part thereof nor for any negligence in the management, upkeep, improvement, repair or control of the Property or any part thereof resulting in loss or injury or death to any lessee, licensee, employee or other person, nor for any other loss, cost, damage or liability not caused directly by the willful misconduct and bad faith of Lender as determined by a final, non-appealable judgment of a court of competent jurisdiction.

5.     **Application of Income by Lender**.  Lender shall, after payment of all charges and expenses incurred in connection with the enforcement of its rights and remedies under the Loan Agreement, the Mortgage, this Assignment and the other Loan Documents, and the control, care, management, operation, improvement, repair, alteration, and maintenance of the Property, including reasonable compensation to such managing agent and other agents or employees as it may select and employ, and after the accumulation of any reserve deemed advisable by Lender for taxes, assessments, utilities, fire and casualty and liability insurance, and replacements and repairs, credit the balance of income received by it from the Property by virtue of this Assignment to any amounts due and owing to it by Borrower pursuant to the Loan Agreement, the Mortgage, and the other Loan Documents in such order and manner as shall be determined in the sole discretion of Lender. Lender shall not be accountable for more money than it actually receives from the Property nor shall it be liable for failure to collect rents.

6.     **Borrower's Covenants**.  Borrower agrees faithfully to observe and perform all of the obligations and agreements imposed upon Borrower under any of the Additional Collateral and to promptly notify Lender of any defaults, or claimed defaults, asserted with respect to Borrower or any other party thereto under the Additional Collateral.  Borrower will not:  (a) pledge, transfer, mortgage or otherwise encumber or assign any of Borrower's interest in any Additional Collateral or any rents, issues, income, revenue or profits arising or accruing there from except as provided herein; (b) waive, excuse, condone, discount, set-off, compromise, or in

4

any manner release or discharge any Governmental Authority or Contractor, thereunder of or from any of its obligations, covenants, conditions or agreements; (c) cancel, terminate or consent to any surrender of any Additional Collateral, without the prior written consent of Lender; or (d) enter into, execute or deliver any security agreement covering any Additional Collateral without the prior written consent of Lender.

7.    **Default**.    Violation of any of the covenants, representations or provisions contained herein by Borrower, and the failure of Borrower to cure such violation within thirty (30) days after receipt of notice of such violation from Lender, shall be deemed an Event of Default hereunder and under the terms of the other Loan Documents.  An Event of Default under the terms or provisions of any other Loan Document, or a default by Borrower under the terms of any Additional Collateral which is not cured within any applicable grace period thereunder, shall be deemed an Event of Default hereunder.

8.    **Insolvency**.  If any Contractor under any Contract should be the subject of any proceeding under the federal bankruptcy code, as amended from time to time, or any other federal, state, or local statute which provides for the possible termination or rejection of any Contract assigned hereby, Borrower agrees that, if any Contract is so terminated or rejected, no settlement for damages shall be made without the prior written consent of Lender, and any check in payment of damages for termination or rejection of any such Contract will be made payable to Lender.  Borrower hereby assigns any such payment to Lender and further covenants and agrees that, upon the request of Lender, it will duly endorse to the order of Lender any such check, the proceeds of which will be applied to the indebtedness secured by this Assignment in such order and manner as Lender may determine in its sole discretion.

9.    **Status of Lender**.  Nothing herein contained nor any action taken pursuant hereto shall be construed as making Lender a "mortgagee in possession" in contemplation of law, except at the option of Lender, including, without limitation, an entry by Lender upon the Property, nor as constituting a waiver or suspension by Lender of its rights to enforce payment of the indebtedness under the terms of the Note, the Loan Agreement or the Mortgage.  Lender is not the agent of or partner or joint venturer with Borrower or any of the Governmental Authorities or Contractors.

10.    **Copies of the Additional Collateral**.  Borrower shall, upon reasonable request of Lender, promptly furnish Lender a complete written list of all Additional Collateral.  Further, if requested, Borrower shall promptly deliver to Lender original or certified copies of all Additional Collateral and other written agreements, correspondence and memoranda between Borrower (and its predecessors in title) and any Governmental Authority, Contractor, relating to the Property.   To the extent that Borrower does not have the foregoing documents in its possession, Borrower shall deliver copies of the foregoing in its possession, with a certification that, to the best of Borrower's knowledge and belief, each such copy is true, correct and complete and has not been amended, altered, superseded, supplemented or rescinded.

11.    **Governing Law; Severability; Time of Essence**.  This Assignment shall be governed by the laws of the State of Illinois.   Wherever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Assignment or the operation thereof shall be prohibited by or invalid

5

under such law, such provision and its operation shall be effective to the maximum extent permitted by law, without invalidating the remainder of such provision or the remaining provisions of this Assignment or the operation thereof.   Time is of the essence of this Assignment.

12.   **Amendments; Interpretation**.   Neither this Assignment nor any provision hereof may be amended, modified, waived, discharged or terminated except in a writing executed by Borrower and Lender.   The Section headings used herein are for convenience of reference only and shall not define or limit the provisions of this Assignment.   In this Assignment, the singular shall include the plural and the plural shall include the singular and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires.   Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

13.   **Other Security**.   Lender may take or release other security for the indebtedness secured hereby or by the Mortgage, may release any party primarily or secondarily liable therefor, and may apply any other security held by it to the satisfaction thereof, may exercise, fail to exercise or waive any other right or remedy available to it, and may grant extensions, renewals, forbearances or modifications with respect to such indebtedness, all without prejudice to any of its rights under this Assignment.

14.   **Remedies Cumulative**.   Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the powers and rights granted it hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Note, the Loan Agreement, the Mortgage, this Assignment or any other instrument or Loan Document or by or pursuant to law or in equity, by statute or otherwise, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender.   Accordingly, any failure on the part of Lender promptly to exercise any option hereby given or reserved shall not prevent the exercise of any such option at any time thereafter.   This Assignment may be enforced from time to time by Lender at its discretion.   Lender may also at any time cease to enforce this Assignment.   The right of Lender to collect any and all indebtedness held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

15.   **Notice**.   Any notice which any party hereto may desire or may be required to give to any other party hereto shall be made in the manner provided in the Loan Agreement.   Except as otherwise specifically required herein, notice of the exercise of any right or option granted to Lender by this Assignment is not required to be given.

16.   **Binding Effect**.   The provisions of this instrument shall be binding upon Borrower and its legal representatives, successors or permitted assigns, and shall inure to the benefit of Lender and its successors or assigns.

17.   **Effectiveness; Termination Effect**.

(a)   No judgment or decree which may be entered on any debt secured or intended to be secured by this Assignment shall operate to abrogate or lessen the effect of this Assignment, but this Assignment shall continue in full force and effect until the payment, discharge and performance of any and all indebtedness and obligations evidenced by the Note or secured by the

Mortgage and the other Loan Documents, in whatever form, and until all costs and expenses incurred by virtue of the authority herein contained have been fully paid out of rents, income, issues and profits of the Property, or by Borrower, or until such time as this Assignment may be voluntarily released. This Assignment shall also remain in full force and effect during the pendency of any foreclosure proceedings, both before and after sale, until the issuance and recordation of a deed conveying all unreleased portions of the Property, pursuant to the foreclosure, unless and until all indebtedness evidenced or secured by the Mortgage is fully satisfied from the proceeds of such sale.

(b)     Upon satisfaction of the Mortgage encumbering the Property and payment in full of any costs or expenses payable to Lender hereunder, this Assignment shall become and be void and of no effect, but the affidavit, certificate, letter or statement of any officer, agent or attorney of Lender stating that such Mortgage has not been discharged and that any part of the principal, interest or premium on the Note or that any costs or expenses to Lender under the Mortgage, the Loan Agreement, hereunder or under any of the other Loan Documents remain unpaid shall be and remain conclusive evidence of the validity, effectiveness and continuing force of this Assignment, and every person is hereby authorized to rely thereon. Borrower hereby authorizes and directs all Government Authorities, Contractors, and other persons, upon receipt from Lender of written notice to the effect that a default exists under this Assignment, the Loan Agreement, the Note, the Mortgage, or any of the other Loan Documents, to rely thereon as conclusive evidence of such default for purposes of dealing with Lender, and any Contractor or Governmental Authority is directed to pay over to Lender all income, revenues and profits (including, without limitation, option payments, deposits and purchase prices), payable or accruing under the agreements with such entities and to continue to do so unless otherwise notified by Lender.

18.     **JOINT AND SEVERAL LIABILITY**. This Assignment is made subject to the terms of Section 10.21 of the Loan Agreement and the terms of Section 10.21 of the Loan Agreement are hereby incorporated herein by this reference.

19.     **COUNTERPARTS**.   This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together will constitute one and the same instrument. The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this letter agreement attached thereto.

**[The remainder of this page is left blank intentionally]**

**IN WITNESS WHEREOF**, Borrower has executed and delivered this instrument as of the day and year first above written.

BORROWER:

**KDA PROPERTIES LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:   Manager

By: _____
Name: Amin Suliaman
Title:   Manager


**NATIV DENVER LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:   Manager

By: _____
Name: Amin Suliaman
Title:   Manager

EXHIBIT 13

# SUBORDINATION AGREEMENT

by

## KDA PROPERTIES LLC

having an office at
1612 Wazee Street,
Denver, Colorado 80202

("**Landlord**")

and

## NATIV DENVER LLC

having an office at
1612 Wazee Street,
Denver, Colorado 80202

("**Tenant**")

in favor of

## PANGEA MORTGAGE CAPITAL, LLC

having an office at
549 W. Randolph Street, 2nd Floor
Chicago, Illinois 60661

("**Lender**")

March 11, 2020

## SUBORDINATION AGREEMENT

**NOTICE:  THIS SUBORDINATION AGREEMENT RESULTS IN ANY RIGHTS UNDER SAID LEASE BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF THE MORTGAGE REFERENCED HEREIN.**

**THIS SUBORDINATION AGREEMENT** (this "Subordination") made as of March 11, 2020 (the "Effective Date") by **KDA PROPERTIES LLC**, a Colorado limited liability company ("Landlord"), and **NATIV DENVER LLC**, a Colorado limited liability company   ("Tenant"; Landlord and Tenant are collectively referred to herein as "Borrower") in favor of **PANGEA MORTGAGE CAPITAL, LLC**, an Illinois limited liability company, and its successors and assigns ("Lender").

## R E C I T A L S :

A.     Lender is prepared to make a loan (the "Loan") to Landlord in the original principal amount of Six Million Six Hundred Fifty Thousand Dollars ($6,650,000) pursuant to a Loan Agreement of even date herewith between Landlord and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), which Loan shall be evidenced by that certain Promissory Note of even date herewith given by Landlord in favor of Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note"). Initially capitalized terms not defined herein shall have the meanings given such terms in the Loan Agreement;

B.     The Note is secured, inter alia, by that certain Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents, of even date herewith, given by Landlord in favor of Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Mortgage") encumbering that certain real property (the "Land") situated in the City of Denver, State of Colorado, and more particularly described on Exhibit A attached hereto and incorporated herein by this reference, together with the buildings, structures and other improvements now or hereafter located thereon (collectively, the "Improvements") (the Land and the Improvements are hereinafter sometimes collectively referred to as the "Property");

C.     Tenant, as lessee, and Landlord, as lessor, have entered into that certain Lease dated as of February 25, 2020 (the "Lease") wherein Tenant leases the Property from Landlord;

D.     As a condition to making the Loan to Landlord, Lender has required that Landlord and Tenant enter into this Subordination for the benefit of Lender; and

E.     Lender's making the Loan to Landlord is of substantial benefit to Tenant and Landlord and, therefore, Tenant and Landlord desire to execute and deliver this Subordination.

## A G R E E M E N T :

NOW, THEREFORE, in consideration of the foregoing premises, the agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree, as of the Effective Date of this Subordination first written above, as follows:

1.     All of the respective rights of Landlord and Tenant under the Lease shall be subject and subordinate to the liens of Lender under the Note and the Loan Documents (as defined in the Loan Agreement).  Landlord and Tenant agree that without Lender's prior written approval (which approval may be withheld or conditioned in Lender's sole and absolute discretion), (a) the Lease shall not be surrendered, terminated, extended or cancelled, (b) the Lease shall not be amended or modified in any material respect, and (c) neither shall assign, transfer, grant a security interest in, pledge or hypothecate its interest in the Lease (including its right to receive rent, fees or payments thereunder).

2.     Upon conveyance of the Property in foreclosure of the Mortgage or transfer of the Property by deed in lieu of foreclosure of the Mortgage (a "Foreclosure"), all rights of Landlord and Tenant under the Lease (including without limitation, all rights to collect any rents, fees or commissions) shall automatically terminate without the need for any further notice and not survive as to, or be binding upon, Lender or the purchaser of the Property upon a Foreclosure.  Upon a Foreclosure, Landlord and Tenant hereby agree to cooperate with Lender, or the subsequent owner of the Property, in order to assure an orderly transition of the Property.  After a Foreclosure, Lender and any other foreclosure purchaser of the Property shall not be liable for any defaults of Landlord or any other previous owner under the Lease, shall not be liable for repayment of any loans made by Tenant to Landlord or to any other person or entity (without implying Lender's consent to any loans made to Landlord in violation of the provisions of the Loan Documents) and shall have no liability under the Lease from and after the date Lender or the foreclosure purchaser transfers the Property.  Upon a Foreclosure, the employees at the Property will be employees of the Tenant or Manager, as applicable, and not Lender or any other foreclosure purchaser.  Nothing contained herein shall be deemed or construed to modify or affect the rights and obligations of Landlord and Tenant to each other.

3.     Landlord and Tenant hereby intentionally and unconditionally subordinate and make junior the Lease to the Mortgage and other Loan Documents (as defined in the Mortgage).  Without limiting the generality of the foregoing, the Lease and all the liens, security interests or charges created thereby, all rights, remedies, terms and covenants contained therein and all present and future leases evidenced or secured thereby, together with any and all other present and future rights, privileges and interests of Landlord and Tenant in and to the Property, shall be subordinate and subject to the Mortgage and other Loan Documents, the liens security interests and charges created by the Mortgage and other Loan Documents, all rights, remedies, terms and covenants contained in the Mortgage and other Loan Documents and all present and future indebtedness evidenced or secured by the Mortgage and other Loan Documents, together with all rights, privileges and interests of Lender in and to the Property.  Without limiting the foregoing, the parties hereto acknowledge and agree that Lender has a first priority lien and security interest in all of the Property, including all accounts and deposit accounts established and/or maintained pursuant to the Lease, and that the Mortgage and any other liens, security interests or charges which Lender may have in or against the Property shall at all times be and remain unconditionally prior and superior to the Lease.

4.      Landlord and Tenant shall deliver notice of any default or termination by the other party under the Lease concurrently to Lender at the following address:

> Pangea Mortgage Capital, LLC
> 549 W. Randolph Street, 2nd Floor
> Chicago, Illinois 60661

5.      At any time that a Cash Trap Period exists, Landlord and Tenant will remit  all Rents directly to Lender or as Lender may direct.

6.      THIS SUBORDINATION SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES; PROVIDED, HOWEVER, THAT TO THE EXTENT THE MANDATORY PROVISIONS OF THE LAWS OF ANOTHER JURISDICTION RELATING TO (I) THE PRIORITY OF THE LEASE OR THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE MORTGAGE IN ANY OF THE PROPERTY, OR (II) THE AVAILABILITY OF AND PROCEDURES RELATING TO ANY REMEDY HEREUNDER OR RELATED TO THIS SUBORDINATION ARE REQUIRED TO BE GOVERNED BY SUCH OTHER JURISDICTION'S LAWS, THOSE OTHER LAWS SHALL BE DEEMED TO GOVERN AND CONTROL.

7.      This Subordination may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

8.      Notwithstanding anything to the contrary contained herein, each individual or entity executing this Subordination as "Borrower" shall be jointly and severally liable for the representations, warranties, covenants and agreements made by Borrower herein, and the liability of each Borrower hereunder, shall be joint and several.  If this Subordination is executed by more than one party constituting Borrower, it is specifically agreed that Lender may enforce the provisions hereof with respect to one or more of such parties constituting Borrower without seeking to enforce the same as to all or any such parties.  Each of the parties constituting Borrower hereby waives any requirement of joinder of all or any of the parties constituting Borrower in any suit or proceeding to enforce the provisions of this Subordination.


**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE]**

EXECUTED as of the year and day first above written.

**"LANDLORD"**

**KDA PROPERTIES LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager


**NATIV DENVER LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager


[Signatures Continue on Next Page]

**"TENANT"**

**NATIV DENVER LLC,**
a Colorado limited liability company

By: _____
Name: Kenneth C. Ware
Title:  Manager

By: _____
Name: Amin Suliaman
Title:  Manager

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_____, manager on behalf of _KDA Properties LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

_07-25-2020_
(Commission Expiration)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020


State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_____, manager on behalf of _KDA Properties LLC_, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)

_07-25-2020_
(Commission Expiration)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020

State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Kenneth C. Ware_____, manager on behalf of _Nativ Denver LLC___, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)


_07-25-2020_____
(Commission Expiration)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020


State of Colorado
County of Jefferson

The foregoing instrument was acknowledged before me this 24th day of February, 2020 by
_Amin Suliaman_____, manager on behalf of _Nativ Denver LLC___, a
Colorado LLC.


_Kathryn Amber Bailey_
(Notary's official signature)


_07-25-2020_____
(Commission Expiration)

KATHRYN AMBER BAILEY
Notary Public
State of Colorado
Notary ID # 20164028160
My Commission Expires 07-25-2020

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

LOTS 13 AND 14, BLOCK 20, EAST DENVER,
CITY AND COUNTY OF DENVER, STATE OF COLORADO.