EXHIBIT 14

**SPECIAL SERVICER AGREEMENT**
_____

THIS SERVICING AGREEMENT (this "**Agreemen**t") is dated as of **(Date)** and entered into by and between the Servicer / Management Group and KDA Properties LLC (the Owner) in respect of certain services to be provided by the Servicer to the Owner with respect to the Participation Agreement on the terms and conditions set forth herein.

For good and valuable consideration, receipt of which is hereby acknowledged, the Servicer and the Owner (each a "**Party**" and collectively the "**Parties**") agree to be bound by the following terms and conditions:

| **TRANSACTION SUMMARY** |
|---|
| Servicing Fee:      __$3,000/week__ [1] |
| Property Owner:      **KDA Properties LLC** |
| Servicer / Mngmt Group:      **Wazee Group LLC** |
| Agreement Date:      **June 1, 2021** |

**1.**      **SERVICING OF THE SPECIFIED INTEREST.**

     Section 1.01 Agreement Terms. Effective June 1, 2021, Wazee Group LLC (servicer) has taken over management of Nativ Hotel and Lounge as a result of the termination of the lease term May 31,2021, and Nativ Denver LLC's (the Lessee) default in its rent payments to KDA. Term will end when either event occurs: (a) KDA Properties LLC sells the real estate or (b) Nativ Denver LLC satisfies it's renal repayment to KDA Properties.

     Section 1.02  Agreement Services.   Wazee Group LLC, in its capacity as the servicer under the Agreement, shall comply with its obligations and agreement thereunder, including the delivery of revenues from the credit card merchant processor for the sale of goods in either the Hotel, the Bar, or both if applicable, the conveyance of information and documents received by the Servicer and the administration and enforcement, pursuant to the terms of the Agreement, including the standard of care set forth therein.

     Section 1.03 Enhanced Reporting Services. The Servicer shall provide the OWNER with the reporting services specified on Schedule 1 hereto (the "**Enhanced Reporting Services**"). The Servicer shall not be responsible for or have any duty to ascertain or inquire into the contents of any certificate, report, financial report or other information or documentation provided by the Owner, including any certification, report, financial report or other information or documentation on which the Enhanced Reporting Services are based. The Servicer shall not be liable to the OWNER for any action taken or not taken by the Servicer in providing the Enhanced Reporting Services other than as a result of the Servicer's gross negligence, fraud, willful misconduct or material breach of any duty or obligation under this Agreement, in each case, as determined by a court of competent jurisdiction by final and nonappealable judgment.

**2.**      **FEES PAYABLE TO SERVICER.**

     Section 2.01   Servicing Fee. As compensation for the Services provided by the Servicer to the OWNER the OWNER agrees to pay to the Servicer, for its own account, a servicing fee for the period from the Agreement Date until the Termination Date (the "**Servicing Fee**"). The Servicing Fee shall be paid by the OWNER to the Servicer weekly provided, that any accrued and unpaid Servicing Fee shall be paid by the OWNER to the Servicer within ten (10) days after the Termination Date.  The Servicing Fee

for any week during which the Termination Date occurs shall be pro-rated for the number of days from the beginning of such week to the Termination Date. For the avoidance of doubt, the Servicing Fee shall not be modified after the Agreement Date, including any transfer by the OWNER of any of its Specified Interest (unless such transfer results in a Termination Date).

Section 2.02    Payments. All payments to be made under this Agreement shall be made to the Servicer in United States dollars in immediately available funds not later than the date specified therefor in this Agreement; provided, that if any such date shall not be a Business Day, payment shall be made on the next succeeding Business Day. The OWNER's obligation to pay the Servicing Fee will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute the OWNER may have. All of the Servicing Fees shall be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement. The OWNER acknowledges that the Servicer reserves the right to allocate, in whole or in part, to any of the Servicer's affiliates all or part of the Servicing Fee in the Servicer's sole discretion.

## 3.    **REPRESENTATIONS AND WARRANTIES.**

Section 3.01    Representations and Warranties. Each of the Parties hereto represents and warrants to the other Party that, as of the Agreement Date:

(a)    Such Party (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement.

(b)    Such Party's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) such Party's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to such Party, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to such Party or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which such Party may be a party, by which such Party may be bound or to which any of the assets of such Party is subject.

(c)    This Agreement (i) has been duly and validly authorized, executed and delivered by such Party and (ii) is the legal, valid and binding obligations of such Party, enforceable against such Party in accordance with its terms, except that such enforceability against such Party may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies.

(d)    No notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Person, other than those that have already been obtained, is or will be required for such Party to execute, deliver, and perform its obligations under, this Agreement.

## 4.    **TERMINATION.**

Section 4.01 Termination Upon Certain Transfers. The obligation of the OWNER to pay the Servicing Fee and the obligation of the Servicer to provide the Enhanced Reporting Services shall terminate at either (a) the end of the agreement or (b) upon the sale of the property to another owner

Section 4.02 Termination Upon Repayment of Specified Interest. The obligation of the OWNER to pay the Servicing Fee and the obligation of the Servicer to provide the Enhanced Reporting Services shall terminate upon the date that all advances to, and debts, liabilities, obligations, covenants and duties of, the Servicer, has been paid in full, satisfied, discharged or fully extinguished.

Section 4.04 Servicer Insolvency. The OWNER may terminate the obligation of the OWNER to pay the Servicing Fee and the obligation of the Servicer to provide the Enhanced Reporting

Services at any time if either the Servicer or a direct or indirect parent company of the Servicer (a) has become the subject of a proceeding under any Debtor Relief Law or (b) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation, the Board of the National Credit Union Administration or any other Governmental Authority acting in such a capacity.

Section 4.05    Termination for Cause. The OWNER may terminate the obligation of the OWNER to pay the Servicing Fee and the obligation of the Servicer to provide the Enhanced Reporting Services at any time for Cause.  For the purposes hereof, "**Cause**" means a reasonable good-faith determination of the OWNER based on findings of fact which are disclosed to Servicer that the Servicer was (i) grossly negligent,
(ii) acted with reckless disregard of the OWNER's (or any Governmental Assignee's) interests, (iii) engaged in willful misconduct or fraud while discharging its material duties under this Agreement or (iv) otherwise materially breached any duty or obligation under this Agreement and failed to cure such breach within thirty
(30) days after written notice from the OWNER.

Section 4.06 Servicer Obligations Upon Termination. For the avoidance of doubt, the occurrence of any Termination Date shall not affect the obligation of the Servicer to continue performing the pursuant to the terms of the Agreement, if applicable.

## 5.    NOTICES; PAYMENTS.

Section 5.01  Notices. All notices and other communications under this Agreement shall be in writing and addressed to the Servicer or the OWNER, as applicable, at the notice address provided for such Party in the Participation Agreement or the Co-Lender Agreement, as applicable.

Section 5.02 Payments.  All payments to the Servicer under this Agreement shall be made by wire transfer to the Servicer Account. All Payments to the Owner, for revenue generated, shall be made by wire transfer.

## 6.    MISCELLANEOUS.

Section 6.01 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 6.02   No Third-Party Beneficiaries.  Nothing contained herein is intended or shall be deemed to create or confer any rights upon any third Person not a party hereto, whether as a third-party beneficiary or otherwise, except as expressly provided herein.

Section 6.03    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good-faith negotiations to

replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 6.04 Governing Law. This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

Section 6.05    Jurisdiction.  Each of the Parties irrevocably and unconditionally submits to the non-exclusive jurisdiction of the courts of the State of Colorado sitting in Denver County, and of the United States District Court of Denver Colorado, and any appellate court from any thereof, and agrees that all claims in respect of any action, litigation or proceeding in respect of this Agreement may be heard and determined in such Colorado State court or, to the fullest extent permitted by applicable law, in such federal court.

Section 6.06 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 6.07 Counterparts; Integration; Effectiveness; Electronic Signatures. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  ThisAgreement shall become effective when it shall have been duly executed and delivered by the Servicer and the OWNER. The words "executed," signed," "signature," and words of like import as used above and elsewhere in this Agreement or in any other certificate, agreement or document related to this transaction shall include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and otherelectronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to orlogically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means)shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the FederalElectronic Signatures in Global and National Commerce Act, and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 6.09 Servicer Not a Fiduciary. The Parties agree that the Servicer shall not be subject to any fiduciary or implied duties.


[Remainder of this page intentionally left blank.]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized officers or representatives.

**KDA PROPERTIES LLC**, as the OWNER

By: _Kenneth C Ware_____
    Name: Kenneth C. Ware
    Title: Manager / Member

**WAZEE GROUP LLC** as the Servicer

By:_____
    Name: Amin Suliaman
    Title: Manager / Member

**NATIV DENVER LLC** as the Lessee

By:_Kenneth C Ware_____
    Name: Kenneth C. Ware
    Title: Manager / Member


EXHIBIT 15





EXHIBIT 16















































EXHIBIT 17

EXHIBIT 18

**BUSINESS** • News

# LoDo hotel files for bankruptcy in bid to slow down foreclosure process

The owner of the Nativ Hotel building in downtown Denver has filed for Chapter 11 bankruptcy protection



Lily O'Neill, BusinessDen

Amin Suliaman is a co-owner of the Nativ Hotel.

By **LILY O'NEILL** | BusinessDen

2

The owner of the Nativ Hotel building in downtown Denver has filed for Chapter 11 bankruptcy protection in an effort to slow the foreclosure process — and a nightclub operator currently facing heat from the city wants to move in.

KDA Properties LLC said in its Wednesday filing that it owes $9.61 million to four creditors.

The bulk of the money — $8.07 million — is owed to Chicago-based Pangea Mortgage Capital. The claim is secured by the four-story building Nativ occupies at 1612 Wazee St., as well as other assets. Pangea did not respond to a request for comment.

"We've recently had the intention to exit the property, but we're going to exit our way," said Nativ Hotel co-owner Amin Suliaman. "I'm not going to let them bully us out of the property."

Companies use Chapter 11 bankruptcy protection to reorganize and help keep the business alive, paying creditors over time.

Suliaman told BusinessDen the bankruptcy filing pertains solely to the business' real estate. He said the 14-room hotel and attached nightclub are run by a different entity that did not file for bankruptcy.

Pangea Mortgage Capital initiated the foreclosure process for the hotel building in December 2020, according to Denver's Public Trustee Office. Suliaman said the business was about to receive its PPP funds in January and was "blindsided."

An auction of the property was initially set for May, but has been repeatedly pushed back. Suliaman said the lender has not set an official date because the business has been making its monthly mortgage payment of $56,000.

"This gives us an opportunity to reset with a neutral third party in the bankruptcy court, and forces our lender to address the plan in place that we have to exit," Suliaman said. "It gets us back to an even playing field."

Attorney Jeffrey Weinman of Weinman & Associates is representing Nativ in bankruptcy proceedings.



Lily O'Neill, BusinessDen

The hotel is on the market for around $7 million, Suliaman said.

## Building up for sale; hotel largely not operating

In its filing, KDA Properties said it has assets totaling $11.61 million. Of that, $10.8 million is what the company estimates the Wazee Street building is worth.

But Suliaman also said the building is currently on the market with an asking price of $7 million. Skyler Cooper of Marcus & Millichap has the listing.

Hotel operations have been paused since the pandemic began, with the exception of large bookings for nightclub visitors. Suliaman said increasing cleaning costs and an employee shortage has made it more expensive to run the hotel. The nightclub continues to operate.

Suliaman owns 49 percent of KDA Properties. Kenneth Ware, listing a Centennial address, owns the other 51 percent. Ware is also the entity's second-largest creditor, owed $1.2 million for "capital investment," according to the filing.

KDA Properties said it has had no revenue this year. It said it made $75,000 in "rental income from Nativ Hotel" in 2020, and $118,613 in 2019.

"You know, we've had better investments," Suliaman said. "This wasn't our best,



Lily O'Neill, BusinessDen

The four-story building the Nativ Hotel occupies is at 1612 Wazee St.

## From marijuana to missed payments

The Nativ Hotel opened in spring 2015, and has had something of a tumultuous existence.

Shortly before Nativ opened in 2015, The Denver Post's cannabis section dubbed it "central Denver's first outwardly 420-friendly hotel," citing balconies where guests could smoke weed, a cafe serving coffee infused with CBD and owners involved in other marijuana-related businesses.

By July 2015, however, the hotel was telling guests they could not use marijuana on the property, according to Westword, which said the move was "reportedly because neighbors and the landlord were surprised by the pro-pot stance."

Then, in early 2018, the company that had been operating the hotel pulled out, letting its landlord take over control of the business. A couple months later, KDA Properties LLC paid $6.05 million for both the business and its real estate, Suliaman told BusinessDen at the time.

In 2019, Suliaman and KDA Properties were sued by the former owners of the Nativ Hotel, Hotel Denver, LLC, for missing a $5.5 million promissory note



Lily O'Neill, BusinessDen

The nightclub at the Nativ Hotel continues to operate.

## Beta owner eyes property

Valentes Corleons, the owner of Beta nightclub at 1909 Blake St., posted on social media earlier this month, saying the keys to the hotel would be in his hands once Nativ hit auction.

Suliaman doesn't want to see that happen.

"I would rather burn this place to the ground than have Valentes take over," he said.

Suliaman said he believes that a local real estate investor is working with his lender to buy Nativ's building out of foreclosure and have Corleons operate a business there. That's another reason he wanted to delay the foreclosure process, he said.

Corleons, however, told BusinessDen Wednesday that while he does want to buy the property, he's not working with anyone else and hasn't been in touch with the lender. He said he originally wanted to buy the property years ago, but Suliaman "stole the deal from underneath me."

Beta nightclub is currently facing 10 alleged violations of the Denver municipal code and Colorado state law, including having inadequate security and allowing the distribution of narcotics. The city's Department of Excise and Licenses will hold a hearing Oct. 18 to determine whether the business should be fined or have its dance cabaret and tavern liquor licenses suspended or revoked.

Corleons' attorney previously told BusinessDen the alleged violations by his client's business are a "little exaggerated" and that the owner took big steps to ensure there was adequate security.

In addition to Beta, Corleons owns Purple Martini downtown, and he took over El Chapultepec jazz club when it closed in December after nearly nine decades. He also purchased the 5,184-square-foot building next to Beta — previously home to Falling Rock Tap House — in July for $2.5 million.

# Popular in the Community

AdChoices ▷                              Sponsored

Policies
Report an Error
Contact Us

## Stay in the loop.

*Sign up for Breaking Business News email alerts.*

Enter your email

**SIGN UP**

By signing up, you agree to our privacy policy and terms of service.

---

TAGS:  **BANKRUPTCY**,  **MORE BUSINESS NEWS**



# Lily O'Neill |
## Reporter

---